IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

2007 MAY -3  A 9: 55

ASSOCIATION OF CITIZENS TO      )
PROTECT AND PRESERVE THE        )
ENVIRONMENT OF THE OAK          )
GROVE COMMUNITY, a voluntary,   )
non-profit unincorporated association, )
                                )
  PLAINTIFF,           )
                                )
VS.                             )
                                )
UNITED STATES FEDERAL           )
AVIATION ADMINISTRATION,        )
RANS BLACK, in his official     )
capacity as Jackson Airport's   )
District Office, KEAFUR GRIMES, )
in his official capacity as an  )
employee and responsible official )
of the Federal Aviation Administration )
and Fictitious Defendants, A, B, )
C, D, and E, whether singular   )
or plural, those other persons, )
corporations, firms, or other   )
entities whose wrongful conduct )
caused injuries and damages to  )
the Plaintiffs, all of whose true )
and correct names are unknown   )
to the Plaintiffs at this time but )
will be substituted by amendment )
when ascertained,               )
                                )
  DEFENDANTS.          )

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

Case Number: 2:07 CV 378-MEF

## COMPLAINT

Comes now the Plaintiff in the above-styled cause and hereby files this Complaint against the above-referenced Defendants:

1. This is an action to enjoin Defendants from proceeding with the approval of an airport improvement project located in the City of Troy, Pike County, Alabama until Defendants request and consider an adequate Environmental Impact Statement, as required by 42 U.S.C. §§ 4321 *et seq.* In addition, this action alleges that the Federal Aviation Administration violated the

Administrative Procedures Act (5 U.S.C. §§ 551 *et seq.*) by failing to follow and implement its own environmental regulations.

2.  Plaintiff is an association of concerned citizens who own land that adjoins or is near the proposed airport expansion and/or who are citizens concerned with preserving and protecting the environment of the Oak Grove Community.

3.  Defendant Federal Aviation Administration is responsible for the planning and approval for all major airport expansion projects in the United States.

4.  Defendant Rans Black is the manager of the Jackson Airport's District Office which is the FAA's Regional Office covering Alabama and Mississippi, and, as such, is responsible for planning and approving major airport expansion projects in the State of Alabama. Defendant Black acted on behalf of the FAA in issuing the FAA's "finding of no significant impact" regarding the airport expansion project at issue in this case.

5.  Defendant Keafur Grimes is an employee of the Federal Aviation Administration assigned to the Jackson Airport's District Office. Defendant Grimes acted on behalf of the FAA in approving the Environmental Assessment completed in this matter.

6.  All Defendant are sued in their official capacities and at times are collectively referred to herein as "the Defendants" or "the FAA."

7.  This action raises issues of Federal law and therefore, this Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331(a). In addition, the Plaintiff is seeking a declaration that Defendants violated the Administrative Procedure Act and therefore, this Court has jurisdiction under the Declaratory Judgment Act (28 U.S. C. §§ 2201 *et seq.*).

8.  The City of Troy, Alabama is presently engaged in preparations for the improvement of the Troy Municipal Airport located in Troy, Alabama. The City has filed a request for Federal assistance under the Airport Improvement Program. Therefore, the proposed work requires the FAA to issue an environmental finding after undertaking a study pursuant to the National Environmental Policy Act (NEPA) 42 U.S.C. §§ 4321.

9.  By way of summary, the proposed project includes the following improvements:

    a.    Extension of runway 07 by approximately 1500 feet and displacing the runway 25 threshold approximately 745 feet, to achieve an ultimate runway length of approximately 6,509 feet;

    b.    Extend the existing parallel taxiway of the runways referenced above approximately 1500 feet;

    c.    Grade and improve the existing runway safety area (RSA) to meet CII Airport design standards;

    d.    Relocate approach visual aids and glide slopes;

      e.      Install runway end identification lights (REILS); and

      f.      Install runway and taxiway markings.

10. The Oak Grove United Methodist Church is located at the outer edge of the Troy Municipal Airport and the 1500 foot expansion to runway 07 extends in the direction of the Church. Other members of the association own land identified by the Defendants to be condemned to complete the proposed modification.

11. On August 9, 2005, Defendant Grimes, in his official capacity as an employee and agent of the Federal Aviation Administration, approved the Environmental Assessment prepared by the City of Troy and its agents for this project.

12. On August 15, 2005, Defendant Black issued a "finding of no significant impact" (FONSI) regarding the proposed project. The Environmental Assessment is attached to this Complaint as Exhibit "A" and is incorporated as if set out fully herein. The FONSI is attached as Exhibit "B" to this Complaint and is incorporated as if set out fully herein.

13. At the present time, the FAA has completed its environmental review and evaluation with respect to the project and has awarded the City of Troy funds to obtain real property needed for the project. No construction has yet begun on the expansion project.

14. The area that will be affected by the project consists of eighteen (18) acres of wetlands that provide valuable natural habitat for a large number and variety of wildlife. The project calls for the dredging and filling of said wetlands.

15. In addition to the destruction of wetlands, the project will have additional adverse affects on the quality of the environment, to include, but not limited to, increase in noise levels, light emissions, and significant impacts on the cultural aspects of the Oak Grove United Methodist Church and surrounding area. Pursuant to the National Environmental Policy Act, NEPA, 42 U.S.C. §§ 4321 et seq., the FAA is required to include a detailed Environmental Impact Statement in every recommendational report on a proposal for major Federal actions significantly affecting the quality of the human environment. The procedures and regulations established by the FAA regarding NEPA and the environmental process are provided in FAA Order 1050.1, "Policies and Procedures for Considering Environmental Impacts" and in Order 5050.4 "Airport Environmental Handbook."

16. Contrary to the finding issued by Defendant Black in this case, the project is a major Federal action significantly affecting the quality of the human environment requiring the preparation of an Environmental Impact Statement. According to FAA Order 1050.1E paragraph 501, "An Environmental Impact Statement shall be prepared for major Federal actions significantly affecting the quality of the human environment." Furthermore, FAA Order 5050.4a, paragraph 26(a) requires that in determining whether an Environmental Impact Statement is required for a proposed Federal action, it is necessary to consider the overall cumulative impact of the proposed action and the consequences of subsequent related actions.

17. Although the Environmental Assessment prepared in this case indicates the proposed action's impacts would meet or exceed significant thresholds, the FAA, through Defendant Black, issued a finding of no significant impact, eliminating the need for an Environmental Impact Statement. It should be noted that the preparation of an Environmental Impact Statement will provide additional, detailed evaluations of the proposed action and its alternatives, including the "no action" alternative (FAA Order 1050.1e, paragraph 201d). The decision by Defendant Black to issue a FONSI in this case was arbitrary, capricious, and an abuse of discretion.

18. Because of the failure of the FAA to follow its own regulations and Orders, which would require the preparation of an Environmental Impact Statement with respect to this project, the project's adverse impacts will not receive appropriate attention by officials nor will its adverse impacts receive appropriate attention or consideration by members of the public and their elective representatives who be called on to appropriate funds for the project.

19. In addition to the above, the City of Troy has altered its mitigation plan for the destruction of wetlands contemplated by the project. Initially, as described in the Environmental Assessment (See Exhibit "A" at Appendix E), the City proposed to mitigate the destruction of wetlands by creating twenty-four (24) acres of wetland habitat on site. In approving the Environmental Assessment, the FAA instructed the City to "eliminate any creation of wetlands in the vicinity of the proposed project." However, the FAA did not approve any alternative plan in its FONSI. In its application to the FAA for funds to begin the process of land acquisition for the project, the City stated that it intended to "offset the impact associated with the proposed project by either purchasing credits from an approved wetland mitigation bank or by creating, restoring, and enhancing wetlands in an approved offsite location."

20. This change in plans was solidified by the City's March 14, 2006 application to the U.S. Army Corp of Engineers for a "Section 404" permit to dredge and fill wetlands. In the City's application to the Army, the City completely abandoned its plan to create wetlands on site or in an approved off site location. Instead, the City now proposes to the Army Corp of Engineer that it will purchase 20.06 forested wetland credits from the McClamore Mitigation Bank in Elmore County, Alabama. This change in the mitigation plan does not appear in the Environmental Assessment approved by FAA officials. It was also not part of the Environmental Assessment at the time of the public hearing in this case, denying members of the public an opportunity to ask questions and to discuss with City officials the new mitigation plan.

21. Furthermore, FAA Order 1050.1E, paragraph 405g(4) states "proposed changes in or deletion of a mitigation measure that was included as a condition of approval of the FONSI must be reviewed by the same FAA offices that reviewed the original FONSI and must be approved by the same approving official." In essence, the FAA has approved the Environmental Assessment without knowing what mitigation plan will be used to offset the destruction of wetlands.

22. If the City is permitted to proceed with the project without full compliance with the

mandatory requirements of NEPA, the Plaintiff will suffer irreparable injury, for which there is no adequate remedy at law.

WHEREFORE, Plaintiff requests that:

1. This Court issue a Preliminary Injunction restraining the FAA from undertaking any further action with the respect to the project, except for such action as may be necessary to comply with the requirements of NEPA;

2. This Court permanently enjoin the FAA from undertaking any further action with respect to the project to include, but not limited to, restricting the use of federal funds unless and until the FAA has fully complied with all requirements of NEPA and its own regulations; and

3. This Court grant Plaintiff its costs herein, and such other and further relief as may be proper.

Respectfully submitted,

Benjamin M. Bowden (BOW035)
ASB-1909-N43B
Attorney for Plaintiff

Albrittons, Clifton, Alverson,
Moody & Bowden, P.C.
Post Office Drawer 880
Andalusia, Alabama 36420
Telephone : (334)-222-3177
Fax:  (334)-222-2696
E-mail: bbowden@albrittons.com

# EXHIBIT
# A



## The City of TROY

P.O. Box 549
301 Railroad Avenue
Troy, Alabama 36081

**Executive Department**

Mayor
Jimmy C. Lunsford

Council
President
John H. Witherington
Vice President
Wanda H. Moultry

Charles W. Meeks
Charlie "Sarge" Dunn, Sr.
Jason A. Reeves

Clerk &
Treasurer
Alton Starling

Legal Notice
Troy Municipal Airport
Troy, Alabama

Troy, AL-An Environmental Finding of No Significant Impact (FONSI) has been prepared relating to the proposed extension of Runway 7/25 and other improvements at the Troy Municipal Airport.

The FONSI is available for public review at City Hall, City of Troy, 301 Railroad Ave, Troy, AL (City Planning Department 566-0177)

The FONSI may also be reviewed at the following Federal Aviation Administration office:

Airports District Office
Federal Aviation Administration
100 West Cross Street, Suite B
Jackson, MS  39208-2307
Telephone: (601) 664-9900

Herman C. Lott
City Planner/Administrator

The Messenger August 21 and 24, 2005

Phone
334/ 566-0177

Fax
334/ 670-6004

Website
www.troyalabama.com

Email
troy@troyalabama.com

# ENVIRONMENTAL ASSESSMENT

## PROPOSED AIRPORT EXPANSION
Troy Municipal Airport
Troy, Alabama

Submitted to the
**Alabama Department of Transportation
and the
U.S. Department of Transportation
Federal Aviation Administration**

by the
**City of Troy**

Prepared by
**Barge, Waggoner, Sumner and Cannon, Inc.
2047 West Main Street, Suite 1
Dothan, Alabama 36301**

## December 2004

This environmental assessment becomes a Federal document when evaluated and signed by the responsible official.

_____        _____
Responsible Official                                          8/9/05
                                                                        Date

# TABLE OF CONTENTS

DESCRIPTION OF PROPOSED PROJECT ................................................................1

DECISION REQUIRED ...................................................................................2

PROJECT HISTORY .....................................................................................2

EXISTING CONDITIONS AND TRENDS .....................................................................3
    Project Location ....................................................................................3
    Population Characteristics .........................................................................6
    Economic Base and Activity ........................................................................6
    Land Use ...........................................................................................8
    Growth Trends .....................................................................................11
    Topography and Natural Features ...................................................................11

PURPOSE AND NEED FOR PROJECT .......................................................................13
    Need for Additional Runway Length .................................................................13
    Need for Improved Facilities ......................................................................13
    Summary ...........................................................................................14

ALTERNATIVES ........................................................................................15
    Extend Runway 25 ..................................................................................15
    Extend Runway 07/25 ...............................................................................16
    Extend Runway 14/32 ...............................................................................17
    Preferred Alternative - Extend Runway 07 ..........................................................18
    Postponing the Project ............................................................................19
    No Action Alternative .............................................................................19

SOCIAL AND ENVIRONMENTAL CONSEQUENCES .............................................................21
    Noise Impacts .....................................................................................21
    Compatible Land Use ...............................................................................26
    Social Impacts ....................................................................................26
    Relocation Impacts ................................................................................29
    Induced Socioeconomic Impacts .....................................................................29
    Air Quality .......................................................................................32
    Water Quality .....................................................................................33
    Section 4(f) Properties ...........................................................................35
    Historic and Archaeological Resources .............................................................36
    Biotic Communities ................................................................................37
    Endangered and Threatened Species .................................................................38
    Wetlands ..........................................................................................38
    Floodplains .......................................................................................42
    Coastal Zone Management Program and Coastal Barrier Islands ........................................42
    Wild and Scenic Rivers ............................................................................42

Prime and Unique Farmlands.................................................................................43
Energy Supply and Natural Resources...................................................................43
Light Emissions ....................................................................................................44
Solid Waste Impact...............................................................................................45
Construction Impacts ............................................................................................45
Other Considerations ............................................................................................46
Environmental Justice ...........................................................................................47

**LIST OF PREPARERS**

**APPENDICES**

| | |
|---|---|
| Appendix | "A" - Runway Extension Justification Report |
| Appendix | "B" - Correspondence |
| Appendix | "C" - Phase I Cultural Resource Assessment |
| Appendix | "D"- Wetland Delineation Report |
| Appendix | "E"- Wetland Preliminary Mitigation Plan |
| Appendix | "F"- Ecological Assessment |
| Appendix | "G" –Public Hearing Documentation |

## LIST OF FIGURES

Figure                                                                                                Page

1.    Location Map ................................................................................4

2.    Airport Layout Drawing....................................................................5

3.    Existing Land Use Map.....................................................................9

4.    Zoning Map.................................................................................10

5.    Topographic Map...........................................................................12

6.    2003 Noise Contours.......................................................................23

7.    2013 Noise Contour ........................................................................24

7a.   2013 Enlarged Noise Contour ...............................................................25

8.    Land Acquisition Plan......................................................................30

9.    Proposed Property Map (Aerial) – Runway 07 ...............................................31

10.   Impacted Wetlands.........................................................................41

## LIST OF TABLES

Table                                                                                                 Page

1.    Pike County Population Data and Estimates, 1980 to 2010 ...................................6

2.    Pike County Per Capita Income, 1985 to 2010 ..............................................6

3.    Pike County - Number of Persons Employed by Industry Type, 1985 to 2010 ...................7

4.    Aviation Forecast Summary.................................................................14

5.    Land Use Compatibility Guidelines.........................................................28

# ENVIRONMENTAL ASSESSMENT
PROPOSED AIRPORT EXPANSION
Troy Municipal Airport
Troy, Alabama

## DESCRIPTION OF PROPOSED PROJECT

The project includes a proposal to make certain improvements to the runway, runway safety area, taxiway, and airfield lighting system at the Troy Municipal Airport. The purpose of the project is to provide the public with a modern aviation facility that will safely accommodate a wide variety of general aviation aircraft, including business jets. The proposed airport improvements, if implemented, will likely be funded with a combination of federal, state, and local funds. The proposed airport expansion program will consist of the following airport improvements:

A.   Acquire approximately 90 acres of land.

B.   Extend the existing 5,009 foot runway approximately 1,500 feet to the west (Runway 07 end), while displacing the Runway 25 threshold approximately 745 feet for a total runway length 6,509 feet.

C.   Extend the existing parallel taxiway approximately 1,500 feet to the west, in conjunction with the proposed runway extension.

D.   Grade and improve the Runway Safety Area (RSA) for Runway 07/25. The RSA will be 400 feet wide and extend 1,000 feet beyond each runway end.

E.   Relocate a section of the existing taxiway serving Runway 14/32 approximately 300 feet from centerline.

F.   Relocate approach visual aids and glide slope antenna.

G.   Install Runway End Identification Lights (REILS) and Precision Approach Path Indicator (PAPI) Lights.

H.   New runway and taxiway markings.

It is expected that the proposed airport improvements will be implemented over a three to five year period beginning in 2005. The timing and phasing of the airport improvements will be dependent on the availability of funding assistance from the Alabama Department of Transportation - Bureau of Aeronautics and the Federal Aviation Administration.


## DECISION REQUIRED

This Environmental Assessment will be submitted to the Federal Aviation Administration (FAA) for approval. Under the National Environmental Policy Act of 1969, Federal agency decision-makers must consider environmental factors when reviewing Federal projects. The FAA is required to consider environmental consequences of proposed Federal airport improvement projects. The purpose of the EA is to help the FAA decide whether there are significant environmental impacts associated with the proposed project. If so, then a more detailed Environmental Impact Statement (EIS) is needed. If not, then a Finding of No Significant Impact (FONSI) will be issued and no further analysis will be required.


## PROJECT HISTORY

The proposed runway extension project for the Troy Municipal Airport is a transportation improvement project that has been recognized and endorsed by local authorities. The need for expanding and modernizing the Troy Municipal Airport results from increased aviation activity at the airport and aggressive economic development efforts in Troy. The goal of the airport expansion project is to provide the public with a safe aviation facility that will accommodate a variety of general aviation aircraft, including business jets.

The proposed runway expansion is consistent with the Airport Layout Drawing (ALD). The ALD, an FAA-approved planning document, graphically depicts existing and planned airport facilities including the extension of Runway 07/25. The ALD is shown in Figure 2.

## EXISTING CONDITIONS AND TRENDS

The review of existing socioeconomic and physical conditions in the project area provides a baseline for the evaluation of impacts related to the implementation of the proposed project. Demographic, land use, and transportation factors have been gathered from a variety of sources to aid the assessment of the nature and extent of anticipated social and environmental impacts.

### Project Location

The Troy Municipal Airport is located on Airport Road, approximately five (5) miles north of the City of Troy in Pike County, Alabama. The airport is within the corporate limits of Troy and is within the City's police jurisdiction and planning region. The airport is bordered by U.S. Highway 231 and County Road 105 to the east, County Road 36 to the south, County Road 289 to the west, and County Road 52 to the north. Troy Municipal Airport has two operational asphalt runways. The primary runway, designated Runway 07/25, is oriented in a general northeast-southwest alignment. The location of the airport is shown in Figure 1.



SOURCE: Official 2000 ALABAMA Highway Map Prepared by
the ALABAMA DEPARTMENT OF TRANSPORTATION.



PIKE COUNTY,
ALABAMA

NORTH

**BWSC**
BARGE
WAGGONER
SUMNER &
CANNON, INC.

Engineers, Planners, and Surveyors

**LOCATION  MAP**
TROY  MUNICIPAL  AIRPORT
TROY, ALABAMA

FIGURE
**1**



### RUNWAY PROTECTION ZONE (RPZ) DIMENSIONS

| RWY END | EXISTING | PROPOSED |
|---|---|---|
| 7 | 1,000' IW x 1,700'L x 1,510'OW | 1,000' IW x 1,700'L x 1,510'OW |
| 25 | 500' IW x 1,000'L x 700'OW | 500' IW x 1,700'L x 1,010'OW |
| 14 | 500' IW x 1,000'L x 700'OW | SAME |
| 32 | 500' IW x 1,000'L x 700'OW | SAME |

### RUNWAY SAFETY AREA (RSA) DIMENSIONS

| RWY END | EXISTING | PROPOSED |
|---|---|---|
| 7 | 126' WIDE x 200' BEYOND RUNWAY END | 400' WIDE x 1000' BEYOND RUNWAY END |
| 25 | 150' WIDE x 255' BEYOND RUNWAY END | 400' WIDE x 1000' BEYOND RUNWAY END |
| 14 | 150' WIDE x 300' BEYOND RUNWAY END | SAME |
| 32 | 150' WIDE x 200' BEYOND RUNWAY END | 150' WIDE x 300' BEYOND RUNWAY END |

### OBJECT FREE AREA (OFA) DIMENSIONS

| RUNWAY | EXISTING | PROPOSED |
|---|---|---|
| 7 | 500' WIDE x 300' BEYOND RUNWAY END | 800' WIDE x 1,000' BEYOND RUNWAY END |
| 25 | 500' WIDE x 255' BEYOND RUNWAY END | 800' WIDE x 1,000' BEYOND RUNWAY END |
| 14 | 500' WIDE x 300' BEYOND RUNWAY END | SAME |
| 32 | 500' WIDE x 300' BEYOND RUNWAY END | SAME |

### CLEARANCE DATA

| NO. | ELEVATION | CLEARANCE |
|---|---|---|
| C1 | 383.0' | 31.4' |
| C2 | 453.0' | 42.1' |
| C3 | 365.0' | 34.8' |
| C4 | 385.0' | 45.4' |

### AIRPORT DATA

| | EXISTING | PROPOSED |
|---|---|---|
| AIRPORT REFERENCE POINT COORDINATES (NAD 83) | N 31°51'37.50" W 86°00'43.70" | N 31°51'37.57" W 86°00'59.76" |
| MEAN MAX. TEMP. HOTTEST MONTH | 90°F | SAME |
| AIRPORT ELEVATION | 398' | SAME |
| NAVIGATIONAL AIDS | BEACON, GPS, NDB, VOR | SAME |

### ALL WEATHER WIND ROSE

SOURCE: NATIONAL CLIMATIC DATA CENTER
LOCATION: MONTGOMERY, ALABAMA
TIME PERIOD: 1991 - 2000

### RUNWAY DATA

| | 7/25 | | | 14/32 | |
|---|---|---|---|---|---|
| | EXISTING | PROPOSED | | EXISTING | PROPOSED |
| AIRPORT REFERENCE CODE | B-II | C-II | | B-II | SAME |
| CRITICAL AIRCRAFT | CITATION III | GULFSTREAM III | | CITATION III | SAME |
| APPROACH VISIBILITY MINIMUMS | ¾ MILE | SAME | | VISUAL | SAME |
| RUNWAY LENGTH | 5,009' | 6,509' | | 5,022' | SAME |
| RUNWAY WIDTH | 100' | SAME | | 100' | SAME |
| APPROACH SLOPE RWY 7 / RWY 14 | 50:1 | SAME | RWY 14 | 20:1 | SAME |
| APPROACH SLOPE RWY 25 / RWY 32 | 20:1 | 34:1 | RWY 32 | 20:1 | SAME |
| INSTRUMENT RUNWAY RWY 7 / RWY 14 | ILS,NDB,GPS | SAME | | NONE | SAME |
| INSTRUMENT RUNWAY RWY 25 / RWY 32 | N/A | GPS | | NONE | SAME |
| MARKINGS | PRECISION | SAME | | VISUAL | SAME |
| LIGHTING | MIRL/MITL | SAME | | MIRL | SAME |
| APPROACH AIDS RWY 7 / RWY 14 | ILS, NDB, GPS | PAPI/REILS | RWY 14 | NONE | SAME |
| APPROACH AIDS RWY 25 / RWY 32 | VASI | PAPI/REILS | RWY 32 | NONE | SAME |
| % WIND COVERAGE | 97.53% | 99.52% | | 98.69% | SAME |
| TRUE RUNWAY BEARING | 69°37'23" | SAME | | 322°59'14" | SAME |
| EFFECTIVE GRADIENT | 0.096% | 0.092% | | 0.647% | SAME |
| PAVEMENT CONSTRUCTION | ASPHALT | SAME | | ASPHALT | SAME |
| PAVEMENT STRENGTH (lbs.) | 24,000 LBS SW 90,000 LBS DW 140,000 LBS DWT | SAME | | 24,000 LBS SW 90,000 LBS DW 140,000 LBS DWT | SAME |
| RUNWAY END COORDINATES (NAD 83) RWY 7 / RWY 14 | N 31°51'31.49" W 86°01'18.80" | N 31°51'26.28" W 86°01'35.10" | RWY 14 | N 31°51'54.63" W 86°00'53.41" | SAME |
| RUNWAY END COORDINATES (NAD 83) RWY 25 / RWY 32 | N 31°51'48.86" W 86°00'24.41" | SAME | RWY 32 | N 31°51'15.00" W 86°00'18.34" | SAME |
| RUNWAY END ELEVATIONS RWY 7 / RWY 14 | 388.7' | 387.5' | RWY 14 | 398.1' | SAME |
| RUNWAY END ELEVATIONS RWY 25 / RWY 32 | 393.5' | SAME | RWY 32 | 365.6' | SAME |
| DISPLACED THRESHOLD COORDINATES (NAD 83) RWY 7 / RWY 14 | N/A | N/A | RWY 14 | N/A | N/A |
| DISPLACED THRESHOLD COORDINATES (NAD 83) RWY 25 / RWY 32 | N/A | N 31°51'46.27" W 86°00'32.50" | RWY 32 | N 31°51'15.79" W 86°00'19.04" | N/A |
| DISPLACED THRESHOLD ELEVATIONS RWY 7 / RWY 14 | N/A | 392.0' | RWY 14 | 366.0' | N/A |
| DISPLACED THRESHOLD ELEVATIONS RWY 25 / RWY 32 | N/A | N/A | RWY 32 | N/A | N/A |
| TOUCHDOWN ZONE ELEVATIONS RWY 7 / RWY 14 | 392.0' | 389.0' | RWY 14 | N/A | N/A |
| TOUCHDOWN ZONE ELEVATIONS RWY 25 / RWY 32 | N/A | 393.5' | RWY 32 | N/A | N/A |

### LEGEND

| | EXISTING | PROPOSED |
|---|---|---|
| GRADE CONTOURS | ~250~ | NOT SHOWN |
| AIRPORT PROPERTY LINE | | |
| PROPERTY EASEMENT | | |
| RUNWAY SAFETY AREA (RSA) | | |
| BUILDING RESTRICTION LINE (BRL) | N/A | |
| OBJECT FREE AREA (OFA) | | |
| FENCE LINE | | |
| THRESHOLD LIGHTS | | |
| GLIDE SLOPE ANTENNA | | |
| VASI/PAPI | | |
| BUILDING/BUILDING TO BE REMOVED | | |
| PAVEMENT/PAVEMENT TO BE REMOVED | | |
| WIND INDICATOR | | |
| ROTATING BEACON | | |
| CRITICAL AREA | | N/A |
| AIRPORT REFERENCE POINT | | |
| NDB (NON-DIRECTIONAL BEACON) | | N/A |
| REILS | | |



FIGURE
2

Troy Municipal Airport – Environmental Assessment                                    Troy, Alabama

## Population Characteristics

Census data, presented in Table 1, shows that Pike County experienced an increase in population during the period from 1980 to 2000. The projected population levels for Pike County show that the growth trend is expected to continue.

**Table 1**
**PIKE COUNTY POPULATION DATA AND ESTIMATES**
**1980 TO 2010**

| Year | Pike County | Change (%) |
|------|-------------|------------|
| 1980 | 28,130 | -- |
| 1985 | 27,840 | -1.04% |
| 1990 | 27,660 | -0.65% |
| 1995 | 29,110 | 5.24% |
| 2000 | 29,630 | 1.79% |
| 2005 | 29,780 | 0.50% |
| 2010 | 30,390 | 2.05% |

*Source: Woods and Poole Economics, Inc., 2002*

## Economic Base and Activity

As reflected in Table 2, the per capita income based on current dollars increased from $6,317 in 1985 to $20,507 in 2000 according to data provided by Woods and Poole Economics, Inc.

**Table 2**
**PIKE COUNTY PER CAPITA INCOME**
**1985 to 2010**

| Year | Per Capita Income (in current dollars) |
|------|----------------------------------------|
| 1985 | $6,317 |
| 1990 | $13,862 |
| 1995 | $17,056 |
| 2000 | $20,507 |
| 2005 | $23,867 |
| 2010 | $29,273 |

*Source: Woods and Poole Economics, Inc., 2002*

Table 3 provides a breakdown of the number of persons employed in Pike County based on one-digit industries as defined in the 1987 Standard Industrial Classification Manual (SIC). Employment is classified in a given industry depending on the primary activity of the establishment. In 1990, the manufacturing industry employed the largest number of people with state/local government and the retail industry ranking second and third. By 2000, the retail trade industry employed the largest number of people while the services and manufacturing industry ranked second and third.

### Table 3
### PIKE COUNTY
### NUMBER OF PERSONS EMPLOYED BY INDUSTRY TYPE
### 1985 to 2010

|  | 1985 | 1990 | 1995 | 2000 | 2005 | 2010 |
|---|---|---|---|---|---|---|
| *PRIVATE EMPLOYMENT* | 8,700 | 10,270 | 12,120 | 12,500 | 13,230 | 14,000 |
| **Farming** | 970 | 850 | 850 | 820 | 820 | 820 |
| **Agricultural services, forestry, fisheries, and others** | 70 | 120 | 150 | 190 | 210 | 220 |
| **Mining** | 0 | 10 | 0 | 0 | 0 | 0 |
| **Construction** | 610 | 660 | 770 | 790 | 820 | 840 |
| **Manufacturing** | 2,200 | 3,130 | 3,040 | 2,580 | 2,530 | 2,480 |
| **Transportation & Warehousing** | 1,040 | 970 | 1,500 | 1,480 | 1,700 | 1,930 |
| **Wholesale trade** | 570 | 470 | 660 | 720 | 730 | 730 |
| **Retail trade** | 1,660 | 2,190 | 2,790 | 3,170 | 3,370 | 3,600 |
| **Finance, insurance, and real estate** | 560 | 660 | 700 | 780 | 860 | 930 |
| **Services** | 1,990 | 2,070 | 2,520 | 2,800 | 3,040 | 3,280 |
| *GOVERNMENT EMPLOYMENT* | 2,770 | 2,980 | 2,800 | 2,710 | 2,790 | 2,850 |
| **Federal Civilian** | 70 | 80 | 70 | 80 | 80 | 80 |
| **Federal Military** | 270 | 240 | 210 | 180 | 180 | 180 |
| **State and local government** | 2,430 | 2,650 | 2,510 | 2,450 | 2,520 | 2,580 |

*Source: Woods and Poole Economics, Inc., 2002*

## Land Use

Although the Troy Municipal Airport is located several miles north of the city, the airport is located within the corporate limits of Troy. Land use in the vicinity of the airport generally consists of agricultural land use, scattered residential land use, commercial land use, and institutional land use as depicted in Figure 3.

Residential land use adjacent to the airport includes single family housing and mobile home parks located primarily along road corridors. Small clusters of homes are found along Old Highway 231 (County Road 105) to the east of the airport, County Road 36 to the south of the airport, County Road 289 to the west of airport, and County Road 52 to the north of the airport. Northridge Mobile Home Park and Brantley Mobile Home Park are located approximately 0.5 miles to the east-southeast of the airport.

Commercial land use in the immediate vicinity of the airport is primarily found along the U.S. Highway 231 corridor. Commercial enterprises include several convenience store/gas stations. Industrial land use in the vicinity of the airport is mainly associated with the airport, with some nearby light industrial facilities. The Troy Department of Industrial Development has developed property on the northern portion of the airport. Currently, Sikorsky Support Services, Inc. operates in this industrial area. Plans for the area include the future development of an industrial park on the north side of the airport.

Institutional land uses located nearby include the Apostolic Hope Tabernacle on County Road 36 which is approximately 0.5 miles south of the airport and the Oak Grove Methodist Church, located approximately 0.3 miles southwest of the airport. There are no public parks, schools, or hospitals in the immediate vicinity of the airport.

As mentioned previously, the airport is within the corporate boundary of the City of Troy. The City has zoned the airport as light industrial with tracts of land located to the north and southeast zoned as residential and manufactured housing. Figure 4 shows the current zoning designations around the airport.



FIGURE
3

EXISTING LAND USE MAP
TROY MUNICIPAL AIRPORT
TROY, ALABAMA

BWSC | BARGE
WAGGONER
SUMNER &
CANNON, INC.

Engineers, Planners, and Surveyors

...\1701847 Land Use.dgn 12/10/2004 10:49:58 AM



M–1  LIGHT INDUSTRIAL
MH  MOBILE HOME
R–R  RESIDENTIAL
N2  NOT ZONED

**ZONING MAP**
TROY MUNICIPAL AIRPORT
TROY, ALABAMA

FIGURE
4

BWSC | BARGE WAGGONER SUMNER & CANNON, INC.
Engineers, Planners, and Surveyors

...\EA_Drawings\1701847_Zoning.dgn 11/12/2003 11:12:27 AM

## Growth Trends

The Pike County area has experienced steady growth in population and economic activity. The socioeconomic trends are expected to continue for the foreseeable future. As population and economic growth continues, it is expected that residential, industrial and commercial land uses will develop in the vicinity of the airport.

## Topography and Natural Features

Topography in northwestern Pike County in and around the airport is characterized as relatively flat with low rolling hills. The elevation of the airport is 398 feet above Mean Sea Level. The topography of the project area is shown in Figure 5. Beeman Creek is located approximately 250 feet west of the proposed extension of Runway 07 end. Also, Lake Haven, a five acre man-made lake is located to the west-southwest of the airport.



2,000'    0    2,000'    4,000'

1" = 2,000'

ANSLEY QUADRANGLE
ALABAMA
7.5 MINUTE SERIES (TOPOGRAPHIC)

NEEDMOORE QUADRANGLE
ALABAMA
7.5 MINUTE SERIES (TOPOGRAPHIC)

YOUNGBLOOD QUADRANGLE
ALABAMA
7.5 MINUTE SERIES (TOPOGRAPHIC)

TROY QUADRANGLE
ALABAMA
7.5 MINUTE SERIES (TOPOGRAPHIC)


BARGE
WAGGONER
SUMNER &
CANNON, INC.
Engineers, Planners, and Surveyors

# TOPOGRAPHIC MAP
## TROY MUNICIPAL AIRPORT
## TROY, ALABAMA

FIGURE
5

...\1701847_Topographic.dgn  06/10/2004 03:39:59 PM

## PURPOSE AND NEED FOR PROJECT

The proposal to upgrade and modernize the Troy Municipal Airport will provide a safe aviation facility that meets current design standards. The proposed project will improve the existing local transportation network by allowing a range of general aviation aircraft, including business jets, to safely use the Troy Municipal Airport.

### Need for Additional Runway Length

The capability of the Troy Municipal Airport to fully serve the people and business community of the surrounding area is currently limited by the length of the runway. In 2003, a survey was conducted to determine the demand by individuals and corporations operating turbojet aircraft that require access to the Troy Municipal Airport but are unable to operate there safely or efficiently due to insufficient runway length. The findings of the survey, discussed in the Runway Extension Justification Report attached to this document as Appendix "A," identified over 500 itinerant operations by turbojet aircraft operations needing a runway length longer than the existing 5,009 feet. There is strong agreement by operators that the additional runway length is needed and that more turbojet operations would result once the extension is completed. In addition, numerous operators are currently upgrading or anticipating an upgrade of larger aircraft to their fleet. This clearly demonstrates an existing and additional demand that exceeds the FAA criteria for extending the Runway from its existing length of 5,009 feet to 6,509 feet. The performance characteristics of the turbojet aircraft that utilize the airport necessitate the additional runway length for enhanced safety and operational efficiency.

### Need for Improved Facilities

An overall increase in based aircraft and annual aviation operations are projected for the airport. The Airport Layout Plan (ALP) identified the need for additional facilities and improvements to provide a safe and modern airport for both existing and forecasted levels of aviation activity at the airport. The based aircraft and aircraft operations forecast was updated for this Environmental Assessment to reflect current conditions (2003) and the expected based aircraft and aircraft operations for the year 2013. The updated forecast summary, presented in

Troy Municipal Airport – Environmental Assessment                                    Troy, Alabama

Table 4, shows an increase in based aircraft and aircraft operations for the ten-year period from 2003 to 2013. The increase in based aircraft and aircraft operations will be generated primarily by increases in local population and economic activity.

**Table 4**
**AVIATION FORECAST SUMMARY**
**Troy Municipal Airport**

| Year | 2003 | 2013 |
|------|------|------|
| Based Aircraft | 48 | 68 |
| Local Operations | 8,928 | 12,648 |
| Itinerant Operations | 32,000 | 45,333 |
| Military Operations | 28,160 | 28,160 |
| Total Operations | 69,088 | 86,141 |

*Source: Barge Waggoner Sumner & Cannon, Inc.*

**Summary**

The need to accommodate aircraft, the expected overall increase in general aviation activity, and the need to meet safety-based airport design criteria supports the proposal to expand and upgrade the facilities at the Troy Municipal Airport.

## ALTERNATIVES

Alternatives for accomplishing the objectives of the proposed airport facilities expansion have been evaluated as part of this Environmental Assessment. In this case, the extension of either end of the existing primary runway (Runway 07/25); the extension of the secondary runway (Runway 14/32); and the establishment of a precision-instrument approach on the extended runway were the dominant criteria differentiating the available development alternatives. The ability to ultimately achieve a 6,500 foot runway in a cost effective manner, while satisfying airspace and environmental concerns, is the overall goal of the airport development program. After careful evaluation of environmental impacts and design considerations, an alternative was selected that imparted the least amount of adverse environmental and social impact. Such an alternative will be presented in this section as the "Preferred Alternative." This section will briefly discuss development alternatives, postponing the project, and the "No Action" Alternative. A more detailed explanation of the alternatives evaluated can be found in the Runway Development Alternatives Study, which is attached to this report.

### Extend Runway 25

This alternative consists of extending Runway 25 approximately 1,500 feet for a total runway length of 6,509 feet; extending the parallel taxiway approximately 1,500 feet; constructing a 1,000 foot long by 400 foot wide runway safety area beyond the ends of Runway 07 and Runway 25; and upgrading the airfield lighting system and approach aids.

The extension of Runway 25 to the east is restricted by the location of Sirkorsky Support Services access road, County Road 105 (Old Montgomery Highway) and U.S. Highway 231. Under this proposal, each road would have to be relocated to accommodate the runway extension and satisfy Runway Safety Area requirements. U.S. Highway 231 is a major four-lane highway that provides north/south access into the City of Troy. In addition to the road relocations, this proposal would cause the displacement of residences and businesses that are located on County Road 105 and U.S. Highway 231. Finally, this alternative would cause the relocation of the localizer and require the placement of fill in a large wetland area located to the east of Runway

25. In this regard, the alternative of extending Runway 25 is not considered feasible and has been removed from further consideration.


## Extend Runway 07/25

This alternative consists of extending the runway 750 feet on the Runway 25 end and 750 feet on the Runway 07 end for a total runway length of 6,509 feet; extending the parallel taxiway 1,500 feet; constructing a 1000 foot long by 400 foot wide runway safety area beyond the ends of Runway 07/25; and upgrading the airfield lighting system and approach aids.

This proposal would require the acquisition of approximately 90 acres of land for the runway and taxiway extension, as well as for the Runway Protection Zones for Runway 07/25. This alternative would also impact Sirkorsky Support Services access road and County Road 105 (Old Montgomery Highway). Under this proposal, each road would have to be relocated to accommodate the runway extension and satisfy Runway Safety Area requirements.

Implementation of this alternative would impact two large forested wetland systems located beyond the ends of each runway. An extension of the Runway 25 end would cause the placement of fill into a forested wetland system associated with an unnamed tributary to Conecuh Creek. In addition, extending the Runway 07 end will directly impact a man-made lake (Lake Haven) and affect a forested wetland complex associated with Beeman Creek. Finally, this alternative would cause the relocation of the localizer and glide slope antennae. In this regard, the alternative of extending Runway 25 and Runway 7 is not considered feasible and has been removed from further consideration.

### Extend Runway 14/32

The improvements proposed in this alternative involve the extension of both ends of Runway 14/32 for a total runway length of 6,500 feet and the relocation of its full-length parallel taxiway to a 300 foot separation distance; constructing a 1,000 foot long by 400 foot wide runway safety area beyond the ends of Runway 14 and Runway 32; relocating the Instrument Approach Landing System (ILS) and radar equipment from Runway 07 to Runway 14/32; and relocating the visual approach aids on Runway 14/32.

Major factors affecting the extension of Runway 14/32 include development cost and airspace considerations. Development cost is primarily driven by earthwork requirements. The removal of a hill on the approach to Runway 14 generates the largest cost among the alternatives considered. Cuts exceeding 35 feet in depth and the need to remove terrain to accommodate a precision or non-precision approach increase the cost for this alternative. Another significant cost item for this alternative is the relocation of the Instrument Landing System and radar equipment.

Airspace issues are also critical to the evaluation of this alternative. Representatives of the United States Army Aviation Center at Fort Rucker have stated that they consider the precision instrument approach to Runway 14 as not being feasible. The concern is airspace and air traffic control conflicts between Cairns ARAC and Montgomery Approach Control. The boundary between the two areas of responsibility is located approximately five miles north of the airport and an additional ten miles of airspace will need to be transferred to the Cairns ARAC to accommodate the precision instrument approach.

With regard to the approach to Runway 32, an important consideration is that the final segment of the ILS approach will be over the urbanized, central sections of the City of Troy. The flight tracts associated with this option will expose large areas of residential development and numerous sensitive land uses to aircraft overflights and noise.

In addition to the airspace issues and development cost, this alternative would require the City to acquire approximately sixteen parcels of property, including seven single-family residences. Approximately thirty-nine acres of land would be required to be purchased on the Runway 14 end and fifty-one acres on the Runway 32 end for the runway construction and

establishment of new Runway Protection Zones. Finally, this alternative would also result in the relocation of County Road 289 approximately 1,359 feet to the northwest to achieve the appropriate clearance off of the Runway 14 end. Development cost along with airspace issues and social impacts provides the basis for removing this alternative from further consideration.

## Preferred Alternative - Extend Runway 07

The Preferred Alternative consists of extending the Runway 07 end approximately 1,500 feet to the west, while displacing the threshold of Runway 25 approximately 745 feet, to achieve a total runway length of 6,509 feet. The displacement of the Runway 25 threshold will provide for the 1,000 foot long by 400 foot wide runway safety area and reduce land acquisition requirements. The existing taxiway will be extended approximately 1,500 feet to the west to provide a full-length parallel taxiway for the runway. In addition, a section of the taxiway serving Runway 14/32 will be relocated approximately 300 feet from the runway centerline.

The project will require the acquisition of approximately 90 acres of land for the runway and taxiway extension, as well as for the Runway Protection Zones for Runway 07/25. The project will include installing Runway End Identification Lights (REILS), installing Precision Approach Path Indicator (PAPI) lights for Runway 07/25, and relocating the visual aids and glide slope antenna.

The Preferred Alternative will not displace any residences, businesses, or public use facilities, nor will it conflict with any land use plans or create an incompatible land use. It should be noted that the Oak Grove Methodist Church and cemetery are located along County Road 289 approximately 300 feet east and 800 feet south of the proposed extension of Runway 07. However, no portion of the Church or cemetery property will be acquired by implementing the Preferred Alternative. Detailed information regarding the Church and cemetery can be found under the Social Impact category on pages 25-26 of this document.

The Preferred Alternative will directly impact a five acre man-made lake (Lake Haven) located to the west-southwest of the airport. In addition, a jurisdictional wetland delineation revealed that approximately 18 acres of a wetland complex associated with Beeman Creek will be affected. Detailed information regarding wetland impacts can be found on pages 32-33 of this

document.  Implementation of the Preferred Alternative will not impact any archeological sites or historic resources nor will any endangered species be affected.

Based on the information gathered for this Environmental Assessment, it is recommended that extending Runway 07 be adopted for the long-range development plan for providing a 6,500 foot, precision instrument runway at the airport.  Major factors supporting this recommendation include: airspace issues related to the establishing an Instrument Landing System on Runway 14/32; overflight of the urbanized areas of the city in regards to extending Runway 14/32; the cost of relocating the ILS and radar equipment to Runway 14/32; relocation of residences with regard to extending Runway 14/32; relocation of three roads including a U.S. Highway with regard to extending Runway 25; relocation of residences with regard to extending Runway 25; impact to a large forested wetland system with regard to extending Runway 25; and relocation of the localizer with regard to extending Runway 25.

No significant impacts have been identified during the consideration and evaluation of the Preferred Alternative.  This alternative is not being considered on the basis of any "built-in" mitigation measures.

## Postponing the Project

Postponing the proposed expansion of the Troy Municipal Airport will delay any potential adverse environmental, social, or economic impacts associated with the construction of the Preferred Alternate.  This delay will affect people directly impacted by the proposed project by generating concern and uncertainty as to the timing of the land acquisition and construction activities.  The postponing of the proposed project will delay any safety-based improvements and benefits to the traveling public.

## No Action Alternative

The evaluation of the No Action alternative should consider the purpose and need for the proposed project.  As stated previously, the proposed expansion of the Troy Municipal Airport is a development project which would provide a safe, efficient, and modern airport facility to meet the existing and anticipated demands of the aviation community.

The No Action alternative precludes any new construction and improvements at the Troy Municipal Airport, other than routine improvements and maintenance. The selection of this alternative will avoid any adverse environmental, social, and economic impacts associated with the implementation of the Preferred Alternative. Adoption of the No Action alternative would not satisfy the existing and future demands of the aviation community or contribute to the development of an integrated transportation network capable of fully serving the needs of the City of Troy. As such, the No Action alternative is not considered to be an acceptable alternative.

## SOCIAL AND ENVIRONMENTAL CONSEQUENCES

### Noise Impacts

A computer-based model was employed to determine existing and projected noise levels at the Troy Municipal Airport and to help identify any incompatible land uses. The noise analysis was accomplished by using the Integrated Noise Model (INM), Version 6.1. The INM is a valuable computer-based noise simulation instrument approved by the FAA for delineating and defining the impact of aircraft noise on environs on or near airports. Noise exposure maps are useful as a planning tool for both the airport operator and those who plan the growth of the communities in the vicinity of the airport.

The INM program uses aircraft noise data, performance data, and operations data as the main categories of input to calculate noise levels. The operational inputs required by the INM computer model include: runway configuration, runway utilization percentages, flight track descriptions and utilization rates, and aircraft activity categorized by level and mix of aircraft operations. The noise analysis was based on inputs for the 2003 base year and for the year 2013 with the Preferred Alternative in place.

The most commonly used noise metric, and the one used for this noise analysis, is the Day/Night Average Sound Level (DNL). The DNL noise metric reflects the cumulative noise levels compiled and averaged over a 24-hour period and is weighted to account for the quieter background noise levels from 10 p.m. to 7 a.m., with a 10 decibel penalty applied for that period. Noises occurring at night are recognized as more likely to disturb people than the same noise occurring during the day.

Once the noise is modeled by the INM, the DNL levels are depicted as contour lines centered on the runway. The contours can then be superimposed on a map to identify incompatible land uses. The numbers used in quantifying noise levels in the DNL analysis have been associated with different degrees of impact. Generally, noise levels of 65 DNL and higher are considered to be incompatible with most noise sensitive land uses such as residential.

The results of the analysis show that noise levels of 65 DNL and higher are being generated by the current level of aviation activity. The 65 DNL noise contour does not extend outside the existing airport property boundary. Therefore, the 65 DNL contour does not

encompass any residences or other sensitive land uses.  The noise exposure for the 2003 level of activity is presented in Figure 6.

The noise analysis conducted for the level of activity projected for the year 2013 show that aircraft operations will continue to produce noise levels of 65 DNL and higher (Figures 7 and 7a).  Although the noise contours are appreciably larger than the contours generated for 2003 operations, the 65 DNL contour will be mainly restricted to airport property.  However, it should be noted that Oak Grove Methodist Church is located just outside of the 65 DNL as depicted in Figures 7 and 7a.  The increase in the size of the noise exposure contours is a result of increased aircraft operations.  Based on the noise analysis, the existing and forecasted aircraft noise levels do not constitute an impact on any existing or planned noise sensitive receptors or create a conflict with existing or proposed land uses.

**'2003' NOISE CONTOURS**
**TROY MUNICIPAL AIRPORT**
**TROY, ALABAMA**

FIGURE 6

BWSC
BARGE
WAGGONER
SUMNER &
CANNON, INC.
Engineers, Planners, and Surveyors

J:\701847_Noise_July04_2003.dgn  12/09/2004 10:13:45 AM



**BWSC** BARGE WAGGONER SUMNER & CANNON, INC.

Engineers, Planners, and Surveyors

FIGURE 7

**'2013' NOISE CONTOURS**
TROY MUNICIPAL AIRPORT
TROY, ALABAMA

...17011847_Noise_July04_2013.dgn 12/09/2004 10:15:39 AM



'2013' NOISE CONTOURS
TROY MUNICIPAL AIRPORT
TROY, ALABAMA

OAK GROVE
METHODIST CHURCH

FIGURE
7a

BWSC | BARGE
WAGONER
SUMNER &
CANNON, INC.

Engineers, Planners, and Surveyors

...\1701847_New2013_Contours-A.dgn 12/09/2004 10:22:03 AM

**Compatible Land Use**

The Troy Municipal Airport is located within the corporate boundaries of the City of Troy. The airport is considered an integral component of the local transportation system and a key element for the continued economic prosperity of the City of Troy and Pike County. The proposed extension of Runway 07 will not create any land use conflicts or incompatibilities. Correspondence from the Alabama Department of Transportation is attached in Appendix "B" of this report.

No major shifts or changes in land use are anticipated as a result of implementing the proposed airport runway extension project. It is expected that the areas surrounding the airport will remain primarily agricultural with scattered residential development. Expected developments in the vicinity of the airport will include business and industrial land uses.

**Social Impacts**

The proposed extension of Runway 07 at the Troy Municipal Airport will not have an adverse effect on community access to public or neighborhood facilities, nor will the proposed project divide any communities or neighborhoods.

Implementation of the Preferred Alternative will not cause the displacement of any residences, businesses or public use facilities. Figure 8 depicts the location of parcels to be acquired for the proposed airport runway extension project.

Two churches are located in the immediate vicinity of the Troy Municipal Airport. The Apostolic Hope Tabernacle located on County Road 36 is approximately 0.5 miles south of the Runway 32 end. The second church, Oak Grove Methodist Church, is located on County Road 289 (Price Road) approximately 1,200 feet west and 800 feet south of the existing Runway 07 end. After the runway is extended 1,500 feet to the west, the Oak Grove Methodist Church will be located approximately 300 feet east and 800 feet south of the extended Runway 07 end. However, it should be noted that no portion of Oak Grove Methodist Church or the cemetery associated with the Church will be acquired by implementing the preferred alternative. Figure 9 is an aerial photograph depicting the location of the Church in relation to the proposed project.

Oak Grove Methodist Church, established in 1885, has a congregation that is majority white and holds a weekly service on Sunday mornings. The exterior of the building is constructed of vinyl siding which was added in the late 1980s. Stained glass windows were added to the building around 1995. No school or daycare is present in the facility. Although the proposed extension of Runway 7 will result in an increase in noise at the airport, the Oak Grove Methodist Church is located just outside the 65 DNL noise contour as shown in Figures 7 and 7a. As depicted on Table 5, noise levels less than 65 DNL are considered to be compatible with most noise sensitive land uses such as residential and churches. Therefore, based on the noise analysis, the existing and forecasted aircraft noise levels do not constitute a significant impact on any existing or planned noise sensitive receptors or create a conflict with existing or proposed land uses.

It should also be noted that the City of Troy will do everything possible within FAA regulations to conserve the natural buffer of trees between the Oak Grove Church and the proposed project site. Only the areas mandated by the FAA and ALDOT Aeronautics Bureau will be cleared or trimmed for this project.

Implementation of the Preferred Alternative will not appreciably alter the layout, character, or quality of other neighborhoods or established subdivisions within the project area. The Preferred Alternative will not disrupt orderly, planned development or affect the delivery of public services, including police, fire, and emergency services; public mass transit systems; and school bus services. No appreciable changes in employment are anticipated as a result of implementation of the Preferred Alternative.

**Table 5**
## LAND USE COMPATIBILITY GUIDELINES

| | Below 65 Decibels | 65 - 70 Decibels | 70-75 Decibels | 75-80 Decibels | 80-85 Decibels | Over 85 Decibels |
|---|---|---|---|---|---|---|
| **Residential** | | | | | | |
| Residential (Other than mobile homes and transient lodges) | Y | N[1] | N[1] | N | N | N |
| Mobile Home Parks | Y | N | N | N | N | N |
| Transient Lodging | Y | N[1] | N[1] | N[1] | N | N |
| **Public Use** | | | | | | |
| Schools | Y | N[1] | N[1] | N | N | N |
| Hospitals and Nursing Homes | Y | 25 | 30 | N | N | N |
| Churches, Auditoriums and Concert Halls | Y | 25 | 30 | N | N | N |
| Governmental Services | Y | Y | 25 | 30 | N | N |
| Transportation | Y | Y | Y[2] | Y[3] | Y[4] | Y[4] |
| Parking | Y | Y | Y[2] | Y[3] | Y[4] | N |
| **Commercial Use** | | | | | | |
| Offices, Business and Professional | Y | Y | 25 | 30 | N | N |
| Wholesale/Retail Building Materials, Hardware, Farm Equipment | Y | Y | Y[2] | Y[3] | Y[4] | N |
| Retail Trade-General | Y | Y | 25 | 30 | N | N |
| Utilities | Y | Y | Y[2] | Y[3] | Y[4] | N |
| Communications | Y | Y | 25 | 30 | N | N |
| **Manufacturing and Production** | | | | | | |
| Manufacturing, General | Y | Y | Y[2] | Y[3] | Y[4] | N |
| Photographic and Optical | Y | Y | 25 | 30 | N | N |
| Agriculture (Except Livestock) and Forestry | Y | Y[6] | Y[7] | Y[8] | Y[8] | Y[8] |
| Livestock Farming and Breeding | Y | Y[6] | Y[7] | N | N | N |
| Mining, Fishing, Resource Production and Extraction | Y | Y | Y | Y | N | N |
| **Recreational** | | | | | | |
| Outdoor Sports Arenas and Spectator Sports | Y | Y[5] | Y[5] | N | N | N |
| Outdoor Music Shells and Amphitheaters | Y | N | N | N | N | N |
| Nature Exhibits and Zoos | Y | Y | N | N | N | N |
| Amusement, Parks, Resorts and Camps | Y | Y | Y | N | N | N |
| Golf Courses, Riding Stables and Water Recreation | Y | Y | 25 | 30 | N | N |

Note: The designations contained in this table do not constitute a Federal determination that any use of land covered by the program is acceptable or unacceptable under Federal, State or local law. The responsibility for determining the acceptable and permissible land uses and the relationship between specific properties remains with the local authorities. FAA determinations under Part 150 are not intended to substitute Federally determined land use for those determined to be appropriate be local authorities in response to locally determined needs and values in achieving noise-compatible land uses.

**Key to Table**

| | |
|---|---|
| SLUCM | Standard Land Use Coding Manual |
| Y (YES) | Land Use and related structures are compatible without restrictions. |
| N (NO) | Land Use and related structures are not compatible and should be prohibited. |
| NLR | Noise Level Reduction (outdoor to indoor) are to be achieved through incorporation of noise attenuation into the design and construction of structure. |
| 25,30 or 35 | Land use and related structures are generally compatible; measures to achieve NLR of 25,30 or 35 DNL must be incorporated in design and construction of structure. |

1. Where the community determines that residental or school uses must be allowed, measures to achieve outdoor to indoor NLR of at least 25 DNL and 30 DNL should be incorporated into building codes and be considered in individual approvals. Normal residential construction can be expected to provide a NLR of 20 DNL, thus, the reduction requirements are often stated as 5, 10 or 15 DNL over standard construction and normally assume mechanical ventilation and closed windows year round. however, the use of NLR criteria will not eliminate outdoor noise problems.
2. Measures to achieve NLR of 25 DNL must be incorporated into the design and construction of portions of the buildings where the public is received, office areas, noise-sensitive areas, or where the normal noise level is low.
3. Measures to achieve NLR of 30 DNL must be incorporated into the design and construction of portions of the buildings where the public is received, office areas, noise-sensitive areas, or where the normal noise level is low.
4. Measures to achieve NLR of 35 DNL must be incorporated into the design and construction of portions of the buildings where the public is received, office areas, noise-sensitive areas, or where the normal noise level is low.
5. Land use compatible provide special sound reinforcement systems are installed.
6. Residential buildings require an NLR of 25 DNL.
7. Residential buildings require an NLR of 30 DNL.
8. Residential buildings not permitted.

▨ Noncompatible land use.

SOURCE: 14 CFR FAR Part 150, Appendix A, Table 1 (28 December 1995).

**Relocation Impacts**

The implementation of the Preferred Alternative will require the acquisition of approximately 90 acres. Implementation of the Preferred Alternative will not cause the displacement of any residences, businesses or public use facilities. Figure 8 depicts the proposed land acquisition plan.

The Federal Aviation Administration's policies and procedures that will be used to acquire property and provide relocation assistance are based on the requirements set forth in 49 CFR Part 24, Uniform Relocation Assistance and Real Property Acquisition Regulations for Federal and Federally Assisted Programs. The policies provide for fair, impartial, and consistent property appraisals and negotiation practices. Financial assistance is available to compensate the land owner and tenants for moving costs, and if applicable, reestablishment expenses.

The assistance to be provided under specific circumstances and conditions is outlined in a brochure prepared by the Federal Aviation Administration entitled Land Acquisition for Public Airports, which explains a displacee's rights and benefits for the conveyance of property and relocation to replacement property. The booklet will be provided to the affected landowners.

**Induced Socioeconomic Impacts**

By providing the facilities necessary for the support of regular business jet operations at the airport, and the ability to handle the operations safely and efficiently, the potential for attracting new businesses and industries to the area will be presented. There is also the potential, although modest, that the expansion will influence such factors as shifts in patterns of population movement and growth, public service demands, and changes in business and economic activity. These secondary impacts are not anticipated to be of a level of significance, which would require detailed analysis.



PROPOSED PROPERTY LINE

PROPOSED RPZ

EXISTING RPZ

PRICE ROAD

EXISTING PROPERTY LINE

MAGNETIC DECLINATION
2.24° W - 2002. ANNUAL
RATE OF CHANGE 7.32' W

400'    0    400'    800'

BOUNDARY OF TRACTS TO BE ACQUIRED



PROPOSED PROPERTY MAP

TROY MUNICIPAL AIRPORT
TROY, ALABAMA

FIGURE
8



PROPOSED AIRPORT
PROPERTY LINE

SAFETY AREA

PROPOSED 6,500' x 100' RWY

PROPOSED TAXIWAY

OBJECT FREE AREA

PROPOSED
AIRPORT
PROPERTY
LINE

OAK GROVE
UNITED METHODIST
CHURCH

OAK GROVE MEMORIAL
CEMETERY

SCALE: 1"=300'

BWSC
BARGE
WAGGONER
SUMNER &
CANNON, INC.
Engineers, Planners, and Surveyors

PROPOSED PROPERTY MAP ~ RUNWAY 07 END
TROY MUNICIPAL AIRPORT
TROY, ALABAMA

FIGURE
9

Troy Municipal Airport – Environmental Assessment

## Air Quality

Aircraft pollutant standards, as mandated by the Federal Aviation Administration, require airport conformance with a State Implementation Plan as approved or promulgated under Section 110 of the Clean Air Act, as amended. A pertinent element of the plan is the requirement for states to designate all areas as either nonattainment or attainment areas based on National Ambient Air Quality Standards (NAAQS) for all criteria pollutants. Nonattainment areas are those areas which do not meet air quality standards, and attainment areas are those where air quality standards have been attained but are controlled to prevent further significant deterioration beyond acceptable limits. It has been determined by the Alabama Department of Environmental Management (ADEM), Air Division, that Pike County, and therefore the Troy Municipal Airport, is presently located within an attainment area and that the proposed project will not have a significant impact on air quality. However, in July 1997, the U.S. Environmental Protection Agency (EPA) introduced proposed changes to both the particulate and ozone NAAQS that could affect the attainment status of various Alabama counties, including Pike County. ADEM is currently in negotiations with the EPA to determine the counties that are found to be in nonattainment for the ozone standard. ADEM states that the attainment area status of Pike County is unlikely to change pending the new NAAQS for ozone. Correspondence from the Alabama Department of Environmental Management, Air Division is included in Appendix "B."

The provisions in FAA Advisory Circular (AC) 150/5370-10 Standards for Specifying the Construction of Airports, Item p-156, will be used to minimize any short term impacts from dust and open burning. As the Troy Municipal Airport will have less than 180,000 general aviation operations annually, it is exempted from detailed analysis with respect to National Ambient Air Quality Standards.

## Water Quality

The Clean Water Act of 1977, as amended, requires proper authorities to establish water quality standards, control discharges into surface and subsurface waters, develop waste treatment management plans and practices, and issue permits for discharges and for dredge and fill operations. The environmental assessment requires description of design, mitigation measures, and construction controls as they apply to the proposed action in order to demonstrate that local, state and federal water quality standards and permit requirements will be met.

Water service to the airport is provided by the City of Troy Water Works and Sewer Board. It is not anticipated that there will be a substantially increased demand for water supplies at the airport if the proposed project is implemented. The proposed runway extension will not impact any aquifers designated as sole or principal drinking water resources for the airport area.

Section 404 of the Clean Water Act of 1977 (33 USC 1344) prohibits the filling activities in waters, including wetlands, of the United States without securing a permit from the U.S. Army Corps of Engineers. It has been determined that jurisdictional wetlands will be directly impacted by the proposed projects; therefore, a Section 404 permit will be obtained prior to construction.

In accordance with the 1982 Airport Act, a water quality certification is required for the approval of an Airport Improvement Program application when a project involves airport location, a major runway extension, or a runway location. A water quality certification will be obtained from the Alabama Department of Environmental Management (ADEM) prior to initiation of construction activities at the Troy Municipal Airport.

Potential adverse impacts to surface and ground water quality are normally related to those resulting from construction activities and the maintenance and use of the new facility. Potential construction-related impacts in water ways include increased turbidity, sedimentation, the improper use of fertilizers, and accidental releases of petroleum products from equipment and machinery. Increased turbidity is a temporary phenomenon while sedimentation, the improper use of fertilizers, and petroleum contamination may have a long-term adverse effect on aquatic organisms and habitats. A Construction General Permit for Storm Water Discharges from Construction Activities will be obtained from the State Water Division.

The construction phase of the proposed development will include measures to control erosion and the discharge of suspended materials into water bodies as prescribed in FAA Advisory Circular 150/5370-10 Standards for Specifying Construction of Airports. The plans and specifications for the proposed project will incorporate those design and construction measures necessary to control erosion, minimize the impact of sedimentation, and prevent pollution. Specific measures to protect water quality may include the use of silt fences and traps, staked hay bales, seeding and mulching of exposed soils, sedimentation traps, diversion ditches, and ditch and slope linings. The construction phase of the proposed project will also incorporate the use of Best Management Practices (BMPs), as recommended by the ADEM, in an effort to maintain the quality of any storm water discharged from the construction site and to minimize the potential for groundwater contamination during construction efforts. The use of BMPs are required by state-issued National Pollutant Discharge Elimination System (NPDES) permits for construction projects. A Notice of Intent (NOI) will be filed and a NPDES permit will be obtained from the Alabama Department of Environmental Management prior to initiation of any construction activities associated with the proposed project. Best management practices identify commonly-accepted measures that can be taken, depending on the specific situation, to control erosion and sedimentation. Best management practices also detail recommended procedures related to the handling and storage of petroleum products and other potentially hazardous materials on the construction site.

Potential adverse impacts related to the use and maintenance of the new facility may result from the occasional use of fertilizers, herbicides, and pesticides; random spills; and storm water runoff. The improper use of fertilizers, herbicides, and pesticides can be detrimental to water quality and aquatic organisms. However, if used properly, these substances have very little effect on water quality or aquatic organisms. In regard to random spills, the frequency and magnitude of accidents cannot be accurately predicted. Vehicles and aircraft will have the potential to be involved in accidents which could result in pollution of adjacent water bodies. Airfield storm water runoff may contain varying levels of suspended solids, heavy metals, oils, nutrients, and other pollutants.

The potential impact of the pollutant load on adjacent water bodies varies greatly and is influenced by numerous factors including the frequency and duration of rainfall events, wind, vegetation, traffic volumes, and adjacent land uses.

Construction of the proposed improvements to the airport facility, utilizing erosion and sedimentation control measures and pollution prevention practices, will have minimal short-term and long-term adverse impacts on water quality and aquatic habitats. The potential to adversely impact water quality in adjacent water bodies as a result of normal use and maintenance of the new facility should be no greater than if the proposed project were not constructed. The proposed runway extension will not create a significant impact on the quantity or quality of public drinking water supplies, groundwater or surface waters.

## Section 4(f) Properties

Section 4(f) of the <u>Department of Transportation Act</u> provides that no program or project will be approved which requires the use of any publicly owned land from a public park, recreation area, historic site, or wildlife and waterfowl refuge of national, state, or local significance as determined by those authorities who have jurisdiction over such areas unless there is no practicable alternative available and provisions to minimize the possibility of harm are included in the planning.

The proposed runway extension at the Troy Municipal Airport will not involve any public park, public recreation area, or a designated wildlife or waterfowl refuge of national, state, or local significance. Since there will be no use of, or adverse impact to, public park property as a result of constructing the preferred alternate, the requirements of Section 4(f) of the <u>Department of Transportation Act</u> do not apply. Correspondence from the U.S. Fish and Wildlife Service, and the Alabama Historical Commission are included in Appendix "B."

## Historic and Archaeological Resources

The Environmental Assessment for the proposed development actions at the Troy Municipal Airport is required to examine thresholds concerning two basic laws which apply to this category of impact. The first law, the National Historic Preservation Act of 1966, as amended, requires an initial review to determine whether or not any land involved in potential environmental impact is either in, or eligible for, inclusion into the National Register of Historic Places. The second law, the Archeological and Historic Preservation Act of 1974, provides for the survey, recovery, and preservation of significant scientific, prehistoric, historical, archeological, or paleontological data which could be damaged or irretrievably lost as the result of a development which has received federal funding.

At the request of the Alabama Historical Commission, a Phase I Cultural Resource Assessment (CRA) was conducted by qualified archeologists to determine if the proposed project will have the potential to adversely impact archaeological and cultural resources. The results of the Phase I CRA indicate that the subject property at the Troy Municipal Airport contains no identified cultural or archeological sites. No cultural material was recovered from the shovel tests performed. It should be noted that any undisturbed area not included in the Phase I CRA will be surveyed prior to the start of construction. The Alabama Historical Commission correspondence is included in Appendix "B." The Phase I Cultural Resource Assessment is included in Appendix "C."

The Alabama Historical Commission also evaluated the Oak Grove Methodist Church and cemetery with regard to their eligibility for the National Register of Historic Places. After reviewing the affects of the proposed project on the Oak Grove Methodist Church and cemetery, the Alabama Historical Commission has determined that the resources are not eligible for the National Register under any criteria due to the significant interior and exterior modifications. Should additional information regarding the history of the Oak Grove Methodist Church become available during the course of the project, the Alabama Historical Commission will then re-evaluate the National Register eligibility of the Oak Grove Methodist Church and cemetery. The Alabama Historical Commission correspondence is included in Appendix "B."

**Biotic Communities**

The proposed airport runway extension project will not impact any publicly owned wildlife or waterfowl refuge of local, state, or national significance. The proposed action will not impact any critical habitat associated with federal or state-listed threatened or endangered species. The proposed action will not affect any federal or state forests.

Pursuant to the <u>Fish and Wildlife Coordination Act</u>, the U.S. Fish and Wildlife Service (USFWS) requested that the project be evaluated for the presence of wetlands, that the project be designed to avoid wetland habitats, and that Best Management Practices be implemented during construction phases to protect water quality.

Jurisdictional wetlands were identified within the project impact area by the U.S. Army Corps of Engineers. As discussed in the Wetlands section of this Environmental Assessment, approximately 18 acres of jurisdictional wetlands will be affected by the proposed project.

Filling activities such as grading and land clearing with heavy equipment will be necessary for the construction of the runway extension and parallel taxiway at the airport; therefore, a Section 404 - Dredge and Fill permit from the U.S. Army Corps of Engineers will be required.

The expansion of the airport will result in a minor alteration of existing habitat. The expansion of the airport will convert relatively few acres of habitat which represents a small percentage of the area's inventory and affects only common wildlife species. As such, no significant impact to biotic communities is anticipated as a result of the proposed action. Correspondence from the U.S. Fish and Wildlife Service, the Alabama Forestry Commission, and the U.S. Army Corps of Engineers are included in Appendix "B."

## Endangered and Threatened Species

Early coordination responses were received from the U.S. Fish and Wildlife Service regarding threatened, endangered and special concern species in the project vicinity (see correspondence Appendix B).

The following species are listed as known to occur or possibly occur in the project area:

| Species | Common Name | Federal Status | Known Occurance Area |
|---|---|---|---|
| *Trillium reliquum* | Conferderate wakerobin | Endangered | Pike Co., AL |

A botanical review for the presence or absence of the relict trillium (*Trillium reliquum*), was performed for the project area during the period of March 13 through April 4, 2003. The relict trillium was not found in the project area. The botanical survey discovered scattered populations of the *Trillium decipiens*, a related cousin to the endangered species. Confirmation of this related species was provided by Mr. Tom Patrick, an expert systematic botanist affiliated with the Georgia Department of Natural Resources. The proposed project is not expected to affect any populations of the Federally protected *Trillium reliquum*. A copy of the Ecological Assessment report has been included in Appendix "F" to this report.

## Wetlands

At the request of the U.S. Army Corps of Engineers (USACOE), a wetland delineation was performed by Wetland Sciences, Inc. to investigate whether the construction of the preferred alternative at the Troy Municipal Airport will impact wetlands subject to the permitting authority of the USACOE pursuant to Section 404 of the Clean Water Act. Section 404 prohibits filling activities in waters of the United States, including wetlands, unless the work has been authorized by a Department of the Army permit. The USACOE concurred with the findings that there are two wetland habitats that will be directly impacted by the proposed construction and which can be classified as jurisdictional. The primary wetland habitats proposed for fill are characterized as hydrologically altered medium quality riparian systems. Impacts to this wetland typology total 13 acres.

Very few mature canopy trees remain within either of the areas proposed for fill. The few remaining mature canopy specimens include the sweetbay (*Magnolia virginiana*), sweetgum (*Liquidambar stryciflua*), Tulip poplar (*Liriodendron tulipifera*), and sycamore (*Platanus occidentalis*).

The second distinct wetland typology included within the proposed impact is associated with an open water system created by the emplacement of an earthen dam essentially impounding a former forested wetland. The total impact associated with this proposed impact is 5 acres.

According to the preliminary wetland mitigation plan, which is included in Appendix "E", the City of Troy proposes a combination of creation techniques to offset the proposed impacts to medium and low quality, previously altered wetland resources associated with the runway expansion. The methodologies described are fairly basic in their application and the desired results are expected to occur in a fairly rapid fashion. The completion of the proposed created mosaic wetland habitat / community will produce a stable marsh/buttowood community within eight to ten months of planting. Beneficial wetland functions expected to be provided by the proposed mitigation activities described within this report will be similar to those functions provided by a natural wetland system. These include but are not limited to, habitats for wildlife, recharge of groundwater, water quality improvement, and flood control.

Alternative mitigation strategies were assessed during the project planning stages. It was determined that no mitigation bank exists that incorporates the Troy Airport within the permitted service area. Therefore, the mitigation bank alternative cannot be utilized in this instance and on-site wetland creation efforts were deemed the most cost effective and ecologically sound approach to meeting mitigation requirements mandated by the United States Army Corps of Engineers.

The wetland system proposed for mitigation is expected to consist of the installation of tree species within saturated conditions. These types of re-created habitats are not conducive or designed for waterfowl attraction. Waterfowl such as ducks and geese are typically attracted to open water systems. The project as proposed is eliminating a five (5) acre lake that would typically support ducks and geese in the project area. The area adjacent to and surrounding the existing airport maintains large areas of forested wetlands and thus the addition of the mitigation

wetland creation acreage is insignificant in terms of the potential to support a greater or more significant population of wetland dependent avian fauna. As stated, it is anticipated that certain wading birds may utilize the area during the first few years but the vertical development of the trees over time will preclude wading and waterfowl from foraging and thus limit their presence, as in the case within the existing forested wetland areas. Additionally, the proposed filling in of the existing lake will likely result in a loss of waterfowl habitat and decrease the potential for any negative wildlife interactions in association with airport operations.

In short, forested wetland habitats associated with a large jurisdictional complex associated with an unnamed tributary of Beeman Creek are quite common in and around the existing airport, and the mitigation plan proposes in kind forested wetland creation as mitigation. This effort as presented is not expected to increase avian or wildlife presence in or within the vicinity of the airport. The proposed mitigation plan compensates for the impacts associated with the proposed wetland impacts. A Section 404 permit will be acquired prior to the start of construction. Correspondence from the USACOE is included in Appendix "B".



FORESTED WETLANDS TO BE FILLED (13.0 Ac.)

OPEN WATER TO BE FILLED (5.0 Ac.)



OBJECT FREE AREA. ALL TREES AND STUMPS TO BE REMOVED (2.0 Ac.)

EXISTING WETLANDS (TO REMAIN) (17.7 Ac.)

CREATION (24.1' Ac.)



IMPACTED WETLANDS
TROY MUNICIPAL AIRPORT
TROY, ALABAMA

FIGURE 10

1"=300'

**Floodplains**

The proposed action is not located within the limits of a base floodplain associated with any water body, as delineated on the Pike County, Alabama, Flood Insurance Rate Map (Panel 0103150 003B/ CBPP) produced by the Federal Emergency Management Agency (FEMA). This project will not indirectly support secondary development within a base floodplain.

**Coastal Zone Management Program and Coastal Barrier Islands**

The Troy Municipal Airport is not located within the area subject to the requirements of the Alabama Coastal Area Management Program. Further, the airport is not located in an area subject to the requirements of the Coastal Barrier Resources Act. No further analysis in this regard is necessary.

**Wild and Scenic Rivers**

In October 1968, Congress created the National Wild and Scenic Rivers System to preserve selected rivers and stream segments in their free-flowing condition to protect the water quality of these rivers and to fulfill other national conservation purposes. In addition to the National Park Service, there are four other federal agencies charged with protecting and managing the wild and scenic rivers. The agencies include the Bureau of Land Management, the U.S. Army Corps of Engineers, the U.S. Fish and Wildlife Service, and the U.S. Forest Service.

There are no river or stream segments classified as "Wild and Scenic" that will be affected by the proposed project. The National Park Service also maintains the Nationwide Rivers Inventory, which is a listing of more than 3,400 free-flowing river segments that possess natural or cultural value. It should be noted that Beeman Creek a tributary to the Conecuh River is located approximately 1500 feet west of the proposed runway extension. The Conecuh River is listed on the Nationwide Rivers Inventory (NRI). However, according to the National Park Service, the proposed project is unlikely to have any tangible impacts to the NRI-listed segment and the National Park Service has no comments or objectives concerning the project. Correspondence from the National Park Service-Rivers, Trails Conservation Assistance is included in Appendix "B".

**Prime and Unique Farmlands**

The Farmland Protection Policy Act (FPPA) of 1981 was designed to minimize the contribution of federal programs to the unnecessary and irreversible conversion of farmland to uses other than those which are agricultural in nature. Farmland protected under this act is defined as "prime" farmland, "unique" farmland, and farmland of local or state importance. Prime farmland is defined as land which has the best combination of physical and chemical characteristics for producing agricultural crops with minimum input of fuel, fertilizer, pesticides, and labor, and without intolerable soil erosion. Unique farmland is land used for production of specific high-value food and fiber crops.

The Natural Resources Conservation Service (NRCS) has determined that the project site contains prime farmland and farmland of local importance. However, the prime farmland will not be directly converted due to the fact that it will only be acquired for the clear zones. Correspondence from the Natural Resources Conservation Service is included in Appendix "B."

**Energy Supply and Natural Resources**

Energy requirements associated with the airport operations have been divided into two general categories. The first category involves those requirements which relate to an increased demand for electricity from stationary facilities such as the FBO/terminal area and airfield lighting. The second category involves those requirements which relate to providing aircraft fuel.

The expansion of the facilities at the Troy Municipal Airport will increase the electricity demands slightly primarily due to additional runway, taxiway, and approach lights. The degree to which energy efficient systems are included in the plans will determine the significance of this demand. Energy is presently provided to the airport by the Alabama Power Company. The additional electricity demand anticipated from the proposed airport expansion is not expected to be significant and can easily be provided through existing electrical distribution networks.

According to the Geological Survey of Alabama, the geology of the Troy Municipal Airport is mapped on the "Geologic Map of Alabama" (1988) as Pleistocene age high terrace deposits consisting of pale-yellowish-orange to moderate-reddish-brown lenticular beds of poorly sorted sand, ferruginous sand, silt, clay, and gravel. There are no identified surface mineral

resources in the study area that would be impacted by the proposed expansion. Correspondence from the Geological Survey of Alabama is included in Appendix "B."

**Light Emissions**

Airfield lighting currently in use at the Troy Municipal Airport includes Medium Intensity Runway Lights (MIRL) and Medium Intensity Taxiway Lights (MITL). Visual Approach Slope Indicator Lights (VASI) are installed for the approach on Runway 25. Other airfield lighting includes outdoor area lighting at the aircraft parking apron, terminal building, and aircraft storage hangars.

The proposed airfield lighting improvements will include the installation of new medium intensity runway and taxiway lights in association with the proposed runway and taxiway extensions for Runway 07/25. In addition, Uni-directional Runway End Identification Lights (REILS) and Precision Approach Path Indicator (PAPI) Lights will be installed.

Lighting impacts are concerned with the extent to which any lighting associated with the proposed airport expansion would create an annoyance among residents or traffic in the vicinity of the airport. The Troy Municipal Airport is located in a predominantly agricultural setting with few residential homes located nearby.

The REILs and PAPIs direct their light in the direction of the runway's approach slope. This shielding, minimizes the exposure of light to surrounding residents. Furthermore, both REILs, runway, and taxiway lights are set to activate on several intensity levels (full, med, low, and off). These intensity levels are controlled by pilots by way if radio. Typically, pilots on an approach will bring airport lighting to the highest setting in order to identify the runway environment. Upon acquiring sight of the runway, pilots will under most conditions turn all airfield lighting to the lowest level to reduce possible light interference during the final stages of landing. At this setting the REILs are not active. Additionally, airfield light emission is further reduced by the presents of a vegetative barrier. These factors, shielding, pilot controlled lighting, and the use of vegetative barriers will be used to minimize any increase in light emission.

## Solid Waste Impact

The amount of solid waste generated and collected at the Troy Municipal Airport is not expected to increase substantially as a result of constructing the proposed airport improvements. It is anticipated that the composition of the solid waste generated at the terminal facilities will remain constant or experience only minor changes. Solid waste generated by routine activities at the airport is collected by a private contractor and is transported for disposal at a permitted landfill. Construction waste will be removed by private contractors, and all other trash associated with daily activity at the airport will be transported by appropriate personnel to a licensed landfill. There are no landfills located within a five-mile radius of the Troy Municipal Airport; therefore, further compliance with FAA Advisory Circular 150/5200-33, Hazardous Wildlife Attractants on or Near Airports, will not be required.

## Construction Impacts

The construction of the proposed project will result in some temporary, unavoidable impacts related to air quality, noise levels, water quality, and traffic inconveniences. The project construction plans will require that the contractor use appropriate measures to minimize any impacts which could possibly occur. The incorporation of the provisions and specifications of FAA Advisory Circular 150/5370-10, Standards for Specifying the Construction of Airports, Item P-156, will be used in order to avoid and/or minimize adverse construction impacts. The following discussion briefly describes the possible impacts and measures that may minimize the impacts.

The amount of airborne suspended particulates will be expected to increase temporarily in the project area during construction activities. To minimize impacts from fugitive dust, the contractor will be required to implement adequate dust control measures. Such measures may include, but not be limited to, watering of dirt stockpiles and exposed areas. Additionally, the open burning of vegetation and wood wastes, if undertaken, will be conducted in accordance with all state air pollution control regulations and local ordinances.

There may be a slight and temporary impact from the noise and dust associated with the delivery of materials and the operation of machinery on site. The impacts may be mitigated, to

some extent, by limiting construction to daylight hours and requiring that the contractor use designated haul routes to avoid, as much as possible, residential and other noise sensitive receptors. On-site construction noise is expected to have a negligible, temporary impact on nearby residences and businesses.

The construction of the proposed airport expansion project will include the use of commonly-accepted measures to minimize erosion, sedimentation, and water pollution. Erosion and sedimentation control measures may include, but not be limited to, the use of staked hay bales and silt fences during construction. Soils exposed during construction will be re-seeded as soon as practical to minimize erosion potential and establish permanent ground cover. The construction activities will require a National Pollutant Discharge Elimination System (NPDES) permit from the Alabama Department of Environmental Management. Implementation of Best Management Practices by the contractor, as mandated by the required NPDES permit, will ensure that all steps necessary to maintain the quality of water discharged from the construction site into adjacent water courses, wetlands, and water bodies are taken. Wastes, loose soil, and other debris will not be deposited into streams or other water bodies.

The disposal of wastes, debris, and excavated material will be handled in accordance with applicable state and local requirements. The contractor will be required to use legally operating landfills for the disposal of wastes, debris, and materials generated during the construction of the proposed project.

Care will be taken not to leave borrow pits behind construction. Any borrow pits will be filled with debris associated with any clearing and construction prior to being backfilled.

## Other Considerations

Unavoidable adverse impacts associated with the proposed airport improvements include an increase in noise levels due to an increase in aviation activity and temporary construction impacts such as dust and noise from trucks and equipment.

The preparation of this environmental assessment has been coordinated with appropriate federal, state, and local units of government and agencies. Correspondence and documentation

received from responding agencies has been referenced in the appropriate discussions and included in the Appendix "B" of this report.

## Environmental Justice

The U.S. Environmental Protection Agency defines environmental justice as "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies. Fair treatment means that no group of people, including racial, ethnic, or socioeconomic group share bear a disproportionate share of the negative environmental consequences resulting from industrial, municipal, and commercial operations or the execution of federal, state, local, and tribal programs and policies."

Troy Municipal Airport will not unfairly or adversely impact any group of people, including racial, ethnic, or socioeconomic groups. The population in the vicinity of the airport is diverse with no concentrations of minorities.

Troy Municipal Airport – Environmental Assessment                    Troy, Alabama

## LIST OF PREPARERS

The engineering, architectural, and planning firm of Barge, Waggoner, Sumner, and Cannon, Inc. (BWSC) was responsible for the preparation of this Environmental Assessment.   Within this firm, individuals having key roles were:

| | |
|---|---|
| Keith Shippey | Environmental Planner |
| Justin Thomason | Aviation Planner |

Subconsultants were used to address certain specialized aspects of the environmental analysis. These were:

| | |
|---|---|
| Archeology | Terry Lolley, M.A., R.P.A., Archaeologist |
| | P.E. LaMoreaux & Associates, Inc. |
| | Tuscaloosa, Alabama |
| | |
| Wetlands | Craig Martin, Sr. Scientist |
| | Wetland Sciences, Inc. |
| | Pensacola, Florida |
| | |
| Botanical Review | Keith D. Johnson, Environmental Scientist |
| | Wetland Sciences, Inc. |
| | Pensacola, Florida |

# APPENDICES

**APPENDIX "A"**     Runway Extension Justification Report

**APPENDIX "B"**     Correspondence

**APPENDIX "C"**     Phase I Cultural Resource Assessment

**APPENDIX "D"**     Wetland Delineation Report

**APPENDIX "E"**     Preliminary Wetland Mitigation Plan

**APPENDIX "F"**     Ecological Assessment

**APPENDIX "G"**     Public Hearing Documentation

Appendix A - RW
Ext. Just. Study

# APPENDIX A

## Runway Extension Justification Report

# Runway Extension Justification Report

## TROY MUNICIPAL AIRPORT



Prepared for the

**City of Troy**

Post Office Box 549
Troy, Alabama  36081

December 2003



5960 Carmichael Place
Montgomery, Alabama 36117
334-409-2972

# RUNWAY EXTENSION JUSTIFICATION REPORT
## Troy Municipal Airport
### Troy, Alabama

## Purpose

The purpose of this report is to document the demand by individuals and corporations operating turbojet aircraft that require access to the Troy Municipal Airport but are unable to operate safely due to insufficient runway length. Specifically this report addresses those requirements associated with the extension of a runway beyond 5,500 feet in length, as outlined by the Federal Aviation Administration (FAA). The FAA guidelines note that in order for the agency to consider a request from a community for funding of a runway extension project beyond 5,500 feet, justification is needed documenting those operations requiring the additional length. The guidelines require the identification and documentation of 700 annual itinerant operations (AIO) of which at least 500 of those AIO's must be by aircraft requiring the additional length. An operation is defined by the FAA as either a take-off or a landing. A visit from an itinerant aircraft equals two operations.

## Survey Methods

A telephone survey was conducted by Barge Waggoner Sumner and Cannon, Inc. during the month of November, 2003 to determine if there is a demand by potential users that would warrant the extension of the runway from its present length of 5,000 feet to 6,500 feet.

A contact list was prepared in advance of the telephone survey. Discussions were held with Mr. Trent Crawford, Airport Manager, Marsha Gaylord of the Pike County Chamber of Commerce, and local companies that use turbojet aircraft or have clients and/or suppliers that use turbojet aircraft as well as other regular users of the airport. Additionally, turbojet aircraft operators located throughout the United States who would reasonably be expected to visit Troy, Alabama were included in the telephone contact list. The type of turbojet aircraft considered critical for demonstrating a need for additional runway length include those produced by Lear, Gulfstream, Cessna, Canadair, and Hawker.

Information gathered in the telephone survey included the name of the company, contact person, corporate address, type of aircraft operated, aircraft "N" number, annual number of operations by each type of aircraft, and a statement of runway length needed to overcome off-loading or haul distance penalties. Off-load and haul distance penalties relate to flights (operations) that must be altered in order to meet the performance characteristics of the aircraft. Aircraft performance characteristics consider such factors as existing runway length and gradient, environmental factors, payload, and haul distances.

Typically, the pilot will reduce (off-load) the amount of fuel or cargo carried to meet aircraft performance characteristics. Reducing fuel loads result in decreased performance by "penalizing" the aircraft's haul distance. Reducing the cargo carried penalizes aircraft efficiency and may result in the need for additional flights or use of extra aircraft. Applying this information to the operators own knowledge of their stage lengths and frequency of operation into and out of the airport, an accurate idea of the number of penalized or altered operations could be identified.

Table 1 summaries survey information and categories operations into three distinct groupings, annual, additional, and penalized. Annual operations are the total number of operations conducted into and out of the Troy Municipal Airport by each operator. Additional operations are operations that could be expected if the runway were extended to 6,500 feet. Penalized operations are the number of current annual operations that must be altered due to existing runway length.

One significant environmental factor considered was wet runway conditions. Wet runway conditions require the pilot to increase take-off and landing distances due to increase roll resistance and decrease braking action, respectively. In some instances this requires the pilot to increase the dry field length values by a factor of 1.5 - 2.0. Given these requirements, even smaller turbojet aircraft may, on occasion, be constrained by the existing field length. Several of these smaller turbojet operators coincidentally were anticipating the purchase of larger aircraft.

## Survey Results

Approximately 16 aircraft operators were identified of which 8 responded indicating their annual operations and aircraft performance requirements. All eight of the operators stated they needed additional runway length for safe and efficient operations. A summary of the survey results is presented in Table 1.

Sikorsky Helicopters stated that in the past, they have utilized a military C-17 for delivery of helicopters and parts. They would be very interested in utilizing this aircraft more often if the runway were extended. Troy State University is becoming nationally recognized in several sports programs and has seen an increase in opportunities to travel great distances to different sports venues. Currently chartered aircraft, usually a B-727-200 and 737-200, for the Athletic Department must use Dannelly Field in Montgomery due to the insufficient runway length currently available at the Troy Municipal Airport. Lockheed Martin is very interested in bringing in larger aircraft for shipping missile systems and parts but due to security concerns could not estimate the number of operations they would generate.

Sanders Aviation has a fleet of approximately 20 aircraft including a two Gulfstream IIs, a Citation 500, and a T-2B trainer jet. This fleet services the travel requirements for three separate companies in the Troy area. Destinations cover North America, Central America, and the Caribbean with regular trips to St. Thomas, San Jose, Los Angeles, Costa Rica, Montreal, Cozamel, Seattle and Portland, Maine. Sanders Aviation flies approximately 1800 operations annually from the Troy Municipal Airport, of which 450 are penalized due to insufficient runway length. These penalized operations to the afore mentioned destinations currently force Sanders Aviation to offload fuel, reduce haul lengths, or make additional fuel stops.

A runway length of 7,340 feet would be required for Sanders Aviation to operate its two Gulfstream IIs at maximum takeoff gross weight under conditions common at the Troy Municipal Airport. Furthermore, Gulfstream operating manuals for the G-II require pilots to decrease available field length by 11 percent for every five knots of tailwind and 18 percent for every one percent of uphill slope. Given these conditions Sanders' G-IIs could require a takeoff length in excess of 10,000 feet.

The total number of annual operations anticipated by all the aircraft operators, including those who do not need additional length, was 1,934.  Of this amount, 542 operations were penalized by the current runway length. This figure (1,934) does not include the additional 12 operations that would be added if the runway was extended.

## Findings

The survey identified over 500 annual itinerant operations by turbojet aircraft operations needing a runway length longer than the existing 5,000 feet.  There is strong agreement by operators that the additional runway length is needed and that more turbojet operations would result once the extension is completed.  Add to this, the fact that numerous operators are currently upgrading or anticipating an upgrade of larger aircraft to their fleet.  This clearly demonstrates an existing and additional aviation demand that exceeds the FAA criteria for extending the runway from its existing length of 5,000 feet to 6,500 feet.  The performance characteristics of the turbojet aircraft expected to utilize the airport necessitates the additional runway length for enhanced safety and operational efficiency.

## Evaluation

There are several reasons that an aircraft may require more runway than is available at the Troy Municipal Airport.  Elevation, a factor in all runway length calculations, is constant in the case of a particular location.  The other factors that enter into the equation are:

1. Density Altitude
2. Aircraft Weight
3. Weather Conditions (wet or dry runway)

Calculations must be made by the pilot to ensure that the runway is long enough, in light of each of these factors, for landing, climb and takeoff (accelerated-stop operations).  An accelerated-stop operation is a non-emergency action to safely abort a takeoff and bring the aircraft to a halt at any time prior to the "decision point" of a takeoff operation.  Climb considerations may involve clearing

obstructions (man-made or natural) or meeting departure performance profiles. An aborted takeoff after the decision point is an emergency action involving an emergency landing.

1. Density Altitude - The density altitude is an artificially derived height above sea level assuming standard temperature and pressure. Density altitude is determined by pressure altitude and ambient temperature. For a given pressure altitude, the higher the temperature the higher the density altitude. The higher the density altitude, the longer the runway required for takeoff. Since the mean maximum temperature of the hottest month is $90^0$ Fahrenheit, the Troy, Alabama climate adversely affects the takeoff performance of all aircraft, requiring longer runway lengths than would be required in cooler climates.

2. Aircraft Weight - As an aircraft's weight increases, the runway length required for safe takeoff operations increases. The gross weight of an aircraft consists of the aircraft empty weight (the weight of the basic airplane and equipment, unusable fuel, pilots, undrainable oil, and hydraulic fluid) and the useful load (the weight of passengers, useable fuel, drainable oil and cargo). An aircraft may need to take off at a high weight (sometimes maximum gross allowable weight) because of the weight of passengers and/or cargo, or because the necessary haul distance to the first fuel stop (stage length) requires a heavy fuel load. With many of the jet aircraft serving Troy, stage lengths are so great that the passengers or fuel loads must be curtailed or the stage length shortened to meet aircraft performance characteristics.

3. Weather Conditions - Whether the runway is wet or dry has a profound effect on the ability of an aircraft to accelerate, decelerate and stop in a given distance. The wet conditions usually occur in the late afternoon which is a peak activity time for the airport. Although each aircraft may have a unique adjustment for wet conditions, a 15% increase in calculated length for wet runways is an average standard. Pilots familiar with the Troy Municipal Airport always consider the probability of a wet runway in their estimates of required length.

The aircraft operators surveyed were enthusiastic about the possibility of a longer runway at the Troy Municipal Airport. The corporations contacted do business, plan to do business, or plan to visit the Troy, Alabama area. An extended, jet-capable runway will have a positive impact on economic activity in the area by allowing corporate and recreational visitors to fly directly from Troy, Alabama

to distant destinations.  The need for a safe and efficient airport has been recognized and endorsed by local officials as an important element in the local transportation system.

TABLE 1

Runway Extension Justification Report
Troy Municipal Airport
Troy, Alabama
AIRCRAFT OPERATIONS REPORT

| COMPANY | TYPE | "N" NUMBER | ANNUAL | ADDITIONAL | PENALIZED | REMARKS |
|---|---|---|---|---|---|---|
| SARA LEE BOB RUSSELL, DIRECTOR OF FLIGHT OPS - PENTASTAR AVIATION 800-662-9612 | GULFSTREAM IV<br><br>GLOBAL EXPRESS | N49SL<br><br>N1SL | 24 | | 6 | Runway length currently impacts stage length. Some trips require refueling stops. Would use Global Express if runway was extended. |
| SOUTHERN COMPANIES DON CLEVENGER, MANAGER OF OPERATIONS 205-257-6924 | LEAR 45 | N60PC | 16 | | 16 | Current fleet of Lear 45's require extra length during wet conditions. ISA conditions require 4993' feet for landing. An increase in temperature and elevation will easily increase the landing distance to over 5000 feet. |
| SIKORSKY TONY SCOTT, OPERATIONS MANAGER PO BOX 1087 TROY, AL 36081 334-566-9660 | C-130<br>HAWKER | CHARTER<br>CHARTER | 18<br>20 | | 18<br>20 | Current runway length limits company in the type of aircraft that can service the company. If the runway were to be extended, larger aircraft than the C-130 could support the companies operations. |
| HUDSON INDUSTRIES PO BOX 847 TROY, AL 36081 334-566-6270 | CITATION CHARTER HAWKER 700 CHARTER | | 20 | | | Charters aircraft from several companies |

TABLE 1 cont'

Runway Extension Justification Report
Troy Municipal Airport
Troy, Alabama
AIRCRAFT OPERATIONS REPORT

| COMPANY | TYPE | "N" NUMBER | ANNUAL | ADDITIONAL | PENALIZED | REMARKS |
|---|---|---|---|---|---|---|
| SANDERS COMPANIES MARK CALK, DIRECTOR OF FLIGHT OPERATIONS P.O. Box 707 Troy, Al. 36081 334-566-5184 | CITATION 500 GULFSTREAM II GULFSTREAM II | N777SL N27SL N17KW | 1800 | | 450 | Runway length currently impacts stage length. Chief pilot stated that approximately 450 operations with their Gulfstream II must depart with reduced fuel loads due to the length and/or wet weather conditions. |
| LOCKHEED MARTIN JOYCE VONDRAN, MANAGER, HUMAN RESOURCES 5500 County Rd. 37 Troy, Al. 36081 334 670-9500 | LEAR LEAR | 55 60 | 8 8 | | | Runway length requires aircraft to use military power during take-offs. Runway extension will allow this company to begin cargo operations of company supplies and materials which cannot be accomplished at this time. |
| FLIGHT OPTIONS, INC. JOE CORSILLO 26180 Curtis Wright Pkwy Richmond Hts., OH 44143 877-358-6786 | HAWKER 700 CITATION 550 CHALLENGER 600 | N440CW N257CW N664CW | 20 | 12 | | Operates several charters out of Troy. Would like to utilize the Challenger 6 times per year but unable to due to runway length |
| TROY STATE UNIVERSITY JUDY MORGAN, ADMIN. ASST., Athletic Dept. 100 S. George Wallace Dr. Troy, Al. 36082 | B-727-200 B-737-200 | Charter Charter N252TR | | | 30 2 | Troy State University charters aircraft for athletic department. The charter aircraft are forced to use the Montgomery Airport due to the runway length. If the runway was lengthened they could use the Troy Municipal Airport |

Appendix B

Correspondence

# APPENDIX B

# Correspondence

## Agencies Contacted

*U.S. Department of Agriculture*
Natural Resources Conservation Service

*U.S. Army Corps of Engineers - Mobile District*

*U.S. Fish and Wildlife Service*

*Geological Survey of Alabama*

*Alabama Department of Environmental Management*
Air Division
Land Division - Hazardous Waste Branch
Water Division

*Alabama Department of Transportation - Seventh Division*

*Alabama Forestry Commission - Southeast Region*

*Alabama Historical Commission*

*Alabama Department of Conservation and Natural Resources*

*South Central Alabama Development Commission*

*National Park Service*

# preserveALA
## ALABAMA HISTORICAL COMMISSION

December 8, 2004

J. Barry Mott
Vice President
Barge, Waggoner, Sumner & Cannon, Inc.
P.O. Box 279
Dothan, Alabama 36302

Re: AHC 2003-0123; Environmental Assessment, Proposed Runway Extension, Troy Municipal
Airport, Pike County

LEE H. WARNER
Executive Director

468 South Perry Street
Montgomery, Alabama
36130-0900

tel 334 242•3184
fax 334 240•3477

Dear Mr. Mott:

The Alabama Historical Commission (AHC) is in receipt of your follow-up letter summarizing
the issues discussed during a recent site visit with Ms. Amanda McBride of our office. To
reiterate, the following issues were discussed.

P.E. LaMoreaux's (PELA) Phase I CRA included the proposed runway safety area with
the exception of the last 500 feet of the safety area. AHC requests that an
archaeological survey be conducted of this area and any other undisturbed area not
included in the Phase I CRA completed by PELA after land acquisition, but prior to
starting construction. Please note that we will also require a Phase I CRA on any
undisturbed fill source areas prior to the start of construction. As plans for this project
have not yet been finalized, we request that AHC's comments be sought prior to
ground disturbing activities (including, but not limited to tree removal, grubbing, grading
and excavation) as the scope of work is developed.

2. Based on the distance between the current proposed airport property line and Oak
Grove Church Cemetery (approximately 300 feet) it was determined that the proposed
construction activities will not impact the cemetery or church property; therefore,
ground penetrating radar testing will not be required.

3. AHC has evaluated the Church and the cemetery with regard to their eligibility for the
National Register of Historic Places. In our letter of November 19, 2004, we stated
that the Oak Grove Church building is not eligible for the National Register under
Criterion A, Architecture. The letter should have stated that the church is not eligible
based on Criterion C. Based on the information provided, AHC has further determined
that the resources are not eligible for the National Register under any criteria due to
significant interior and exterior modifications. Should additional information regarding
the history of the church become available during the course of the project, AHC will
then re-evaluate the National Register eligibility of Oak Grove Church and cemetery.

Finally, should artifacts or archaeological features be encountered during project activities, work
shall cease and our office shall be consulted immediately. Artifacts are objects made, used or
modified by humans. They include but are not excluded to arrowheads, broken pieces of
pottery or glass, stone implements, metal fasteners or tools, etc. Archaeological features are

pottery or glass, stone implements, metal fasteners or tools, etc. Archaeological features are stains in the soil that indicate disturbance by human activity. Some examples are post holes, building foundations, trash pits and even human burials. This stipulation shall be placed on the construction plans to insure contractors are aware of it.

We appreciate your commitment to helping us preserve Alabama's non-renewable resources. Should you have any questions, please contact Amanda McBride of this office and include the AHC tracking number referenced above.

Very truly yours,

Elizabeth Ann Brown
Deputy State Historic Preservation Officer

EAB/ALM/alm

Cc:    Hon. Jimmy C. Lunsford
       City of Troy
       P.O. Box 549
       Troy, Alabama 36081

       Benjamin M. Bowden
       Albrittons, Clifton, Alverson, Moody & Bowden
       P.O. Drawer 880
       Andalusia, Alabama 36420-0880

       Keafur Grimes
       Program Manager
       Federal Aviation Administration
       Airports District Office
       100 West Cross Street
       Jackson, Mississippi 39208-2307



# preserveALA
## ALABAMA HISTORICAL COMMISSION

November 19, 2004

Keith Shippey
Barge Waggoner Sumner & Cannon, Inc.
P.O. Box 279
Dothan, Alabama 36302

Re: AHC 2003-0123; Troy Airport Extension, Pike County

Dear Mr. Shippey:

Thank you for forwarding the information requested in our July 13, 2004. Upon review of the additional information, the Alabama Historical Commission has determined that the cultural resource assessment performed by P.E. LaMoreaux apparently did not include the runway safety area. Therefore, we request that this additional area be surveyed by a professional archaeologist. In addition, we request that a Ground Penetrating Radar (GPR) study be conducted around the cemetery in order to locate graves outside of the current cemetery boundaries, should any exist. The resulting report should be forwarded to our office for review and comment prior to any ground disturbing activities.

Finally, our office has determined that the Oak Grove Church building is not eligible for the National Register under Criterion A (architecture).

We appreciate your efforts on this issue. Should you have any questions regarding archaeology, please contact Amanda McBride of our office. Questions regarding historic structures may be directed to Lindsey Breithaupt. Please reference the AHC tracking number above in all correspondence.

Very truly yours,

Elizabeth Ann Brown
Deputy State Historic Preservation Officer

EAB/ALM/LDB/alm

LEE H. WARNER
Executive Director

468 South Perry Street
Montgomery, Alabama
36130-0900

J 334 242-3184
x 334 240-3477

# preserve**ALA**
## ALABAMA HISTORICAL COMMISSION

July 13, 2004

Mr. Keith Shippey
BWSC
P.O. Box 279
Dothan, Alabama 36302

Re: AHC 03-0123, Troy Airport Extension

Dear Mr. Shippey:

Our office has received many recent inquiries concerning the possible effects of the Troy Airport extension on the Oak Grove Church and cemetery. In reviewing your submission to seek an answer to these questions, we find that the report presents a confusing picture of effects on this resource. The areas of misunderstanding are:

1. The report does not include the Oak Grove Church and Cemetery as a potential historic resource. Please provide our office with historical information, including: Building dates; interior and exterior photographs of the church; photographs of the cemetery; dates of significant changes to the building.

2. It is unclear what the level of ground disturbance will be outside the runway area. Only the runway was tested by the archaeologist, but a BWSC map included in the submission notes includes 50:1 and 20:1 approach surfaces. Will these areas be graded or disturbed?

3. Maps included in the submission present an unclear picture of whether or not property is to be taken from the church or cemetery. In fact, every map in the submission represents it in a different way. Please provide a map which shows the actual situation. A map larger than 11X17 would make it easier for us to see and understand the nature of the possible effect.

Our letter of May 9, 2003 should be considered invalid until these questions can be resolved. We look forward to receiving the additional information.

Very truly yours,

Elizabeth Ann Brown
Deputy State Historic Preservation Officer

LEE H. WARNER
Executive Director

468 South Perry Street
Montgomery, Alabama
36130-0900

334  242·3184
334  240·3477



# STATE OF ALABAMA
## ALABAMA HISTORICAL COMMISSION
468 SOUTH PERRY STREET
MONTGOMERY, ALABAMA 36130-0900

LEE H. WARNER
EXECUTIVE DIRECTOR

TEL: 334-242-3184
FAX: 334-240-3477

May 9, 2003

Mr. Keith Shippey
BWSC
P. O. Box 279
Dothan, AL 36302

Re:    AHC 03-0123
       Cultural Resource Assessment
       Troy Airport Runway Extension
       Pike County, AL

Dear Mr. Shippey:

Upon review of the cultural resource assessment conducted by P. E. LaMoreaux, the Alabama Historical Commission has determined the following.   The results of the assessment indicate that there are no cultural resources listed on or eligible for the National Register of Historic Places within the project boundaries.  Therefore, our office can concur with the proposed project.

We appreciate your efforts in helping us preserve Alabama's non-renewable cultural resources. Should you have any questions or comments or if we may be of further service, please contact Stacye Hathorn of this office and **include the project number referenced above.**

Sincerely,

Elizabeth Ann Brown
Deputy State Historic Preservation Officer

EAB/SGH/gtj

THE STATE HISTORIC PRESERVATION OFFICE



### STATE OF ALABAMA
#### ALABAMA HISTORICAL COMMISSION
468 SOUTH PERRY STREET
MONTGOMERY, ALABAMA 36130-0900

TEL: 334-242-3184
FAX: 334-240-3477

LEE H. WARNER
EXECUTIVE DIRECTOR

November 22, 2002

Barbara M. Burns
Barge, Wagoner, Sumner and Cannon
P.O. Box 279
Dothan, Alabama 36302

Re:    AHC 2003-0123
       EA for the Proposed Development at the Troy Municipal Airport
       Pike County

Dear Ms. Burns:

Our files indicate that the specific location has never been surveyed for cultural resources and it is unknown if sites potentially eligible for the National Register of Historic Places exist here. Although there are no known cultural resources located within the above referenced project there are cultural resources in the vicinity and your project area is similar environmentally to those areas which are known to have significant cultural resources. Therefore, it must be considered culturally sensitive.

The Alabama Historical Commission requests that the project area be surveyed by a professional archaeologist and architect historian. The cultural resource assessment should be submitted to our office for review and determination prior to any construction activities. A copy of the *Alabama Guidelines: Preparing Reports for Historic Architectural Resources Under Section 106 of the National Historic Preservation Act of 1966* is enclosed for your convenience.

Should you have any questions regarding your project please contact this office. For questions regarding archaeology, please contact Stacye Hathorn. For questions about historic structures and visual effects, please contact Lee Anne Hewett. If you have questions about the status of your project please contact Gail Jones.

Yours very truly,

Elizabeth Ann Brown
Deputy State Historic Preservation Officer

enclosure

EAB/LAH/SGH/sgh

**Keith Shippey**

| | |
|---|---|
| **From:** | Jeff_Duncan@nps.gov |
| **Sent:** | Friday, October 01, 2004 11:22 AM |
| **To:** | Keith Shippey |
| **Subject:** | Troy Airport project |

Mr Shippey--

Thank you for consulting the National Park Service regarding the proposed runway extension at Troy Municipal Airport.  I have reviewed the project plans you submitted with respect to possible impacts to the Conecuh River, a segment of which is listed on the Nationwide Rivers Inventory (NRI). The project is unlikely to have any tangible impacts to the NRI-listed segment, and the National Park Service has no comments or objections concerning the project at this time.  Please do not hesitate to contact me should you have additional comments.

Sincerely,

Jeffrey R. Duncan, Ph.D.
National Park Service--RTCA
175 Hamm Rd. Suite C, Chattanooga, TN 37405
Ph. (423) 266-1150  Fax. (423) 266-2558

1



# ADEM

## ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT
POST OFFICE BOX 301463  36130-1463 ♦ 1400 COLISEUM BLVD.  36110-2059
MONTGOMERY, ALABAMA
WWW.ADEM.STATE.AL.US
(334) 271-7700

JAMES W. WARR
DIRECTOR

DON SIEGELMAN
GOVERNOR

Facsimiles: (334)
Administration: 271-7950
General Counsel: 394-4332
Air: 279-3044
Land: 279-3050
Water: 279-3051
Groundwater: 270-5631
Field Operations: 272-8131
Laboratory: 277-5718
Mining: 394-4326
Education/Outreach: 394-4383

November 20, 2002

Ms. Barbara M. Burns
Barge, Waggoner, Sumner & Cannon, Inc.
2047 West Main Street, Suite 1
Dothan, Alabama 36301

RE:    Environmental Assessment
       Proposed Runway Extension and Related Development
       Troy Municipal Airport
       Pike County, Alabama

Dear Ms. Burns:

I am writing in response to your letter dated October 21, 2002, regarding the proposed extension of the existing runways at the Troy Municipal Airport in Troy, Alabama. In this letter, you requested information on the attainment status of Pike County, as well as any significant air quality impacts the proposed project may create for the project area.

Pike County, and therefore the entire project area, is in attainment of the National Ambient Air Quality Standards (NAAQS) for all criteria pollutants. However, EPA promulgated changes to both the particulate and ozone NAAQS in July 1997 that could affect the attainment status of various Alabama counties. The Alabama Department of Environmental Management (ADEM) will be adopting changes into its State Implementation Plan (SIP) in the future to meet these standards. ADEM does not project Pike County to be in nonattainment for either standard, but you should be aware of the possibility of the above changes. Based on the current standards and the information provided in your letter, ADEM does not anticipate this project affecting compliance with these air standards.

Any additional modifications to the airport such as the installation of fuel storage tanks, for example, may require the issuance of applicable permits. If any projects of this type are encountered, the ADEM Air Division should be contacted for further guidance.

I would also like to remind you that any applicable regulations that the ADEM Water and Land Divisions may have which pertain to this project should be addressed.

If you have any questions, please feel free to call me at (334) 271-7929.

Sincerely,

Shelby Stringfellow
Program Development Unit
Control Strategies Section
Planning Branch
Air Division

SLS/ss

Birmingham Branch
110 Vulcan Road
Birmingham, Alabama  35209-4702
(205) 942-6168
(205) 941-1603 [Fax]

Decatur Branch
2715 Sandlin Road, S.W.
Decatur, Alabama  35603-1333
(256) 353-1713
(256) 340-9359 [Fax]

Mobile Branch
2204 Perimeter Road
Mobile, Alabama  36615-1131
(251) 450-3400
(251) 479-2593 [Fax]

Mobile – Coastal
4171 Commanders Drive
Mobile, Alabama  36615-1421
(251) 432-6533
(251) 432-6598 [Fax]

Printed on Recycled Paper



STATE OF ALABAMA
## DEPARTMENT OF CONSERVATION AND NATURAL RESOURCES
64 NORTH UNION STREET
MONTGOMERY, ALABAMA 36130

DON SIEGELMAN
GOVERNOR

RILEY BOYKIN SMITH
COMMISSIONER

STATE LANDS DIVISION
JAMES H. GRIGGS, DIRECTOR

NATURAL HERITAGE SECTION
GREGORY M. LEIN, CHIEF
TELEPHONE (334) 242-3484
FAX NO. (334) 242-0999

December 11, 2002

Ms. Barbara Burns
BWSC Inc.
2047 West Main Street, Suite 1,
P.O. Box 279
Dothan, AL 36302

RE: Sensitive Species Information request
Proposed Runway Extension Troy Municipal Airport

Dear Ms. Burns:

Our office received your request on 12/2/2002 and has since developed the following information pertaining to state protected, federally listed threatened and endangered species, and species that we believe to be sensitive to environmental perturbations. I have enclosed a list of sensitive species which the Natural Heritage Section Database or the U.S. Fish and Wildlife Service have indicated occur or have occurred in Pike County. Additionally, I have listed some potentially helpful and informative web sites at the end of this letter.

The Natural Heritage Section database contains numerous records of sensitive species in Pike County. Our database indicates the area of interest has had no biological survey performed at the delineated location, by our staff or any individuals referenced in our database. Therefore we can make no accurate assessment to the past or current inhabitancy of any federal or state protected species at that location. A biological survey conducted by trained professionals is the most accurate way to ensure that no sensitive species are jeopardized by the development activities. The closest sensitive species is recorded in our database as occurring approximately 13 miles from the subject site. This State protected burrowing speciesoccurs in sandy soils and produces tunnels and mounds. Additionally, the federally protected Relict Trillium has been known to occur widely in this area if the State. Experimental population of this species have appeared to do well in areas protected from deer grasing.

I hope this information will be useful to you. The provided information is to help you in fulfilling your necessary legal obligations. The information does not suggest that protected species are not at this location. The specific location of a sensitive species is considered confidential information by a State Lands Division Regulation and can be released only to individuals who enter into a confidentiality and indemnity contract with the State Lands Division.

The Department of Conservation and Natural Resources does not discriminate on the basis of race, color, religion, age, gender, national origin, or disability in its hiring or employment practices nor in admission to, access to, or operations of its programs, services, or activities.



Ms. Barbara Burns
December 11, 2002
Page two

The Natural Heritage Section provides this information as a service to the people of Alabama. The NHS acts as a clearing house for species distribution data. We happily accept any information environmental researchers are willing to donate. Sensitive species exact locations are kept confidential. If you would be willing to donate any information to this database, we will be better able to assist all individuals interested in environmental compliance.

Sincerely,

*Jo Lewis*

Jo Lewis
Database Manager

Enclosures
Cc: Jon Hornsby

Potentially helpful web sites

Information about federally listed species
http://www.pfmt.org/wildlife/endangered/
http://www.al.nrcs.usda.gov/FOTG/alTE.html
http://ecos.fws.gov/webpage/webpage_usa_lists.html?#AL
http://southeast.fws.gov/daphne/specieslst.htm

Non-game species regulation starts on page 75
http://www.dcnr.state.al.us/agfd/2000-2001_regs.pdf

list of Alabama State Parks and links to more info
http://www.dcnr.state.al.us/parks/state_parks_index_1a.html

http://bluegoose.arw.r9.fws.gov/
http://www.fws.gov/where/regfield.html

list of Refuges in AL with additional pages of refuge details
http://refuges.southeast.fws.gov//index.html

# ALABAMA'S FEDERALLY LISTED AND STATE PROTECTED SPECIES (BY COUNTY)

This list is a combination of the June 2001 U.S.F.W. Service (Daphne field Office) federally listed species by county list and the Alabama State Lands Division's Natural Heritage Section Database of species distributions data. This list is continually being updated, and, therefore, it may be incomplete or inaccurate and is provided strictly for informational purposes. It does not constitute any form of Section 7 consultation. We recommend that the U.S.F.W. Service Field Office in Daphne be contacted for Section 7 consultations. Site specific information can be provided by the Alabama State Lands Division's Natural Heritage Section and/or the U.S.F.W. Service (Daphne field Office) prior to project activities. To be certain of occurrence, surveys should be conducted by qualified biologists to determine if a sensitive species occurs within a project area. Species not listed for a given county does not imply that they do not occur there, only that their occurrence there is as yet unrecorded by these two agencies.

Key to codes on list:

Federal E - Endangered

Federal T - Threatened

(P) - Historical Record and/ or Possible Occurrence in the County

C - Candidate Species

NEP - Nonessential Experimental Populations

## BULLOCK

| Protection Status | Common name | Scientific Name | State Regulation Applicable |
|---|---|---|---|
| Endangered | Relict Trillium | Trillium reliquum | |
| Endangered | Red-cockaded Woodpecker | Picoides borealis | 220-2-.92 (1) (d) |
| Threatened | Eastern Indigo Snake | Drymarchon corais couperi | 220-2-.92 (1) (c) |
| State Protected | Southern Sandshell | Lampsilis australis | 220-2-.98 (1) (a) |
| State Protected | Southeastern Pocket Gopher | Geomys pinetis | 220-2-.92 (1) (e) |

## CRENSHAW

| Protection Status | Common name | Scientific Name | State Regulation Applicable |
|---|---|---|---|
| Endangered | Wood Stork | Mycteria americana | 220-2-.92 (1) (d) |
| Threatened | Red Hills Salamander | Phaeognathus hubrichti | 220-2-.92 (1) (b) |
| Threatened | Eastern Indigo Snake | Drymarchon corais couperi | 220-2-.92 (1) (c) |
| State Protected | Southeastern Pocket Gopher | Geomys pinetis | 220-2-.92 (1) (e) |
| State Protected | Gopher Tortoise | Gopherus polyphemus | 220-2-.92 (1) (c) |
| State Protected | Eastern Coachwhip | Masticophis flagellum | 220-2-.92 (1) (c) |
| State Protected | Alabama Pearlshell | Margaritifera marrianae | 220-2-.98 (1) (a) |

## PIKE

| Protection Status | Common name | Scientific Name | State Regulation Applicable |
|---|---|---|---|
| Threatened | Eastern Indigo Snake | Drymarchon corais couperi | 220-2-.92 (1) (c) |
| State Protected | Southern Sandshell | Lampsilis australis | 220-2-.98 (1) (a) |

Report Date: 01/22/03

# Scotland Yard

Page: 1

## Phone Messages for Barbara Burns

| | | | |
|---|---|---|---|
| **From:** | Wayne Krebs | **Date:** | **01/22/03** |
| **Company:** | Alabama Forest Comm. | **Time:** | **08:40 AM** |
| **Phone:** | | Taken by: Betty Willette | |

| Urgent: [ ] | Returned Call: [ ] | Call Back: [ ] | Will Call Again: [ ] | Phoned: [X] | Wants to see you: [ ] |
|---|---|---|---|---|---|

**Re:** Troy AP. He found no problems with Alabama forestland of anything that is unique.





# ALABAMA
# DEPARTMENT OF TRANSPORTATION

SEVENTH DIVISION
**OFFICE OF DIVISION ENGINEER**
P.O. BOX 647
**TROY, ALABAMA 36081-0647**
Telephone: (334) 566-4830
Fax: (334) 566-8332

DON SIEGELMAN
GOVERNOR

PAUL BOWLIN
TRANSPORTATION DIRECTOR

October 30, 2002

Ms. Barbara M. Burns
Civil/Environmental Project Manager
Barge, Waggoner, Sumner & Cannon, Inc.
P. O. Box 279
Dothan, Alabama 36301

Dear Ms. Burns:

Re: Environmental Assessment
Proposed Runway Extension
Troy Municipal Airport
Pike County

I have reviewed the information you sent concerning the above-referenced project. We are in the initial stages of planning for the construction of a roadway connection to Airport Road between US-231 and the Old Montgomery Highway. This would provide direct access to the airport from US-231 rather than requiring traffic to access the airport using the Old Montgomery Highway. Based on the drawing you submitted, it appears that the 34:1 approach surface will not encroach within the area required for construction of the new connection. Please consider this during the environmental process for the airport extension project.

Let me know if additional information is required.

Sincerely,

Ronald L. Baldwin
Assistant Division Engineer
Preconstruction

/rlb
pc: Mr. J. M. Griffin
    Mr. Carroll Dunn
    File

# United States Department of the Interior



FISH AND WILDLIFE SERVICE
P. O. Drawer 1190
Daphne, Alabama 36526

IN REPLY REFER TO:

03-0137                                    November 8, 2002

Ms. Barbara M. Burns
Barge, Waggoner, Sumner & Cannon, Inc.
P.O. Box 279
Dothan, AL 36302

Dear Ms. Burns:

Thank you for your letter of October 21, 2002, requesting comments on the proposed runway
extension and related development for the Troy Municipal Airport in the City of Troy, Pike
County, Alabama. We have reviewed the information you enclosed and are providing the
following comments in accordance with the Fish and Wildlife Coordination Act (48 Stat. 401,
as amended; 16 U.S.C. et seq.) and the Endangered Species Act of 1973 (87 Stat. 884, as
amended; 16 U.S.C. 1531 et seq.).

A.    Fish and Wildlife Coordination Act

Upon review of the National Wetland Inventory (NWI) maps it appears that there are wetlands
in the project areas. We recommend the areas be evaluated by either the U.S. Army Corps of
Engineers (COE) or a COE-certified wetland delineator to verify presence/absence of wetlands
that would require a Section 404 permit. We recommend that the proposed project be
designed to avoid wetland habitats and that Best Management Practices are implemented
during operations to protect water quality from contamination in the project area. If wetland
habitats cannot be avoided, we recommend a mitigation plan be developed and incorporated
into your project plans and be implemented during construction and maintenance of the
proposed project to protect fish and wildlife.

B.    Endangered Species Act

Our records indicate that no endangered, threatened or proposed species, or their critical
habitat occurs in the project area. Therefore, no further endangered species consultation will
be required for the project unless: 1) the identified action is subsequently modified in a
manner that causes an effect on a listed species or designated Critical Habitat; 2) new
information reveals the identified action may affect federally protected species or designated
Critical Habitat in a manner or to an extent not previously considered; or 3) a new species is

listed or a Critical Habitat is designated under the Endangered Species Act that may be affected by the identified action.

If you have any questions or need additional information, please contact Mr. Scott Floyd at (251) 441-5181, ext. 40.  Please refer to the reference number located at the top of this letter.

Sincerely,

Larry E. Goldman
Field Supervisor



**DEPARTMENT OF THE ARMY**

MOBILE DISTRICT, CORPS OF ENGINEERS
P.O. BOX 2288
MOBILE, ALABAMA 36628-0001

REPLY TO
ATTENTION OF:

March 20, 2003

Regulatory Branch
Operations Division

SUBJECT:  Wetland Delineation, Troy Municipal Airport, Pike
County, Alabama - Jurisdictional Number ALJ03-00477-K


Wetland Sciences Incorporated
Attention: Mr. Craig Martin
100 West Herman Street
Pensacola, Florida  32505

Dear Mr. Martin:

     Per your request, this office completed a field
inspection on March 18, 2003, of the proposed expansion site
of the Troy Municipal Airport in Troy.  Specifically, the
property is located within Section 11, Township 10 North,
Range 20 East, Pike County, Alabama.

     The inspection disclosed that the property contains
wetlands subject to our Federal permitting authority pursuant
to Section 404 of the Clean Water Act of 1977 (33 USC 1344).
Please see enclosed, Basis for Jurisdictional Determination
form.  Section 404 prohibits filling activities in waters of
the United States, including wetlands, unless the work has
been authorized by a Department of the Army permit.
Normally, a permit to fill wetland areas for nonwater-
dependent activities under the present regulations is
difficult to obtain.

     Slab-on-grade construction, some pile-supported
structures, grading, landclearing with heavy equipment, and
construction of a built-up road are considered filling
activities and will require a permit if located in wetlands.
Activities that involve removing of vegetation above the
ground (mowing, rotary cutting, and chainsawing), where the
activity neither disturbs the root system nor involves
mechanical pushing, dragging, or other similar activities
that redeposit excavated soil material, do not require a
Section 404 permit.

     The wetland delineation conducted by your company is
correct as flagged.  The approximate boundaries are shown on
the enclosed sketch.  The exact wetland limits can only be
established by a site survey which is beyond the services
provided by our office.  When the wetlands are subsequently
surveyed for inclusion on a legal description or property

-2-

plat, please submit such a survey to this office for a review and sign-off in order to formally document this determination.

Please be advised that this jurisdictional determination reflects current policy and regulation and is based upon criteria contained in the January 1987 U.S. Army Corps of Engineers' Wetlands Delineation Manual. If after a 5-year period this jurisdictional determination has not been specifically revalidated by the U.S. Army Corps of Engineers, it shall automatically expire. Should you disagree with certain terms and/or conditions of this determination, the enclosed Notification of Applicant Options outlines the steps to take to file your objection.

This letter grants no property rights and does not obviate the necessity for you to obtain any other local, State, or Federal authorization that may be required.

Thank you for your cooperation with our permit program. If you have any questions or require further information concerning this matter, please contact Ms. Cindy J. House-Pearson of the Enforcement Section at (251) 690-3188.

Sincerely,

Ronald A. Krizman
Chief, Regulatory Branch
Operations Division

Enclosure

## NOTIFICATION OF ADMINISTRATIVE APPEAL OPTIONS AND PROCESS AND REQUEST FOR APPEAL

Applicant: *Wetland Sciences* | File Number: *ALJ03-00477-K* | Date: *03/20/03*

| | | See Section below |
|---|---|---|
| | INITIAL PROFFERED PERMIT (Standard Permit or Letter of permission) | A |
| | PROFFERED PERMIT (Standard Permit or Letter of permission) | B |
| | PERMIT DENIAL | C |
| X | APPROVED JURISDICTIONAL DETERMINATION | D |
| | PRELIMINARY JURISDICTIONAL DETERMINATION | E |

SECTION I: The following identifies your rights and options regarding an administrative appeal of the above decision. Additional information may be found at http://usace.army.mil/inet/functions/cw/cecwo/reg or Corps regulations at 33 CFR Part 331.

**A: INITIAL PROFFERED PERMIT:** You may accept or object to the permit.

- **ACCEPT:** If you received a Standard Permit, you may sign the permit document and return it to the district engineer for final authorization. If you received a Letter of Permission (LOP), you may accept the LOP and your work is authorized. Your signature on the Standard Permit or acceptance of the LOP means that you accept the permit in its entirety, and waive all rights to appeal the permit, including its terms and conditions, and approved jurisdictional determinations associated with the permit.

- **OBJECT:** If you object to the permit (Standard or LOP) because of certain terms and conditions therein, you may request that the permit be modified accordingly. You must complete Section II of this form and return the form to the district engineer. Your objections must be received by the district engineer within 60 days of the date of this notice, or you will forfeit your right to appeal the permit in the future. Upon receipt of your letter, the district engineer will evaluate your objections and may: (a) modify the permit to address all of your concerns, (b) modify the permit to address some of your objections, or (c) not modify the permit having determined that the permit should be issued as previously written. After evaluating your objections, the district engineer will send you a proffered permit for your reconsideration, as indicated in Section B below.

**B: PROFFERED PERMIT:** You may accept or appeal the permit

- **ACCEPT:** If you received a Standard Permit, you may sign the permit document and return it to the district engineer for final authorization. If you received a Letter of Permission (LOP), you may accept the LOP and your work is authorized. Your signature on the Standard Permit or acceptance of the LOP means that you accept the permit in its entirety, and waive all rights to appeal the permit, including its terms and conditions, and approved jurisdictional determinations associated with the permit.

- **APPEAL:** If you choose to decline the proffered permit (Standard or LOP) because of certain terms and conditions therein, you may appeal the declined permit under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer. This form must be received by the division engineer within 60 days of the date of this notice.

**C: PERMIT DENIAL:** You may appeal the denial of a permit under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer. This form must be received by the division engineer within 60 days of the date of this notice.

**D: APPROVED JURISDICTIONAL DETERMINATION:** You may accept or appeal the approved JD or provide new information.

- **ACCEPT:** You do not need to notify the Corps to accept an approved JD. Failure to notify the Corps within 60 days of the date of this notice, means that you accept the approved JD in its entirety, and waive all rights to appeal the approved JD.

- **APPEAL:** If you disagree with the approved JD, you may appeal the approved JD under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer. This form must be received by the division engineer within 60 days of the date of this notice.

**E: PRELIMINARY JURISDICTIONAL DETERMINATION:** You do not need to respond to the Corps regarding the preliminary JD. The Preliminary JD is not appealable. If you wish, you may request an approved JD (which may be appealed), by contacting the Corps district for further instruction. Also you may provide new information for further consideration by the Corps to reevaluate the JD.

## BASIS FOR JURISDICTIONAL DETERMINATION
U.S. Army Corps of Engineers, _Mobile_ District

APPLICANT: _Wetland Sciences_

PROJECT LOCATION/WATERWAY: _Troy Municipal Airport, Beeman Creek_

FILE NUMBER: _ALJ03-00477-K_

PROJECT REVIEW COMPLETED:  ☒ Office          ☐ Field

Type of Waters of the United States Present on the project site:

☐ Waters which are currently used, or were used in the past, or may be susceptible for use to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide.

☐ Interstate waters including interstate wetlands.

☒ Other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:
(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes: or
(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or
(iii) Which are used or could be used for industrial purpose by industries in interstate commerce.

☒ Impoundments of waters otherwise defined as waters of the United States under the definition.

☐ Tributaries of waters defined in the four items above.

☐ The territorial seas.

☒ Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in the six items above.

Summary of Indicators supporting the Corps Jurisdiction determination:

☒ Wetland (Corps Wetland Delineation Manual (87 Manual)):
  ☒ Hydrology _Present_
  ☒ Hydric soils _"_
  ☒ Hydrophytic Vegetation _"_

☒ Adjacency _Wetlands adjacent to trib of Beeman Creek_

☒ Tributary connection _Drains to Conecuh River_

☐ Interstate or Foreign Commerce

☐ Navigation

Lateral Extent of Jurisdiction (33 CFR 328 and 329):
☐ Ordinary High Water Mark indicated by:
  ☐ clear, natural line impressed on the bank
  ☐ the presence of litter and debris
  ☐ changes in the character of soil
  ☐ destruction of terrestrial vegetation
  ☐ shelving
  ☐ other: _____

☐ High Tide Line indicated by:
  ☐ oil or scum line along shore objects
  ☐ fine shell or debris deposits (foreshore)
  ☐ physical markings/characteristics
  ☐ tidal gages
  ☐ other: _____

☐ Mean High Water Mark indicated by:
  ☐ survey to available datum;  ☐ physical markings;  ☐ vegetation lines/changes in vegetation types
  ☐ other: _____

☐ Within territorial sea _____
☐ Other indicators _____

Preparer: _A J House-Pearson_  Date: _03/18/03_          (Revised Jan 2002)

17

Form AD-1006

# FARMLAND CONVERSION IMPACT RATING

| PART 1 *(To be completed by Federal Agency)* | 1. Date of Land Evaluation Request  01/14/03 | 2. Sheet ____ of ____ |
|---|---|---|

| Name of Project  Troy Municipal Airport | 4. Federal Agency Involved  FAA | |
|---|---|---|

| 5. Proposed Land Use  Airport | 6. County and State  Pike, Alabama | 7. Type of Project:  Corridor ☐    Other X |
|---|---|---|

| PART II *(To be completed by NRCS)* | 1. Date Request Received by NRCS  ＊ note | 2. Person Completing the NRCS parts of this form. |
|---|---|---|
| 3. Does the site or corridor contain prime, unique, statewide or local important farmland?  Yes ☒  No ☐  *(If no, the FPPA does not apply - Do not complete additional parts of this form)* | 4. Acres Irrigated | 5. Average Farm Size |
| 6. Major Crop(s) | 7. Farmable Land in Government Jurisdiction  Acres          % | 8. Amount of Farmland As Defined in FPPA  Acres          % |
| 9. Name of Land Evaluation System Used | 10. Name of Local Site Assessment System | 11. Date Land Evaluation Returned by NRCS  2/26/03 |

| PART III *(To be completed by Federal Agency)* | Site A | Alternative Site Rating  Site B | Site C | Site D |
|---|---|---|---|---|
| A. Total Acres To Be Converted Directly | 25.0 | | | |
| B. Total Acres To Be Converted Indirectly, Or To Receive Services | 0.0 | | | |
| C. Total Acres in Site | 25.0 | | | |

| PART IV *(To be completed by NRCS) Land Evaluation Information* | | | | |
|---|---|---|---|---|
| A. Total Acres Prime and Unique Farmland | | | | |
| B. Total Acres Statewide and Local Important Farmland | | | | |
| C. Percentage of Farmland in County or Local Govt. Unit to be Converted | | | | |
| D. Percentage of Farmland in Govt. Jurisdiction with Same or Higher Relative Value | | | | |

| PART V *(To be completed by NRCS) Land Evaluation Criterion*  Relative Value of Farmland to be Serviced or Converted (Scale of 0 - 100 Points) | | | | |
|---|---|---|---|---|

| PART VI *(To be completed by Federal Agency) Corridor or Site Assessment Criteria (These criteria are explained in 7 CFR 658.5(b & c))* | Max. Points  Corridor   Other | | Site A | | | |
|---|---|---|---|---|---|---|
| 1. Area in Nonurban Use | 15 | 15 | 11 | | | |
| 2. Perimeter in Nonurban Use | 10 | 10 | 6 | | | |
| 3. Percent of Site Being Farmed | 20 | 20 | 7 | | | |
| 4. Protection Provided by State and Local Government | 20 | 20 | 0 | | | |
| 5. Distance from Urban Built-up area | 0 | 15 | 1 | | | |
| 6. Distance to Urban Support Services | 0 | 15 | 0 | | | |
| 7. Size of Present Farm Unit Compared to Average | 10 | 10 | 0 | | | |
| 8. Creation of Non-Farmable Farmland | 25 | 10 | 0 | | | |
| 9. Availability of Farm Support Services | 5 | 5 | 5 | | | |
| 10. On-Farm Investments | 20 | 20 | 3 | | | |
| 11. Effects of Conversion on Farm Support Services | 25 | 10 | 0 | | | |
| 12. Compatibility with Existing Agricultural Use | 10 | 10 | 3 | | | |
| TOTAL CORRIDOR OR SITE ASSESSMENT POINTS | 160 | | 36 | | | |

| PART VII *(To be completed by Federal Agency)* | | | | |
|---|---|---|---|---|
| Relative Value of Farmland (from Part V above) | 100 | | | |
| Total Corridor or Site Assessment (From Part VI above or a local site assessment) | 160 | | | |
| TOTAL POINTS *(Total of above 2 lines)* | 260 | | | |

| PART VIII *(To be completed by Federal Agency after final alternative is chosen)* | | | |
|---|---|---|---|
| 1. Corridor or Site Selected: | 2. Date of Selection: | 3. Was A Local Site Assessment Used?  Yes ☐    No ☐ |

4. Reason For Selection:

＊ PRIME FARM LAND WILL NOT BE DIRECTLY CONVERTED (WILL BE USED AS CLEAR ZONE
FOR EXTENTION.  M.T.

The completion of this report as directed by Farmland Policy Protection Act
Guidelines also meets requirements directed by Departmental Regulation 9500-
Land Use Policy Guidelines.    Melton Tek 2/26/03

USDA – NRCS
TALLAPOOSA COUNTY SOIL SURVEY OFFICE
1995 Cherokee Road
Alexander City, AL 35010


Rural Economic and    *TROY MUNICIPAL AIRPORT, PIKE Co. ALABAMA*
Community Development
*FEDERAL AVIATION ADMINISTRATION*

RE: Identification of Important Farmland and Delineation of Executive Order Wetlands:

☐ Project Lines — *14B ACRES TOTAL*

▨ Prime Farmland - *25 ACRES TOTAL*

▨ Wetland — *23 ACRES TOTAL*

▨ Other Farmland of Local Importance — *100 ACRES TOTAL*


The Prime Farmland has been identified along the project area in the color of **Green**

The Wetland has been identified along the project area in the color of **Blue**

Other Farmland of Local Importance has been identified in the color of **Red**


The completion of this report as directed by Farmland Policy Protection Act Guidelines also meets requirements directed by Departmental Regulation 9500-3 Land Use Policy Guidelines.

Milton Tuck
Resource Soil Scientist
*12/11/02*





# GEOLOGICAL SURVEY OF ALABAMA



DONALD F. OLTZ
State Geologist

420 Hackberry Lane
P.O. Box 869999
Tuscaloosa, Alabama 35486-6999
Phone (205) 349-2852
Fax (205) 349-2861
www.gsa.state.al.us

October 31, 2002

Ms. Barbara M. Burns
Barge Waggoner Sumner & Cannon, Inc.
P. O. Box 279
Dothan, AL 36302

Dear Ms. Burns:

I am replying to your letter of October 21st, 2002, to Dr. Donald Oltz, regarding mineral resources in the area of the proposed extension of the Troy Municipal Airport located in Pike County, Alabama. The geology of this site is mapped on the "Geologic Map of Alabama" (1988) as Pleistocene age high terrace deposits consisting of pale-yellowish-orange to moderate-reddish-brown lenticular beds of poorly sorted sand, ferruginous sand, silt, clay, and gravel. There are no identified surface mineral resources in the study area that would be impacted by the proposed expansion.

If you desire additional information, please feel free to contact us.

Sincerely,

ECONOMIC GEOLOGY DIVISION

Lewis S. Dean
Geologist

*Science and Service for the People of Alabama*



# ADEM

## ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT

POST OFFICE BOX 301463  36130-1463  ♦  1400 COLISEUM BLVD.  36110-2059
MONTGOMERY, ALABAMA
WWW.ADEM.STATE.AL.US
(334) 271-7700

**JAMES W. WARR**
DIRECTOR

**DON SIEGELMAN**
GOVERNOR

Facsimiles: (334)
Administration: 271-7950
General Counsel: 394-4332
Air: 279-3044
Land: 279-3050
Water: 279-3051
Groundwater: 270-5631
Field Operations: 272-8131
Laboratory: 277-6718
Mining: 394-4326
Education/Outreach: 394-4383

November 21, 2002

**CERTIFIED MAIL # 7099 3220 0002 9941 5772**
**RETURN RECEIPT REQUESTED**

Barbara M. Burns
Barge Waggoner Sumner & Cannon, Inc.
2047 West Main Street, Suite 1
Dothan, Alabama 36301

Re:    **Environmental Assessment**
       **Proposed Runway Extension and Related Development**
       **Troy Municipal Airport**
       **Pike County, Alabama**

Dear Ms. Burns:

Your submittal dated October 21, 2002 regarding the above referenced project has been reviewed by the Assessment Section staff.  After a comprehensive file review and database search to identify any previous hazardous waste or Superfund activity in the immediate area, no information was discovered that would preclude the extension of the runway and development of the area in the scope of work..

If you have any further questions you may contact Pamela Wilson at (334) 271-7987 or you can reach me at (334) 271-7968.

Sincerely,

Dave Davis, Chief
Environmental Assessment Section
Land Division

Cc:    Russell Kelley, Chief
       Permits and Services Division

DD/PRW/lj

Birmingham Branch
110 Vulcan Road
Birmingham, Alabama 35209-4702
(205) 942-6168
(205) 941-1603 [Fax]

Decatur Branch
2715 Sandlin Road, S.W.
Decatur, Alabama  35603-1333
(256) 353-1713
(256) 340-9359 [Fax]

Mobile Branch
2204 Perimeter Road
Mobile, Alabama  36615-1131
(251) 450-3400
(251) 479-2593 [Fax]

Mobile – Coastal
4171 Commanders Drive
Mobile, Alabama  36615-1421
(251) 432-6533
(251) 432-6598 [Fax]

Printed on Recycled Paper



**Alabama Cemetery Preservation Alliance**
**P.O. Box 3932**
**Montgomery, Alabama 36109-0932**

10 July 2004

Lorena Joyce. Nicoll
*Founding President*
Ted Urquhart
President

Tel: 334-272-0481
Email: alabama79@att.net
Tel: 850 –243-7010
Email: ted.urquhart@cox.net

Federal Aviation Administration

To Whom It May Concern,

The Alabama Cemetery Preservation Alliance (ACPA) is organized as a *nonprofit* cemetery advocacy group to preserve Alabama's rich cemetery heritage. Our goals are ambitious and far-reaching as we pursue preserving and honoring the burial places of our ancestors. We are in partnership with the Alabama Historical Commission, many historical organizations, churches and cemeteries throughout Alabama. Our precious historical heritage is being lost daily and overtime man's irresponsible actions are slowly transforming our land into a polluted and hostile home. The impact on expansion of the Troy Airport will undoubtedly destroy some of the essential environment of the area that will be lost forever.

The expansion of the Troy Airport is of grave concern to us. The Oak Grove United Methodist Church, which has been fully active since 1892, is now threatened by the impact of a runway that could well be the demise of this sacred and holy ground. This is a community of faith dedicated to honoring the resting place of their ancestors and should not be disturbed. This is a community of faith that attends church and Sunday school. This is a community of faith that should be saved for generations to come.

Please explore some constructive alternatives and help us safeguard this church and cemetery.

Sincerely yours,

*Lorena J. Nicoll*

Lorena Joyce Nicoll
Founding President
ACPA Treasurer

cc: 1. Oak Hill United Methodist Church
    2. City of Troy
    3. BWSC, Inc.
    4. Allbrittons,Clifton, Alverson, Moody, & Bowden, PC

Appendix C

PHASE 1 - CRA



**Phase I Cultural Resource Assessment
Proposed Runway Extension
Troy Municipal Airport
Pike County, Alabama**

**April 8, 2003**



**P. E. LaMOREAUX & ASSOCIATES, INC.**
Hydrologists, Geologists, Environmental
Scientists, & Engineers

PELA

# Phase I Cultural Resource Assessment
# Proposed Runway Extension
# Troy Municipal Airport
# Pike County, Alabama

## Prepared For:

Barge, Waggoner, Sumner, & Cannon
2047 West Main Street, Suite 1
Dothan, Alabama 36302

## Prepared By:

P.E. LaMoreaux & Associates, Inc.
P.O. Box 2310
Tuscaloosa, Alabama 35403

April 8, 2003

Terry L. Lolley, M.A., R.P.A.
Archaeologist

© 2003, P.E. LaMoreaux & Associates, Inc.

PELA

# CONTENTS

Page

INTRODUCTION ........................................................................................ 1
LITERATURE AND DOCUMENT SEARCH ............................................ 1
LABORATORY METHODS AND COLLECTION CURATION ................... 1
ENVIRONMENTAL SETTING ................................................................. 1
FIELD METHODS.................................................................................... 2
SURVEY RESULTS ................................................................................ 2
SURVEY INTERPRETATION, EVALUATION, AND RECOMMENDATIONS .......... 3
REFERENCES ........................................................................................ 4

## FIGURES

Figure 1.    Project Area Showing Survey Coverage (Youngblood 1981 USGS 7.5' Quadrangle).
Figure 2.    View of a Low-Lying Area Near the Lake Facing Southwest.
Figure 3.    View of Dense Vegetation Facing West.
Figure 4.    View of a Wooded Portion of the Eastern Project Area Facing West.
Figure 5.    View of Standing Water in a Grassy Area Facing West.
Figure 6.    View of the Eastern Project Area Along the Dirt Road Facing Northwest.
Figure 7.    View of Standing Water Near the Lake Facing South.
Figure 8.    General View of the Sloped Area North of the Lake Facing West.
Figure 9.    Barn Located North of the Project Area Facing East.

P.E. LaMoreaux & Associates

## INTRODUCTION

In April 2003, an archaeological team from P.E. LaMoreaux & Associates, Inc. (PELA) conducted a cultural resource assessment for the proposed runway extension at the Troy Municipal Airport in Pike County, Alabama.  The purpose of this investigation was to locate and document any prehistoric and historic cultural resources that may be present, and to obtain sufficient data about those resources to allow PELA to make any recommendations for avoidance or mitigation of adverse impacts to any sites from the proposed activities. Mr. Terry Lolley served as Principal Investigator for this project.

The project area (Figure 1) is comprised of approximately 26 acres, with 5 acres of the project area consisting of a lake.  The project area is located in Section 11 of Township 10 North, Range 20 East on the Youngblood (USGS 1981) topographic quadrangle. Graphics documenting the present state of the area with regard to terrain, general flora, and previous land-use are provided within this report (Figures 2 through 9).

## LITERATURE AND DOCUMENT SEARCH

Prior to the fieldwork, a background literature review was performed.  Neither the National Register of Historic Places (NRHP) nor the Alabama Tapestry lists any historic properties within the project area. The Pike County Soil Survey Map (USDA 1910) does not show any historic structures within the project area. The primary source of information for the research was the Alabama State Archaeological Site Files (ASASF), maintained at the University of Alabama's Office of Archaeological Services at the Moundville Archaeological Park, Moundville, Alabama. An examination of the site file maps and site forms indicated no previously recorded sites within the project area.  The nearest recorded sites are approximately two miles to the east. Site 1PK22 was recorded as an unknown aboriginal and 19th century historic surface scatter in a cultivated field. The material recovery included prehistoric ceramics and lithics and historic ceramics. Site 1PK22 was not recommended as eligible for the NRHP. Site 1PK33 consisted of a surface scatter of prehistoric ceramics and lithics in a cultivated field (Earnest 1995). In addition, Walnut Creek complicated stamped sherds were also recovered. Site 1PK33 was recommended as potentially eligible for the NRHP.

## LABORATORY METHODS AND COLLECTION CURATION

All project records generated by the survey will be curated at the Office of Archaeological Services, University of Alabama Museums, Moundville.

## ENVIRONMENTAL SETTING

The project area lies within the Chunnenuggee physiographic district.  Elevation for the project area ranges from 300 to 360 feet above mean sea level.  The project area consists primarily of a wet, low-lying area surrounding a lake (Figure 2).  Moderate slopes are present to the north and west. Vegetation within the low-lying areas consisted of thick vines, small hardwoods, and grasses (Figures 3 through 5).  Dirt roads were present within the eastern portion of the project area (Figure 6).  A portion of the eastern project area consisted of sparse grass (Figure 6) and offered good ground surface visibility.

2

The most recent Pike County Soil Survey indicated two soil complexes within the project area (Neal 1997). A brief description of each complex is presented below.

**Cowarts-Troup complex, 8 to 20 percent slope.** These are deep, well-drained soils on side slopes and narrow ridges. The surface layer is generally dark grayish-brown loamy sand approximately 15 centimeters thick. The subsoil is yellowish-brown sandy clay loam. The complex is not suited for cultivation and is primarily woodland. There is a high frequency of flooding in areas that contain this soil complex. The soil was observed within the project area on the slopes around the lake.

**Mantachie, Kinston, Iuka complex, 0 to 1 percent slope, frequently flooded.** This complex consists of deep, poorly drained soils within floodplains. The surface layer is generally brown loam approximately 10 centimeters thick. The subsoil is mottled light gray, brownish-yellow, and yellowish-brown loam. The complex is poorly suited for cultivation and is primarily woodland. Frequent flooding and wetness are characteristic of the complex. Soils of this complex occur within the project area in the level, low-lying areas around the lake.

## FIELD METHODS

The survey was conducted in accordance with procedural standards set by the Alabama Historical Commission. A pedestrian walkover was performed as the primary method of survey for areas with low site probability as dictated either by previous survey experience in this region, or by the present condition of the land under investigation. These areas include slopes, drainages, roadcuts and associated pushpiles, and areas where erosion has exposed the subsoil. A standard 30 meter (m) interval transect pattern was employed over areas considered to have a higher site probability (Figure 1). Shovel tests were excavated at 30 m intervals along transects where subsoil or disturbances did not preclude excavation. The tests consisted of standard 30-centimeter (cm) diameter cylindrical holes excavated to the top of the underlying subsoil. Shovel test soils were passed through a 1/4" wire mesh screen to recover any cultural materials, which may have been present. Shovel test locations labeled as "no test performed" were situated along a transect where ground surface conditions, such as standing water, erosion, slope, or ground visibility, precluded the need for shovel testing.

The use of a handheld GPS and digital topographic map provided navigational assistance in transect placement. The GPS unit has a stated accuracy between 5.0-6.0 meters.

## SURVEY RESULTS

A two-person archaeological team from PELA conducted the survey on April 2 and April 3, 2003. The survey was initiated in the eastern portion of the project area with transects oriented east to west (Figure 1). The terrain gradually sloped to the west from a dirt road, and then became level as one proceeded westward. The ground surface near the dirt road (Figure 6) consisted of sparse grass and offered good surface visibility. A silt fence was located on the edge of the road. The vegetation within the eastern portion of the project area ranged from dense vines and bushes to sparse hardwoods and open spaces (Figures

3

3 through 5). Many locations of standing water were encountered, particularly closer to the lake and drainage (Figure 7). Several wild hogs were encountered in this portion of the project area. The portion of the project area north of the lake was moderately sloped and less wet. The vegetation consisted primarily of small hardwoods, pines, and thick understory (Figure 8). A levee was located on the western edge of the lake.

A representative soil profile from the low-lying area consisted of 0-10 centimeters of brown (10YR4/3) loam, overlying 10-20 centimeters of dark brown (10YR3/3) sandy loam. The subsoil consisted of light gray (10YR7/1) clay loam. A representative soil profile from the sloped area north of the lake consisted of 0-13 centimeters of dark brown (10YR3/3) sandy loam, overlying 13-30+ centimeters of yellowish-brown (10YR5/4) sandy clay subsoil.

No prehistoric or historic sites were located within the project area. A vehicular survey within a one-mile diameter around the project area did not locate any historic standing structures. The structures (Figure 9) situated outside the project area consisted of several mobile homes, new homes, and dilapidated barns. No structures were observed along the approach to the proposed runway extension. Oak Grove Cemetery is located south of the project area (Figure 1). The earliest interment at the cemetery was in 1877, and the cemetery is still in use today.

## SURVEY INTERPRETATION, EVALUATION, AND RECOMMENDATIONS

P.E. LaMoreaux & Associates, Inc. (PELA) conducted this survey for the Troy Municipal Airport through Barge, Waggoner, Sumner, and Cannon, Inc. in compliance with Federal and State regulations. The project area consists primarily of low-lying wet areas. No prehistoric or historic sites were recorded within the project area. It is PELA's opinion that the current project area for the proposed runway extension will not impact any known cultural resources that are eligible or potentially eligible for the NRHP.

P.E. LaMoreaux & Associates

PELA

4

# REFERENCES

Earnest, Tray G.
1995    *A Cultural Resource Reconnaissance of Selected Portions of the Conecuh, Pea, and Choctawhatchee Rivers in Southeast Alabama.*    Troy State University, Archaeological Research Center.  Troy, Alabama.

Neal, Harold B.
1997    *Soil Survey of Pike County.* United States Department of Agriculture, Washington.

United States Department of Agriculture
1910    Soil Survey Map of Pike County, Alabama.

United States Geological Survey
1981    Youngblood 7.5 Minute Topographic Quadrangle.

PELA

**FIGURES**

Figure 1.    Project Area Showing Survey Coverage (Youngblood 1981 USGS 7.5' Quadrangle).
Figure 2.    View of a Low-Lying Area Near the Lake Facing Southwest.
Figure 3.    View of Dense Vegetation Facing West.
Figure 4.    View of a Wooded Portion of the Eastern Project Area Facing West.
Figure 5.    View of Standing Water in a Grassy Area Facing West.
Figure 6.    View of the Eastern Project Area Along the Dirt Road Facing Northwest.
Figure 7.    View of Standing Water Near the Lake Facing South.
Figure 8.    General View of the Sloped Area North of the Lake Facing West.
Figure 9.    Barn Located North of the Project Area Facing East.

P.E. LaMoreaux & Associates

Figure 1.  Project Area Showing Survey Coverage (Youngblood 1981 USGS Quadrangle).

○ Negative Shovel Test
● No Test Performed
□ Project Area
- - Dirt Road

PELA



Figure 2.  View of a Low-Lying Area Near the Lake Facing Southwest.



Figure 3.  View of Dense Vegetation Facing West.



Figure 4.  View of a Wooded Portion of the Eastern Project Area Facing West.



Figure 5.  View of Standing Water in a Grassy Area Facing West.

PELA



Figure 6.  View of the Eastern Project Area Along the Dirt Road Facing Northwest.



Figure 7.  View of Standing Water Near the Lake Facing South.



Figure 8.  General View of the Sloped Area North of the Lake  Facing West.



Figure 9.  Barn Located North of the Project Area Facing East.

Appendix D
Wetland Delin. Report



February 25, 2003

Ms Barbara Burns P.E.
Barge, Waggoner, Sumner & Cannon Inc.
2047 West Main St, Suite 1
Dothan, Alabama 36301

Re: Non-binding wetland jurisdictional determination associated with the Troy Airport.


Dear Ms. Burns,


Wetland Sciences Incorporated (WSI) has completed the field assessment of properties associated with the proposed Troy Municipal Airport expansion within Section 11, Township 10N, Range 20 Pike County , Alabama (Figure 1).   The area investigated maintained a large jurisdictional complex associated with an unnamed tributary of Beeman Creek.

Field jurisdictional efforts were concentrated on areas as outlined within project documents provided.  Following is a report detailing the non-binding wetland jurisdictional determination on the above-cited project.


Wetlands were identified according to methods outlined in the US Army Corps of Engineer's 1987 *"Corps of Engineers Wetland Delineation Manual"* (Waterways Experiment Station Technical Report Y-87-1, January, 1987).  This method of wetland identification is the method most commonly used by wetland regulatory officials.
This assessment included an analysis of plant communities, soils, and indirect hydrologic indicators.  During this determination, Wetland Sciences, Inc. identified a wetland complex within the subject parcel.  The upland/wetland boundary was flagged with pink surveyors tape and labeled alphanumerically to aide regulatory review during subsequent field efforts.

The wetland complex located on the eastern side of the project exist as riparian wetlands which enter into Beeman Creek a tributary to the Conecuh River.  These swamp forest wetlands maintain vegetation consisting of slash pine (Pinus elliottii), water oak (Quercus nigra), red maple (Acer rubrum), Bay magnolia (Magnolia virginiana), red bay (Persea palustuis) and sweet gum (Liquidambar stryciflua).  The groundcover existing within this habitat was largely dominated by various species of ferns (Woodwardia spp.).


Soils within the wetland are classified as Mixed alluvial.  High water table, frequent flooding, and poor permeability characterize this soil type.  These soils as examined with this specific wetland typology displayed many of the hydric soil characteristics including soil color, mineral organic coating, redoximorphic features, and saturation criterion. This soil typology is listed within the National Hydric soil list.



Soil Plate 15 taken from the USDA NRCS Soil Survey Pike County, Alabama

Alterations to the wetlands hydrology are present in the form of a man made impoundment which has effectively inundated formerly dry lands.

I have submitted the required information for a site review to the Mobile District. This formal review will finalize the regulatory jurisdictional issues associated with the above described project. I will confirm the date and time of this scheduled review for your convenience.

If any questions arise, please feel free to contact me at either the below-listed letterhead address or by telephone at (850) 433-1499.

Sincerely,
WETLAND SCIENCES, INC.

Craig D. Martin
Sr. Scientist

Cc: Cindy House- Pearson, USACOE



February 25, 2003

Cindy House-Pearson
United States Army Corps of Engineers
Mobile District Regulatory Branch
109 St. Joseph Street.
7th Floor, Room 7012
Mobile, Alabama  36628

*Re: Troy Airport binding jurisdictional request.*

Dear Cindy,

During February 2003, Wetland Sciences conducted non-binding jurisdictional determinations on the parcel of land located in association with the Troy Municipal Airport

This effort was accomplished by the staff of WSI on February 20, 2003 and did reveal the presence of wetlands within the subject area.  The findings of the jurisdictional examination are detailed within the enclosed report.

Please review the enclosed aerial, data sheets and associated topo quad and schedule the review at your earliest convenience.

Representatives of WSI, would like to accompany you during the investigation, so please call in advance to schedule a time and date.  If any questions arise, please feel free to contact me at either the below-listed letterhead address or by telephone at (850) 433-1499.

Sincerely,

Craig D. Martin
Sr. Scientist
Wetland Sciences, Inc.


Cc: Ms Barbara Burns P.E., BWSC



SUBJECT PARCEL

Scale 1 : 162,500
1" = 2.56 mi

© 2002 DeLorme. XMap® 3.5. Data copyright of content owner.
Zoom Level: 10-3  Datum: NAD27

DATA FORM
ROUTINE WETLAND DETERMINATION
(1987 COE Wetlands Delineation Manual)

| | | |
|---|---|---|
| Project/Site: __Troy Airfield__ | | Date:3/3/2003 |
| Applicant/Owner: Wetland Sciences, Inc. | | County: Pike |
| Investigator: CDM | | State: Alabama |

| | | | |
|---|---|---|---|
| Do Normal Circumstances exist on the site? | (Yes) | No | Community ID: FwSwamp |
| Is the site significantly disturbed (Atypical Situation)? | Yes | (No) | Transect ID: X |
| Is the area a potential Problem Area? | Yes | (No) | Plot ID: 1 |

## VEGETATION

| Dominant Plant Species | Stratum | Indicator | Dominant Plant Species | Stratum | Indicator |
|---|---|---|---|---|---|
| 1. *Pinus elliottii* | Canopy | FACW | 9. | | |
| 2. *Cyrilla racimaflora* | Canopy | FACW | 10. | | |
| 3. *Nyssa bi-flora* | Canopy | Obl | 11. | | |
| 4. *Magnolia virginiana* | Canopy | FACW | 12. | | |
| 5. Ilex myrtifolia | Shrub | FACW | 13. | | |
| 6. Ilex coriacea | Shrub | FACW | 14. | | |
| 7. *Woodwardia aereolata* | Herb | FACW | 15. | | |
| 8. | | | 16. | | |

Percent of Dominant Species that are OBL, FACW or FAC
(excluding FAC-)                                100%

Remarks:

## HYDROLOGY

| Recorded Data (Describe in Remarks): | Wetland Hydrology Indicators: |
|---|---|
| ☐ Stream, Lake, or Tide Gauge | Primary Indicators: |
| ☐ Aerial Photographs | ☐ Inundated |
| ☐ Other | ☒ Saturated in Upper 12 Inches |
| ☒ No Recorded Data Available | ☐ Water Marks |
| | ☐ Drift Lines |
| | ☐ Sediment Deposits |
| | ☐ Drainage Patterns in Wetlands |
| Field Observations: | Secondary Indicators (2 or more requires) |
| | ☒ Oxidized Root Channels in Upper 12 Inches |
| Depth of Surface Water: N/A(in.) | ☐ Water-Stained Leaves |
| | ☒ Local Soil Survey Data |
| Depth to Free Water in Pit: 8(in.) | ☒ FAC-Neutral Test |
| | ☐ Other (Explain in Remarks) |
| Depth to Saturated Soil: 4(in.) | |

Remarks:  Hydrologic indicators become more prevalent within the site as one proceeds south and eastward

## SOILS

Map Unit Name
(Series and Phase): ___KINSTON___

Taxonomy (Subgroup): Typic fluvaquent

Drainage Class: ___PD___
Field Observations
Confirm Map Type  Yes  (No)

Profile Description:

| Depth (Inches) | Horizon | Matrix Color (Munsell Moist) | Mottle Colors (Munsell Moist) | Mottle Abundance/Contrast | Texture, Concretions, Structure, etc. |
|---|---|---|---|---|---|
| 0-2 | O2 | | | | Unrecog Organic Horizon |
| 2.5-8.5 | A1 | 10YR 2/1 | | | Loose single grain |
| 8.5-18 | A2 | 10YR 3/1 | | | Fine sand, fine granular |
| | | | | | |
| | | | | | |
| | | | | | |

Hydric Soil Indicators:  Redoximorphic features fairly distinctive

- [ ] Histosol
- [ ] Histic Epipedon
- [ ] Sulfidic Odor
- [ ] Aquic Moisture Regime
- [ ] Reducing Conditions
- [x] Gleyed or Low-Chromo Colors

- [ ] Concretions
- [x] High Org Content in Surface Layer in Sandy Soils
- [ ] Organic Streaking in Sandy Soils
- [x] Listed on Local Hydric Soil List
- [ ] Listed on National Hydric List
- [ ] Other (Explain in Remarks)

Remarks: Single grain mineral many coated – organic bodies present- distinct redoxomorphic features

## WETLAND VEGETATION

Hydrophytic Vegetation Present?  (Yes)  No (Circle)
Wetland Hydrology Present?  (Yes)  No
Hydric Soils Present?  (Yes)  No

Is this sampling point within a wetland? (Yes) No  (Circle)

Remarks:  The acreage under consideration exists within a fairly natural condition.  Upland/wetland boundary exists as a fairly distinctive vegetative transition. A few man made lakes exist within the project boundary that were created within wetlands and thus are included within the jurisdictional assessment.

DATA FORM
ROUTINE WETLAND DETERMINATION
(1987 COE Wetlands Delineation Manual)

| | |
|---|---|
| Project/Site:     Troy Airport<br>Applicant/Owner: Wetland Sciences, Inc.<br>Investigator: CDM | Date:2/26/03<br>County: Pike<br>State: Alabama |

| | | | |
|---|---|---|---|
| Do Normal Circumstances exist on the site? | (Yes) | No | Community ID: |
| the site significantly disturbed (Atypical Situation)? | Yes | (No) | Transect ID: U |
| Is the area a potential Problem Area? | Yes | (No) | Plot ID:  1 |

## VEGETATION

| Dominant Plant Species | Stratum | Indicator | Dominant Plant Species | Stratum | Indicator |
|---|---|---|---|---|---|
| 1. *Pinus palustuis* | Canopy | FACU | 9. *Cornus florida* | Canopy | FACU |
| 2. Pinus elliottii | Canopy | FACW | 10. *Quercus nigra* | Canopy | FAC |
| 3. Quercus virginiana | Canopy | FACU | 11.*Liquidambar strycifiua* | Canopy | FAC |
| 4. *Magnolia grandiflora* | Canopy | FAC+ | 12. | | |
| 5. *Aristida stricta* | Herb | FAC | 13. | | |
| 6. *Ilex vomitoria* | Shrub | FAC | 14. | | |
| 7. *Serenoa repens* | shrub | FACU | 15. | | |
| 8.  *Ilex opaca* | Shrub | FAC- | 16. | | |

Percent of Dominant Species that are OBL, FACW or FAC
(excluding FAC-)          22%

Remarks: Ridge top community

## HYDROLOGY

| | |
|---|---|
| ☐ Recorded Data (Describe in Remarks):<br>    ☐ Stream, Lake, or Tide Gauge<br>    ☐ Aerial Photographs<br>    ☐ Other<br>☒ No Recorded Data Available | Wetland Hydrology Indicators:<br>Primary Indicators:<br>    ☐ Inundated<br>    ☐ Saturated in Upper 12 Inches<br>    ☐ Water Marks<br>    ☐ Drift Lines<br>    ☐ Sediment Deposits<br>    ☐ Drainage Patterns in Wetlands<br>Secondary Indicators (2 or more requires)<br>    ☐ Oxidized Root Channels in Upper 12 Inches<br>    ☐ Water-Stained Leaves<br>    ☐ Local Soil Survey Data<br>    ☐ FAC-Neutral Test<br>    ☐ Other (Explain in Remarks) |

Field Observations:

Depth of Surface Water:          >18" (in.)

Depth to Free Water in Pit:          N/A (in.)

Depth to Saturated Soil:          >18" (in.)

Remarks:

## SOILS

Map Unit Name
(Series and Phase): _____ Cowarts/Troup Complex _____     Drainage Class: __WD__

Field Observations

Taxonomy (Subgroup): _____     Confirm Map Type   Yes   No

Profile Description:

| Depth | Horizon | Matrix Color | Mottle Colors | Mottle | Texture, Concretions, |
|---|---|---|---|---|---|
| (Inches) | Horizon | (Munsell Moist) | (Munsell Moist) | Abundance/Contrast | Structure, etc. |
| 0- 6. | A1 | 10YR 5/4 | | | Sandy loam/ Weak crumbly |
| 6- 16 | A2 | 10YR 5/8 | | | Sandy Clayey loam, fine grain |
| | | | | | |
| | | | | | |
| | | | | | |

Hydric Soil Indicators:

- ☐ Histosol
- ☐ Histic Epipedon
- ☐ Sulfidic Odor
- ☐ Aquic Moisture Regime
- ☐ Reducing Conditions
- ☐ Gleyed or Low-Chromo Colors

- ☐ Concretions
- ☐ High Org Content in Surface Layer in Sandy Soils
- ☐ Organic Streaking in Sandy Soils
- ☐ Listed on Local Hydric Soil List
- ☐ Listed on National Hydric List
- ☐ Other (Explain in Remarks)

Remarks: No hydric soil indicators present within the areas distinguished as uplands

## WETLAND VEGETATION

| | | |
|---|---|---|
| Hydrophytic Vegetation Present?   Yes   (No) (Circle) | | (Circle) |
| Wetland Hydrology Present?   Yes   (No) | Is this sampling point within a wetland?   Yes  (No) |
| Hydric Soils Present?   Yes   (No) | |

Remarks:  Uplands distinguished by Ilex opaca , ilex vomitoria typically define the boundary.

Appendix E - Prelim.

Wetland Mit. Plan

# APPENDIX E

## Preliminary Wetland Mitigation Plan



# PRELIMINARY MITIGATION PLAN

## USACOE #ALJ03-00477-K

### Troy Municipal Airport
### Pike County, Alabama

**Barge Waggoner Sumner and Cannon, Inc.**
**2047 West Main Street, Suite 1**
**Dothan, Alabama 36301**



**Wetland Sciences, Inc.**
**100 W. Herman St.**
**Pensacola, Fl 32505**

**April 30, 2004**

## Foreword

A dredge-and-fill permit is being sought to allow for the expansion of the existing runway and installation of a taxiway in association with the existing Troy Municipal Airport facility in an effort to comply with Federal Aviation Administration (FAA) design standards. The mitigation narrative is being provided here to provide information associated with project justification and discuss details associated with the proposed compensatory mitigation

## Project Description

In an attempt to provide a comprehensive wetland impact analysis Barge Waggoner Sumner & Cannon (BWSC) evaluated long term (10yrs) projected design requirements of the project in relation to consistency with FAA airport design guidelines. The need for the extension of the runway was documented in a Runway Extension Justification Study prepared in 2003. The Runway Extension Justification Study demonstrated an existing and additional aviation demand that exceeds the FAA criteria for extending a runway at the airport from its existing length of approximately 5,000 feet to 6,500 feet. The performance characteristics of the turbojet aircraft expected to utilize the airport necessitates the additional runway length for enhanced safety and operational safety.

Based on these design projections the Troy Municipal Airport expansion project will require 2.0 acres of short term modifications to wetlands associated with runway expansion and the establishment of obstruction free areas (OFA). Long term permanent impacts totaling 18 acres associated with the runway expansion and installation of a taxiway as designed within the plans and projected for construction on the western side of the existing runway.

## Existing Land uses

Property located within the vicinity of the proposed project consist primarily of rural residential with minor sections of land devoted to agricultural and hunting leases

## Wetland Delineation

Staff associated with Wetland Sciences performed a non-binding wetland delineation during **November 2002** and this effort was subsequently reviewed by United States Army Corps of Engineers personnel during March of 2003. The wetland jurisdictional line was verified and designated a formal approved jurisdictional file # **ALJ03-00477-K**.

**Ecological Assessment of Impact site**

Generally the wetlands proposed for impact would be considered to fall into two distinct classifications. The primary wetland habitats proposed for fill associated with runway and taxiway expansion are characterized as hydrologically altered medium quality riparian systems. Impacts to this wetland typology total 13 acres.

Very few mature canopy trees remain within either of the areas proposed for fill. The few remaining mature canopy specimens include the sweetbay (*Magnolia virginiana*), sweetgum (*Liquidambar strraciflua*), Tulip poplar (*Liriodendron tulipifera*), and sycamore (*Platanus occidentalis*).

The second distinct wetland typology included within the proposed impact is associated with an open water system created by the emplacement of an earthen dam essentially impounding a former forested wetland. Total acreage associated with this proposed impact is 5 acres.

**Mitigation Goals, Objectives, and Performance Standards**

During site plan development alternatives for accomplishing the airport facilities expansion were examined. The physical, environmental, and aeronautical constraints and advantages for extending each of the two existing runways, Runway 07/25, and Runway 14/32 were analyzed. Runway development alternatives examined included extending Runway 14/32, extending Runway 07 and extending Runway 25. However, the extension of the Runway 25 end was eliminated from review as a practicable alternative due to the significant physical, environmental, and social constraints. This alternative would generate significant environmental impacts due to the extension of the runway and relocation of the Sikorsky Support Services access road through a large forested wetland associated with an unnamed tributary of Conecuh Creek. In addition, this alternative would require the relocation of County Road 105 and U.S. Highway 231. Finally, this alternative would cause the displacement of residences and businesses that are located on County Road 105 and U.S. Highway 231.

With regard to extending Runway 14/32, development cost and airspace considerations were the primary constraints. The removal of a hill on the approach to Runway 14 generates the largest cost among the alternatives considered. Cuts exceeding 35 feet in depth and the need to remove terrain to accommodate a precision or non-precision approach increase the cost for this alternative. Another significant cost item is the relocation of the Instrument Landing System and radar equipment.

In addition to the development cost associated with extending Runway 14/32, airspace considerations were also critical. The overflight of the urbanized areas of the city present a significant concern in regards to this alternative. The introduction of flights and aircraft noise over sensitive areas has the potential to generate opposition and controversy among the citizens of the city. As such, the development of Runway 14/32 presents more airspace and flight impacts than the extension of Runway 07.

Based on the information gathered for the different alternatives, it was recommended that the extending Runway 07 be adopted for the long-range plan development for providing a 6,500 foot, precision instrument runway at the airport. Major factors supporting this recommendation include airspace issues related to establishing an Instrument Landing System on Runway 14/32; the significantly higher development costs associated with extending Runway 14/32; and the cost of relocating the Instrument Landing System and radar equipment to Runway 14/32.

Avoidance of wetland impacts could not be accomplished due to the extensive wetland complex located in close approximation to the existing runway. Minimization of impacts to existing wetland resources was accomplished by the provision of temporary impact to wetlands which exist within the Object Free Area. The remaining wetland impacts are associated with the installation of the runway expansion area and runway safety area whose design is consistent to strict Federal Aviation Administration guidelines. All wetland impacts proposed have been deemed un-avoidable.

## Wetland fill

Within this Plan the applicant proposes comprehensive impacts in an effort to provide a complete and through evaluation of the project in an effort to seek regulatory approval one time verses a partial submittal requiring regulatory approval numerous times for many aspects of the project over a long time frame. Therefore, it was decided to evaluate the project in a comprehensive manner. The runway expansion, taxiway, and runway safety area necessitate wetland filling totaling **18.00 acres**. These areas can not be avoided due to the orientation of the existing runway, and strict adherence to design specifications. Impacts are associated with a narrow band of riparian forested wetlands which run perpendicular to the existing runway orientation. Of the 18.00 acres proposed for fill, 5 acres are associated with open water as the result of an impoundment.

## Wetland Clearing

An obstruction free area is required around the periphery of the runway for safety purposes. Obstruction free areas located within wetlands total 2.0 acres and the design proposes to remove all timber and stumps, re-grade to pre-timber conditions and replant with facultative wetland grasses and ferns.

## Wetland Impact Summary

## Fill

In total the applicant proposes the filling of 18.00 acres to complete the proposed airport expansion project. Of the eighteen acres, thirteen acres are composed of previously timbered, hydrologically altered forested wetlands, the remaining five acres of impact is associated with an open water area associated with a privately maintained earthen dam.

**Clearing/debris removal**

OFA comprise 2.0 acres of wetlands where impact will be temporary in nature due to the potential to restore grade and replant with low stature aquatic vegetation. Alteration within the OFA's is associated with clearing and stump removal for the purpose of developing the facilities peripheral areas to be in compliance with Federal Aviation Administration standards.

The site development and construction project is part of a major economic development effort that will bring many needed jobs to Pike County. Rationales for the proposed mitigation plan, as well as the plan itself, are presented within this mitigation proposal.

**Background of Rationale for Mitigation**

Project owners and their representatives including their consultants have discussed design, engineering and environmental specifics with regulatory agency representatives and the information generated from such discussions have be incorporated in the design as provided with the overall mitigation plan. A detailed site assessment of the wetlands proposed for impact as well as the surrounding habitats was performed by representatives of Barge Waggoner Sumner & Cannon Inc and staff associated with Wetland Sciences to examine the ecological status of the site and devise mitigation alternatives.

WSI herein proposes the following mitigation plan for the expansion efforts associated with the Troy Municipal Airport to compensate for the filling of approximately **18.00 acres** and temporary impact to **2.0 acres** of Federally regulated jurisdictional wetlands.

**A) Mitigation Concept :   Creation  &  Preservation**

This proposed mitigation plan has been designed to offset the wetland impacts as follows:

1. The re-grading and re-vegetation of 2.0 acres of  temporary impact associated with the provision of Obstruction Free Areas
2. The creation of 24 acres of a mosaic herbaceous marsh/swamp forest contiguous wetland habitat.
3. The preservation of existing, and created wetlands via a conservation easement.
4. The establishment of fixed point photographic and vegetative monitoring transects throughout representative areas within the mitigation parcel in order to develop a monitoring protocol consistent with Federal specifications.

Additionally, the re-vegetated herbaceous and on-site forested creation areas will increase the diversity of existing wetland types over those now in existence. Finally, the addition of the fringing enhanced hardwood community will provide functions greater than the existing open water wetlands proposed for impact.

**General Information about the Mitigation Sites.**

A current aerial photograph (1999) is provided which depicts the approximate proposed impact areas and mitigation features (Figure 1).

**Description of the Proposed Mitigation Site(s).**

1. Project Design: A copy of the Airport Layout Drawing (ALD) exhibits the proposed improvements consistent with Federal Aviation Administration (FAA) design criteria is provided as Attachment 1.

2. Mitigation: A detailed site plan depicting impact and associated mitigation features is provided Attachment 2

3. Jurisdictional Determination: A jurisdictional review of the site was accomplished by staff of Wetland Sciences and verified by Ms. Cindy House-Pearson during March 2003. A formal survey of the approved jurisdictional boundary accomplished by representatives of BWSC is the basis for the resulting impact analysis and development of the mitigation plan.

## Mitigation Specifications

1. **Creation:** The applicant proposes the creation of 24 acres of contiguous herbaceous scrub/shrub wetland mosaic. These created habitats will be designed to mimic high quality herbaceous/low shrub wetlands. It is WSI's intention to excavate these created systems 18' to 24" below existing wetland grade. This protocol should provide a more hydric habitat during the late summer and early fall months and thus potentially attract and support a variety of wildlife including waterfowl, wading birds, as well as indigenous reptiles and amphibians. The proposed created wetland mitigation sites are collectively classified as upland mixed forests consisting of soils that are moderately well drained to somewhat poorly-drained, located on low positions within uplands. Typically, the surface layer is very dark gray loamy sand about 5 inches thick. The subsurface layer is dark grayish brown loamy sand about 3 inches thick with very dark gray streaks along root channels. The underlying material is sand to a depth of more than 80 inches. The wetland creation component will occur concomitantly with wetland impacts.

2. **Hydrology:** The hydrologic regimen within the proposed mitigation area will be primarily dictated by groundwater influences and base flow augmented to some extent by flows originating from the two hillside seeps located to the north and east of the creation sites. The created wetlands will be designed and excavated to sufficient depths that would support inundated and saturated conditions throughout the year.

3. **Vegetation and Planting:** The mitigation wetlands vegetation establishment efforts will occur concomitantly with all fill placement. The vegetation to be installed within the created wetland communities will be dictated primarily by hydrologic indicators located at each site location. The areas that maintain adequate hydrology will be vegetated with obligate wetland species such as wild rice (*Zizania aquatica*), softstem bulrush (*Scirpus validus*) and pickerelweed (*Pontederia cordata*), whereas the less hydric sites will have wool grass (*Scirpus cyperinus*), soft rush (*Juncus effusus*) and buttonbush (*Cephalanthus occidentalis*) installed. These species are all found within the natural contiguous wetland areas in and around the project proximity.

The woody specimens will be planted on 15-foot centers representing a tree density of 300 trees per acre. The herbaceous vegetation will be planted on two foot centers. The diverse planting assemblage will provide immediate wetlands habitat attributes, and the installation of both woody and herbaceous vegetation will respond with   Plant material will be obtained from suppliers within the same USDA hardiness sub-zone as the mitigation sites.

a.  Tree species to be planted within the wetland mitigation sites will be 3- gallon containerized stock ranging in heights between 2.5ft. and 4ft.  Herbaceous plant material will be provided as bare root stock in viable condition.

b.  Available hydrology via sub-surface and precipitation is expected to be adequate for plant establishment.

c.  Tree and marshland species that are to be planted within the wetland mitigation sites will be staggered to result in a more natural spatial distribution and to avoid establishing straight rows of trees.   Obligate herbaceous species such as the bulrush (*S. validus*), wild rice (*Z. aquatica*), and the pickerelweed (*Pontederia cordata*) will be planted in the lower elevation areas in an attempt to establish a marsh/low woody mosaic wetland community.   These species also provide important habitat, foraging and food sources for wetland dependant species.

d.  Plant material survivorship will be guaranteed to exceed 85%

e.  Monitoring efforts to examine the functional attributes associated with the mitigation wetlands will be accomplished via methodology consistent with any special conditions associated with the USACE permit.

f.  Alabama Department of Environmental Management (ADEM) Water Quality Certification will be obtained within the same time frame as the Federal Section 404 permitting process.

**Conclusions**

In summary, the applicant proposes a combination of creation techniques to offset the proposed impacts to medium and low quality, previously altered wetland resources associated with the runway expansion. The methodologies described are fairly basic in their application and the desired results are expected to occur in a fairly rapid fashion. The completion of the proposed created mosaic wetland habitat / community will produce a stable marsh/buttowood community within eight to ten months of planting. Beneficial wetland functions expected to be provided by the proposed mitigation activities described within this report will be similar to those functions provided by a natural wetland system. These include but are not limited to, habitats for wildlife, recharge of groundwater, water quality improvement, and flood control. The proposed mitigation plan compensates for the impacts associated with the proposed wetland impacts.

# ATTACHMENT A

## Airport Layout Drawing





## DECLARED DISTANCES

| RUNWAY NUMBER | LANDING DISTANCE AVAILABLE | | ACCELERATE-STOP DISTANCE AVAILABLE | | TAKEOFF DISTANCE AVAILABLE | | TAKEOFF RUN AVAILABLE | |
|---|---|---|---|---|---|---|---|---|
| | EXISTING | PROPOSED | EXISTING | PROPOSED | EXISTING | PROPOSED | EXISTING | PROPOSED |
| 7 | N/A | 5,764' | N/A | 5,764' | N/A | 6,509' | N/A | 6,509' |
| 25 | N/A | 5,764' | N/A | 6,509' | N/A | 6,509' | N/A | 6,509' |
| 14 | 4,922' | N/A | 4,922' | N/A | 5,022' | N/A | 5,022' | N/A |
| 32 | 4,922' | N/A | 5,022' | N/A | 5,022' | N/A | 5,022' | N/A |

## EXISTING

| NO. | STRUCTURE |
|---|---|
| E-1 | LOCALIZER ANTENNAE |
| E-2 | GLIDE SLOPE ANTENNAE |
| E-3 | LOCALIZER EQUIPMENT SHELTER |
| E-4 | VOR |
| E-5 | AIRPORT REFERENCE POINT |
| E-6 | LIGHTED WIND INDICATOR |
| E-7 | RADAR DOME |
| E-8 | ROTATING BEACON |
| E-9 | VASI |

AIRPORT LAYOUT DRAWING

TROY MUNICIPAL AIRPORT
TROY, ALABAMA

ALP APPROVAL BLOCK

JIMMY C. LUNSFORD
MAYOR
CITY OF TROY

DATE

CONSTRUCTION NOTICE REQUIREMENT
TO PROTECT OPERATIONAL SAFETY AND FUTURE
DEVELOPMENT, ALL PROPOSED CONSTRUCTION
ON THE AIRPORT MUST BE COORDINATED BY THE
AIRPORT OWNER WITH THE FAA AIRPORTS DISTRICT
OFFICE PRIOR TO CONSTRUCTION. FAA REVIEW
TAKES APPROXIMATELY 60 DAYS.

BWSC

BARGE
WAGGONER
SUMNER &
CANNON, INC.

Engineers, Planners and Surveyors

| DR. | TAH | DATE | DESCRIPTION |
|---|---|---|---|
| CHK. | JMT | 8-2-02 | ORIGINAL ISSUE |
| | TAH | 8-13-02 | FINAL ISSUE |
| | TAH | JMT | RUNWAY EXTENSION |

FIGURE 2

MAGNETIC DECLINATION
2.24°W - 2002. ANNUAL
RATE OF CHANGE 7.32'W

400'    0    400'    800'

1"=400'

# ATTACHMENT B

## Proposed Mitigation Plan View



FORESTED WETLANDS TO BE FILLED (13.0 Ac.)

OPEN WATER TO BE FILLED (5.0 Ac.)

OBJECT FREE AREA. ALL TREES AND STUMPS TO BE REMOVED (2.0 Ac.)

EXISTING WETLANDS (TO REMAIN) (17.7 Ac.)

CREATION (24.1' Ac.)

IMPACTED WETLANDS
TROY MUNICIPAL AIRPORT
TROY, ALABAMA

BWSC
BARGE
WAGGONER
SUMNER &
CANNON, Inc.
Engineers, Planners, and Surveyors

FIGURE
10

1"=300'

Appendix F

Ecological Assess.

# APPENDIX F

# Ecological Assessment

# Ecological Assessment Endangered Species Review: Troy Airfield Expansion

## Prepared For:

### Barge Waggoner Summer & Canon Inc



WETLAND SCIENCES INCORPORATED










# ECOLOGICAL ASSESSMENT
## Endangered Species Review



# In association with the proposed Troy Airfield Runway Expansion

## Pike County, Alabama

Prepared for:

BWSC
2047 West Main Street,
Suite 3
Dothan, Alabama 36301-3001

By:



Report and associated field investigation completed

By:



100 West Herman Street, Pensacola, Florida 32505
850-433-1499, www.wetlandsciences.com

**Keith D. Johnson**
Environmental Scientist

**Craig D. Martin**
Senior Biologist

# TABLE OF CONTENTS

PAGE

................................................................................................1

SUMMARY ................................................................................2

INTRODUCTION .......................................................................2

PROJECT GEOGRAPHIC LOCATION......................................2
    Ecological Characterization...............................................2

JURISDICTIONAL WETLAND DETERMINATION....................2

................................................................................................3

ENDANGERED & THREATENED SPECIES ...........................4
    Classification System ..................................................4
    Methodology ...............................................................5
        *Herpetofauna(Reptiles)* ........................................5
        *Avian (Birds)*......................................................5
        *Flora(Plants)*......................................................6

Results and Summary ..........................................................7

References.............................................................................

LIST OF APPENDICIES

    A – SITE VICINITY MAP
    B – ADCNR & USFWS CORRESPONDENCE
    C – REPRESENTATIVE SITE PHOTOGRAPHS

# SUMMARY

The firm Wetland Sciences Incorporated (WSI) performed an ecological assessment associated with the proposed Troy airport expansion project located within Section 11, Township 10 North, Range 20 East, Pike County Alabama. Prior to the initiation of the ecological assessment representatives of Barge Waggoner Sumner and Cannon, Incorporated (BWSC) received a correspondence from the Alabama Department of Conservation and Natural Resources stating that the Relict trillium (*Trillium reliquum*) may be present within the proposed project vicinity. This species of Trillium hasn't been documented in Pike County but due to the species scattered range and occurrence within adjacent Bullock County it was determined that a survey for this federally listed plant be undertaken. This species of *Trillium* is federally listed as endangered and is a tuberous rhizomatous perennial. The leaves of the plant only appear for a short period of time in early spring, causing the efforts associated with location and identification of the species to be very seasonally dependant. Wetland Sciences personnel evaluated potential locations from March 13- April 4, during which time staff environmental scientists and botanists performed pedestrian surveys within and immediately adjacent to the proposed airport expansion project. The botanical surveys time frame coincided with the time in which the species emerges and can be identified fairly easily. Prior to the site investigation, investigators became familiar with the discerning characteristics distinguishing the federally listed *Trilium reliquum* from other such similar species such as *Trillium decumbans* and *T. decipiens*. The botanical field survey found no specimens of the federally listed Trillium.

# INTRODUCTION

Wetland Sciences, Inc. was contracted to examine the habitat and evaluate the potential environmental impacts associated with a proposed airport expansion in the vicinity of Troy, Alabama. All aspects of the airfield expansion project were assessed relative to the potential environmental impact to endangered species, and wetlands. Field efforts were undertaken by staff of Wetland Sciences Incorporated (WSI) during March 19- April 4, 2003.

In total the proposed project area basically encompasses nearly 100 acres located Northwest of the City of Troy which is in the north-central portion of Pike County, Alabama (Appendix A).

# PROJECT GEOGRAPHIC LOCATION

Pike County lies within the East Gulf Coastal Plain section of the Coastal Plain Physiographic Province. Hydrologic influences within the general project area are fairly well defined with large rivers and creeks such as the Conecuh River and Beeman Creek located on either side of the project

# JURISDICTIONAL WETLAND DETERMINATION

As a component of the overall project a jurisdictional wetland determination was completed by Wetland Sciences within February 2003 and confirmed by representatives of the United States Army Corps of Engineers, Mobile District on March 20, 2003. The jurisdictional designation for the project is ALJ03-00477-K.

# ECOLOGICAL CHARACTERIZATION

Four distinctive habitats were encountered within the project vicinity during the investigation:

1. Riparian
2. Impoundment
3. Mature Hardwood
4. Cleared Uplands

# ENDANGERED &THREATENED SPECIES REVIEW

This portion of the document details and summarizes the results of a survey that was conducted to determine the status of threatened and endangered flora associated with a proposed airfield expansion (Appendix B-ADCNR Letter). This report also discusses methodologies and findings associated with the survey.

## Classification System

This section defines the classification systems, reviews the federal, state, and local regulations established for the protection and preservation of threatened and endangered species, discusses the potential presence of any such species, and finally lists other species encountered during the field surveys.

Certain federal regulatory departments have the authority to protect rare, threatened and endangered flora and fauna that occur in Florida. The United States Fish and Wildlife Service (USFWS) maintains a list as authorized by the Endangered Species Act of 1973 (16 USC 1531), and which enumerates the endangered and threatened wildlife and plants, 50 CFR 17.11-12 (Appendix B). The current list was provided by the United States Fish and Wildlife Service Threatened and Endangered Species System (TESS) as of March 15, 2001. The Daphe field office maintains a County specific list in which Pike County no records for the occurrence of Federally protected organisms. Adjacent counties (Barbour, Bullock, Coffee, Montgomery) maintained specific species occurrences, therefore, it was deemed the

survey should consider the possible occurrence of the Wood Stork (Endangered), Eastern Indigo (Threatened), and the Relict trillium (Endangered).

Listed species are either classified as endangered (E), threatened (T), of special concern (SSC), or considered (C) for such listing. Endangered species include those threatened with extinction if deleterious factors continue to impact their populations. These include species whose numbers have already declined to a critically low number or whose habitats have been so critically reduced or degraded that some assistance is necessary to ensure their survival.

Threatened species populations, although not as critically stressed as endangered species, are also jeopardized. Species of special concern are those that warrant special attention due to similarity in appearance to other species, commercial exploitation, environmental changes, and/or trends that indicate long-term population declines. Species listed within this category may also have potential impact on endangered or threatened populations of other species.

## Methodology

The current study was initiated with reviews of federal and state laws. Results of these reviews were then used to develop a comprehensive list of threatened and endangered species, or species of special concern, that may occur within the project site.

Through evaluation of the classified land uses and vegetation types, as well as those citing habitat preferences for rare, threatened and species of special concern, specific areas of the project site were identified that could possibly support listed species.

On-site field verification of land use, associated vegetation types and the comprehensive terrestrial and aquatic evaluation was conducted over the period extending from March 19- April 8, 2003. This evaluation focused on habitats that could potentially support state or federally listed species or species of special concern. The survey was performed within both aquatic and upland habitats in which the proposed project is expected to occur. The survey efforts had the sole aim of determining habitat status for the wood stork, indigo snake and relict trillium. Surveys were based on visual detection methodologies. The time frame for the evaluation focused on the life history of the Relict trillium. Due to this plants ephemeral occurrence, our ecological evaluation targeted time

4

frames expected for spring leaf out and flowering when the species was most apt to be visible and speciated.

### Reptiles

The eastern indigo snake (*Drymarchon corais couperi*) is the only Federally listed reptile proposed for listing and potentially occurring within the project site. Although not specifically listed within Pike County, adjacent Coffee County maintains this species. No eastern indigos were observed during the site reconnaissance. The indigo is difficult to census due to their cryptic nature and seasonal activity patterns. This reptile typically resides within armadillo or gopher tortoise burrows association and the proposed work is located primarily within the open water sections of the project, and thus will not pose any threat to the saltmarsh snake or to any of the listed species.

### Avian

The listed avian fauna which may reside or forage within, or proximal to, the site open water/tidal flats/wetlands are:

- Wood stork

The open water and swamp forest portions of the project were visually examined using the same conditions and techniques as described above. No Wood stork were encountered nor would the proposed project disrupt foraging or shelter requirements of this species.

### Flora

The relict trillium (*Trillium reliquum*) has not been documented in Pike County but has been found within neighboring Bullock County, and therefore this species could potentially be found within Pike County. A review for this particular species was initiated during the period of April 8- March 15. As stated previously within the document this species only appears for a short time in early spring. During this spring leaf out and flowering period it is necessary to examine the leaf and flower morphology which distinguish *T. reliquum* from it's close relatives *T. decipiens* and *T. decumbans*.

5

Relict trillium was not found during the field reviews and not expected to occur within the project location.

## RESULTS

Over six days of field survey were expended during site reconnaissance and examination activities within the proposed project area. A similar survey was undertaken concomitant to this in Henry County during the same time frames as the Pike County efforts. The Henry County botanical review located numerous individuals of *Trillium spp.*, therefore, biologists which performed the review in Pike County are certain the time frames for Trillium occurrence were correctly assessed as well as the techniques for location and identification. No relict trillium or any other Federally listed plant or animal species were found nor expected to be found within the proposed project boundaries.

6

# REFERENCES

Allen, M. 1988. Wildlife Survey Methodology Guidelines - for Section 18.D of the Application for Development Approval. FG&FWFC, Tallahassee, FL.

7

**Appendix A
Site Vicinity Map**



# APPENDIX B

# ADCNR CORRESPONDENCE
## USFWS ALABAMA COUNTY LIST



STATE OF ALABAMA
DEPARTMENT OF CONSERVATION AND NATURAL RESOURCES
64 NORTH UNION STREET
MONTGOMERY, ALABAMA 36130

DON SIEGELMAN
GOVERNOR

RILEY BOYKIN SMITH
COMMISSIONER

December 11, 2002

STATE LANDS DIVISION
JAMES H. GRIGGS, DIRECTOR

NATURAL HERITAGE SECTION
GREGORY M. LEIN, CHIEF
TELEPHONE (334) 242-8484
FAX NO. (334) 242-0999

Ms. Barbara Burns
BWSC Inc.
2047 West Main Street, Suite 1,
P.O. Box 279
Dothan, AL 36302

RE: Sensitive Species Information request
Proposed Runway Extension Troy Municipal Airport

Dear Ms. Burns:

Our office received your request on 12/2/2002 and has since developed the following Information pertaining to state protected, federally listed threatened and endangered species, and species that we believe to be sensitive to environmental perturbations. I have enclosed a list of sensitive species which the Natural Heritage Section Database or the U.S. Fish and Wildlife Service have indicated occur or have occurred in Pike County. Additionally, I have listed some potentially helpful and informative web sites at the end of this letter.

The Natural Heritage Section database contains numerous records of sensitive species in Pike County. Our database indicates the area of interest has had no biological survey performed at the delineated location, by our staff or any individuals referenced in our database. Therefore we can make no accurate assessment to the past or current inhabitancy of any federal or state protected species at that location. A biological survey conducted by trained professionals is the most accurate way to ensure that no sensitive species are jeopardized by the development activities. The closest sensitive species is recorded in our database as occurring approximately 13 miles from the subject site. This State protected burrowing speciesoccurs in sandy soils and produces tunnels and mounds. Additionally, the federally protected Relict Trillium has been known to occur widely in this area if the State. Experimental population of this species have appeared to do well in areas protected from deer grasing.

I hope this information will be useful to you. The provided information is to help you in fulfilling your necessary legal obligations. The information does not suggest that protected species are not at this location. The specific location of a sensitive species is considered confidential information by a State Lands Division Regulation and can be released only to individuals who enter into a confidentiality and indemnity contract with the State Lands Division.

The Department of Conservation and Natural Resources does not discriminate on the basis of race, color, religion, age, gender, national origin, or disability in its hiring or employment practices nor in admission to, access to, or operations of its programs, services, or activities.

Ms. Barbara Burns
December 11, 2002
Page two

The Natural Heritage Section provides this information as a service to the people of Alabama. The NHS acts as a clearing house for species distribution data. We happily accept any information environmental researchers are willing to donate. Sensitive species exact locations are kept confidential. If you would be willing to donate any information to this database, we will be better able to assist all individuals interested in environmental compliance.

Sincerely,

Jo Lewis
Database Manager

Enclosures
Cc: Jon Hornsby

Potentially helpful web sites

Information about federally listed species
http://www.pfmt.org/wildlife/endangered/
http://www.al.nrcs.usda.gov/FOTG/alTE.html
http://ecos.fws.gov/webpage/webpage_usa_lists.html?#AL
http://southeast.fws.gov/daphne/specieslst.htm

Non-game species regulation starts on page 75
http://www.dcnr.state.al.us/agfd/2000-2001_regs.pdf

list of Alabama State Parks and links to more info
http://www.dcnr.state.al.us/parks/state_parks_index_1a.html

http://bluegoose.arw.r9.fws.gov/
http://www.fws.gov/where/regfield.html

list of Refuges in AL with additional pages of refuge details
http://refuges.southeast.fws.gov//index.html

**U.S. Fish & Wildlife Service**

hreatened and Endangered Species System (TESS)

Listings by State and Territory, as of 4/8/2003

*Notes:*
- *Displays one record per species or population.*
- *Includes experimental populations and similarity of appearance listings.*
- *The range of a listed population does not extend beyond the states in which that population is defined.*
- *Includes non-nesting sea turtles and whales in State/Territory coastal waters.*
- *Includes species or populations under the sole jurisdiction of the National Marine Fisheries Service.*

Go to the Threatened and Endangered Wildlife and Plants Page
Go to the TESS Home Page
Back to Table of Contents

- *Click on the highlighted scientific names below to view a Species Profile for each listing.*

---

### Alabama — 115 listings

**Animals — 97**

| *Status* | Listing |
|---|---|
| E | Acornshell, southern (*Epioblasma othcaloogensis*) |
| T (S/A) | Alligator, American (*Alligator mississippiensis*) |
| E | Bat, gray (*Myotis grisescens*) |
| E | Bat, Indiana (*Myotis sodalis*) |
| XN | Bean, Cumberland (pearlymussel) AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (*Villosa trabalis*) |
| XN | Blossom, tubercled (pearlymussel) AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (*Epioblasma torulosa torulosa*) |
| E | Blossom, turgid (pearlymussel) Entire Range; Except where listed as Experimental Populations (*Epioblasma turgidula*) |
| XN | Blossom, turgid (pearlymussel) AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (*Epioblasma turgidula*) |
| E | Blossom, yellow (pearlymussel) Entire Range; Except where listed as Experimental Populations (*Epioblasma florentina florentina*) |
| XN | Blossom, yellow (pearlymussel) AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (*Epioblasma florentina florentina*) |
| E | Campeloma, slender (*Campeloma decampi*) |
| E | Catspaw (=purple cat's paw pearlymussel) Entire Range; Except where listed as Experimental Populations (*Epioblasma obliquata obliquata*) |
| XN | Catspaw (=purple cat's paw pearlymussel) AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (*Epioblasma obliquata obliquata*) |
| E | Cavefish, Alabama (*Speoplatyrhinus poulsoni*) |
| T | Chub, spotfin Entire (*Cyprinella monacha*) |
| XN | Clubshell AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (*Pleurobema clava*) |
| E | Clubshell, ovate (*Pleurobema perovatum*) |

E    Clubshell, southern (*Pleurobema decisum*)

E    Combshell, Cumberlandian Entire Range; Except where listed as Experimental Populations (*Epioblasma brevidens*)

XN    Combshell, Cumberlandian AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (*Epioblasma brevidens*)

E    Combshell, southern (*Epioblasma penita*)

E    Combshell, upland (*Epioblasma metastriata*)

E    Darter, boulder (*Etheostoma wapiti*)

T    Darter, goldline (*Percina aurolineata*)

T    Darter, slackwater (*Etheostoma boschungi*)

T    Darter, snail (*Percina tanasi*)

E    Darter, vermilion (*Etheostoma chermocki*)

E    Darter, watercress (*Etheostoma nuchale*)

T    Eagle, bald (lower 48 States) (*Haliaeetus leucocephalus*)

T    Elimia, lacy (snail) (*Elimia crenatella*)

E    Fanshell (*Cyprogenia stegaria*)

T    Heelsplitter, Alabama (=inflated) (*Potamilus inflatus*)

E    Kidneyshell, triangular (*Ptychobranchus greeni*)

E    Lampmussel, Alabama Entire Range; Except where listed as Experimental Populations (*Lampsilis virescens*)

XN    Lampmussel, Alabama AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (*Lampsilis virescens*)

E    Lilliput, pale (pearlymussel) (*Toxolasma cylindrellus*)

E    Lioplax, cylindrical (snail) (*Lioplax cyclostomaformis*)

XN    Mapleleaf, winged (mussel) AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (*Quadrula fragosa*)

T    Moccasinshell, Alabama (*Medionidus acutissimus*)

E    Monkeyface, Cumberland (pearlymussel) Entire Range; Except where listed as Experimental Populations (*Quadrula intermedia*)

XN    Monkeyface, Cumberland (pearlymussel) AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (*Quadrula intermedia*)

E    Mouse, Alabama beach (*Peromyscus polionotus ammobates*)

E    Mouse, Perdido Key beach (*Peromyscus polionotus trissyllepsis*)

T    Mucket, orangenacre (*Lampsilis perovalis*)

E    Mucket, pink (pearlymussel) (*Lampsilis abrupta*)

E    Mussel, oyster Entire Range; Except where listed as Experimental Populations (*Epioblasma capsaeformis*)

XN    Mussel, oyster AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (*Epioblasma capsaeformis*)

XN    Pearlymussel, birdwing AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (*Conradilla caelata*)

E    Pearlymussel, cracking Entire Range; Except where listed as Experimental Populations (*Hemistena lata*)

XN    Pearlymussel, cracking AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (*Hemistena lata*)

XN    Pearlymussel, dromedary AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (*Dromus dromas*)

E    Pebblesnail, flat (*Lepyrium showalteri*)

E    Pigtoe, dark (*Pleurobema furvum*)

E    Pigtoe, finerayed Entire Range; Except where listed as Experimental Populations (*Fusconaia cuneolus*)

4/8/2003

XN   Pigtoe, finerayed AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (_Fusconaia cuneolus_)

E   Pigtoe, flat (_Pleurobema marshalli_)

E   Pigtoe, heavy (_Pleurobema taitianum_)

E   Pigtoe, rough (_Pleurobema plenum_)

E   Pigtoe, shiny Entire Range; Except where listed as Experimental Populations (_Fusconaia cor_)

XN   Pigtoe, shiny AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (_Fusconaia cor_)

E   Pigtoe, southern (_Pleurobema georgianum_)

E   Pimpleback, orangefoot (pearlymussel) (_Plethobasus cooperianus_)

T   Plover, piping (except Great Lakes watershed) (_Charadrius melodus_)

T   Pocketbook, finelined (_Lampsilis altilis_)

E   Pocketbook, shinyrayed (_Lampsilis subangulata_)

E   Ring pink (mussel) (_Obovaria retusa_)

E   Riversnail, Anthony's Entire Range; Except where listed as Experimental Populations (_Athearnia anthonyi_)

XN   Riversnail, Anthony's AL; Free-Flowing Reach of the Tennessee River below the Wilson Dam, Colbert and Lauderdale Counties, AL (_Athearnia anthonyi_)

T   Rocksnail, painted (_Leptoxis taeniata_)

E   Rocksnail, plicate (_Leptoxis plicata_)

T   Rocksnail, round (_Leptoxis ampla_)

T   Salamander, Red Hills (_Phaeognathus hubrichti_)

T   Sculpin, pygmy (_Cottus paulus (=pygmaeus)_)

T   Sea turtle, green (except where endangered) (_Chelonia mydas_)

E   Sea turtle, hawksbill (_Eretmochelys imbricata_)

E   Sea turtle, Kemp's ridley (_Lepidochelys kempii_)

E   Sea turtle, leatherback (_Dermochelys coriacea_)

T   Sea turtle, loggerhead (_Caretta caretta_)

T   Shiner, blue (_Cyprinella caerulea_)

E   Shiner, Cahaba (_Notropis cahabae_)

E   Shiner, palezone (_Notropis albizonatus_)

E   Shrimp, Alabama cave (_Palaemonias alabamae_)

T   Slabshell, Chipola (_Elliptio chipolaensis_)

E   Snail, armored (_Pyrgulopsis (=Marstonia) pachyta_)

E   Snail, tulotoma (_Tulotoma magnifica_)

T   Snake, eastern indigo (_Drymarchon corais couperi_)

E   Stirrupshell (_Quadrula stapes_)

E   Stork, wood (AL, FL, GA, SC) (_Mycteria americana_)

E   Sturgeon, Alabama (_Scaphirhynchus suttkusi_)

T   Sturgeon, gulf (_Acipenser oxyrinchus desotoi_)

T   Tortoise, gopher (W of of Mobile/Tombigbee Rs.) (_Gopherus polyphemus_)

E   Turtle, Alabama red-belly (_Pseudemys alabamensis_)

T   Turtle, flattened musk (species range clarified) (_Sternotherus depressus_)

E   Wartyback, white (pearlymussel) (_Plethobasus cicatricosus_)

E   Whale, finback (_Balaenoptera physalus_)

E   Whale, humpback (_Megaptera novaeangliae_)

E   Woodpecker, red-cockaded (_Picoides borealis_)

## Plants -- 18

_Status_ Listing

T   Amphianthus, little (_Amphianthus pusillus_)

4/8/2003

T  Potato-bean, Price's (*Apios priceana*)
T  Fern, American hart's-tongue (*Asplenium scolopendrium* var. *americanum*)
E  Leather flower, Morefield's (*Clematis morefieldii*)
E  Leather flower, Alabama (*Clematis socialis*)
T  Prairie-clover, leafy (*Dalea foliosa*)
T  Sunflower, Eggert's (*Helianthus eggertii*)
T  Bladderpod, lyrate (*Lesquerella lyrata*)
T  Button, Mohr's Barbara (*Marshallia mohrii*)
E  Harperella (*Ptilimnium nodosum*)
T  Water-plantain, Kral's (*Sagittaria secundifolia*)
E  Pitcher-plant, green (*Sarracenia oreophila*)
E  Pitcher-plant, Alabama canebrake (*Sarracenia rubra alabamensis*)
E  Chaffseed, American (*Schwalbea americana*)
E  Pinkroot, gentian (*Spigelia gentianoides*)
T  Fern, Alabama streak-sorus (*Thelypteris pilosa* var. *alabamensis*)
E  Trillium, relict (*Trillium reliquum*)
E  Grass, Tennessee yellow-eyed (*Xyris tennesseensis*)



# U.S. Fish & Wildlife Service

## Daphne Ecological Services Field Office

*Daphne, Alabama*

Home
Email Daphne ES
News Releases
FAQ
Activity Highlights
Fact Sheets
Endangered Species
Section 7 Consultation
Outreach & Education
Event Calendar
Ecosystems
Office Quick Facts
Office Staff
SE Region
USFWS
Links
Search

For the Media
Media Queries

**ALABAMA'S FEDERALLY LISTED SPECIES**



**BY COUNTY**

Updated - March 12, 2003

We are continually updating this list and, therefore, it may be incomplete and is provided strictly for informational purposes. This list does not constitute any form of Section 7 consultation. We recommend that this office (Daphne, AL Field Office - USFWS) be contacted for more current, site specific information prior to project activities. To be certain of occurrence, surveys should be conducted by qualified biologists to determine if a Federally protected species occurs within a project area.

Key to codes on list:

E - Endangered
T - Threatened
CH - Critical Habitat has been designated
PE - Proposed to be listed as Endangered
PT - Proposed to be listed as Threatened
PCH - Proposed Critical Habitat
C - Candidate Species
(P) - Possible Occurrence

**Autauga**

E - Wood stork *Mycteria americana*
E - Alabama sturgeon *Scaphirhynchus suttkusi*
E - Alabama canebrake pitcher plant *Sarracenia rubra ssp. alabamensis*
T - Price's potato bean *Apios priceana*

**Baldwin**

4/9/2003

ECH - Alabama beach mouse *Peromyscus polionotus ammobates*
ECH - Perdido Key beach mouse *Peromyscus polionotus trissylepsis*
E - Red-cockaded woodpecker *Picoides borealis*
E - Least tern *Sterna antillarum*
TPCH - Piping plover *Charadrius melodus*
T - Bald eagle *Haliaeetus leucocephalus*
E - Wood stork *Mycteria americana*
E - Alabama red-bellied turtle *Pseudemys alabamensis*
T - Loggerhead sea turtle *Caretta caretta*
E - Kemp's ridley sea turtle *Lepidochelys kempii*
T - Green sea turtle *Chelonia mydas* (P)
T - Gulf sturgeon *Acipenser oxyrinchus desotoi*
E - Alabama sturgeon *Scaphirhynchus suttkusi*
E - Heavy pigtoe mussel *Pleurobema taitianum*
T - Inflated heelsplitter mussel *Potamilus inflatus*
E - American chaffseed *Schwalbea americana*
T - Eastern indigo snake *Drymarchon corais couperi*
T - Flatwoods salamander *Ambystoma cingulatum* (P)
C - Bachman's sparrow *Aimophila aestivalis*


**Barbour**


E - Wood stork *Mycteria americana*


**Bibb**


E - Red-cockaded woodpecker *Picoides borealis*
E - Cahaba shiner *Notropis cahabae*
T - Goldline darter *Percina aurolineata*
T - Orange-nacre mucket mussel *Lampsilis perovalis*
T - Fine-lined pocketbook mussel *Lampsilis altilis*
E - Cylindrical lioplax snail *Lioplax cyclostomaformis*
E - Flat pebblesnail *Lepyrium showalteri*
T - Round rocksnail *Leptoxis ampla*
T - Mohr's Barbara's buttons *Marshallia mohrii*
E - Tennessee yellow-eyed grass *Xyris tennesseensis*
C - Georgia rockcress *Arabis georgiana*


**Blount**


T - Flattened musk turtle *Sternotherus depressus*
E - Triangular kidneyshell mussel *Ptychobranchus greenii*
T - Fine-lined pocketbook mussel *Lampsilis altilis*
E - Ovate clubshell mussel *Pleurobema perovatum*
E - Plicate rocksnail *Leptoxis plicata*
T - Eggert's sunflower *Helianthus eggertii*
E - Cahaba shiner *Notropis cahabae*
C - Black Warrior waterdog *Necturus alabamensis*

**Bullock**

E - Relict trillium *Trillium reliquum*

**Butler**

T - Red hills salamander *Phaeognathus hubrichti*

**Calhoun**

E - Gray bat *Myotis grisescens*
E - Red-cockaded woodpecker *Picoides borealis*
T - Pygmy sculpin *Cottus paulus*
T - Blue shiner *Cyprinella caerulea*
T - Fine-lined pocketbook mussel *Lampsilis altilis*
E - Tulotoma snail *Tulotoma magnifica*
T - Painted rocksnail *Leptoxis taeniata*
E - Southern pigtoe mussel *Pleurobema georgianum*
E - Triangular kidneyshell mussel *Ptychobranchus greenii*
E - Southern clubshell mussel *Pleurobema decisum*
E - Tennessee yellow-eyed grass *Xyris tennesseensis*
T - Mohr's Barbara's buttons *Marshallia mohrii*
C - White fringeless orchid *Platanthera integrilabia*

**Chambers**

T - Little amphianthus *Amphianthus pusillus*

**Cherokee**

T - Bald eagle *Haliaeetus leucocephalus*
T - Blue shiner *Cyprinella caerulea*
E - Coosa moccasinshell mussel *Medionidus parvulus*
E - Triangular kidneyshell mussel *Ptychobranchus greenii*
T - Fine-lined pocketbook mussel *Lampsilis altilis*
E - Ovate clubshell mussel *Pleurobema perovatum*
E - Southern clubshell mussel *Pleurobema decisum*
E - Green pitcher plant *Sarracenia oreophila*
E - Harperella *Ptilimnium nodosum*
T - Mohr's Barbara's buttons *Marshallia mohrii*
E - Alabama leather flower *Clematis socialis*
T - Kral's water-plantain *Sagittaria secundifolia*

**Chilton**

T - Bald eagle *Haliaeetus leucocephalus*
E - Red-cockaded woodpecker *Picoides borealis*
E - Wood stork *Mycteria americana*
E - Alabama canebrake pitcher plant *Sarracenia rubra ssp.alabamensis*
T - Painted rocksnail *Leptoxis taeniata*


## Choctaw

T - Bald eagle *Haliaeetus leucocephalus*
E - Wood stork *Mycteria americana*
T - Gopher tortoise *Gopherus polyphemus*
T - Gulf sturgeon *Acipenser oxyrinchus desotoi*
E - Alabama sturgeon *Scaphirhynchus suttkusi*
T - Inflated heelsplitter mussel *Potamilus inflatus*


## Clarke

E - Wood stork *Mycteria americana*
T - Bald eagle *Haliaeetus leucocephalus*
T - Gulf sturgeon *Acipenser oxyrinchus desotoi*
E - Alabama sturgeon *Scaphirhynchus suttkusi*
T - Inflated heelsplitter mussel *Potamilus inflatus*
E - Heavy pigtoe mussel *Pleurobema taitianum* (P)
C - Black pine snake *Pituophis melanoleucus lodingi*


## Clay

E - Southern pigtoe mussel *Pleurobema georgianum*
T - Blue shiner *Cyprinella caerulea*
E - Tulotoma snail *Tulotoma magnifica*
T - Fine-lined pocketbook mussel *Lampsilis altilis*
C - White fringeless orchid *Platanthera integrilabia*


## Cleburne

E - Red-cockaded woodpecker *Picoides borealis*
E - Southern pigtoe mussel *Pleurobema georgianum*
E - Southern clubshell mussel *Pleurobema decisum*
E - Triangular kidneyshell mussel *Ptychobranchus greenii*
T - Fine-lined pocketbook *Lampsilis altilis*
C - White fringeless orchid *Platanthera integrilabia*


## Coffee

T - Gulf sturgeon *Acipenser oxyrinchus desotoi*
T - Eastern indigo snake *Drymarchon corais couperi*

**Colbert**

E - Gray bat *Myotis grisescens*
E - Indiana bat *Myotis sodalis* (P)
E - Pink mucket pearly mussel *Lampsilis abrupta*
E - White warty-back pearly mussel *Plethobasus cicatricosus*
E - Rough pigtoe pearly mussel *Pleurobema plenum*
E - Cumberlandian combshell mussel *Epioblasma brevidens*
E - Ring pink mussel *Obovaria retusa*
E - Turgid blossom pearlymussel *Epioblasma turgidula*
E - Cracking pearlymussel *Hemistena lata*
E - Fanshell *Cyprogenia stegaria*
T - Lyrate bladder-pod *Lesquerella lyrata*
E - Alabama cave shrimp *Palaemonias alabamae*
E - Spotfin chub *Cyprinella (=Hybopsis) monacha*
C - Slabside pearlymussel *Lexingtonia dolabelloides*
T - Eggert's sunflower *Helianthus eggertii* (P)

**Conecuh**

E - Gray bat *Myotis grisescens*
T - Red hills salamander *Phaeognathus hubrichti*
E - Red-cockaded woodpecker *Picoides borealis*
T - Eastern indigo snake *Drymarchon corais couperi* (P)
C - Alabama pearlshell *Margaritifera marrianae*

**Coosa**

E - Red-cockaded woodpecker *Picoides borealis*
T - Bald eagle *Haliaeetus leucocephalus*
T - Blue shiner *Cyprinella caerulea*
E - Tulotoma snail *Tulotoma magnifica*
T - Fine-lined pocketbook mussel *Lampsilis altilis*
T - Kral's water-plantain *Sagittaria secundifolia*

**Covington**

E - Red-cockaded woodpecker *Picoides borealis*
T - Eastern indigo snake *Drymarchon corais couperi*
T - Red hills salamander *Phaeognathus hubrichti*
T - Flatwoods salamander *Ambystoma cingulatum* (P)
T - Gulf sturgeon *Acipenser oxyrinchus desotoi*

**Crenshaw**

T - Red hills salamander *Phaeognathus hubrichti*
E - Wood stork *Mycteria americana*

## Cullman

T - Flattened musk turtle *Sternotherus depressus*
E - Ovate clubshell mussel *Pleurobema perovatum*
E - Triangular kidneyshell mussel *Ptychobranchus greenii*
T - Fine-lined pocketbook mussel *Lampsilis altilis*

## Dale

T - Gulf sturgeon *Acipenser oxyrinchus desotoi*
T - Eastern indigo snake *Drymarchon corais couperi* (P)

## Dallas

T - Bald eagle *Haliaeetus leucocephalus*
E - Wood stork *Mycteria americana*
E - Red-cockaded woodpecker *Picoides borealis*
E - Alabama sturgeon *Scaphirhynchus suttkusi*
E - Southern clubshell mussel *Leurobema decisum*
E - Heavy pigtoe mussel *Pleurobema taitianum*
T - Orange-nacre mucket mussel *Lampsilis perovalis*
T - Fine-lined pocketbook mussel *Lampsilis altilis*

## DeKalb

E - Gray bat *Myotis grisescens*
E - Indiana bat *Myotis sodalis* (P)
T - Blue shiner *Cyprinella caerulea*
T - Fine-lined pocketbook mussel *Lampsilis altilis*
T - Kral's water-plantain *Sagittaria secundifolia*
E - Green pitcher plant *Sarracenia oreophila*
E - Harperella *Ptilimnium nodosum*
T - Eggert's sunflower *Helianthus eggertii* (P)

## Elmore

E - Tulotoma snail *Tulotoma magnifica*
E - Fine-lined pocketbook mussel *Lampsilis altilis*
E - Alabama canebrake pitcher plant *Sarracenia rubra ssp.a labamensis*
C - Georgia rockcress *Arabis georgiana*

## Escambia

E - Wood stork *Mycteria americana*

E - Red-cockaded woodpecker *Picoides borealis*
T - Bald eagle *Haliaeetus leucocephalus*
T - Gulf sturgeon *Acipenser oxyrinchus desotoi*
T - Eastern indigo snake *Drymarchon corais couperi*


## Etowah

T - Flattened musk turtle *Sternotherus depressus*
T - Mohr's Barbara's buttons *Marshallia mohrii*
E - Green pitcher plant *Sarracenia oreophila*
E - Alabama leather flower *Clematis socialis*
E - Southern clubshell mussel *Pleurobema decisum*
T - Fine-lined pocketbook mussel *Lampsilis altilis*
E - Triangular kidneyshell mussel *Ptychobranchus greenii*
E - Southern pigtoe mussel *Pleurobema georgianum*
E - Ovate clubshell mussel *Pleurobema perovatum*


## Fayette

T - Orange-nacre mucket mussel *Lampsilis perovalis*
E - Dark pigtoe mussel *Pleurobema furvum*
T - Fine-lined pocketbook mussel *Lampsilis altilis*


## Franklin

T - Bald eagle *Haliaeetus leucocephalus*
E - Gray bat *Myotis grisescens*
E - Cumberlandian combshell mussel *Epioblasma brevidens*
T - Lyrate bladder-pod *Lesquerella lyrata*
E - Leafy prairie clover *Dalea foliosa*
E - Tennessee yellow-eyed grass *Xyris tennesseensis*
T - Eggert's sunflower *Helianthus eggertii*
C - Slabside pearlymussel *Lexingtonia dolabelloides*


## Geneva

T - Gulf sturgeon *Acipenser oxyrinchus desotoi*
E - Red-cockaded woodpecker *Picoides borealis*
T - Eastern indigo snake *Drymarchon corais couperi* (P)


## Greene

T - Orange-nacre mucket mussel *Lampsilis perovalis*
T - Alabama moccasinshell mussel *Medionidus acutissimus*
E - Southern clubshell mussel *Pleurobema decisum*
E - Ovate clubshell mussel *Pleurobema perovatum*

E - Heavy pigtoe mussel *Pleurobema taitianum*
T - Inflated heelsplitter mussel *Potamilus inflatus*
E - Stirrup shell mussel *Quadrula stapes*


**Hale**


E - Red-cockaded woodpecker *Picoides borealis*
T - Bald eagle *Haliaeetus leucocephalus*
E - Wood stork *Mycteria americana*
T - Inflated heelsplitter mussel *Potamilus inflatus*


**Henry**


T - Bald eagle *Haliaeetus leucocephalus*
E - Relict trillium *Trillium reliquum*
T - Eastern indigo snake *Drymarchon corais couperi* (P)


**Houston**


T - Flatwoods salamander *Ambystoma cingulatum* (P)
T - Eastern indigo snake *Drymarchon corais couperi* (P)


**Jackson**


E - Gray bat *Myotis grisescens*
E - Indiana bat *Myotis sodalis*
T - Bald eagle *Haliaeetus leucocephalus*
E - Palezone shiner *Notropis albizonatus*
E - Anthony's riversnail *Athearnia anthonyi*
E - Shiny pigtoe pearly mussel *Fusconaia cor (edgariana)*
E - Pink mucket pearly mussel *Lampsilis abrupta*
E - Alabama lamp pearly mussel *Lampsilis virescens*
E - Pale lilliput pearly mussel *Toxolasma cylindrellus*
E - Fine-rayed pigtoe mussel *Fusconaia cuneolus*
E - Green pitcher plant *Sarracenia oreophila*
T - American hart's-tongue fern *Phyllitis scolopendrium var. americana*
T - Eggert's sunflower *Helianthus eggertii* (P)
C - Slabside pearlymussel *Lexingtonia dolabelloides*
C - White fringeless orchid *Platanthera integrilabia*


**Jefferson**


T - Flattened musk turtle *Sternotherus depressus*
E - Watercress darter *Etheostoma nuchale*
E - Cahaba shiner *Notropis cahabae*
PE - Vermilion darter *Etheostoma chermocki*

E - Upland combshell mussel *Epioblasma metastriata*
T - Fine-lined pocketbook mussel *Lampsilis altilis*
E - Triangular kidneyshell mussel *Ptychobranchus greenii*
T - Orange-nacre mucket mussel *Lampsilis perovalis*
E - Plicate rocksnail *Leptoxis plicata*
E - Leafy prairie clover *Dalea foliosa*


## Lamar


E - Southern combshell mussel *Epioblasma penita*
E - Southern clubshell mussel *Pleurobema decisum*
E - Ovate clubshell mussel *Pleurobema perovatum*
T - Orange-nacre mucket mussel *Lampsilis perovalis*
T - Alabama moccasinshell mussel *Medionidus acutissimus*


## Lauderdale


E - Gray bat *Myotis grisescens*
E - Indiana bat *Myotis sodalis* (P)
T - Bald eagle *Haliaeetus leucocephalus*
TCH - Slackwater darter *Etheostoma boschungi*
ECH - Alabama cavefish *Speoplatyrhinus poulsoni*
E - Spotfin chub *Cyprinella (=Hybopsis) monacha*
E - Ring pink mussel *Obovaria retusa*
E - Turgid blossom pearlymussel *Epioblasma turgidula*
E - Cracking pearlymussel *Hernistena lata*
E - Pink mucket pearly mussel *Lampsilis abrupta*
E - White warty-back pearly mussel *Plethobasus cicatricosus*
E - Rough pigtoe pearly mussel *Pleurobema plenum*
E - Fanshell *Cyprogenia stegaria*
T - Eggert's sunflower *Helianthus eggertii* (P)


## Lawrence


E - Gray bat *Myotis grisescens*
E - Indiana bat *Myotis sodalis*
E - Red-cockaded woodpecker *Picoides borealis*
E - Pink mucket pearly mussel *Lampsilis abrupta*
T - Alabama moccasinshell mussel *Medionidus acutissimus*
T - Fine-lined pocketbook mussel *Lampsilis altilis*
T - Orange-nacre mucket mussel *Lampsilis perovalis*
E - Dark pigtoe mussel *Pleurobema furvum*
E - Triangular kidneyshell mussel *Ptychobranchus greenii*
E - Rough pigtoe mussel *Pleurobema plenum*
E - Leafy prairie clover *Dalea foliosa*
T - Lyrate bladder-pod *Lesquerella lyrata*
T - Eggert's sunflower *Helianthus eggertii* (P)


## Lee

E - Relict trillium *Trillium reliquum*
E - Ovate clubshell mussel *Pleurobema perovatum*
E - Southern clubshell mussel *Pleurobema decisum*
T - Fine-lined pocketbook mussel *Lampsilis altilis*

## Limestone

E - Gray bat *Myotis grisescens*
E - Indiana bat *Myotis sodalis* (P)
T - Slackwater darter *Etheostoma boschungi*
E - Boulder darter *Etheostoma wapiti*
E - Pink mucket pearly mussel *Lampsilis abrupta*
E - Rough pigtoe mussel *Pleurobema plenum*
E - Cumberland monkeyface mussel *Quadrula intermedia*
E - Cracking pearlymussel *Hemistena lata*
E - Ring pink mussel *Obovaria retusa*
E - Anthony's riversnail *Athearnia anthonyi*
E - Slender campeloma snail *Campeloma decampi*
E - Armored snail *Pyrgulopsis pachyta*
T - Eggert's sunflower *Helianthus eggertii* (P)

## Lowndes

E - Wood stork *Mycteria americana*
E - Alabama sturgeon *Scaphirhynchus suttkusi*

## Macon

E - Red-cockaded woodpecker *Picoides borealis*
E - Wood stork *Mycteria americana*
E - Southern clubshell mussel *Pleurobema decisum*
E - Ovate clubshell mussel *Pleurobema perovatum*
T - Fine-lined pocketbook mussel *Lampsilis altilis*

## Madison

E - Gray bat *Myotis grisescens*
T - Bald eagle *Haliaeetus leucocephalus*
T - Slackwater darter *Etheostoma boschungi*
E - Snail darter *Percina tanasi*
E - Alabama cave shrimp *Palaemonias alabamae*
E - Pink mucket pearly mussel *Lampsilis abrupta*
E - Shiny pigtoe pearly mussel *Fusconaia cor (edgariana)*
E - Fine-rayed pigtoe mussel *Fusconaia cuneolus*
E - Rough pigtoe mussel *Pleurobema plenum*
C - Slabside pearlymussel *Lexingtonia dolabelloides*
E - Slender campeloma snail *Campeloma decampi*
T - Price's potato bean *Apios priceana*

E - Morefield's leather flower *Clematis morefieldii*
T - Eggert's sunflower *Helianthus eggertii* (P)


**Marengo**


T - Bald eagle *Haliaeetus leucocephalus*
T - Inflated heelsplitter mussel *Potamilus inflatus*


**Marion**


E - Southern combshell mussel *Epioblasma penita*
C - White fringeless orchid *Platanthera integrilabia*


**Marshall**


E - Gray bat *Myotis grisescens*
E - Indiana bat *Myotis sodalis*
E - Red-cockaded woodpecker *Picoides borealis*
T - Bald eagle *Haliaeetus leucocephalus*
T - Flattened musk turtle *Sternotherus depressus*
E - Snail darter *Percina tanasi*
E - Pink mucket pearly mussel *Lampsilis abrupta*
E - Shiny pigtoe pearly mussel *Fusconaia cor (edgariana)*
E - Fine-rayed pigtoe mussel *Fusconaia cuneolus*
E - Orange-footed pimpleback mussel *Plethobasus cooperianus*
E - Rough pigtoe mussel *Pleurobema plenum*
T - Price's potato bean *Apios priceana*
E - Green pitcher plant *Sarracenia oreophila*
T - Eggert's sunflower *Helianthus eggertii* (P)
C - Slabside pearlymussel *Lexingtonia dolabelloides*


**Mobile**


T - Piping plover *Charadrius melodus*
E - Red-cockaded woodpecker *Picoides borealis*
E - Least tern *Sterna antillarum*
T - Eastern indigo snake *Drymarchon corais couperi*
T - Gopher tortoise *Gopherus polyphemus*
E - Alabama red-bellied turtle *Pseudemys alabamensis*
T - Loggerhead sea turtle *Caretta caretta*
E - Kemp's ridley sea turtle *Lepidochelys kempii* (P)
T - Green sea turtle *Chelonia mydas* (P)
T - Gulf sturgeon *Acipenser oxyrinchus desotoi*
T - Flatwoods salamander *Ambystoma cingulatum* (P)
E - Louisiana quillwort *Isoetes louisianensis* (P)
C - Black pine snake *Pituophis melanoleucus lodingi*


**Monroe**

E - Gray bat *Myotis grisescens*
T - Bald eagle *Haliaeetus leucocephalus*
T - Red hills salamander *Phaeognathus hubrichti*
T - Gulf sturgeon *Acipenser oxyrinchus desotoi*
E - Alabama sturgeon *Scaphirhynchus suttkusi*
E - Heavy pigtoe mussel *Pleurobema taitianum*
C - Alabama pearlshell *Margaritifera marrianae*
T - Eastern indigo snake *Drymarchon corais couperi* (P)

## Montgomery

E - Wood stork *Mycteria americana*

## Morgan

E - Gray bat *Myotis grisescens*
E - Indiana bat *Myotis sodalis*
E - Pink mucket pearly mussel *Lampsilis abrupta*
E - Ring pink mussel *Obovaria retusa*
E - Rough pigtoe mussel *Pleurobema plenum*
E - Leafy prairie clover *Dalea foliosa*
T - American hart's-tongue fern *Asplenium scolopendrium var.americana*
T - Eggert's sunflower *Helianthus eggertii* (P)

## Perry

T - Bald eagle *Haliaeetus leucocephalus*
E - Red-cockaded woodpecker *Picoides borealis*
E - Cahaba shiner *Notropis cahabae*

## Pickens

E - Red-cockaded woodpecker *Picoides borealis*
T - Orange-nacre mucket mussel *Lampsilis perovalis*
T - Alabama moccasinshell mussel *Medionidus acutissimus*
E - Southern clubshell mussel *Pleurobema decisum*
E - Ovate clubshell mussel *Pleurobema perovatum*
E - Heavy pigtoe mussel *Pleurobema taitianum*
E - Stirrup shell mussel *Quadrula stapes*

## Pike

## Randolph

T - Little amphianthus *Amphianthus pusillus*

## Russell

E - Shiny-rayed pocketbook mussel *Lampsilis subangulata*
E - Red-cockaded woodpecker *Picoides borealis*
C - Georgia rockcress *Arabis georgiana*

## Shelby

E - Gray bat *Myotis grisescens*
E - Indiana bat *Myotis sodalis*
E - Cahaba shiner *Notropis cahabae*
T - Goldline darter *Percina aurolineata*
T - Painted rocksnail *Leptoxis taeniata*
E - Tulotoma snail *Tulotoma magnifica*
E - Southern clubshell mussel *Pleurobema decisum*
E - Triangular kidneyshell mussel *Ptychobranchus greenii*
E - Southern acornshell mussel *Epioblasma othcaloogensis* (P)
T - Fine-lined pocketbook mussel *Lampsilis altilis*
T - Orange-nacre mucket mussel *Lampsilis perovalis*
T - Alabama moccasinshell mussel *Medionidus acutissimus*
E - Cylindrical lioplax (snail) *Lioplax cyclostomaformis*
E - Flat pebblesnail *Lepyrium showalteri*
T - Round rocksnail *Leptoxis ampla*

## St. Clair

E - Tulotoma snail *Tulotoma magnifica*
E - Southern acornshell mussel *Epioblasma othcaloogensis*
E - Triangular kidneyshell mussel *Ptychobranchus greenii*
E - Southern pigtoe mussel *Pleurobema georgianum*
T - Fine-lined pocketbook mussel *Lampsilis altilis*
E - Upland combshell mussel *Epioblasma metastriata*
E - Southern clubshell mussel *Pleurobema decisum*
E - Alabama leather flower *Clematis socialis*

## Sumter

E - Wood stork *Mycteria americana*
E - Ovate clubshell mussel *Pleurobema perovatum*
T - Inflated heelsplitter mussel *Potamilus inflatus*
E - Stirrup shell mussel *Quadrula stapes*
E - Heavy pigtoe mussel *Pleurobema taitianum*
T - Gopher tortoise *Gopherus polyphemus*

## Talladega

E - Red-cockaded woodpecker *Picoides borealis*
T - Fine-lined pocketbook mussel *Lampsilis altilis*
E - Coosa moccasinshell mussel *Medionidus parvulus*
E - Southern pigtoe mussel *Pleurobema georgianum*
E - Tulotoma snail *Tulotoma magnifica*
T - Painted rocksnail *Leptoxis taeniata*
T - Lacy elimia (snail) *Elimia crenatella*

## Tallapoosa

E - Red-cockaded woodpecker *Picoides borealis*
T - Fine-lined pocketbook mussel *Lampsilis altilis*

## Tuscaloosa

E - Red-cockaded woodpecker *Picoides borealis*
T - Flattened musk turtle *Sternotherus depressus*
E - Southern clubshell mussel *Pleurobema decisum*
E - Dark pigtoe mussel *Pleurobema furvum*
E - Ovate clubshell mussel *Pleurobema perovatum*
T - Alabama moccasinshell mussel *Medionidus acutissimus*
T - Inflated heelsplitter mussel *Potamilus inflatus*
T - Fine-lined pocketbook mussel *Lampsilis altilis*
T - Orange-nacre mucket mussel *Lampsilis perovalis*
C - Black Warrior waterdog *Necturus alabamensis*
C - White fringeless orchid *Platanthera integrilabia*

## Walker

T - Flattened musk turtle *Sternotherus depressus*
E - Ovate clubshell mussel *Pleurobema perovatum*
E - Triangular kidneyshell mussel *Ptychobranchus greenii*
T - Fine-lined pocketbook mussel *Lampsilis altilis*
C - Black Warrior waterdog *Necturus alabamensis*

## Washington

E - Wood stork *Mycteria americana*
T - Eastern indigo snake *Drymarchon corais couperi*
T - Gopher tortoise *Gopherus polyphemus*
T - Gulf sturgeon *Acipenser oxyrinchus desotoi*
T - Inflated heelsplitter mussel *Potamilus inflatus*
E - Louisiana quillwort *Isoetes louisianensis* (P)
C - Black pine snake *Pituophis melanoleucus lodingi*

## Wilcox

T - Bald eagle *Haliaeetus leucocephalus*
E - Wood stork *Mycteria americana* (P)
T - Gulf sturgeon *Acipenser oxyrinchus desotoi*
E - Alabama sturgeon *Scaphirhynchus suttkusi*
C - Alabama pearlshell *Margaritifera marrianae*
E - Heavy pigtoe mussel *Pleurobema taitianum* (P)
C - Georgia rockcress *Arabis georgiana*


## Winston


T - Flattened musk turtle *Sternotherus depressus*
E - Red-cockaded woodpecker *Picoides borealis*
T - Orange-nacre mucket mussel *Lampsilis perovalis*
T - Alabama moccasinshell mussel *Medionidus acutissimus*
E - Coosa moccasinshell mussel *Medionidus parvulus*
E - Dark pigtoe mussel *Pleurobema furvum*
E - Triangular kidneyshell mussel *Ptychobranchus greenii*
T - Fine-lined pocketbook mussel *Lampsilis altilis*
E - Ovate clubshell mussel *Pleurobema perovatum*
T - Kral's water-plantain *Sagittaria secundifolia*
T - Alabama streak-sorus fern *Thelypteris pilosa var. alabamensis*
C - Black Warrior waterdog *Necturus alabamensis*
C - White fringeless orchid *Platanthera integrilabia*


Notes:


- Bald eagles *Haliaeetus leucocephalus*, red-cockaded woodpeckers *Picoides borealis* and American peregrine falcons *Falco peregrinus anatum* may occur in any county, if suitable habitat exists.

Please send comments, questions, or corrections to patric_harper@fws.gov


| Ecological Services Home Page | Alabama Map | Southeast Region Home Page | Privacy Information |

# APPENDIX C

# REPRESENTATIVE SITE PHOTOGRAPHS



**Photograph 1.** Representative photograph of the mesic hardwood association found within the project boundary

Photograph 2.  Headwater seep forested wetland.  Note wetlands in foreground and uplands in background



**Photograph 3.  Representative Hardwood swamp forest**



**Photograph 4. Hardwood Association**

Appendix G

Public Hearing Docs.

# PUBLIC HEARING
## Environmental Assessment for the
## Proposed Airport Improvements at the
## Troy Municipal Airport

The City of Troy will conduct a Public Hearing to solicit comments regarding the Environmental Assessment (EA) prepared for the proposed airport improvements at the Troy Municipal Airport. Development plans considered in the preparation of the EA include extending the existing 5,009 foot runway approximately 1,500 feet to the west (Runway 07 end) to achieve an ultimate runway length of 6,009 feet. Other improvements will involve extending the existing parallel taxiway approximately 1,500 to the west and grading and improving the Runway Safety Area (RSA) for Runway 07/25. The RSA will be 400 feet wide and extend 1,000 feet beyond each runway end, in conjunction with the proposed runway extension. In addition, Runway End Identification Lights (REILS) and Precision Approach Path Indicator Lights (PAPIS) will be installed. The purpose of the project is to improve safety and access to the airport.

The purpose of this Public Hearing is to receive comments from individuals, public officials, agencies, and organizations concerning the environmental, social, and economic effects of the proposed development.

The Public Hearing will be held on Thursday, July 15, 2004, from 5:00 p.m. to 7:00 p.m. at Troy City Hall located at 301 Railroad Avenue in Troy, Alabama. The meeting will be informal and those wishing to attend may do so at any time between the hours of 5:00 p.m. to 7:00 p.m.

Maps and layout plans will be on display at the meeting. Representatives of the City of Troy and the City's consultant, Barge Waggoner Sumner & Cannon, Inc., will be present to discuss the proposed improvements and answer questions.

Copies of the Environmental Assessment are available for review at Troy City Hall and local public libraries.

Dates: 06/15, 06/27, 07/04 and 07/11

## Public Hearing Summary

On July 15, 2004, a Public Hearing was held at the Troy Municipal Complex from 5:00 p.m. to 7:00 p.m. for the purpose of soliciting public comment regarding the potential environmental, social and economic impacts associated with the proposed expansion of the Troy Municipal Airport. The meeting was conducted by the City of Troy with assistance from Barge, Waggoner, Sumner and Cannon, Inc. (BWSC), the project consultant.

The purpose of the public hearing was to discuss the potential environmental, social and economic impacts associated with the proposed expansion of the Troy Municipal Airport. A handout was distributed to familiarize the citizens with the proposed project and provide a summary of anticipated impacts. In addition, comment sheets were made available for those wishing to submit written comments and a certified court reporter was present to document the hearing. A copy of the transcript prepared by the court reporter is included in Appendix G of the Environmental Assessment.

The following discussion summarizes the major issues raised at the hearing.

Historic and Archaeological Resources
Several questions and comments were received with regard to the Oak Grove United Methodist Church and/or cemetery eligibility for inclusion in the National Register of Historic of Historic Places. BWSC representatives agreed to consult with the Alabama Historical Commission to determine the Church and cemetery's eligibility with regard to the National Register of Historic of Historic Places. This additional coordination found that the church and cemetery are not eligible for listing by the Alabama Historical Commission. Additional correspondence with the Alabama Historical Commission has been included under Appendix B in the Environmental Assessment.

Noise Impacts
Several attendees voiced concern about the noise level and potential impacts to the Oak Grove Methodist Church. BWSC representatives agreed to review the noise exposure maps that were included in the Environmental Assessment. The noise analysis was updated by using the latest version of the Integrated Noise Model (INM), Version 6.1. Noise exposure maps have been included in Figures 6, 7 and 7A of the Environmental Assessment.

Wetlands
Several comments were received regarding the impact to wetlands located in the project area. No impact to wetlands will occur without obtaining a Section 404 permit from the U.S. Army Corps of Engineers.

Alternatives to Extending Runway 07
Several comments were received regarding analyzing additional alternatives to achieve the airport expansion project. Additional information regarding the alternatives was included in the report.

# ATTENDANCE ROSTER
## PUBLIC INVOLVEMENT MEETING

ENVIRONMENTAL ASSESSMENT
FOR THE PROPOSED
RUNWAY EXTENSION AND AIRPORT IMPROVEMENTS
TROY MUNICIPAL AIRPORT

Page ___ of ___

### July 15, 2004

| Name | Address | Telephone Number |
|------|---------|------------------|
| Janice Castleberry | 304-2 nd | 566-1413 |
| Janet Kervin | POB 921 Troy, AL | 670-3524 |
| Jeff Kervin | POB 921 Troy | 566-4006 |
| J. LeVeque | CR 1149 | 566-5261 |
| Nancy Bennett | 106 Jeffcoat Troy | 566-6225 |
| Eunice McKim | Pine Level, Al. | 588-7492 |
| James D. Howard | 2637 Green Oaks Dr. Montgomery, AL 36107 | 265-6021 |
| Mildred Youngblood | 209 Fairview Troy | 566-2750 |
| Brenda Youngblood | White Dr. Troy | 566-4388 |
| Kelley Youngblood | White Dr. Troy | 566-4389 |
| Kellel Cleveland | 306 Woodland Cir Troy, Al | 808-8368 |
| Mike Fox | 2123 CR 7755 Troy Al | 566-2683 |
| Michael Anderson | 3040 Co.Rd 1177N Troy | 566-2434 |
| Jared Cleveland | 306 Woodland Circle Troy | 808-8368 |
| Johnny Steed | 747 Orion St. Troy | 566-7734 |
| Diane Lefontaine | 3543 Co. Rd. 7702 Troy, Al. | 584-7392 |
| T. J. Dillard | Troy | 566-1558 |
| Dianne Henderson | 205 Glenwood Ave Troy | 566-8600 |
| Allan Pennington | Troy | 268-0905 |
| Charles R. Warren | Troy | |

Barge, Waggoner, Sumner and Cannon, Inc.
2047 West Main Street
Dothan, Alabama 36301
Phone: 334.793.6266

R:\17018\47\Public Hearing\PH_AttendRoster.doc

# ATTENDANCE ROSTER
## PUBLIC INVOLVEMENT MEETING

ENVIRONMENTAL ASSESSMENT
FOR THE PROPOSED
RUNWAY EXTENSION AND AIRPORT IMPROVEMENTS
TROY MUNICIPAL AIRPORT

Page ___ of ___

### July 15, 2004

| Name | Address | Telephone Number |
|---|---|---|
| Billy & Betty Dwright | TROY | 566-2832 |
| Buggie & Peggy Can | Troy | 566-7912 |
| Eugene & Angie Perry | Troy | 566-7057 |
| Donald & Rachel Lee | Troy | 566-7580 |
| W. Z. T____ III | TROY | 566-3798 |
| H.T. Urquhart | Mary Esther FL | 850-243-7010 |
| John F. Turner | Dothan, AL | 334-792-6947 |
| Charlene T. Green | Dothan, Al. | 334-792-0494 |
| Ben Bowden | Andalusia, AL | 334-222-3177 |
| Alex Nicoll | Chattanooga, TN. | 423-899-4845 |
| Joyce Nicoll | Montgomery, AL | N/A |
| R.C. Carter | Troy AL | 566-1413 |
| Annie S. Howard | Montgomery Al. 36107 | 334-265-6021 |
| Leo Bennett | TROY AL | 334-566-6225 |
| Athol ___ | TROY, AL | 334-566-2564 |
| Lexie Aldridge | Troy, AL | 334-566-5857 |

*Barge, Waggoner, Sumner and Cannon, Inc.*
*2047 West Main Street*
*Dothan, Alabama 36301*
*Phone: 334.793.6266*

R:\17018\47\Public Hearing\PH_AttendRoster.doc

Austin Chastain    Thomasville, GA    229-227-9885

# ATTENDANCE ROSTER
## PUBLIC INVOLVEMENT MEETING

ENVIRONMENTAL ASSESSMENT
FOR THE PROPOSED
RUNWAY EXTENSION AND AIRPORT IMPROVEMENTS
TROY MUNICIPAL AIRPORT

Page ___ of ___

### July 15, 2004

| Name | Address | Telephone Number |
|------|---------|------------------|
| Gloria LeVeque | 2494 Co Rd 1149 | 566-6902 |
| Helen Li Veguu | 2440 C Rd 1149 | 566-5261 |
| Mary R. Roten | 820 Sir Michael, Montg 36109 | 272-4515 |
| Ronald Powell | P.O. Box 231 Troy | 484-8940 |
| Ann Marie Hussey | 308 2nd Avenue Troy | 566-1819 |
| Jewell Griffin | 4196 Co Rd 7714 Troy | 566-1633 |
| Priscilla Kervin | 1833 Co Rd 1148 Froy | 566-4171 |
| Delaney Kervin | 1833 Co Rd 1148 Troy | 566-4171 |
| Joel Kervin | 106 Glenwood Ave. | 566-2589 |
| Luna Houston | 1833 Co. Rd. 1148 Troy | |
| Jay Campbell | 2005 Co. Rd. 1177 Troy | 566-2002 |
| Anne Campbell | 109 Forest Avenue Troy | 566-4014 |
| Marly Alwarrit | 3062 County Rd 1149, Troy | 566-4382 |
| Nancy Howard | 107 Norfolk Ave. Tm | 566-348 |
| Carl Hussey | 308 2nd Ave Troy | 566-1819 |
| Leigh Anne Henderson | 205 Glenwood Ave Troy | 566-8600 |
| Warren Giles | 984 Sunset Blvd Troy | 566-8600 |

Barge, Waggoner, Sumner and Cannon, Inc.
2047 West Main Street
Dothan, Alabama 36301
Phone: 334.793.6266

R:\17018\47\Public Hearing\PH_AttendRoster.doc

Jennifer Delong 976 Co. Rd 1148 Troy 566-4063
Katie Delong 976 Co Rd 148 Troy 566-4063
Evan Delong 976 Co Rd 1148 Troy 566 4063
Alan W McNitt 204 Lamar St. Troy 36081 566-4720
Mom Marston 272 Lilliquin Dr. Thomasville, GA 229-227-9805

# ATTENDANCE ROSTER
## PUBLIC INVOLVEMENT MEETING

ENVIRONMENTAL ASSESSMENT
FOR THE PROPOSED
RUNWAY EXTENSION AND AIRPORT IMPROVEMENTS
TROY MUNICIPAL AIRPORT

Page __ of __

### July 15, 2004

| Name | Address | Telephone Number |
|------|---------|------------------|
| Oscar Turnipseed | P.O. Box 0753 Mont. AL 36121 | 334 833-4090 |
| Marylenn Hoffman | 111 Camellia Ave. Troy, Al 36081 | 334-566-5675 |
| Norman Campbell | 2065 County Rd 1177 Troy AL | See 2062 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

*Barge, Waggoner, Sumner and Cannon, Inc.*
*2047 West Main Street*
*Dothan, Alabama 36301*
*Phone: 334.793.6266*

R:\17018\47\Public Hearing\PH_AttendRoster.doc

# APPENDIX G

# Public Hearing Documentation

COPY

\*    \*    \*    \*    \*    \*    \*    \*

July 15, 2004

Public Hearing

Troy Municipal Airport Runway Expansion Project

\*    \*    \*    \*    \*    \*    \*    \*

The following public hearing was held on Thursday,

July 15th, 2004, at 5:00 p.m., at 306 East Academy Street,

Troy, Alabama, before me, Stephanie D. Garrett,

Court Reporter and Notary Public in and for the State of

Alabama at Large.

Stephanie D. Garrett, CCR - (334) 566-2039

1    **MR. MOTT:**  Good evening.  My name is Barry Mott.

2    I'm the office manager for the engineering firm Barge,

3    Waggoner, Sumner & Cannon.  We're the engineers for the

4    airport and for the City of Troy.  Thank you for coming

5    tonight.  This is a -- the public involvement meeting, or

6    the public hearing for the environmental assessment for the

7    airport extension.

8         Before we get started, I want to introduce just

9    real quickly the staff I brought with me from the firm.

10   Keith Shippey, in the striped shirt.  Keith handles our

11   land acquisition and environmental -- environmental issues.

12   And in the coat and tie is Justin Thomason.  Justin is an

13   aviation planner with our firm who will be able to answer

14   your questions about the process, any questions that you

15   have about where we're going from here, noise contours,

16   anything like that.  We're gonna try to get the right

17   person to answer your questions.  I apologize for the close

18   room.  We were gonna split up, but we were requested to get

19   everybody together so everybody could hear all the

20   questions.

21        I wanted to say that the public hearing is from

22   5:00 to 7:00.  That's the time frame that we set up to get

23   started.  If you would, we've got a court reporter that's

24   here.  She's gonna try to document every question that

25   you've got.  When you give your question, if you would, if

Stephanie D. Garrett, CCR - (334) 566-2039

1    you give your name, she'll record it on the record.  And
2    please be patient with us.  If you'll ask one question at a
3    time, we'll get you an answer on it.  If we cannot answer
4    your question for whatever reason, we'll document that
5    question and get you an answer back in writing.  In
6    addition, there's a comment sheet -- written comment sheet.
7    They're located here, where you checked in at the front.
8    If you don't have one -- it should be in your packet as
9    well -- let me know.  I'll get you one.  If you will write
10   any written comments that you want, this will be included
11   in with the public record for any questions or comments
12   that you have.  If it is a question we will get it answered
13   and get it back to you, if you'll give us a way to do so.
14           There's a sign-in sheet up front.  Anybody that
15   wants to sign in, please do so.  It's not a requirement
16   that you do so, but it's nice that we have a record of who
17   was here.  Real informal.  I'm just gonna open the floor up
18   for questions.  If you'll please be patient with us, and if
19   you'll raise your hand or give me some kind of sign,
20   I'll -- I'm trying to keep it to one question so we can
21   document it for the record and give you an answer.
22           Yes, sir?
23       MR. BOWDEN:  My name is Ben Bowden, and I'm an
24   attorney from Andalusia.  And I am here on behalf of
25   some -- the Oak Grove United Methodist Church.  And I mean

4

1    no disrespect by sitting down, but just to be informal, I

2    think that's fine.  Of course, you know that we're opposed

3    to the extension of runway, I think it's 07, in the

4    direction of the church.  And I don't think that's any

5    secret to any of you folks involved in the project.  And so

6    we have a -- you know, I have a lot of questions, having

7    reviewed the environmental assessment, that I want to ask

8    you.  But I don't want to assume anything or get in the way

9    of anybody else, so I need to know, before we get started,

10   what your -- you know, how much time you will give me.  I

11   would like -- I have several questions.  I have a written

12   response I'd like to give you.  So I could just sort of

13   tear into that, or if you want to tell me how much time I

14   have, I'll hit the points that are more important --

15            MR. MOTT:  If you're representing everybody here

16   and asking their questions, that will be fine.  I do want

17   to give everybody that's here a chance to speak.  Again,

18   the time limit that we set here was something we set aside

19   so everybody could have a chance to speak, so --

20            MR. BOWDEN:  Well, that was -- that's my point.

21   I don't want to --

22            MR. MOTT:  -- give some of these people a chance

23   to ask one or two questions.

24            MR. BOWDEN:  I don't want to dominate, so I want

25   to know from you how you want to handle that.

MR. MOTT:  If you want to start off and ask one or two questions, then we keep coming back and give people a chance to answer them.  But I'd like to give as many people here a chance to speak as we can.

MR. BOWDEN:  Okay.  Well, that sounds fine.  And if we hit a lull, I'll jump back in again.

MR. MOTT:  Okay.

MR. BOWDEN:  The first thing I want to ask you has to do with the historical nature of the church and its eligibility for placement on the National Historical Register.  I believe y'all talked about that in your report.  You talk about sites that would be eligible.  On page 31 of the report you talk about historic and archeological resources.  And you mention there that you had a -- what you call a Phase I Cultural Resource Assessment that went out and looked at the site, and then you -- I believe you're concluding that there are no historical sites there that would be eligible for listing on the National Historic Register.  Is that correct?  Am I correct in the way that I read that?

MR. SHIPPEY:  Yeah.  We did actually employ another subconsultant to complete a Phase I Cultural Resource Assessment.  And that was based on the request of the State Historical Commission.  And we submitted -- we did have them complete their report, and we submitted that

1    to the SHPO, or the State Historical office in Montgomery,

2    to, you know, formally, I guess -- first of all, they

3    requested the Phase I. We completed Phase I. We sent them

4    back a letter. They responded saying there's no other

5    things we need to do. That's kind of what we did.

6         MR. BOWDEN: Okay. In the assessment, what

7    you're calling a Phase I, and I don't know really what that

8    means, but in the study done by the other firm --

9         MR. SHIPPEY: Right.

10        MR. BOWDEN: -- they didn't mention Oak Grove

11   United Methodist Church as a historic church. Is that --

12   that right?

13        MR. SHIPPEY: I'd have to verify the report we

14   got. It's in our EA -- have you had a chance to review our

15   EA that's been out on public --

16        MR. BOWDEN: Right. I've got it in my hands

17   right now. And that Phase I assessment was sent to the

18   historical commission who then sent a memo saying they

19   concurred with the project?

20        MR. SHIPPEY: That's correct.

21        MR. BOWDEN: Now, since that time have you

22   received a letter from Elizabeth Ann Brown with the State

23   Historic Commission saying that they are revoking their

24   concurrence of the project?

25        MR. SHIPPEY: Personally, I haven't seen the

1   letter.  But if you've got a copy -- it hasn't come across

2   my desk.

3           MR. BOWDEN:  I'll give you a second to look at

4   that, because it's unfair to ask you any questions about

5   something you haven't seen.

6           MR. SHIPPEY:  Yes.  I have not -- I have not seen

7   this letter.  This is the first time I've seen it.

8           MR. BOWDEN:  Well, I can tell you that it says

9   that they have misunderstandings about the nature of the

10  project and how it would impact Oak Grove United Methodist

11  Church.  And -- they being the Alabama Historical

12  Commission.  And they have asked for some additional

13  information.  They want to know historical information

14  about the church itself, building dates, interior and

15  exterior photographs of the church, photographs of the

16  cemetery, and then they have some other questions about the

17  project.  And then they conclude by stating that their

18  letter of May 9th, 2003, when they concurred with the

19  project, is now invalid.

20          MR. MOTT:  The date on this letter is the 13th.

21  I just want everybody to know the date on the letter.  It's

22  not something that was issued months ago.  We haven't had a

23  chance to review it.  We will definitely go and answer all

24  of their questions.

25          MR. BOWDEN:  What happens now, in light of this

1    letter, both in terms of what you're gonna do and how

2    you'll deal with that insofar as the public is concerned?

3          MR. MOTT:  Justin, you want to talk about the

4    FONSI and how -- what the results of --

5          MR. BOWDEN:  I know about the FONSI.  I want to

6    know what you're gonna do about this.

7          MR. SHIPPEY:  Basically, this letter is -- like I

8    said, it's the first I've seen it.  I'll get back -- we

9    will have to respond to the letter to the State.  And

10    before the FAA can issue the FONSI, this issue will have to

11    be cleared up in the State's eyes to, you know, insure that

12    we've done everything -- if they've found something they

13    didn't look at to start with, we'll have to address these

14    issues.

15          MR. BOWDEN:  Do you -- the report that the

16    Phase I -- that report -- that report was turned in to you;

17    is that right?

18          MR. SHIPPEY:  That is correct.  A professional --

19    I'm not a professional archeologist.  We had a professiona

20    archeologist complete that report and turn it in to us.

21          MR. BOWDEN:  And did you -- I'm assuming you

22    looked at it when you got it.

23          MR. SHIPPEY:  Yeah.  I read it.

24          MR. BOWDEN:  And did you not think it significa

25    that Oak Grove Church, which you've got a poster board

Stephanie D. Garrett, CCR - (334) 566-2039

there with pictures, was not included in that report?

    MR. SHIPPEY:  I'm not saying I didn't think it was important.  I guess I'm just --

    MR. MOTT:  I don't -- I don't want this turned into a deposition.  You know, I'll answer any questions you have and -- you know, if it's something in writing, we'll respond to it in writing.  We'll have to have the State's concurrence to go forward.  So if the State Historical Commission has given us something that we need to review, we'll have to respond to that back to them in writing.

    MR. BOWDEN:  Okay.  And I realize that sort of got you on the spot, so I'll ask this question.  How is the process for when you accumulate the information sought in the letter and you give that to the State, and you set a public hearing here today for us to come in and give you some input, how do you deal with the fact that now you've got to get some additional information together insofar as it relates -- let me ask it this way:  Are you gonna have another public hearing, so we can hear what you have to say about the church?  I mean, how is that gonna be dealt with?

    MR. MOTT:  Do you want to answer that, as far as the FAA is gonna look at the comments?

    MR. SHIPPEY:  To be honest with you, I -- I've never had the -- I've never been involved in a second public hearing.  That's not to say that -- it would have to

1    be an FAA determination on that.  We will respond to this

2    letter.  If the State approves what we send in as a

3    response, we'll forward that to the FAA and -- along with

4    all the other comments we receive.  I mean, that's why

5    we're here.  If we miss something in the report, that's one

6    of the main reasons we're here, giving everybody an

7    opportunity to -- of course, all of that goes in, and then

8    if they decide we need a second public hearing, then we'll

9    have another public hearing.  That's not to say we

10   definitely are or definitely are not at this time.  I

11   really can't answer that.

12            MR. BOWDEN:  Okay.  So you can't tell me whether

13   or not we'll have another chance for public input on the

14   information you gather for the State?  You don't know one

15   way or the other?

16            MR. MOTT:  Typically, they give one opportunity

17   to address all your comments.  Please get them to us

18   verbally and/or in writing.  We have to respond to all of

19   those requests.  If we can't answer them verbally, we have

20   to get back to you in writing.  We take all this

21   information and we submit that in to the FAA as the results

22   of our public hearing, and they make the determination of

23   what we're gonna do.

24            MR. SHIPPEY:  I guess to kind of elaborate a

25   little bit, you know, the FAA, if they find, based on what

Stephanie D. Garrett, CCR - (334) 566-2039

1    we submit, if we need to do further analysis, they can

2    require us to do that, an environmental impact statement,

3    or they can issue a FONSI.  So they could require further

4    review in that regard.

5                MR. TURNER:  I think his question is, if you

6    submit that to the FAA, is it submitted to anybody -- to

7    the members of this church?

8                MR. SHIPPEY:  As far as our response to them?

9                MR. TURNER:  That's correct.

10                MR. SHIPPEY:  I guess you formally request a copy

11    of a letter that we send to them, then I don't see -- I

12    mean, it's all public record.  I don't see why we couldn't

13    get you the response we send to them.

14                MR. MOTT:  And SHPO too.  Once we reply back to

15    the historical office, that's public record at that time

16    too.  So if you -- my card's up front.  If you will take

17    one of my cards and let me know, I'll be glad to send

18    whatever copy when we send that letter back to whoever

19    wants to know.  The point here is we're not trying to hide

20    any information.  I promise you that.  We're trying to get

21    everything we can back out to you.  We've got no reason to

22    hide anything.  So if you want something, please let me

23    know.  If you'll give just a written comment saying, I'd

24    like a copy of this, or if you'll get one of my cards and

25    let me know -- the reason I tell you to do it this way is

1   this goes into the public record. Your notes will go into

2   the document that goes in as public record. So If you will

3   turn one of these things into us, you'll know that you've

4   got your comments written and --

5           MR. BOWDEN: Can I do that with a -- I have a

6   written response.

7           MR. SHIPPEY: Yeah.

8           MR. BOWDEN: Can I just give this to somebody?

9           MR. MOTT: Oh, sure. Give it to me.

10          MR. BOWDEN: And I -- by giving that to you,

11  you're assuring me that that will be put in with the EA

12  when it goes to the FAA?

13          MR. MOTT: Absolutely.

14          MR. BOWDEN: I have other questions, but I'll

15  give somebody else an opportunity --

16          MR. MOTT: Let's give somebody else a chance and

17  we'll come back.

18          MR. TURNER: Why do we have to submit this when

19  we've already signed in out there and given our name and

20  address?

21          MR. MOTT: Is that the back-sheet comment?

22          MR. TURNER: Yes.

23          MR. MOTT: You don't have to submit this if you

24  don't want to. If you have a --

25          MR. TURNER: But I'd like a copy of your -- what

1    they find, what they respond.

2        MR. MOTT:  One of my business cards is up front.

3    Again, my name's Barry Mott, in the Dothan office.  If --

4    just leave your name and address of how to send it to you

5    and I'll get you a copy and send it to you.

6        MR. TURNER:  Thank you very much.

7        MR. MOTT:  Or if you've got a business card, or

8    got something that you can give me your name and how you

9    want it sent, either mail, or fax, or e-mail.  I can do any

10    of those.

11        MR. TURNER:  Thank you.

12        MR. MOTT:  Anybody else have a question?  I'll

13    turn it back over to him then.

14        MR. BOWDEN:  I'm just curious.  You've got a

15    poster of the church with all the pictures on it up here.

16        MR. THOMASON:  That was put up by church members.

17        MR. BOWDEN:  Okay.  I have questions about

18    wetlands.  You know, one of the big findings of the -- of

19    your environmental assessment is that you're gonna have to

20    take or destroy 18 acres of the wetlands.  I've read that

21    correctly, haven't I?

22        MR. SHIPPEY:  That's correct.

23        MR. BOWDEN:  Let me ask you this:  Who should I

24    be asking this question about wetlands to?

25        MR. MOTT:  Keith.  Keith did the EA report.  I'm

1  trying to refer the question to people that did the report

2  or that did the study.  They're the ones that can answer

3  them best.

4      MR. BOWDEN:  Keith, on the wetlands issue, the

5  first thing I wanted to ask you is it's come to my

6  attention that this mitigation plan that you have is to

7  take -- create 24 new acres of wetlands; is that right?

8      MR. SHIPPEY:  That's currently what we're looking

9  at doing -- creating, to offset the impacts to the --

10      MR. LEE:  How do you create wetlands?

11      MR. SHIPPEY:  Well, there's several ways to do

12  it.  I mean --

13      MR. LEE:  Well, you're filling it in, so how do

14  you create it?  I mean --

15      MR. SHIPPEY:  Well, what -- like I said, I'm not

16  a wetland scientist, but I'm gonna try to answer the best I

17  can.  What we're proposing to do is create --

18      MR. LEE:  Well, there's only so much of it.

19      MR. MOTT:  You want me to answer the wetlands?

20  As an engineer -- let me quickly tell you, Keith is

21  environmental in our firm, Justin is a planner, and I'm a

22  professional engineer.  Any job that we come across that we

23  have a wetland issue, basically we're taking away wetlands

24  from a project, there's rules that we have to apply by.

25  One is we can create additional wetlands, and that has to

go before the corps of how many acres of wetlands that we have to, what they call, mitigate back.  We have to create wetlands.  So what we do is we use a -- someone that's certified to set up this plan of how we do it.  They go in and dig down an area that will stay wet.  The wetlands are created.  They plant them back as wetlands.  And the idea is that you give back more wetlands than you take out.  That is approved by the corps.  And then a certain period of time after you do that, they come back and check up and make sure that the wetlands were installed properly and still do exist.  And if they do not exist as they should be, they'll come back to the owner and the engineer and say, it didn't work, you better come up with something else.  So dig it back down, create more wetlands, either on site or somewhere in the proximity of the project.

      MR. JINRIGHT:  I have a question about that.  Tim Hornsby, whose mother lives where that road was closed at the end of the runway, he suggested that the road be run around that runway when it was built the last -- when the road was closed.

      MR. MOTT:  Yes, sir.

      MR. JINRIGHT:  He was told that it could not be done because of the wetlands.  Now what's changed between that time and this?  Are there not wetlands still there just like there was before that?

Stephanie D. Garrett, CCR - (334) 566-2039

1    MR. SHIPPEY:  Well, we have formally done a

2    wetland delineation, that we've got a copy of, that the

3    corps has approved.  And they've gone out on site and said,

4    yes, there are your wetland boundaries.  Now, to be honest

5    with you, I -- as far as the road relocation goes, I'm not

6    sure exactly -- because I wasn't involved, I'm not sure

7    exactly --

8    MR. MOTT:  I don't know what the conditions were

9    of that project.

10    MR. JINRIGHT:  Did y'all not do the first study?

11    Did y'all not do the first study for the -- when the road

12    closing took place?  Or was that some other firm?

13    MR. MOTT:  None of us personally did it, so I

14    can't speak for --

15    MR. JINRIGHT:  Was it your firm or somebody else?

16    MR. SHIPPEY:  It was our firm that did the -- I

17    guess the fencing project.  Is that what you're referring

18    to with the road?

19    MR. JINRIGHT:  Right.

20    MR. SHIPPEY:  Probably.  I -- I mean, if you're

21    saying they came out there and said, there are wetlands,

22    you cannot relocate this road there, I'm sure the wetlands

23    are -- like I said, I wasn't involved at that --

24    MR. JINRIGHT:  Well, that's what I don't

25    understand.  If it was wetlands there and they took our

17

road --

      MR. SHIPPEY:  Are you talking about right in

here?

      MR. JINRIGHT:  The end of the runway now.  Where

the fence is.

      MR. SHIPPEY:  Okay.  You can see right here this

is dry.  You can see that the stream runs right here and

this has been --

      MR. LEE:  Now, y'all piled dirt in that stream

when you extended that last little extension there.  The

stream is wet.

      MR. MOTT:  To answer your question, I don't know

what has changed.  I don't know.

      MR. JINRIGHT:  Well, that's what bothers me.

We're asking a lot of questions.  We're not getting any

answers.

      MR. MOTT:  I can tell you how this project would

relate to it in relation to the EA, but how did it relate

to another project -- I mean, I'll be glad to research it

and get you an answer.

      MR. JINRIGHT:  Well, I would sure like to have an

answer about that, because I don't -- I can't understand

why there couldn't be a road run through there before, but

it's okay now to extend the runway and fill it up with

dirt.  I don't understand that.

1    MR. TURNER: Billy, tell them who you are.

2    MR. JINRIGHT: Billy Jinright. I'm sorry.

3    MR. THOMASON: My thinking from the aviation

4  standpoint, if you look at the road's location, the section

5  that was closed, to relocate this road around the extension

6  we would have to go not only around the end of the actual

7  pavement itself, the FAA also mandates that you have

8  certain areas that are cleared in case of an underrun or

9  overrun of an aircraft in an emergency situation. These

10  areas are called the runway safety area and the runway

11  object-free area. Those are the areas that are indicated

12  by these -- this triple-dash line and single-dash line

13  here. In addition to that, we're not allowed to have

14  any -- you're not allowed to have anything in those areas,

15  one of those being a road. If we were to come outside of

16  that, we still have to meet not only those safety-area

17  requirements, but also requirements for Part 77, which is

18  the FAA's directives on how high things can be in the

19  vicinity of an airport and what determines obstructions.

20    In order to do that, we would have to probably

21  come up here and not reroute the road around it, but just

22  bring another street off, just because of the proximity of

23  a road relocation to, I guess it's County Road 291, and

24  then meet those requirements for -- not only the

25  safety-area requirements, but also the Part 77 height

1  requirements as well.  The FAA requires that you have at

2  least 15 feet of clearance over a road for the clearance of

3  automobiles.

4      MR. JINRIGHT:  You're talking about the height

5  from the road to the runway?

6      MR. THOMASON:  Yes, sir.  Basically, your --

7      MR. JINRIGHT:  15 feet --

8      MR. THOMASON:  -- your road elevation and your

9  runway elevation are the same.  You have a certain slope

10  that you go up from the runway from 200 feet off the runway

11  end, and that has to clear the road by 15 feet.

12      MR. JINRIGHT:  Well, I think this road would have

13  been well below 15 feet from the way -- from the way that

14  looks, the way the runway's stepped up from the road.

15      MR. MOTT:  Any changes that we do to a delineated

16  wetland, in other words we --

17      MR. LEE:  Like filling it in?

18      MR. MOTT:  Sir?

19      MR. LEE:  Like filling it in?

20      MR. MOTT:  If that's disturbing that wetland --

21  in other words, if we do anything to that wetland, whether

22  it's filling that wetland in or -- we would have to have

23  the permission of the corps of what we're gonna do and how

24  we're approaching to do it.

25      MR. LEE:  Who do you people -- are you in the

1    employ of the city?

2          MR. MOTT:  We work for the city, under contract

3    with the city.

4          MR. LEE:  So you're really not impartial in this

5    whole matter then, are you?  You've got a monetary interest

6    in --

7          MR. MOTT:  Well, as a professional engineer, I

8    have a code of ethics that I have to live by.  It's my

9    career.  I'm gonna do the right thing, regardless, you

10    know --

11          MR. LEE:  Well, we can count on that then?

12          UNIDENTIFIED MALE SPEAKER:  Well, let me mention

13    something since we're talking about wetlands.

14          MR. MOTT:  Yes, sir.

15          UNIDENTIFIED MALE SPEAKER:  On this thing right

16    here, propose you're gonna close the Sugar Pit Road.

17          MR. MOTT:  Right.

18          UNIDENTIFIED MALE SPEAKER:  If you close the

19    Sugar Pit Road you'll have to put a road right there and

20    that is wetland.  That's doggone (inaudible) right there.

21    (Inaudible) which is gonna be all wetland.

22          MR. THOMASON:  I don't believe we're closing any

23    roads.

24          MR. SHIPPEY:  No.  No.  We're not.  We're not.

25    This road here will remain open.  It's outside of what we

1    call the safety area right here.  Anything in here has to

2    be -- this road right here has to be --

3                UNIDENTIFIED MALE SPEAKER:  Are we gonna have

4    that in writing?

5                MR. SHIPPEY:  I can put that in writing.  I mean,

6    that is outside -- we are --

7                UNIDENTIFIED MALE SPEAKER:  Well, I don't

8    understand why we did all this survey -- of course, you

9    could explain that to me, why I've got all these surveyors

10   telling me they're closing that road.

11               MR. LEE:  Who do the surveyors work for?

12               MR. MOTT:  The surveyors work for me.  They're

13   part of my firm.  Did the survey trucks have BWSC written

14   on --

15               MR. LEE:  I don't know.  The group of people that

16   kept going on my place out there and driving stakes, they

17   never -- they never asked permission, they never did

18   anything.  They're just there.  Like, you know, I'm showing

19   up in your yard driving stakes or something.

20               MR. MOTT:  If they were driving stakes in your

21   yard, I need to know so --

22               MR. LEE:  Well, they were driving stakes on my

23   piece of land out there.

24               MR. MOTT:  They shouldn't have gotten off the

25   right of way of the road.

1      MR. LEE:  They were way off the right of way of

2  the road.

3          UNIDENTIFIED FEMALE SPEAKER:  Way off the right

4  of way.

5          MR. BOWDEN:  Do you mind if I go back to my

6  question?

7          MR. MOTT:  Can I point out one thing before we go

8  back?  One thing I failed to mention earlier is what you're

9  shown on these drawings is just a proposed extension.

10  There's a -- there's been no design of this runway

11  extension at this point.  In other words, we have not

12  surveyed from the end of that runway out, we don't know,

13  number one, how the contours will tie in.  In other words,

14  we know -- once we go into the design phase we'll know what

15  the runway elevation will have to be.  We'll have to have

16  good topo information, so we'll know how to tie in.  That's

17  gonna affect how many acres of wetlands that we disturb.  A

18  lot of things will be handled in the design phase.

19  Everything that we're talking about now is just in general

20  terms.  This is the best guess -- I hate to use that word,

21  guess, but it's the best guess that we have at this time of

22  what the design will be, so there's limits shown of what --

23  the effected properties, that kind of stuff.  I just want

24  to point that out before we move on.

25          MR. LEE:  I still don't understand how you

replace the natural occurrence that is in that wetland by
digging up something somewhere else and putting some water
on it.  The natural -- whatever it is at -- is what the --
intent of the wetland, the way I understand it.

MR. MOTT:  Yeah.  The National Corps of Engineers
has a set requirement, this is how we have to mitigate back
wetlands.  We have to follow the national law on how to do
it.  There's a whole division that does nothing else.

MR. SHIPPEY:  And a permit has to be issued by
the corps of engineers before the project can --

MR. LEE:  Yeah.

MR. SHIPPEY:  -- proceed.

MR. JINRIGHT:  Has the Army Corps of Engineers
checked off on this yet?  Have they approved it?

MR. SHIPPEY:  The Army Corps of Engineers has
approved our delineation.  Yes, sir.  And that's
delineating the -- I guess it's roughly 18 acres.

MR. JINRIGHT:  When did that happen?

MR. SHIPPEY:  I'd have to go back and check the
records, but we have a letter from them approving our
delineation.  Which, actually, we delineated 30 acres out
there, but we're not gonna be impacting the entire
30 acres.  So what they've agreed to is our delineation of
the 30 acres.

MR. BOWDEN:  Keith, I think it's important that

1    you explain what you mean by that.  When you say that they

2    have agreed with your delineation, am I not right that

3    you're just saying they've agreed with you on what you've

4    identified as wetlands out there; is that right?

5         MR. SHIPPEY:  That's correct.

6         MR. BOWDEN:  They have not agreed with you that

7    your mitigation plan is sufficient --

8         MR. MOTT:  That's correct.

9         MR. SHIPPEY:  That's correct.

10        MR. BOWDEN:  In fact, I mean, you've not even

11   coordinated that with them yet --

12        MR. MOTT:  We have not coordinated that because

13   we don't know what we're disturbing at this point.  We need

14   to --

15        MR. BOWDEN:  Although you want us -- you're gonna

16   send this up and you're telling us you don't know what

17   you're gonna disturb yet.

18        MR. THOMASON:  We can't do that until after the

19   design has been complete.

20        MR. BOWDEN:  Then we'll all be -- it'll be too

21   late for us all to say anything about it.

22        UNIDENTIFIED MALE SPEAKER:  That's the way I see

23   it.

24        MR. BOWDEN:  Let me go back to my question.  Your

25   proposal is to take 24 acres, condemn an additional

1    24 acres, and make that into new wetlands; is that right?

2    　　　　MR. MOTT:  I wouldn't use the word condemn.

3    　　　　MR. BOWDEN:  You're gonna take that from whoever

4    owns it and turn it into new wetlands?

5    　　　　MR. MOTT:  No.  We're not taking to -- to do

6    wetlands, no, sir.

7    　　　　MR. BOWDEN:  Whose land is it that you're gonna

8    turn into wetlands?

9    　　　　MR. MOTT:  At this point, I do not know.

10    　　　　MR. SHIPPEY:  Well, we'd be -- you say take.  I

11    mean, we'd be purchasing property.

12    　　　　MR. BOWDEN:  Well, that's what condemn -- you

13    understand what condemn means?

14    　　　　MR. SHIPPEY:  I understand what condemn means,

15    but I'm not gonna say we're --

16    　　　　MR. BOWDEN:  That means you go to somebody who

17    doesn't want to sell you their property and you take it --

18    you take it from them and pay them for it, of course.

19    　　　　MR. MOTT:  That's not what you asked.  You asked

20    if we're gonna condemn it.  I don't know at this point.

21    　　　　MR. BOWDEN:  You don't know whose land is gonna

22    be chosen for the new wetlands?

23    　　　　MR. MOTT:  We don't know how many acres of

24    wetlands we'll have to mitigate back.  The design hasn't

25    been completed at this time.  All we can tell you is from

26

1   the drawing, just a guess of what the contours would be.

2   We have not surveyed that land.  We don't know what the

3   actual elevations are.  We've got set requirements of what

4   those contours and slopes have to be, and depending on what

5   the design shows will be how many wetland acres we --

6          MR. BOWDEN:  When will you know that in this

7   process?

8          MR. MOTT:  Once this project -- if this project

9   is -- comes back as approved by the FAA, the city will have

10  to apply for a grant to do the design for the runway

11  extension.  They'd have to also apply for a grant -- I say

12  apply for a grant, they can pay for it out of pocket if

13  they wish to -- apply for a grant to purchase the property

14  or do a land acquisition project and construct the runway.

15  So one of the next phases would be, if everything comes

16  back clean and the FAA approves the environmental

17  assessment, we will do the designs in the next phases.  But

18  that will be up to the city to determine if they're ready

19  to go forward with the project.

20         MR. BOWDEN:  So just to clarify then, the corps

21  has not said that they agree that your mitigation plan will

22  or will not be accepted?

23         MR. MOTT:  They have not written to us; is that

24  correct?

25         MR. SHIPPEY:  Well, we've created a mitigation

27

1    plan, but it has not been approved by the corps.

2            MR. BOWDEN:  And have you coordinated it with

3    them yet?

4            MR. SHIPPEY:  No.  The plan has not been -- the

5    mitigation plan has not been submitted to the corps.

6            MR. BOWDEN:  Okay.  In your -- again, on the

7    wetlands issue, in your initial -- in the environmental

8    assessment part, you talk about the wetlands and you

9    mention that you're gonna try to -- the new wetlands that

10   you're gonna be creating, you're gonna do something to

11   limit waterfowl coming near the airport; is that right?

12           MR. SHIPPEY:  Yes.  That is what -- and, again,

13   I'm not trying to dodge your question, but --

14           MR. BOWDEN:  It seems like you are.

15           MR. SHIPPEY:  Well, I mean, I'm not.  We have a

16   firm -- Wetland Science has kind of developed a plan with

17   the -- with our review, but --

18           MR. BOWDEN:  Well, let me ask my question again.

19   If you can answer it, fine.  If you can't, just say, I

20   can't answer it.  You have said in the environmental

21   assessment, which I understand you to be the author of,

22   that the new wetlands will be designed in a way where they

23   will discourage or try to keep out waterfowl.  Is that

24   true, or not, or do you remember?

25           MR. SHIPPEY:  We will -- in other words, we will

28

1    do all we can to design it so we don't attract wildlife

2    or -- you know, certain wildlife that will interfere with

3    the planes. We're definitely going to try to avoid that.

4           MR. LEE: Well, supposing that some of the land

5    owners, and I'm one of them, just comes to the point --

6    and, you know, you're wanting to take whatever you want to

7    take, to do whatever you're wanting to do, and I just tell

8    you I've got other plans for it and I ain't selling it.

9           MR. MOTT: Did you get his name?

10          MR. LEE: Donald Lee.

11         MR. MOTT: I just want to make sure. I'm sorry.

12         MR. TURNER: This is John Turner. I'm confused

13    that you're sitting here saying you're going to -- you're

14    giving your best idea about your plan and the area you want

15    to do it. You don't know if you're going to get approval

16    to do the wetlands. They come back and say no, what are

17    you gonna do, pick another area?

18         MR. SHIPPEY: We will -- if they -- if they do

19    not approve what we have for a mitigation plan, we will

20    work to develop a mitigation plan they approve. I mean,

21    people mitigate wetlands all over the country, you know,

22    building roads or whatever, and you can get a permit to do

23    it. You just have to do it according to the Corps of

24    Engineers' guidelines. And we -- if they deny our

25    preliminary mitigation plan, then they will state why and

1    we will work to get that approved.

2            MR. LEE:  Well, really the wetland law doesn't

3    mean anything?  It's just a way of y'all shuffling stuff

4    around and destroying wetland, and you just kind of like --

5            MR. THOMASON:  We are required to replace what we

6    impact.  And most of the time we create more of a wetland

7    area than we started --

8            MR. LEE:  But you can't recreate what's down

9    there.  You can't recreate a natural wetland.

10           MR. MOTT:  Keith, you want to answer his question

11   about the land?  He asked the question what do we do if

12   we'd like to acquire his land and they refuse to sell it.

13   In other words, we can't negotiate a price for purchasing

14   the property.

15           MR. SHIPPEY:  I mean, you mentioned condemn, you

16   know, that's -- that's what we'd have to do.

17           MR. LEE:  Then you'll just have to do it.  If I

18   wanted to sell it, there would be a sign on it.

19           MR. MITCHELL:  I want to talk about that, that

20   condemning.  I pastored a church in Southaven, Mississippi,

21   which is on the crux of Memphis International.

22           MR. MOTT:  Yes, sir.

23           MR. MITCHELL:  We're two miles -- over two miles

24   from the runway.  The FAA came in and condemned half of the

25   subdivision.  One hundred houses were torn down and the

1   slabs ripped up, and the homeowners had no choice.  Noise

2   from a 727 -- you've got on your thing here a 727 coming in

3   here for Troy State.

4           MR. MOTT:  Yes, sir.

5           MR. MITCHELL:  We're talking about two miles of

6   land that's condemned, that could never have a house built

7   on it, never have a subdivision on it.  That --

8           MR. THOMASON:  Yes, sir.  That -- comparing

9   Memphis International to Troy Municipal --

10          MR. MITCHELL:  No, sir.  We're talking about a

11  727.  It doesn't have to be but one.

12          MR. THOMASON:  Yes, sir.  It's all about the

13  number of operations.  And Memphis International -- it's

14  also the number of operations and time of the operation.

15  Now, Memphis incurs a significant noise penalty because

16  most of their operations are FedEx aircraft operating at

17  night.  Here, these are most likely going to be aircraft

18  that are coming in in the afternoons picking up athletes,

19  taking them to sporting events.

20          UNIDENTIFIED FEMALE SPEAKER:  Oh, my goodness.

21          MR. MOTT:  Please.  Please.

22          MR. LEE:  If Auburn University flies their team

23  out of Montgomery, where there already is an existing

24  airport, how can you justify the expenditure of funds to

25  extend this little airport out here?

31

1       MR. THOMASON:  Because it's not just for Troy

2 State.  It's for a variety of operators operating in our

3 airport now.

4       MR. LEE:  The University of Alabama flies out of

5 Birmingham most of the time.

6       MR. TURNER:  If you expand the runway, you're

7 saying now what you're limiting to travel.  What is the

8 future?  You don't know what the future is and how many

9 planes are gonna be coming in and out.

10       MR. THOMASON:  Right.

11       MR. TURNER:  So how do you justify that?

12       MR. THOMASON:  We've used the FAA Terminal Area

13 Forecast and applied that to an aircraft mix that we

14 believe will use the airport --

15       MR. TURNER:  There's a man sitting here telling

16 you they had to condemn them within so many miles, that

17 didn't work.

18       MR. THOMASON:  Yes, sir.  Because that is a

19 completely different noise model.  The model for Memphis is

20 not gonna compare to a model for Troy Municipal.

21       MR. TURNER:  It's not now.  But I'm talking about

22 the future.

23       MR. LEE:  (Inaudible.)

24       MR. TURNER:  I hope they're recording this so we

25 can come back in 20 years and --

32

1      MR. THOMASON: Well, Memphis has ten times that

2  every hour.

3      MR. MITCHELL: But you're saying -- I didn't hear

4  that right. We're spending eleven million dollars, and the

5  county is spending $500,000 to accommodate ten flights a

6  year?

7      MR. THOMASON: No, sir. That's just from the 727

8  aircraft that you identified earlier. The majority of the

9  aircraft identified in the runway justification study are

10  larger corporate jets used by businesses that are operating

11  in the area.

12      MR. LEE: Yeah. But they took the C-5 --

13      UNIDENTIFIED FEMALE SPEAKER: (Inaudible.)

14      MR. THOMASON: Yes, sir. C-5 is a special

15  military aircraft designed to take off on short runways.

16      UNIDENTIFIED MALE SPEAKER: So is the C-130. And

17  you've got it listed as one needing a runway in your

18  report.

19      MR. LEE: And (inaudible).

20      THE COURT REPORTER: I -- I cannot --

21      MR. MOTT: Y'all, please -- please, one question

22  at a time. I'll answer any question you've got. She's

23  trying to record it. Okay? Yes, ma'am?

24      MS. LEVEQUE: I'm Liz LeVeque. I live on 231 --

25  old 231, and there's already C-130s leaving there, and

33

1    they're loud enough. So if you're having more airplanes

2    coming in, it's gonna be really loud. And I thought it

3    was -- right now we're having helicopters from Sikorsky,

4    and they buzz our house. But now you're gonna have jets

5    coming over our house.

6        MR. THOMASON: The jets are already operating out

7    of the airport.

8        MS. LEVEQUE: That's right. So why would you

9    need it bigger to --

10       MR. THOMASON: Because they're having to operate

11   with reduced loads, having to use higher thrust settings.

12   Those higher thrust settings are actually louder. If they

13   had more runway, they could use less power. It's just like

14   revving up your car. If you've got to go up a small hill,

15   your car is not gonna rev as high as if you have to go up a

16   steep hill.

17       MR. MITCHELL: Sir, I'm a pilot, and I question

18   that.

19       MR. THOMASON: Well, that's why we have to have

20   thrust settings in our model.

21       MR. MITCHELL: Well, we are taught to take off

22   full throttle because you don't know what's gonna happen

23   between you and the end of the runway. And I've flown the

24   727 simulator and they are -- it's full thrust. Now, maybe

25   that's changed since I did it, but I don't think you adjust

1    the throttle back and forth when you take off in an air --

2    I've never heard of that.  Maybe you know something new.

3        MR. THOMASON:  That's -- in the IN model we're

4    required to use thrust settings.  And that's one of the

5    items that we have to account for in the model.

6        MR. MITCHELL:  I understand.  But I'm telling you

7    that the pilot's not.

8        MR. THOMASON:  Yes, sir.  Well, I can't control

9    what the pilot does.

10       MR. MITCHELL:  Right.  That's my point.

11       UNIDENTIFIED MALE SPEAKER:  Which leads us to my

12   question about the sound.  How do you arrive at the -- how

13   is that measured?  Y'all -- is that a guestimate or --

14       MR. THOMASON:  No, sir.  That's using the

15   Integrated Noise Model, which is the FAA's standard for

16   noise model and it's the only one accepted by the FAA.

17   Basically, what we do is we group aircraft with flight

18   noise characteristics and operations, put those on flight

19   tracks.  And we have to break those operations down by

20   times of day.  Operations that you might hear during the

21   day are counted as one, because of the perceived limitation

22   of noise at night and later in the evening.  Noise that

23   incurs during a certain period in late -- early evening has

24   a factor applied to it that increases -- it's -- I can't

25   remember the specific logarithmic equation, but it's --

1  it's a certain number higher.  So one operation -- we'd

2  have to say one and a half.  That's just an estimate.  And

3  then operations that take place between ten o'clock at

4  night and seven o'clock in the morning are counted as ten

5  times the number operated if that operation occurred during

6  the day.

7  UNIDENTIFIED MALE SPEAKER:  Is that because of

8  the atmosphere or --

9  MR. THOMASON:  It's all perceived noise.

10  UNIDENTIFIED MALE SPEAKER:  Oh, it's perceived

11  noise?

12  MR. THOMASON:  Yes, sir.

13  UNIDENTIFIED MALE SPEAKER:  Well, now, you

14  understand one of our major things is that the church is in

15  danger of the noise?  That's one of the main objections we

16  have in this thing.

17  MR. THOMASON:  Yes, sir.

18  UNIDENTIFIED MALE SPEAKER:  And I don't see how

19  you can -- I believe you said it was 65 to the front door

20  of the church.

21  MR. BOWDEN:  Back.

22  UNIDENTIFIED MALE SPEAKER:  65.  And that is the

23  limit.  Is that the limit, 65?

24  MR. THOMASON:  65 is the point at which the FAA

25  agrees that there is an impact to residents.

36

1     MR. BOWDEN:  Did you know that the church had a

2  problem with the airport when you did your noise model?

3     MR. THOMASON:  No, I did not.

4     MR. BOWDEN:  So it's just a coincidence that the

5  threshold gets drawn at the back door of this church, the

6  maximum --

7     MR. THOMASON:  Yes.

8     MR. BOWDEN:  Let me ask you this:  Did you take

9  into account that a lot of the trees would be cut down

10  between --

11     MR. THOMASON:  No, sir.  That doesn't have any

12  affect on the model.

13     MR. BOWDEN:  Does it have any affect on the

14  noise?

15     MR. THOMASON:  It does not have any affect on the

16  model.

17     MR. BOWDEN:  You're doing this on a computer

18  then?

19     MR. THOMASON:  Yes.

20     MR. BOWDEN:  You're not out at the airport

21  with --

22     MR. LEE:  So you can make it do what you want it

23  to do?

24     MR. THOMASON:  No, sir.

25     MR. BOWDEN:  Did you put any of the larger

Stephanie D. Garrett, CCR - (334) 566-2039

37

1   military aircraft into the software?

2          MR. THOMASON:  I believe we put in the C-130 and

3   the C-5.  I'd have to go back to the records to make sure.

4          MR. BOWDEN:  Did you put in the C-17?

5          MR. THOMASON:  I couldn't tell you without --

6          MR. BOWDEN:  Do you have the data that you put

7   into your model?

8          MR. THOMASON:  Yes.

9          MR. BOWDEN:  Can we get that?

10         MR. MOTT:  Yeah.  It's in the --

11         MR. THOMASON:  Yes.

12         MR. BOWDEN:  Of course, it -- it's only -- the

13  output -- these noise contours are only as good as the data

14  that's put in there.  You are in control of that; is that

15  right?

16         MR. THOMASON:  The information dictates what goes

17  in, yes.

18         MR. BOWDEN:  Right.  Did you note -- I don't know

19  if this would matter or not because I've never dealt with

20  this kind of software, but I did note that on the FAA

21  website that in March 2003 they came out with an upgrade on

22  the software.  Does that impact your analysis at all?  You

23  used the 6.0 --

24         MR. THOMASON:  I believe it was 6.1.  But I don't

25  believe it will impact it a great deal.  We have not run --

38

1    since the EA has been published we have not rerun the

2    noise. That's not something the FAA is requiring.

3         MR. BOWDEN: Well, the FAA is not involved yet.

4    And you used version 6.0, according to your report. And my

5    question is -- and I don't know. Maybe it doesn't matter.

6    Maybe version 6.1 makes changes that wouldn't impact the

7    ultimate answer, but I'm asking you, does the fact that

8    there's a version 6.1 -- I mean, I know when I get

9    Microsoft version upgrades it's different, it matters.

10   That's why they put it out. Does it matter there's a

11   version 6.1 out? It came out a year ago. Would that

12   change your analysis? Could it change your analysis?

13        MR. THOMASON: Could it? It could possibly.

14        MR. BOWDEN: And that could make it 65 degrees on

15   the front side of the --

16        MR. THOMASON: There's no way to --

17        MR. MOTT: We used the most available software

18   that we had at the time we did the EA.

19        MR. BOWDEN: When did you do it?

20        MR. MOTT: I don't know.

21        MR. BOWDEN: Because this software came out in

22   March of 2003. This is July of 2004, so --

23        MR. MOTT: Did the FAA approve the sound contours

24   that we presented? Or is that included in the EA?

25        MR. THOMASON: That's included in the EA.

1  　　　　MR. MOTT:  So the FAA has the position to look at

2  what's offered in the EA and see whether we did it

3  correctly or not.

4  　　　　MR. BOWDEN:  Well, everything you do, the FAA

5  will look at and see whether you did it correctly or not.

6  　　　　MR. MOTT:  That's correct.

7  　　　　MR. BOWDEN:  So back to my question.  6.1 is a

8  better version -- well, not a better version, a different

9  version, that came out in 2003.  You didn't use that

10  version and you're telling me that it could make a

11  difference.

12  　　　　MR. THOMASON:  I'm telling you that there's no

13  way to know unless I redo the model.

14  　　　　MR. BOWDEN:  Do you plan to redo it?

15  　　　　MR. THOMASON:  We don't have any plans to redo it

16  at this time.

17  　　　　MR. MOTT:  If the FAA tells us to go back and

18  rerun it, we'll go back and rerun it.

19  　　　　MR. BOWDEN:  The fact that it's that close to the

20  church, the threshold, doesn't concern you enough that

21  maybe you should go back and check that, any one of you

22  three?

23  　　　　MR. MOTT:  We -- we will do whatever the FAA

24  requires us to do for the project.

25  　　　　MR. TURNER:  I thought you said at the beginning

Stephanie D. Garrett, CCR - (334) 566-2039

1    you'd do what was right.

2        MR. MOTT:  I understand.  Please understand too

3    that we're trying to --

4        MR. TURNER:  I mean, that's what you said, is it

5    not?

6        MR. MOTT:  We can go back every week and redesign

7    the same project 14 times.  There's nothing fragrantly

8    wrong with the results that we've gotten.  If the FAA comes

9    back and says, you know, we've got a new version of the

10   software and we want you to rerun contours, we'll do

11   whatever they ask us to do.

12        UNIDENTIFIED MALE SPEAKER:  Can I ask you a

13   candid question?

14        MR. MOTT:  Yes, sir.

15        UNIDENTIFIED MALE SPEAKER:  If you decide to run

16   the runway in any direction you want to, you're gonna

17   justify it one way or the other?

18        UNIDENTIFIED FEMALE SPEAKER:  Uh-huh.

19        MR. THOMASON:  No, sir.  We --

20        UNIDENTIFIED MALE SPEAKER:  I mean, can you --

21   you tell me that you could not justify running one a

22   certain way if you didn't want to run it that way.

23        MR. THOMASON:  We hired a company out of Atlanta

24   to do a study to tell us which end to extend.  What would

25   provide the airport with the best --

1    UNIDENTIFIED MALE SPEAKER:  And I read -- I read

2    some of those.  I think there was one, two, three of them.

3    I read those.  And all those things depends on the person

4    receiving and giving.  You know, I don't understand -- you

5    could sit here and justify another runway the very same way

6    you're justifying this one, I believe.  You could justify

7    that north/south runway.

8        MR. THOMASON:  No, sir.  That's why we had the

9    study done, to tell us which end we need to extend.  And

10   that's why we have a third party doing it.  That's not

11   something that Barge, Waggoner, Sumner & Cannon is coming

12   to you saying, this is the best runway to extend.  It was

13   an outside third party with nothing to gain.  They were

14   just doing a study, putting numbers in.

15       UNIDENTIFIED MALE SPEAKER:  How long have you

16   worked with these folks?

17       MR. THOMASON:  Six years.

18       UNIDENTIFIED MALE SPEAKER:  Six years.

19       MR. JINRIGHT:  Billy Jinright.  The question I

20   have, who has the final decision about whether this is

21   gonna be done or not?  The FAA?  What y'all recommend to

22   them, will they -- will they have the final decision, or

23   the City of Troy, or what?

24       MR. SHIPPEY:  The FAA will have the final

25   decision whether or not -- how to go from here based off

42

1    this report.  The FAA has the final decision on approving

2    this environmental assessment.

3              MR. JINRIGHT:  But they will make their decision

4    totally on the report that y'all give them?

5              MR. SHIPPEY:  Yes, sir.  They will make -- review

6    our report, and make a decision based on the report that we

7    give them.

8              MR. JINRIGHT:  So all of -- so what we need to do

9    is whip up on y'all and not the FAA; is that correct?

10   That's what I -- that's the question -- I mean, that's

11   what's bothering me.  You know, it bothers me that the

12   city -- it bothers me there's no City of Troy officials

13   here today.  For sure not the mayor and the councilmen.

14             UNIDENTIFIED MALE SPEAKER:  They're out here.

15             MR. JINRIGHT:  I'm sorry.  I didn't see them.  I

16   don't have eyes in the back of my head.  But it bothers me

17   that the recommendations that y'all are gonna make is gonna

18   make them look bad.  They do a --

19             MR. LEE:  They work for them.

20             MR. JINRIGHT:  What was that?

21             MR. LEE:  They work for them.

22             MR. JINRIGHT:  Well, it bothers me that what

23   y'all are recommending is gonna take away a lot for the

24   good that they've done for the City of Troy.  A lot of

25   people are not gonna -- are gonna lose faith in them,

Stephanie D. Garrett, CCR - (334) 566-2039

1   because when you start putting runways in the back of a

2   church, that's not good.  That is just not good.  And I

3   don't -- I don't understand.  You know, I -- it bothers me

4   that the people are gonna lose faith in our city officials.

5   So I would suggest to y'all that maybe you need to do a

6   different study, and have some answers for all these

7   questions we've got.  Because I just -- I don't know -- I

8   have lost faith in -- I know y'all must be a good firm.  I

9   don't mean to beat up on y'all.  If I thought it would do

10  any good, I'd get a big stick and hit you over the head

11  with it.  But we just -- we've asked a lot of questions

12  here today that we're not getting any answers for, and we

13  don't know whether we're gonna have another hearing or not.

14           MR. THOMASON:  Yes, sir.  And we've tried, to the

15  best of our ability, to anticipate the questions that you

16  as a community would ask.  Now, we're not perfect and we're

17  not gonna be able to answer all of those questions.

18  There's --

19           MR. JINRIGHT:  I don't think any of them have

20  been answered.  You know, very few questions have been

21  answered.  So why are we having a public hearing when y'all

22  are not ready to answer the questions?

23           MR. MOTT:  If there's any questions that we

24  haven't answered, please, you know, y'all fill this -- I'm

25  serious.  Fill this out and --

44

1        MR. JINRIGHT:  Well, why are we having this

2   hearing?  Why not just --

3        MR. THOMASON:  It's a requirement for the FAA.

4        MR. JINRIGHT:  Another thing that -- while I'm

5   talking to you -- that bothers me in the report y'all had,

6   it says that this church, Oak Grove United Methodist

7   Church, is mostly white.  If we had been a minority church,

8   would that have made a difference in y'all's study?  Why

9   was that put in the report?

10       UNIDENTIFIED FEMALE SPEAKER:  What importance was

11  that?

12       MR. SHIPPEY:  I -- that was put in the report due

13  to the fact someone from the FAA...

14       UNIDENTIFIED FEMALE SPEAKER:  He can't answer it.

15       UNIDENTIFIED FEMALE SPEAKER:  Uh-huh.  Yeah.

16       MR. SHIPPEY:  I'm not trying to -- I just -- they

17  wanted -- I mean they wanted us to put as much information

18  about the church, as far as service, denomination, you

19  know, that I could.  That's what I --

20       MR. JINRIGHT:  You know, all we had --

21       MR. THOMASON:  We were asked the question from

22  the FAA and we answered it to the best of our ability.

23       MR. JINRIGHT:  Well, what difference would it

24  make to them?

25       MR. THOMASON:  That's a question for the FAA,

45

1    sir.

2           MR. JINRIGHT:  Is there an FAA official here

3    today?

4           MR. THOMASON:  No, sir.

5           MR. HUDSON:  Are we gonna have a meeting with

6    them?  Carl Hudson.

7           MR. THOMASON:  You're more than welcome to --

8    it's the FAA office in Jackson, Mississippi.

9           MR. HUDSON:  They're the ones wanting to take the

10   land, so they could come here to us.

11          MR. MOTT:  You can -- you can request that of the

12   FAA.  We can't call for --

13          MR. HUDSON:  Well, how about y'all request it for

14   us?

15          MR. MOTT:  If you'll document it down, it goes

16   right in their hands.

17          MR. HUDSON:  That will be fine.

18          MR. MOTT:  There's a gentleman in the back that's

19   been waiting for a long time.  Sir?

20          MR. URQUHART:  Not a long time, but just

21   listening to things.  We've been talking about wetlands,

22   we've been talking about the church.  I'm Ted Urquhart and

23   I'm with the Alabama Cemetery Preservation Alliance, and so

24   far -- you have a historic cemetery here that the reason

25   we're here is we have been asked to come here, as some of

the previous plans, as the individuals understood it,
you're gonna be running a fence line right through the
cemetery.

MR. THOMASON:  No, sir.

MR. URQUHART:  Now you're saying that you have
not made any plans.  You sure have some good ideas though
as to what properties --

MR. THOMASON:  Yes, sir.  This whole process
starts with an airport layout plan.  That plan is a -- this
drawing, approved by the FAA, lists the predicted project
that we would like to undertake.  The city cannot receive
any federal funding unless that project is drawn on this
drawing and approved by the Federal Aviation
Administration.  Now, it costs us money and it costs the
city money and it costs the FAA money to produce these
drawings, so what we usually do is to --

MR. URQUHART:  Cost of business.

MR. THOMASON:  Well, yes, sir.  But we try to
eliminate needlessly having to come back time after time
and update the drawing to reflect certain changes.  We put
the -- this is the master plan basically.  This is gonna be
a 20-year plan, so we try to show all development on there
that we see happening in the future.

MR. URQUHART:  Well, my question is --

MR. THOMASON:  So if we don't want to acquire

1    this land right now, we don't have to, but the possibility

2    is there.  Now, in --

3              MR. URQUHART:  What I'm saying is --

4              MR. THOMASON:  Just one second.  Let me finish.

5              MR. URQUHART:  That's a historic cemetery.

6    You're not gonna move into it.

7              MR. THOMASON:  Yes, sir.  In our last meeting

8    concerns were voiced about the cemetery.  We've gone back

9    and revised the property line.  Now, we haven't updated

10   that drawing, but we can acquire less.  So the property

11   line on the ALP reflects one thing, but our plan has pulled

12   back the property line from the cemetery and the church

13   considerably.

14             MR. URQUHART:  If you pull back from the

15   cemetery, are you also gonna leave part of that tree line

16   there, the --

17             MR. THOMASON:  Yes, sir.  Our --

18             MR. URQUHART:  Or is that gonna get wiped out

19   because of the safety of flight?

20             MR. THOMASON:  Our intention is to leave as much

21   vegetative barrier as is allowed by the FAA.

22             MR. MOTT:  Can I talk a minute about the slope,

23   the glide paths, and stuff?  The reason he said as much as

24   can be left, let me explain a little bit about that.  You

25   have a glide path off horizontally on each side and off on

1  the end.  Until we get topo information of what's there we

2  may have to top some trees out, keep them down below a

3  certain elevation.  But we want as much buffer between the

4  runway and the church as can be left.

5          MR. URQUHART:  I understand that.  But if you go

6  out there and look at it, you've got a heck of a gulley.

7  You're gonna have to do some filling out there.

8          MR. MOTT:  There's no way for us to tell until we

9  survey all through there, and we can't survey on your land

10  without your permission, so we have not --

11          MR. LEE:  What do you call them folks that's been

12  out there?

13          UNIDENTIFIED MALE SPEAKER:  The heck you say.

14  Y'all did it.

15          MR. MOTT:  In my office I am not aware of any

16  survey on individual property owners' land without their

17  permission.

18          MR. LEE:  You entered on mine and surveyed it.

19  Somebody did.

20          MR. MOTT:  I have completely instructed our crews

21  not to get off the right of way on anybody's land.  If they

22  have, I apologize.  You can talk to me one-on-one about --

23          MR. JINRIGHT:  Will you have a show of hands of

24  anybody in here that was contacted by your surveyors?

25          MR. MOTT:  I don't know of anybody that was

49

1    contacted to get on their land to do any surveying, with

2    the exception of what was on the right of way, that's the

3    only instruction they were given.  As the engineer on the

4    job they were not instructed to do so.  Now, if they did,

5    please get with me, I'd like to go see.  I'll come out

6    there and look at your land.  If I see stakes that are out

7    there --

8            MR. HUDSON:  They didn't put stakes.  They tied

9    ribbons and cut pathways.

10           MR. MOTT:  If you'll show me, I'll address it

11    with my staff.

12           MR. HUDSON:  Well, it's not gonna do any good

13    now.

14           MR. LEE:  They're not out there.  I gathered them

15    up.

16           MR. MOTT:  I can only do -- if you'll show it to

17    me, I'll try to address it, but I did not instruct them to

18    go out there on your land.

19           MR. TURNER:  This is John Turner.  I just want

20    one clarification.  Are you saying that you are not going

21    to take any land from the cemetery as it is right now?  Is

22    that yes or no?

23           MR. THOMASON:  Our intention right now is we are

24    not going to acquire any property inside --

25           MR. TURNER:  That's a catch phrase, to say our

50

1    intention is not.  It's yes or no.

2         MR. THOMASON:  It's not a yes or no question,

3    sir.  It's gonna be -- it's a yes or no question for the

4    FAA but not for us.

5         (Multiple conversations going on at once.)

6         THE COURT REPORTER:  I cannot hear.  I cannot

7    hear.

8         MR. TURNER:  My understanding is that right now

9    you have got a historical -- you have had a survey done,

10    what they say is the best from a third party.  And what

11    you're saying is this is what you're gonna do.  No matter

12    what you -- we have to say, you're gonna answer all the

13    government agencies that are gonna approve whatever you

14    want to do and you're gonna put this in.  We have no say.

15    Is that yes or no?

16         MR. THOMASON:  No, sir.  It's proof that you're

17    here tonight that that's not the case.

18         MR. TURNER:  My statement was, your plan, you're

19    gonna submit it to the FAA, and if they approve it, you're

20    gonna do it?

21         MR. MITCHELL:  Absolutely.

22         MR. TURNER:  Yes or no?

23         MAYOR LUNSFORD:  Let me -- I'm sorry.  We're not

24    supposed to get involved in the public hearing, but I'm

25    speaking on behalf of the intent of the City of Troy, and

1    if the plans were drawn where they will acquire any

2    property of the church, then we need to amend the plan.

3    That is not the intent of the City of Troy, that has never

4    been the intent of the City of Troy, and it jeopardizes the

5    extent of this project.  The cemetery nor the church

6    property will be disturbed in this project.

7           UNIDENTIFIED FEMALE SPEAKER:  It will be

8    disturbed, just not acquired.

9           MAYOR LUNSFORD:  Excuse me.  I apologize.  I'm

10   not trying to -- it will not be part of any acquisition now

11   or in the future.

12          MR. MITCHELL:  Can I speak to the mayor?  I don't

13   know what the rules are here.

14          MR. MOTT:  It's informal.  Mayor, if you --

15          MAYOR LUNSFORD:  Sure.

16          MR. MITCHELL:  The FAA has absolute total power

17   here.  They tore down churches.  Now -- and I'm just saying

18   that.  I know what your intent is, but I'm just saying if

19   this thing comes down to the FAA, they can do whatever they

20   want to do.  And they may not do it.  I'm not saying

21   they're gonna do it.  But they can do it and not bat an

22   eye.  I've seen it personally.

23          MAYOR LUNSFORD:  I understand that.  And Ozark,

24   Alabama, 35 miles south of us, has an eight-million-dollar

25   expansion going on right now.  They relocated a church.

1    They relocated 40 houses.  It was required.

2              MR. TURNER:  Was there a cemetery at that church?

3              MR. SHIPPEY:  No, there's not.

4              MAYOR LUNSFORD:  I'm sorry.  I don't know.  I'm

5    just saying that the -- I've looked at these plans and I

6    don't see any required purchase of property that extends up

7    to the cemetery property, unless something has happened --

8              MR. BOWDEN:  That's not the point though.  The

9    point is, it's not the taking of the church property.  It's

10   the impact on that landscape out there that you're not

11   addressing, Mayor.

12             MAYOR LUNSFORD:  Again, I apologize.  My only

13   point here is --

14             MR. BOWDEN:  Well, we hear you when you say

15   you're not gonna take the church property, but putting in

16   that runway where it runs 500 feet behind the church,

17   cutting down a bunch of trees, and then saying that you

18   want to do that to bring in military aircraft, you may not

19   take the actual ground, but you're taking what's important

20   to that church out there.  You understand that --

21             MAYOR LUNSFORD:  I can't argue that point.  I'm

22   not here to argue that.

23             MS. CARR:  It was our understanding that the

24   church in Ozark -- the church was willing and agreeable and

25   preferred to make that sell.  They did not physically force

53

1    them to do that.

2         MAYOR LUNSFORD:  And I really can't speak to

3    that.  But my point is, when I hear any questions about

4    acquisition, it's not to be a part of this project, if it

5    jeopardizes --

6         MR. MOTT:  At this point I can honestly say that

7    we have not looked at acquiring any portion of the church

8    or the cemetery.

9         UNIDENTIFIED MALE SPEAKER:  Well, there was a

10   time on Price Road -- there was no intentions of closing

11   Price Road.  I could ask you five or six years ago, no, we

12   don't have any intention of closing that road and putting

13   hardship on my church members.  You would have probably

14   said, no, sir, we're not gonna do it.  But just in a matter

15   of time, the road was closed.  And they didn't discuss it

16   with anybody, they just come out and closed it.  And I'm

17   sure -- you say that the Sugar Pit Road won't be closed,

18   but I guarantee you wouldn't have that other line drawn in

19   that wetland there if you weren't gonna close Sugar Pit

20   Road.

21        MR. THOMASON:  That's a parcel line that

22   indicates different tracts of land.  That's not a proposed

23   road.

24        MR. SHIPPEY:  That road is not gonna be closed

25   right there.

Stephanie D. Garrett, CCR - (334) 566-2039

1    UNIDENTIFIED MALE SPEAKER:  What about the yellow

2    line right there?

3    MR. BOWDEN:  That right there.  What is that?

4    UNIDENTIFIED MALE SPEAKER:  That is a proposed

5    road that --

6    MR. SHIPPEY:  That road is not gonna be closed.

7    It's not inside -- it's not inside the runway safety area,

8    so this road shown right --

9    MR. THOMASON:  That's the existing road.

10    MR. SHIPPEY:  Yeah.  This is outside of the

11    runway safety area.

12    MR. THOMASON:  This is not a -- this drawing is

13    done from aerial mapping and aerial photography.  This is

14    not a proposed road.  This is what the aerial mappers use

15    to depict an unimproved road.  Is there a dirt road just

16    adjacent to this bridge right here?

17    UNIDENTIFIED MALE SPEAKER:  No.  That's almost to

18    the creek right there.

19    MR. THOMASON:  We took this and imposed it on

20    that drawing to give you features over an aerial

21    photograph.

22    MR. KERVIN:  I have a question with --

23    Jeff Kervin -- what the mayor has said, which I appreciate

24    his sensitivity to the church property.  Taking into

25    consideration what he said, if it is determined by the FAA

55

1    that acquiring church and/or cemetery property is

2    necessary, would the city and would you abandon the

3    project?

4              MR. THOMASON:  We would do whatever our client

5    advises us to do.

6              MR. KERVIN:  And your client's the city?

7              MR. THOMASON:  The city.  Yes.

8              MR. KERVIN:  Or seek an alternative to coming off

9    of 7 into this --

10             MR. MOTT:  If the mayor tells us not to do

11   something, we're not gonna do it.  Period.  He could tell

12   us to do something and we'd still have to do it -- try to

13   achieve it by the rules.  Don't misconstrue what I said.

14             MR. JINRIGHT:  Billy Jinright.  So we're back now

15   to it's not the FAA, but it's the City of Troy.  We need to

16   be fussing at them instead of the FAA; is that correct?

17             MR. MOTT:  The owner of the project is the City

18   of Troy.  They own the airport.  But they operate the

19   airport under the regulations of the FAA.

20             MR. JINRIGHT:  Okay.

21             MR. KERVIN:  But this property is actually in the

22   county.  So how does that factor in?

23             MR. SHIPPEY:  As far as factor in --

24             MR. KERVIN:  He said that the city has control,

25   but yet the property that is in question is not in the city

1    limits.  It belongs -- it's in the county jurisdiction, not

2    the city jurisdiction.  The city limits ends at that fence

3    that they put up.

4              MR. SHIPPEY:  The city is still considered a

5    sponsor.  They're the ones who apply for the -- you know,

6    the grant -- federal money, that's who the money is issued

7    to, to the city.

8              MR. MOTT:  Somebody had their hand up for a

9    question.

10             MS. HUSSEY:  I was gonna -- Ann Marie Hussey.  I

11   was gonna address the flags on -- that the surveyors had

12   been on the land.  I've got land out there.  I know that

13   somebody has been on mine, that did not have permission,

14   because I have talked to all three parties that owns the

15   land, so I know somebody has been on mine everywhere I look

16   and see the tags.  So that is a definite.

17             MR. MOTT:  If you want me to come to look at what

18   was done, I'll be glad to address it.  I don't know what to

19   say here, but I'll be glad to come look at what they've

20   done and if it was our crew, I'll handle it.

21             MS. HUSSEY:  How will you know it was your crew?

22             MR. SHIPPEY:  When were these flags -- I'm

23   just -- as far as the date goes?  Is this something recent

24   or --

25             MS. HUSSEY:  No.  They've been there --

1          MR. LEE:  Last winter.

2          MS. HUSSEY:  Right.  They went up close to deer

3     season.

4          MR. MOTT:  Probably wetlands maybe.  If you'll

5     show me -- get one of my cards, I'll be glad to look at it

6     and I'll try to figure out if it was us and why and --

7          UNIDENTIFIED FEMALE SPEAKER:  Well, it wasn't

8     just hers.  It was all of us.  They had them flags all over

9     our land.

10         MS. CARR:  Whose responsibility was it to obtain

11    that permission before that was done?

12         MR. TURNER:  What's the use of (inaudible)?  The

13    horses were already out.

14         MR. MOTT:  Well, if it was Barge, Waggoner,

15    Sumner & Cannon, it's my responsibility as office manager

16    to make sure that that is done.  So if they were out there,

17    I'm the person that should know about it.

18         MS. CARR:  I think you're --

19         MS. HUSSEY:  But back to my question is what --

20    what can you do about it now?  And how will you know it was

21    your crew?  By the way they tied the flag in the tree?

22         MR. MOTT:  We use certain kind of colored

23    flagging.  I mean, there's several things that we can -- I

24    don't know, ma'am.  I mean, I'll be glad to address it.

25    I'm not trying to dodge the issue here.  I can't stand here

1    and tell you did my crew do it --

2         MS. CARR:  I think this issue was addressed at a

3    previous meeting back in January --

4         MR. MOTT:  Right.

5         MS. CARR:  -- and I think since that time they

6    have been -- there's been further involvement.

7         MS. HUSSEY:  More flags.

8         MS. CARR:  So, you know, we just don't understand

9    why that was not addressed.

10        MS. HUSSEY:  And maybe you need to get us to

11   raise our hands, the landowners that y'all have -- somebody

12   has been on their property flagging, so you'll know how

13   many of us have been affected.

14        MR. MOTT:  There's been a billion questions at me

15   tonight.  If you'll get one of my cards and contact me, I

16   will take care of it.  I'm not taking notes as I'm up here,

17   so I apologize.

18        MR. THOMASON:  It is important to note that we

19   are not the only surveyor in the area that --

20        MS. HUSSEY:  But nobody else had permission

21   either, so that's --

22        MR. THOMASON:  Yes, ma'am.  That's what I'm

23   saying.  So there's really no way for us to tell.  Unless

24   you saw our truck out there, unless you saw somebody with a

25   Barge, Waggoner shirt, I'm not sure that we can tell.  But

Stephanie D. Garrett, CCR - (334) 566-2039

59

1    if --

2           MR. KERVIN:  If we talked to them, would that

3    count?

4           MR. THOMASON:  Yes.  If you talk to them and find

5    out who they're from -- who they're with, you have every

6    right as a landowner to question why they're on your

7    property.

8           MR. KERVIN:  We did.

9           MR. MOTT:  Was it a white Suburban with these

10   initials on the side of it?

11          MR. KERVIN:  We don't want to get anybody in too

12   big of trouble.  We could tell you their names.

13          MR. MOTT:  They should not have been on your

14   property without your permission.

15          MR. THOMASON:  Yes, ma'am.  I'm sorry.

16          MS. CARR:  I just -- way back to this wetland

17   issue, I've got another couple of questions or comments.

18   When you say that the Army Corps of Engineers has signed

19   off on the delineation plan, that is not the same as the

20   404 permit?

21          MR. SHIPPEY:  No, ma'am.

22          MS. CARR:  Okay.  Now, I did see something that,

23   I believe, was correspondence from you to the city

24   suggesting that to create wetlands it would actually take a

25   five-to-one ratio.

60

1             MR. SHIPPEY:  Yes.

2             MS. CARR:  And which 18 to 24 acres is not.

3             MR. SHIPPEY:  Well, that was probably our -- it

4  may have been in some circumstances they require

5  five-to-one ratios.  That would have to be approved in our

6  plan with the corps on the ratio they make us use.

7             MS. CARR:  So if it was five, which might be --

8             MR. SHIPPEY:  It might -- they can --

9             MS. CARR:  Then that would involve a lot more

10  acreage?

11             MR. SHIPPEY:  That is correct.

12             MS. CARR:  A lot more people would be affected by

13  that.

14             MR. MOTT:  The corps would look at, from our

15  mitigation plan, the quality of wetlands that we're

16  planning on putting back out there.  And they come up with

17  a ratio of the amount of acres we have to put back and the

18  acres we took out.  That's completely in the federal

19  government's hands and we have to do whatever they say.

20             MS. CARR:  So really you don't know how many

21  acres --

22             MR. SHIPPEY:  No.  Not --

23             MR. MOTT:  There's a range, typically two to five

24  is a ratio.  Two acres to one, five acres to one.  Most of

25  the time it's in between those two ranges.  But it's really

1    up to the wetlands expert that designs the mitigation plan

2    and the Corps of Engineers approves that plan.

3          MR. SHIPPEY:  And the quality -- the corps

4    actually rates the quality of wetlands.  And the lower the

5    quality, the less you have to mitigate.  The higher the

6    quality, the more you have to mitigate.

7          MR. THOMASON:  And one thing I don't think we've

8    communicated very well is this is the very beginning stages

9    of the project.  Granted, we've been working on this for

10   several months and several years now, but this is one of

11   the first steps in the actual project.  And our not having

12   some of the answers that I think you want is not a function

13   of us -- I sound like I'm making excuses here, but I'm

14   trying not to.  I'm just trying to say that those will all

15   be addressed, but we just haven't gotten to that point yet.

16         MR. JINRIGHT:  Well, when are we gonna hear them?

17   If there's not gonna be another public hearing --

18         MR. MOTT:  The FAA won't allow us to go forward

19   with the project until we have an approved environmental

20   assessment for this project.  That's a requirement that

21   they put on us.

22         MR. KERVIN:  So when you closed the road -- let's

23   go back.  You said you've been working on this for several

24   years, right?

25         MR. THOMASON:  Yes.

1    MR. KERVIN:  So when y'all closed the dirt road

2    down there, that really wasn't to put the fence up, that

3    was just -- you didn't tell us that -- it was really the

4    plan to --

5    MR. THOMASON:  No, sir.  That was to put the

6    fence up.

7    MR. KERVIN:  And are you gonna fence in all of

8    the new safety zone if you extend this?

9    MR. THOMASON:  Yes.  That will most likely

10    happen.

11    UNIDENTIFIED MALE SPEAKER:  Well, this looks

12    like -- if you close our property line, are you gonna close

13    in all these property lines?

14    MR. THOMASON:  No, sir.  What -- what -- usually,

15    we have to -- the FAA requires us to own this property.

16    This is called the runway protection zone.  That's for

17    protection of people on the ground, to eliminate risk to

18    the public's safety.  The FAA has identified this as a

19    risky area for places -- for homes, businesses.  We're not

20    required to fence that.  We're not restricting your access.

21    UNIDENTIFIED MALE SPEAKER:  But you could fence

22    it?

23    MR. THOMASON:  Well, we wouldn't fence across the

24    road.  We'd -- if we did fence it --

25    MR. KERVIN:  They'd move the road to that

63

1    proposed line --

2              (Multiple conversations going on at once.)

3         MR. THOMASON:  I think it's a county road.  We

4    couldn't do it without the county's permission.

5         UNIDENTIFIED MALE SPEAKER:  Let me ask you

6    something.  Are you aware that this is the --

7         MR. THOMASON:  Right here?

8         UNIDENTIFIED MALE SPEAKER:  Are you aware that

9    this right here, about where this is, is about 75 feet

10   higher than this, plus it's got a high -- three-phase,

11   high-voltage line running over the hill there.  Now, you're

12   gonna have to -- a 727, or whatever, you're gonna have to

13   do something with that three-phase line out there, aren't

14   you?

15        MR. THOMASON:  There's several options --

16        UNIDENTIFIED MALE SPEAKER:  Were you aware that

17   that's out there?

18        MR. THOMASON:  If that was out there when the

19   study was done, yes, sir, we're aware of it.  If it's new

20   construction, which I don't think it is, then it has been

21   identified.

22        UNIDENTIFIED MALE SPEAKER:  And it's gonna be

23   exactly in line with this.  I just wondered if y'all -- it

24   may not be.  There is -- you know, the elevations

25   (inaudible) three-phase, high-voltage line there.

64

1       MR. MOTT:  Sir?

2       MR. TURNER:  John Turner.  If you're gonna

3  increase the traffic, which is gonna add pollutants to the

4  air, has this been evaluated from increasing the

5  deterioration of historical sites that are in this

6  cemetery?

7       MR. SHIPPEY:  What we did for the cemetery,

8  like -- I mean, going back, to what we completed.  We sent

9  in the correspondence to the State Historical Commission.

10  They responded on what we'd have to do to clear this

11  project on their behalf.  That is the Phase I Cultural

12  Resource Assessment.  Now, if you're referring to another

13  type of -- as far as the air goes, impacting the cemetery

14  historically or --

15       MR. TURNER:  Yes.  You're gonna -- you're change

16  the environment around there by increased planes through

17  air emission.  Are you gonna affect the deterioration not

18  only of the church, but of the historical site in the

19  cemetery?

20       MR. THOMASON:  I believe that's something that

21  would come under the EIS, if required by the FAA.  Those

22  are the type of things that are usually completed under

23  that EIS, if the FAA agrees that there's reason to go to

24  that.

25       MR. TURNER:  And how do you get a copy of that?

Stephanie D. Garrett, CCR - (334) 566-2039

1    MR. MOTT:  What?

2    MR. TURNER:  When they do it and what they say.

3    MR. THOMASON:  We'll have to complete that once

4    the FAA tells us that we need to do so.

5    MR. TURNER:  In other words, if they don't tell

6    you it needs to be done, you won't do it?

7    MR. THOMASON:  Right.

8    MR. URQUHART:  The original proposal that you

9    sent into the Historical Commission regarding the Phase I

10   aspect, did you -- I assume you identified the church being

11   there.  Did you identify the cemetery being there as well

12   in that report?

13   MR. BOWDEN:  The opposite is true.  The cemetery

14   was identified but the church was not.  And there was one

15   line that said there was a cemetery that had someone who

16   was interned in 1877.  And there was no further mention in

17   the Phase I report other than that.  Now, if they want to

18   dispute that, they can.  But that's what it says.

19   MR. URQUHART:  You do have a double whammy on the

20   Historical Commission in that you've got a historic

21   cemetery and it's a church home historic cemetery.

22   MR. SHIPPEY:  You know, I -- like I said, we

23   submitted maps to the State Historical Society, we

24   submitted our Phase I.  Initially, they approved -- we got

25   an approval letter saying there's no more further study

Stephanie D. Garrett, CCR - (334) 566-2039

1   required, as far as they're concerned.  Now, today I got a

2   copy of a letter that they've sent.  That's the first time

3   I've seen it.  So like we said before, we will go back and

4   address these issues and do what they require us to do.

5           MR. BOWDEN:  But just to be so we're clear, this

6   is -- the letter's addressed to who?

7           MR. SHIPPEY:  The letter's addressed to me.

8           MR. BOWDEN:  Okay.

9           MR. SHIPPEY:  I'm just saying I -- personally, I

10  haven't seen the letter until you gave it to me today.

11          MR. MOTT:  And it was dated, again, for the 13th,

12  so...

13          MR. THOMASON:  It's only two days old.

14          MR. BOWDEN:  I got my copy e-mail.  I'm assuming

15  y'all have e-mail.

16          MR. SHIPPEY:  Yeah.  But I haven't received an

17  e-mail.

18          MR. MOTT:  They don't send stuff to us e-mail.

19          MR. JINRIGHT:  Billy Jinright.  The other

20  question I have is why the church was left off on the

21  beginning maps to begin with.  Why -- the church being that

22  close to the end of the runway, why was it left off of the

23  maps to begin with?

24          MR. SHIPPEY:  You referring to these maps?  Or

25  what maps --

1    MR. JINRIGHT:  The first one -- the FAA office

2    did not know that there was a church until I called and

3    told them.  They did not know that a church was anywhere

4    close by.  They thought the closest church was two or three

5    or five miles away.

6    MR. SHIPPEY:  Sir, in my -- in my -- I don't know

7    what they told you.  But in my EA I sent them for review, I

8    had in there where this church -- where your church is

9    located.

10    MR. BOWDEN:  You just said something that's

11    important, I think.  You've already sent the FAA the EA?

12    MR. SHIPPEY:  A draft EA.

13    MR. BOWDEN:  Before we had comment from the

14    public, you sent it to them?

15    MR. SHIPPEY:  That is correct.

16    MS. JANET KERVIN:  May I -- Janet Kervin.  May I

17    ask why you did that?  Why you sent it the FAA in draft

18    form before the complete report?

19    MR. THOMASON:  Standard procedure.  We submit it

20    to not only the --

21    MS. JANET KERVIN:  Whose standard procedure?

22    MR. THOMASON:  FAA's standard.

23    MR. BOWDEN:  Is there an FAA regulation on that?

24    MR. SHIPPEY:  Yeah.  We have our guidelines on

25    that.  I can't cite the regulation, but I could look it up

1    and --

2              MR. MOTT:  This is part of the FAA grant to do --

3    and one of the things that we do, whether it's a

4    requirement or courtesy, when we sent the draft EA out to

5    the city, we sent the FAA a copy of that same draft EA so

6    they had the same thing that the city and what you have.

7              MR. BOWDEN:  Since they received their draft,

8    have they contacted you and said, you need to change this,

9    or change that, or do this?  Have you received input from

10   the FAA prior to today?

11             MR. SHIPPEY:  Yes.

12             MR. BOWDEN:  On this EA?

13             MR. SHIPPEY:  Yes.

14             MR. MOTT:  Yes, sir?

15             MR. HUDSON:  Carl Hudson.  Is it y'all's

16   contention that this expansion project will not affect the

17   church?

18             UNIDENTIFIED FEMALE SPEAKER:  And the cemetery?

19             MR. HUDSON:  And the cemetery?

20             MR. MOTT:  For land acquisition?

21             MR. HUDSON:  No.  For noise or whatever.

22             UNIDENTIFIED FEMALE SPEAKER:  Pollution.

23             MR. THOMASON:  That's a -- we can't make that

24   statement, because that's a perceived --

25             MR. HUDSON:  What if the roof falls in, like, the

1   next week?

2          MR. MOTT:  We can't answer that question.

3          MR. HUDSON:  Well, can we take the runway back

4   out then?

5          MR. MOTT:  We can't answer that question.

6          MR. HUDSON:  Well, we need to address that to the

7   FAA and see what they say.

8          MR. JINRIGHT:  That's our concern about the

9   church.  It's an old church building.  That jet engine

10   vibration, folks, is gonna shake the stained-glass windows

11   to pieces.  There's no doubt in my mind that's gonna

12   happen.

13          MS. LEVEQUE:  It already does.  And we live by

14   the airport.

15          MR. JINRIGHT:  And it's just -- I can't

16   understand why somebody -- y'all act like intelligent

17   people -- why you can't go out there and look at that and

18   see, without even having to do a noise study.  I mean, it's

19   just -- that's beyond my comprehension.

20          MR. THOMASON:  Well, sir, it's not what I can

21   see.  It's what I can show the FAA.  And I have to use

22   their model.

23          MR. JINRIGHT:  Well, have you gone out there and

24   looked?

25          MR. THOMASON:  My hands are tied.  I have to use

1    their model and their regulations to determine these

2    things.

3              MR. JINRIGHT:  Are you telling me that if you

4    went out there and looked and told the FAA that this church

5    is too close, that they would not pay any attention to

6    that?

7              MR. THOMASON:  Well, sir, because -- according to

8    the FAA, you're not too close.  I'm not speaking for the

9    FAA --

10             MR. JINRIGHT:  And who from the FAA has been out

11   there and looked?

12             MR. THOMASON:  And I'm not saying that.  I'm

13   saying that from the FAA regulations for airport design,

14   you're not too close.

15             MR. TURNER:  Airport design for what?  Airport

16   design for a community?  Airport design for a mall?

17   Airport --

18             MR. THOMASON:  All of these -- all the items that

19   we're showing here are dictated by AC 150/5300-13,

20   Change 7, I believe, is what we're on now.  That

21   dictates -- that sets out all the separation distances, the

22   safety requirements, the sizes of those for any type of

23   airport.  That's what everything from your small grass turf

24   strip to Hartsfield are all designed off the same book.

25   Now, there's different classifications for each one that --

1      MR. TURNER:  So according to that design, or that

2   document, it should not have any affect on the church?

3      MR. THOMASON:  I didn't say it wouldn't have any

4   affect, because an affect is a perceived disturbance.  You

5   may be affected in your house by a sound that I'm not

6   affected by.  So we can't -- I can't make a blanket

7   statement to that effect.  I'm saying that for separation

8   distances --

9      MR. TURNER:  But they have to have some kind of

10  standard to come up with the model.

11     MR. THOMASON:  Right.  That's the IN noise model

12  5313, which dictates the separation requirements from --

13     MR. TURNER:  But you keep just saying noise.

14  That's not the only environmental thing we have to be

15  concerned about.  That's not the only parameter that you

16  look at.

17     MR. MOTT:  That's the reason for the full EA

18  document.

19     MR. TURNER:  Well, it's confusing to me that you

20  throw a plan up, and it's just a plan, and you're throwing

21  out there to get approval for it, and they're gonna come

22  back and tell you no.  You're gonna give them more

23  paperwork, they're gonna tell you no.  You're gonna give

24  them more paperwork until you get yes.

25     UNIDENTIFIED FEMALE SPEAKER:  Uh-huh.

1    MR. THOMASON:  That's not necessarily the way it

2    always happens.  If they come back and say no, and we --

3    they come back and say no, we have to go back to the

4    drawing board.  That's what this EA is for.

5        MR. TURNER:  Okay.  So what are we doing here

6    today?

7        MR. THOMASON:  Voicing your public opinion.

8        MR. TURNER:  I think you've got the idea of that.

9        MR. THOMASON:  Yes, sir.  And that's one of the

10   documents that goes back to the FAA for their review and

11   approval.

12       MR. MOTT:  They will read --

13       MR. TURNER:  The idea I keep getting is the more

14   paperwork you give them, the more chance you've got for

15   them to say yes.  And then it comes back to you get to this

16   condemned land that they talked before.  I mean, I've heard

17   it before, I don't know how many times, that if the

18   government wants build something, they're gonna build it.

19   And this --

20       UNIDENTIFIED FEMALE SPEAKER:  That's right.

21       MR. LEE:  And that's right down to a local

22   government.

23       MR. TURNER:  So -- but I know the federal

24   government -- well, the FAA, which is a part of it, will

25   overrule the local government.  So it's -- what can we do,

Stephanie D. Garrett, CCR - (334) 566-2039

1    other than just tell you and get your impression, which

2    you're not gonna include all these reports -- are you gonna

3    sit there and go by engineering design and fill out all the

4    forms and submit -- I mean, I've worked for a government,

5    an Army ammunition plant.  And that's what you do.  And

6    I've worked with wetlands and archeological sites.

7        MR. SHIPPEY:  Well, all the comments here today

8    will be forwarded to the FAA for their review.  It's not

9    like we're gonna not forward this.  I mean, all your

10   comments and written statements will be in the hands of the

11   FAA.

12        MR. TURNER:  The only thing I will tell you is my

13   mother is 88 years old.  My great-grandfather helped donate

14   the wood to build this house, and that's where I'm coming

15   from -- to build that church.  And my daddy's in that

16   cemetery.  And I'm gonna be in that cemetery.

17        UNIDENTIFIED FEMALE SPEAKER:  And I'm going to be

18   there.

19        MS. YOUNGBLOOD:  And is it going to affect us

20   being buried there?

21        MR. MOTT:  Give us your name, so she can record

22   it.

23        MS. YOUNGBLOOD:  Mildred Youngblood.  I'm

24   planning to be buried out there.  My husband's out there.

25   My parents, grandparents, great-grandparents and

Stephanie D. Garrett, CCR - (334) 566-2039

1  great-great-grandparents are out there.  I plan to use that

2  cemetery.  My family does.  Am I going to be able to?

3          MR. MOTT:  Yes, ma'am.

4          MR. YOUNG:  You're not gonna bother the cemetery?

5          MR. MOTT:  You heard the mayor say that there is

6  no way this project will acquire the cemetery.  We work for

7  the city.  And if the mayor says no, I can give you the

8  guarantee that no --

9          MS. YOUNGBLOOD:  The mayor told us that they

10  could do anything they wanted to when they closed that road

11  out there.  And I said, how can they close that road when

12  it's been there a hundred years.  It belongs to the county.

13  Well, we can do it.  And they done it.

14          MR. MOTT:  Yes, ma'am.

15          MS. HUSSEY:  I'm Ann Marie Hussey.  The FAA was

16  notified by one of our church members, and when they looked

17  at the map that y'all had submitted to the FAA there was no

18  church or cemetery showed on the map.  They did not realize

19  until they went to digging in Mississippi to find that

20  there actually was a church and cemetery.  Why were we left

21  off of the original --

22          MS. YOUNGBLOOD:  Why didn't the city let them

23  know it?

24          MR. MOTT:  The -- if it was left off, it was not

25  intentional.

Stephanie D. Garrett, CCR - (334) 566-2039

1    MS. HUSSEY:  Well, the FAA said they did not --

2    MR. MOTT:  They do know it now.

3    MS. HUSSEY:  They most definitely know it now.

4    MR. BOWDEN:  I have a couple of questions.

5    MR. MOTT:  Sure.

6    MR. BOWDEN:  In your dialogue with the FAA you

7    had about the environmental assessment, have they told you

8    things that they found objectionable and you had to change

9    some things?

10   MR. SHIPPEY:  They provided comments on the draft

11   EA.  I can't remember exactly what the comments were, but I

12   tried to address them the best I could.

13   MR. BOWDEN:  Right.  So they've kind of already

14   looked at it.  And you feel pretty confident, Keith, that

15   they're gonna be satisfied with the EA?

16   MR. MOTT:  There's no way until you --

17   MR. BOWDEN:  I was asking Keith.

18   MR. SHIPPEY:  Well, I mean, I -- what we're gonna

19   do is take the comments that were submitted tonight, put it

20   in the EA that we have now, address these comments and

21   forward it to the FAA.  Now, whether or not I feel

22   confident they'll accept it, I really don't -- I can't

23   answer.

24   MR. BOWDEN:  You can't tell me whether or not you

25   think they're gonna accept the work that you did on this as

76

1    a -- as a good job and complete after you've had input from

2    them?  Or you just won't say?

3              MR. SHIPPEY:  No.  I really don't know how -- I

4    mean, I addressed their comments.  If they don't think I

5    addressed their comments sufficiently enough, then they'll

6    let me know about it.

7              MR. BOWDEN:  Okay.  I had a question.  I want to

8    know which one of you could talk to me about the

9    justification survey that was done.

10             MR. MOTT:  Justification study?

11             MR. BOWDEN:  Yeah.

12             MR. MOTT:  Justin can do that.

13             MR. BOWDEN:  Can you define what an itinerant

14   operation is?

15             MR. THOMASON:  It's an operation of an aircraft

16   that's not based at -- nonlocal aircraft.

17             MR. BOWDEN:  All right.

18             MR. THOMASON:  Somebody flying into that airport

19   to visit on business or pleasure.

20             MR. BOWDEN:  And in order to justify this

21   expansion, as I read your survey, not having a clue as to

22   what the FAA says about it, only reading your survey, in

23   order to justify this runway expansion or airport

24   expansion, you have to identify at least 500 itinerant --

25   annual itinerant operations that were -- that are being

Stephanie D. Garrett, CCR - (334) 566-2039

1    penalized because of the length of the runway.

2             MR. THOMASON:  It's just annual operations.  It

3    could be a local aircraft.  It could be --

4             MR. BOWDEN:  Do you know why the justification

5    survey says itinerant, AIOs?

6             MR. THOMASON:  No, sir.  I do not.

7             MR. BOWDEN:  Did you write it?

8             MR. THOMASON:  I participated in the survey.

9             MR. BOWDEN:  Have you -- have you read it?

10            MR. THOMASON:  Yes, sir, I have.

11            MR. BOWDEN:  Well, you tell me if I'm reading

12   this wrong.  The guidelines require the identification and

13   documentation of 700 annual itinerant operations, of which

14   at least 500 of those AIOs must be by aircraft acquiring an

15   additional length.

16            MR. THOMASON:  You are reading it correctly.

17            MR. BOWDEN:  And is that not correct?

18            MR. THOMASON:  That's not a correct reflection of

19   the FAA rules for justification of runway.  They -- their

20   requirement is that we show, for an extension past

21   5,000 feet -- excuse me, past 5,500 feet, that we show 700

22   operations, 500 of which are penalized due to runway

23   length.

24            MR. BOWDEN:  But they don't have to be itinerant

25   operations?

1        MR. THOMASON:  No, sir.

2        MR. BOWDEN:  So that's just a mistake that was

3    put in there?

4        MR. THOMASON:  Yes, sir.

5        MR. JINRIGHT:  Okay.  Now, when we talk about

6    mistakes, this survey -- runway extension justification

7    report, that's -- the whole project is resting on that

8    report, is it not?

9        MR. THOMASON:  Yes, sir.  But I don't think it's

10    a correct reflection to say it's all resting on one word.

11        MR. BOWDEN:  I didn't say that.  It's resting on

12    this report, right?

13        MR. THOMASON:  Yes.

14        MR. BOWDEN:  And you admit that initially there's

15    a problem here with -- that you've put something in here

16    that's just not correct?

17        MR. THOMASON:  It's a misused word, I would say.

18        MR. BOWDEN:  Okay.  Let me ask you about who is

19    being penalized.  You identified 542 flights that are

20    penalized.  Penalized being have to take off at less than

21    max gross weight because of the length of the runway.

22        MR. THOMASON:  They're -- it's a variety of

23    carriers that have to take off at less weight, they have to

24    offload cargo, make extra fuel stops.  Then it indicates a

25    penalized operation.

Stephanie D. Garrett, CCR - (334) 566-2039

1    MR. BOWDEN: Okay. And you've identified 542.

2    MR. THOMASON: That's what the report says.

3    MR. BOWDEN: Well, did you come here tonight

4    prepared to talk about the report?

5    MR. THOMASON: Yes, sir. I just didn't come

6    memorizing a lot of the numbers. If the report was in

7    front of me, then we could turn to it and --

8    MR. BOWDEN: Yeah. I'm not gonna misrepresent it

9    to you. And you can look at it, of course, the same thing

10    I'm looking at. But if we agree that it's 542 that you've

11    identified as being penalized -- does that sound right?

12    MR. THOMASON: Yes, sir.

13    MR. BOWDEN: And you needed to identify 500,

14    right?

15    MR. THOMASON: Yes, sir.

16    MR. BOWDEN: Is it not true that 450 of those

17    penalized flights -- out of the 542, 450 of them are from

18    Sanders Aviation?

19    MR. THOMASON: Yes, sir. A larger number were

20    from Sanders Aviation.

21    MR. BOWDEN: Well, you would agree with me that

22    450 out of 542 is a large number?

23    MR. THOMASON: Yes, sir.

24    MR. BOWDEN: So out of the threshold of trying to

25    get up to 500, you found 450 with one company?

1    MR. THOMASON:  Yes, sir.

2    MR. BOWDEN:  And then that report, that gets you

3    over the threshold so that it drives the entire project?

4    MR. THOMASON:  Once we reached a certain point,

5    there was no point in going on, because it -- we felt it

6    was obviously justified.  We turned those in to the FAA.

7    The FAA has the opportunity to call me -- we have to give

8    contact name, title, information on each person that gave

9    operations.  They are -- they have in the past -- I don't

10    know if they contacted any of these people, but they have

11    the right to call and check our work, and they check those

12    aircraft against that to, you know, agree or disagree.  The

13    FAA does have the authority to say, out of your 542

14    operations only 300 count.

15    MR. BOWDEN:  They didn't do that in this

16    situation?

17    MR. THOMASON:  I'm not sure of that.  That's a

18    question for the FAA.

19    MR. BOWDEN:  Did they come back to you and say,

20    these don't count?

21    MR. THOMASON:  They -- we addressed the ones they

22    had questions about.

23    MR. BOWDEN:  Okay.  Did they question the 450?

24    MR. THOMASON:  Yes, sir.

25    MR. BOWDEN:  Where in your report does it say the

1    FAA questioned the 450?

2         MR. THOMASON:  That was a -- it came up after the

3    report was published.

4         MR. BOWDEN:  When do we get to know about that?

5         MR. THOMASON:  Being that we answered their

6    questions and they were satisfied, the numbers are valid

7    numbers.

8         MR. BOWDEN:  All right.  So 450 of the 542 are

9    with Sanders Aviation.  You agreed with me on that.  Let me

10   ask you this question.  Your report says that those 450

11   flights that are being penalized are from the G IIs, Gulf

12   Stream IIs, right?

13        MR. THOMASON:  Yes.

14        MR. BOWDEN:  And does your survey not also say

15   that the G IIs need 7,340 feet to take off at max gross

16   weight?

17        MR. THOMASON:  Yes, sir.

18        MR. BOWDEN:  So the 6500 feet are not gonna fix

19   the problem with the G IIs, are they?

20        MR. THOMASON:  In talking with the pilot for

21   Sanders Aviation, he has indicated that 6500 feet will give

22   them the necessary runway length to meet their hauling

23   requirements.

24        MR. YOUNG:  Okay.  But answer this question for

25   me.  You've written in your report that they need

Stephanie D. Garrett, CCR - (334) 566-2039

1    7,340 feet to operate the two Gulf Stream IIs at maximum

2    take-off gross weight under conditions common at Troy

3    Municipal Airport?

4                MR. THOMASON:  Correct.

5                MR. YOUNG:  All right.  And if that's true, then

6    extending the runway 6500 feet, these same flights would

7    still be penalized?

8                MR. THOMASON:  Yes and no.  They will not be as

9    penalized.  And that reduction ability will allow them

10   to --

11               MR. BOWDEN:  You asked the pilot at Sanders --

12   chief pilot at Sanders about this?

13               MR. THOMASON:  Yes.

14               MR. BOWDEN:  So you basically went to the pilot

15   and said, would you like a longer runway?

16               MR. THOMASON:  No, sir.

17               MR. BOWDEN:  And he said yes?

18               MR. THOMASON:  We polled people that were using

19   the airport, what length runway makes a cheaper flight?  Do

20   you need extra runway length?  Are you commonly penalized

21   because of insufficient runway length?  And the answers are

22   reflected in that report.

23               MR. BOWDEN:  Right.  It says sometimes Sanders'

24   G IIs could require take-off length in excess of

25   10,000 feet.

1   MR. THOMASON:  Yes.

2   MR. BOWDEN:  So based on the survey, as I read

3   it, you're not -- if you did this survey again, you can do

4   this project -- if you did the survey again five years from

5   now, they're gonna say, we need 7,340 feet to take off at

6   max gross weight on G IIs.

7   MR. THOMASON:  I can't speak to what they're

8   gonna say in ten years.

9   MR. BOWDEN:  I said five years.  But you know the

10   point I'm making is that this is not long enough to remedy

11   the problem with the G IIs.

12   MR. THOMASON:  6,500 feet is the limit of the

13   general aviation -- that the FAA will sponsor a general

14   aviation airport without specific letters from operators to

15   go any further.  This is basically the limit for a general

16   aviation airport.

17   MR. BOWDEN:  I don't know what you just said, but

18   I think I've basically made you understand that it seems

19   like this project was being driven by the needs of one

20   company, and even that company's planes that need this much

21   longer runway are still gonna be penalized when it's all

22   said and done.  That's my input.  You don't have to answer.

23   It's not a question.

24   MR. LEE:  Is this just one phase of the project?

25   Are there two more phases out there somewhere?

Stephanie D. Garrett, CCR - (334) 566-2039

1    MR. THOMASON: No, sir. We don't have any more

2    plans to extend the runway past 6,500 feet.

3    MR. LEE: Sounds to me like you probably have it

4    somewhere back there.

5    MR. MOTT: He just said that the limit for a

6    general aviation airport is 6500 feet. This would take it

7    to the limits of a general aviation airport?

8    UNIDENTIFIED MALE SPEAKER: Could you tell me how

9    many towns in the State of Alabama have runways over 6500

10   feet? I know the general -- Birmingham, Mobile,

11   Montgomery, Tuscaloosa, but beyond that --

12   MS. LEVEQUE: Little towns.

13   MR. MOTT: Beyond -- beyond 6,500 feet?

14   UNIDENTIFIED MALE SPEAKER: Or that long.

15   MR. THOMASON: Selma, Anniston, Gulf Shores,

16   Fairhope will.

17   UNIDENTIFIED MALE SPEAKER: Fairhope will?

18   MR. THOMASON: Yes, sir. Decatur. There's

19   probably a lot more, but I'm just drawing a blank right now

20   trying to remember.

21   UNIDENTIFIED MALE SPEAKER: You know, very few

22   towns of 14,000 people have got (inaudible).

23   MR. THOMASON: Yes, sir. But very few towns have

24   the industry that you have in Troy. Not only with Sanders

25   Aviation but with Sikorsky and some of the military and

1    (inaudible) that you have in the area.

2         MS. LEVEQUE:  And the school.  That's ridiculous.

3         UNIDENTIFIED MALE SPEAKER:  You mean they are

4    requesting longer runways too.  Sikorsky --

5         MR. THOMASON:  Yes, sir.  They were identified in

6    the --

7         UNIDENTIFIED MALE SPEAKER:  I did read that.  You

8    know, I live out there (inaudible).

9         MR. BOWDEN:  I have a question about the

10   alternatives that you looked at.  And in the beginning of

11   the report you identified some alternatives.  And if my

12   memory's correct, you identified them as the preferred

13   alternatives, which is what we see on the board before us.

14   You identified a postponement of the project, no action at

15   all, and possibly extending the other end of the runway,

16   which is marked by the two five ends.  Is that the

17   alternatives you looked at in this study?

18        MR. SHIPPEY:  That was the alternatives we were

19   looking at in the environmental assessment, the ones that

20   were in the report.

21        MR. BOWDEN:  Okay.

22        MR. THOMASON:  The other study addressed the

23   possibility of extending the crosswind runway.

24        MR. BOWDEN:  Well, I don't know what other study

25   you're talking about, but in the wetland mitigation plan

1  they talk about extending the other runway. Is that what

2  you're referring to? Because that's the only other study I

3  know of.

4      MR. THOMASON: The approach study down by the

5  firm in Atlanta, I believe it's ASAC, which is a firm that

6  designs approaches and determines possible items that might

7  affect approaches in weather situations.

8      MR. BOWDEN: Is that in your EA?

9      MR. SHIPPEY: No. That specific report is not in

10  the EA.

11      MR. BOWDEN: Why?

12      MR. THOMASON: It's not a requirement to be in

13  the EA.

14      MR. BOWDEN: Is it a requirement to give us as

15  much information as we --

16      MR. THOMASON: Yes, sir. And we could give you a

17  copy of that study if you'd like.

18      MR. BOWDEN: Of course, the hearing will be over

19  and I won't be able to ask you any questions about it.

20      MR. THOMASON: I'll give you my card and you can

21  call me any time.

22      MR. BOWDEN: I've heard that before. On

23  alternatives, in the EA you don't mention the part where

24  you -- I was getting into these different alternatives.

25  And maybe Keith can answer this question. You don't

1    mention the alternative of extending 14/32 at all.

2            MR. THOMASON:  That was because it was deemed

3    unfeasible by that study.

4            MR. BOWDEN:  Isn't it true that the reason it was

5    unfeasible was because it was gonna cost a bunch of money

6    to get that runway up to the same status as what you want

7    to do with the 07?

8            MR. THOMASON:  Anything is possible with the

9    right amount of money, so I can't say that we couldn't

10   extend this runway.  Doing so -- I mean, I'd have to go

11   back and look at the report.  But this was deemed the best

12   alternative from that company.

13           MR. BOWDEN:  Well, we don't have that, so I have

14   to get you to explain that to me.  Isn't it true that cost

15   was a major factor in not working on extending 14/32?

16           MR. THOMASON:  No, sir.  I believe it was a TV

17   antenna several miles out.

18           MR. BOWDEN:  Okay.  Well, how many miles out?

19           MR. THOMASON:  I'm not sure.  It was an -- if I

20   recall correctly, it was an antenna in the approach that

21   would --

22           MR. BOWDEN:  Well, in the report that you let us

23   look at, it talks about 14/32 in the wetlands part.  Keith

24   may remember this.

25           MR. SHIPPEY:  What report?  In the EA?

1    MR. BOWDEN: Yeah. In the EA --

2    MR. SHIPPEY: In this EA?

3    MR. BOWDEN: Well, that's the only EA I got,

4    so --

5    MR. SHIPPEY: Well, that's what I --

6    UNIDENTIFIED FEMALE SPEAKER: Is there another

7    one?

8    MR. SHIPPEY: This is the only EA right here.

9    MR. BOWDEN: Okay. When I say EA, I'm talking

10    about that one.

11    MR. SHIPPEY: Okay.

12    MR. BOWDEN: It doesn't -- Keith, you didn't

13    mention it at all in the alternatives part.

14    MR. MOTT: The runway justification study that

15    was done and approved prior to --

16    MR. BOWDEN: I'm talking about the EA, and it has

17    a list of alternatives.

18    MR. THOMASON: Right. If they weren't listed in

19    there, they were deemed unfeasible by the company out of

20    Atlanta.

21    MR. BOWDEN: Okay.

22    MR. THOMASON: That's why we did not include them

23    in the EA.

24    MR. BOWDEN: Well, we don't get -- have any

25    information on that. But let me ask you this: You're

1    saying it's a TV tower that kept you from doing the

2    other --

3                MR. THOMASON:  I'm recalling the report I read a

4    couple of years ago.

5                MR. BOWDEN:  Well --

6                MR. MOTT:  They took into consideration many

7    things.  You know, geography, cost is definitely one of

8    them --

9                MR. BOWDEN:  Well, I'm just going on --

10               MR. MOTT:  -- another community, another

11   subdivision -- it could have been anything.  They looked at

12   all the different parameters and came back with the

13   recommendation of which runway to extend.

14               MR. BOWDEN:  Well, your mitigation report says,

15   with regard to extending runway 14/32, development cost and

16   airspace consideration were the primary constraints.  Does

17   that refresh anybody's memory about what I'm talking about

18   on 14/32?

19               MR. THOMASON:  I think it was a matter of both.

20   Not only would it be more expensive, but due to the antenna

21   location, and due to items that could have affected the

22   approach or are affecting the approach, 14/32 was not

23   deemed by that company as the preferred option.

24               MR. BOWDEN:  Let me read this to you.  And this

25   is talking about why you didn't choose 14/32 in the

1   mitigation -- wetlands mitigation part.  It's appendix --

2   it's Appendix E.  And the pages are not numbered, so -- but

3   it's the second page.  And it says -- and this is one of

4   the reasons why you didn't extend 14/32.  The end

5   production of flights and aircraft noise over sensitive

6   areas has the potential to generate opposition and

7   controversy among the citizens of the city.  Why is that

8   not true about --

9          MR. MOTT:  Where is that at?  I'm just trying to

10  follow you.  Appendix E?

11         MR. BOWDEN:  You can just look at mine if you

12  want to.

13         MR. MOTT:  What's your question?

14         MR. BOWDEN:  The question was -- I read it to

15  you.  Is it part of the justification for not trying to

16  expand 14/32, it said development cost, airspace

17  considerations, and then it went on to say that the end

18  production of flights and aircraft noise over sensitive

19  areas has the potential to generate opposition and

20  controversy among the citizens of the city.  So has there

21  been some choice that you would rather not inconvenience

22  the citizens in some other place over this country church

23  out here?

24         MR. MOTT:  No.

25         MR. THOMASON:  We're trying to minimize the

Stephanie D. Garrett, CCR - (334) 566-2039

1    effect.

2         MR. BOWDEN:  Who was -- what urban area was going

3    to be affected by the extension of 14/32?

4         MR. MOTT:  We don't know.

5         MR. BOWDEN:  The reason I'm -- it feels like I'm

6    picking on you about this is because a lot of us don't

7    believe that you've really looked at other options.  And

8    that's all we -- one of the main things that we think is

9    only fair, is that you really, really look at the other

10   options.  And, I mean, a person picking up this report

11   would conclude that you haven't.  So I want that to be

12   something that y'all consider to be public input, that cost

13   and noise seems to be the reasons why you won't look at

14   14/32, yet you're willing to take up 18 acres of

15   jurisdictional wetlands, and you're willing to impact the

16   solitude of this church by extending the other runway the

17   other way.  And I don't understand what the difference is

18   between what you're want -- willing to do to the church,

19   and what you aren't willing to do with the other runway.

20   It needs further examination, I think.

21        MR. SHIPPEY:  Well, I -- as far as the noise

22   regarding 14/32 and the urban area, you know, there are

23   houses down here and up along this county road, so -- as

24   far as residential-area houses.

25        MR. MOTT:  Your point's noted.  I mean, I don't

Stephanie D. Garrett, CCR - (334) 566-2039

1    know how we address that comment.

2         MR. JINRIGHT:  There are houses involved in this

3    way too.  I mean, that's -- that's an excuse.  That's

4    not -- that's just not a good reason.  And I don't know if

5    that's y'all's fault or the people from Atlanta that did

6    that survey.  If they're the ones that done it, you know,

7    they need to -- did the City of Troy hire them or did y'all

8    hire them?

9         MR. THOMASON:  I believe they were a

10   subconsultant to us.

11        MR. BOWDEN:  Well, I'm just gonna have to insist

12   that you give us a copy of that justification.  We are at a

13   disadvantage here to tell you how we feel about this

14   project and to be able to justify our feelings.  You know,

15   we can all say we feel a certain way about something, but

16   to be able to justify it, we came in with half the

17   information.  And I think that it needs to be noted to you

18   guys and to the FAA that we didn't get a chance to look at

19   what you're saying threw out the 14/32 options.  And that's

20   not what you said you came here today to do.

21        MR. MOTT:  Okay.

22        MR. BOWDEN:  The runway -- I would like to ask,

23   who can tell me about runway-end identification lights?

24        MR. THOMASON:  I'm sorry.  That's what they pay

25   us for.

1    MR. BOWDEN:  My pilot friend told me that

2    runway-end identification lights -- which you propose to

3    install in this project; is that right?

4        MR. THOMASON:  Yes, sir.

5        MR. BOWDEN:  And unless -- I mean, are they

6    supposed to be at the end of the runway like their name

7    says?

8        MR. THOMASON:  Yes, sir.  They're the two

9    triangular -- they're represented by two triangular objects

10   at the --

11       MR. BOWDEN:  And they come on at night, or stay

12   on all the time, or what do they do?

13       MR. THOMASON:  They're -- in most cases,

14   they're -- there's several options, as far as the

15   installation and the setup of the REILs.  There's different

16   kinds --

17       MR. BOWDEN:  What's happening in this case?  I

18   don't want to know about the --

19       MR. THOMASON:  It's not been decided yet.

20       MR. BOWDEN:  Well, why can't you tell me why it's

21   not been decided yet.

22       MR. THOMASON:  Because we haven't designed the

23   runway yet.  And until we design it, until we -- we specify

24   which type, what kind, the direction, the specifics about

25   the REILs.  You know, we just -- we can't give you that

1    information at this time.

2        MR. BOWDEN:  All right.  Well, the general

3    characteristics of REILs, these lights, they blink.

4    They're strobes.

5        MR. THOMASON:  They're flashing strobe lights at

6    the end of the runway.

7        MR. BOWDEN:  And they come on at night?

8        MR. THOMASON:  Well, they can come on at night,

9    but they can be turned on during the day during periods --

10       MR. BOWDEN:  But you wouldn't make -- they

11   wouldn't definitely be on at night?

12       MR. THOMASON:  They would be at a pilot's

13   control, just like the runway lights.  The pilots click

14   their radio and the lights come on, and --

15       MR. BOWDEN:  Are you telling me that the REILs

16   don't stay on all the time?

17       MR. THOMASON:  No.  They do not necessarily.

18   Some do.  Some don't.

19       MR. BOWDEN:  And you can't tell me whether these

20   are gonna stay on all the time or not?

21       MR. THOMASON:  No, sir.  Because we haven't

22   designed the system yet.

23       MR. BOWDEN:  And you understand that that, again,

24   makes us all uncomfortable when we ask you a question and

25   you say, I don't know, somebody else will tell me what to

1      do?

2            MR. THOMASON:  Yes, sir.

3            MR. BOWDEN:  But let's assume that they're lights

4      that stay on all the time.  They're big strobe lights; is

5      that right?

6            MR. THOMASON:  They're -- depending on the model

7      we use, they're about the size of a basketball.  There's

8      both omnidirectional and directional REILs.

9      Omnidirectionals look like a big coffee can, and they've

10     got a top and a bottom.  In the center is a clear, Lexan

11     plastic trough and it emits light in all directions, like

12     the name says, omnidirectional.  There's also some that

13     look like floodlights that point up toward the approach, so

14     the pilots can see them when they're on their final

15     approach.

16           MR. BOWDEN:  They're bright lights?

17           MR. THOMASON:  Yes, sir.

18           MR. BOWDEN:  So at night, if we're having church,

19     or doing something there, these lights are gonna be

20     potentially on, and if they're these omni lights, they will

21     be clearly shining towards the church?

22           MR. THOMASON:  I can't tell you whether they're

23     gonna shine toward the church or not.

24           MR. BOWDEN:  If they're omni lights, won't they

25     be shining towards the church?

1    MR. THOMASON:  With the vegetative barrier that

2    we're looking at installing, and without going out and

3    looking at the site, it -- there might be terrain in the

4    way.  If there's terrain in the way, you might see a

5    blinking light in the sky.  So it'll be much like the ones

6    that are on top of, you know, cell towers or radio towers.

7        MR. BOWDEN:  It's not there now?

8        MR. THOMASON:  Right.

9        MR. BOWDEN:  It will be there when you're

10   through?

11       MR. THOMASON:  Right.  That is the plan.

12       MR. BOWDEN:  Okay.  That has the potential to

13   impact the community, doesn't it?

14       MR. THOMASON:  Were the light impacts addressed

15   in the EA?

16       MR. SHIPPEY:  Yeah.  You know, we're not -- we

17   will, you know, have the lights not directed -- you know,

18   it's not our intention to put the lights on the church.

19   And in my report, you know, I didn't feel that a

20   significant impact would be -- that the church would not

21   have -- or any residents around there, that -- I guess

22   negative impacts regarding lighting are not anticipated.

23       MR. BOWDEN:  Keith, let's be real clear about

24   that.  In the part where you talked about light emissions,

25   you didn't mention the church, did you?

1          MR. SHIPPEY:  No.  I did not mention the church

2      in here, no.

3          MR. BOWDEN:  In the light emissions part?

4          MR. SHIPPEY:  That's correct.

5          MR. BOWDEN:  So you can't stand here and say that

6      you've addressed the issue of how the light will affect the

7      church in your EA?

8          MR. THOMASON:  Just because we didn't address the

9      church specifically we don't address anyone specifically

10     when we talk about the problem.  And we address the problem

11     and if there's a lack of a problem.

12         MR. MOTT:  Can I switch to somebody for a minute?

13         MR. BOWDEN:  Sure.  I'm sorry.  I didn't mean

14     to --

15         MR. MOTT:  Sir?

16         MR. TURNIPSEED:  I'm Spencer Turnipseed, and I've

17     been the pastor of Oak Grove for just a few weeks.  So I've

18     been listening and learning, more than I have

19     participating, because I need to learn.  And I don't want

20     to offer any conclusive opinions at this point.  I've been

21     listening very interestedly to many of my parishioners, and

22     some who are not, speak about all this.  But I just have

23     two comments that are very clear to me, even without

24     knowing more.  One is that it seems to me that in your

25     responses directly to questions about the church, have you

1   been out there, have you put the church in this report or

2   that report, do you know what impact this might have on the

3   church, you're just as vague as you can be.  Somebody needs

4   to get out there and to realize that it exists, it's on a

5   certain plot of land, and there are things related to the

6   church and its physical property that are directly bearing

7   on this project.  And you can -- I mean, I've just been out

8   there a couple -- what, three or four times so far since

9   being the new minister and I can see the direct

10  relationship between this property from the church.  So

11  some of this doesn't require a whole lot of time, energy,

12  and effort, and I don't -- I don't see that it's happened.

13          Number two -- the other comment I have is it also

14  is very apparent, not only from that particular matter but

15  all the matters that have been before us tonight, that I've

16  heard, that you've just not kept faith with the people.

17  It's just simply put.  You just simply have not kept faith

18  with those who have the most to lose, both with respect to

19  the church cemetery and their own private property in that

20  community.  I mean, it is to me an appalling lack of

21  display of the public trust for you to do that.  And I

22  don't know where this goes in terms of the FAA and all that

23  stuff.  I've been listening.  I know that there are

24  processes and procedures, and you know that better than I.

25  But I'll tell you this:  These folks are not gonna be

1    fooled, and they're not gonna be easily put off, and I'm

2    not either, if you don't keep faith with those who have the

3    most involved and the most to lose.  And it's not just the

4    city and the mayor of the City of Troy that's concerned

5    about those kinds of matters, it's everybody that lives

6    around here or has an interest in those who do.  And you

7    just need to remember that in all of the stuff you do

8    that's technical and that is specific and legalistic.  You

9    need to remember that particular point about people, or

10   you're gonna lose this project.  And even if you win,

11   you're gonna lose.

12            MR. MOTT:  Yes, sir.

13            MR. THOMASON:  One of the things we did at our

14   last meeting when we came down here, all three of us went

15   out and looked at your church.  And we recognize that it's

16   a valuable asset to you, and we understand that.  And we

17   are not here to, in any way, intentionally go in to harm

18   your church.  We're here to -- I want to help you minimize

19   the effect of this project on you.  Anything I can do to

20   help you, I will.  If I have to come down on Sunday, on my

21   own time, and go over the project with you, I have no

22   problem with that.  Because I --

23            UNIDENTIFIED FEMALE SPEAKER:  Abandon the

24   project.  Isn't that the answer?

25            UNIDENTIFIED FEMALE SPEAKER:  What is the

1  projected cost for this project, the finalization of it?

2              MR. THOMASON:  I think approximately five million

3  dollars.

4              UNIDENTIFIED FEMALE SPEAKER:  How much?

5              MR. THOMASON:  Five million dollars.

6              UNIDENTIFIED FEMALE SPEAKER:  Since this project

7  will not accommodate all of Wiley Sanders' planes anyway,

8  has anybody looked at the option of just completely moving

9  the airport to another location in the county and securing

10  500, a thousand acres, where it can be fixed for 50 years

11  or so?

12              MR. THOMASON:  I'm not sure that's been looked at

13  in either the master plan or the (inaudible).

14              UNIDENTIFIED FEMALE SPEAKER:  And do y'all have a

15  website where you put all this information out there?

16              MR. THOMASON:  No, ma'am.

17              UNIDENTIFIED FEMALE SPEAKER:  Could you develop

18  one?

19              MR. MOTT:  The best communication we have is

20  talking to one of the three of us.

21              MR. BOWDEN:  You mentioned the master plan.  Now,

22  I want to be sure I know what you're talking about.  What

23  master plan is that?

24              MR. THOMASON:  The Troy airport has a master plan

25  from several years ago, and I'm not sure if runway

1    alternatives were discussed there or not.

2              UNIDENTIFIED MALE SPEAKER:  What does the

3    five million dollars include?  What part of the project?

4              MR. THOMASON:  It's the whole project.

5              UNIDENTIFIED MALE SPEAKER:  The whole project?

6              MR. THOMASON:  Yes, sir.

7              UNIDENTIFIED MALE SPEAKER:  Five million dollars.

8              MR. THOMASON:  Approximately.

9              UNIDENTIFIED MALE SPEAKER:  Give or take 15 or

10   20?

11             MR. MOTT:  The final cost estimate will happen

12   once we get --

13             MR. THOMASON:  That's a preliminary --

14             MR. MOTT:  Once we -- whether we're talking about

15   10 acres of wetlands or 30 acres of wetlands is gonna

16   greatly impact the price.  There's not a good way to tell

17   you at this point what that cost will be.

18             MR. LEE:  You don't know how many thousands of

19   yards of dirt you're gonna have to move?  It's quite a

20   (inaudible) down there.

21             MR. MOTT:  Yeah.  I know there's gonna be a lot

22   of dirt, but to put a number on it --

23             MR. LEE:  Where do you get the dirt?

24             MR. THOMASON:  We don't know that yet.

25             MR. MOTT:  Yes, sir?

1          MR. TURNER:  John Turner.  You've got five

2    million dollars --

3          MR. THOMASON:  We don't have any money yet.

4          MR. TURNER:  Then how do you know it's 5 million?

5          MR. THOMASON:  No.  We -- that's what we're

6    estimating it will take to --

7          MR. TURNER:  For this project, the way it's set

8    up right now?

9          MR. THOMASON:  Yes, sir.

10          MR. TURNER:  Well, you've got to tie it to

11   something, moving a thousand yards or dirt, or something,

12   to come to 5 million.

13          MR. THOMASON:  We've estimated it based on the

14   aerial mapping that we have.  Now, that doesn't take into

15   account geotechnical investigation, actual fuel surveys.

16   These contours are accurate to functionalize as a contour,

17   just due to the fact they were taken from the air and then

18   done from the photograph.  These are five-foot contours, so

19   you're looking at two-and-a-half feet here or there.  From

20   a plane's point of view, that's not as significant as from

21   an engineer's point of view.  Two feet over, you know, so

22   many thousand feet is gonna make a large difference in

23   cost.

24          MR. TURNER:  What is the cost to go the other way

25   and extend it the other way?

1          **MR. THOMASON:**  I don't have those numbers with

2    me.

3          **MR. TURNER:**  Is it more than five million?

4          **MR. THOMASON:**  I'm not sure.

5          **MR. KERVIN:**  How can you seek approval from any

6    source for a plan when you really don't have any idea how

7    much it's gonna cost?

8          **MR. MOTT:**  It goes back do that runway

9    justification study.  When we looked at the alternatives,

10   it shows the most feasible alternative to --

11         **MR. KERVIN:**  Well, I'm not talking about a

12   feasible alternative.  I'm talking about whether to do the

13   project or not.  Because you're gonna allocate a lot of tax

14   dollars and you don't seem to --

15         **UNIDENTIFIED FEMALE SPEAKER:**  Care.

16         **MR. KERVIN:**  Well, tonight -- I've been to all

17   the meetings, and this is -- this seems to be new

18   information to me, that you have even less of an idea what

19   it's gonna cost than you have in the past.  And I -- I

20   mean, as a taxpayer, it seems to me that -- or as you get

21   into the project and you determine that instead of

22   5 million it's 15 million, are you gonna stop then, or once

23   you start is there any way to stop it?  Or we'll just

24   continue allocating tax dollars to this project until we

25   finish it regardless of the cost of it?  That seems to be

1    what it sounds like to me, that you're gonna get approval

2    for a project with really having no budget for it.  And

3    where's the money gonna come from if you -- if you're

4    wrong?

5            MR. THOMASON:  If we're wrong -- each phase will

6    have cost estimates associated -- we'll have an engineer's

7    opinion of probable cost, just the way any other airport

8    project we do.  We come up with our cost estimate, but

9    that -- that could mean -- we could be right on or we could

10   be way off.  It's all gonna be -- it's all depending on

11   market economy.  You know, if there's, you know, a high

12   asphalt demand in the city and they don't have to worry

13   about the airport, then the prices we got here would be

14   higher.  If they're less, then it might be less.

15           MR. KERVIN:  But at -- is there a point though,

16   and I'm asking a serious question.  I'm not trying to

17   belabor it or anything, but is there a point -- before you

18   start taking property, before you start the project and

19   reach that point of no return, is there going to be a point

20   where we can come back and object, based on the excessive

21   cost, and that you would determine that we need to abandon

22   this project, rather than go forward with it, in any

23   direction?

24           MR. THOMASON:  That would be a question for the

25   FAA.

1        MR. KERVIN:  So --

2        MR. THOMASON:  Because they make all the funding

3    decisions.

4        MR. KERVIN:  So there is no point at which we can

5    say, oops, and back up?  You will be at that point and you

6    are gonna be forced to go forward with it?  And that's one

7    of our fears that we have, that you're -- this is an

8    ill-advised project.

9        MR. THOMASON:  The FAA always has the opportunity

10   to say -- to go --

11       MR. KERVIN:  All right.  But when is that gonna

12   occur?  Are yo -- will you be so far along then that you

13   are at a point of no return then?

14       MR. THOMASON:  That's a -- that's an FAA

15   question.

16       MR. KERVIN:  Because one -- you do -- one of the

17   many points I'm trying to make is that you can't undo what

18   you're about to do.  You cannot -- I guess you could dig up

19   the dirt and the asphalt, but, basically, once it's there,

20   it will be there forever.  And you will -- to the detriment

21   of the church, in our case, and everybody else who's got

22   their own opinion, you will have negatively impacted

23   forever that area, yet you don't know -- you're telling me

24   you don't know for sure what it's gonna cost, but you're

25   gonna get approval for this project and just go forward

Stephanie D. Garrett, CCR - (334) 566-2039

1    regardless of the cost.

2         MR. THOMASON:  We'll get a -- the FAA, just

3    because they approve this environmental assessment doesn't

4    mean they're gonna fund the project.  The FAA still has --

5         MR. KERVIN:  Will there be another meeting then

6    to -- at that point?  Will we all reconvene and come back

7    and say, okay, here it is right here.  We're gonna move

8    this many yards of dirt, we're gonna put up this many cubic

9    feet or yards or whatever of asphalt, and we'll have this

10   many lights, this much chain-link fence, we're gonna take

11   this much land from these people out here, we're gonna

12   mitigate 40 acres of wetlands for this 13 or 14, and right

13   now, if we did it today, it would cost X number of dollars,

14   all right, what say you, taxpayers of the United States of

15   America, City of Troy, up -- and if we say no we're gonna

16   stop then, before you've done anything that can't be

17   undone?

18        MR. THOMASON:  Well, we can give you estimates

19   all day long, but it's gonna be depending on what the

20   contractors bid the project at.

21        MR. KERVIN:  Okay.  So --

22        MR. THOMASON:  This will be something that will

23   have to be advertised for bid in a paper of statewide

24   circulation three times -- three consecutive weeks, and

25   we'll take bids and then we -- we'll accept the bid from

1    the lowest --

2            MR. KERVIN:  And who's gonna pay for the overruns

3    if they occur?  Will your firm pay for those?

4            MR. THOMASON:  The overruns are funded by --

5    typically, overruns are funded by the Federal Aviation

6    Administration.

7            MR. KERVIN:  Okay.  Gotcha.

8            UNIDENTIFIED MALE SPEAKER:  Taxpayers.

9            MR. MOTT:  They approve any change order to the

10   contract.

11           UNIDENTIFIED MALE SPEAKER:  So you're really

12   saying that regardless of what it costs?

13           MR. THOMASON:  No, sir.  They could always say

14   no.

15           UNIDENTIFIED MALE SPEAKER:  I'm just saying once

16   they take a project up, it's gonna be regardless of price,

17   they're gonna do it.

18           MR. MOTT:  Let me pick back up for a minute.

19   There's one thing I want to make clear.  A typical

20   project --

21           UNIDENTIFIED FEMALE SPEAKER:  Uh-huh.

22           MR. MOTT:  -- and I think this is the way this

23   one would run would be once you design the project and you

24   get -- we would bid the project out and get bid prices for

25   the project.  We submit those bid prices, in a grant

Stephanie D. Garrett, CCR - (334) 566-2039

1   application, to the FAA.  They look at the -- they look at

2   the project, what we're talking about doing, they look at

3   the bid cost, and then they will either grant that money

4   for that project or not.  Now, there's things that we have

5   to do to -- they know that there's gonna be a situation on

6   certain projects where we might have overages.  For

7   example, you're going out there, you run into some mucky

8   material, you've got to pull that material up, put some

9   backfill back down below the asphalt.  They give us ranges

10   of what is allowable and not allowable.  But any change in

11   the contract has to go through the FAA and ultimately be

12   signed by the city, the sponsor.

13          UNIDENTIFIED MALE SPEAKER:  So you're really

14   gonna send them a cost estimate?

15          MR. MOTT:  They'll have to approve the low-bid

16   contractor before we can ever start on the property.

17          UNIDENTIFIED MALE SPEAKER:  So if they okay this

18   project there will be a cost estimate in that --

19          MR. THOMASON:  There will be an actual --

20          MR. SHIPPEY:  It will be construction cost.  And

21   the FAA will either accept or not accept.

22          MR. MOTT:  And they have come back and said, that

23   is too much money, we're not doing that project --

24          MR. KERVIN:  So if you send in a bid that's too

25   low, you'll get approval, and you'll go ahead and start,

1    and then they're gonna keep sending the money to you, if it

2    takes fifty million dollars?

3            MR. MOTT:  It has to be justified.  Any change

4    in --

5            MR. KERVIN:  But once they start --

6            THE COURT REPORTER:  I cannot --

7            MR. MOTT:  Hold on.  I'm sorry.

8            THE COURT REPORTER:  I'm sorry.

9            MR. KERVIN:  You would concede though that if

10   they've started, they've acquired the land, they've filled

11   halfway, and they realize then that they're -- you really

12   missed the bid, they're not gonna stop the project right

13   there at 5,917 feet and, oops, that's it, we're not going

14   any farther, I mean, we're not sending any more money?

15           MR. MOTT:  In our contract with the contractor

16   we've identified what the project is, and, typically, it's

17   broken out by so many cubic yards of dirt and so many tons

18   of asphalt and all these things, the lights, the

19   electrical --

20           MR. KERVIN:  Right.

21           MR. MOTT:  -- all these little pieces, they're

22   all identified --

23           MR. KERVIN:  But we're not gonna have a chance to

24   come back though and go over that, is what you've told us

25   earlier.

1         MR. THOMASON:  Right.  Once that contractor

2    agrees to that price, and we submit that price to the FAA,

3    we -- in the bidding process, we require the contractor to

4    give us certain bonds for bid performance --

5         MR. MOTT:  And payment bonds.

6         MR. THOMASON:  -- and payment --

7         MR. MOTT:  That he's gonna pay his subcontractors

8    and he agrees that he's gonna do that project for that

9    amount of money.

10        MR. THOMASON:  If he doesn't do that -- if he

11    comes back and says, you know what, I've started, I can't

12    finish, then we've got a mechanism in place to pull his

13    bond to help cover the cost of finding a new contractor and

14    rebidding the project.

15        MR. KERVIN:  All right.  That answered my

16    question, I think.

17        MR. MOTT:  Yes, sir?

18        UNIDENTIFIED MALE SPEAKER:  Do all contracts have

19    cost overruns?

20        MR. THOMASON:  No, sir.  Not all contracts do.

21    Some have -- I just finished one that had a $20,000

22    underrun.

23        MR. MOTT:  Sir?

24        MR. TURNER:  This is one project that you're

25    presenting to the FAA with a cost estimate and you're

1    asking people to bid.  Once you finalize it and can do the

2    final design, and you come back and get bids, how do you

3    know that doing the opposite way to do the project will not

4    be cheaper than what they're bidding on, if you don't give

5    them two alternatives?

6              MR. MOTT:  We won't do two separate designs for

7    this project.

8              MR. TURNER:  Then how do you know this is the

9    cheapest way to go?

10             MR. MOTT:  The runway justification study and the

11   steps that we've gone through is to insure that we're

12   headed in the right direction.  And they've approved at

13   this point -- at the point you're talking about where we

14   put together a design, that this is the best alternative at

15   that time --

16             MR. TURNER:  Is the best or the cheapest?

17             MR. MOTT:  Well, I'm sure they look at the cost

18   to determine the best alternative.

19             MR. TURNER:  And what is the guidelines for the

20   word best?

21             MR. MOTT:  I don't know.  Like I said, we use --

22             MR. THOMASON:  It's what their guidelines are.

23             MR. TURNER:  Then you're gonna go back to the

24   government -- FAA guidelines?

25             MR. THOMASON:  No.  I'm saying they've looked at

Stephanie D. Garrett, CCR - (334) 566-2039

1    several things.  First and foremost in the FAA's mind is

2    safety.  Cost is not an issue when it comes to safety.

3           MR. TURNER:  I agree with that.

4           MR. THOMASON:  Next is gonna be the operational

5    characteristics of the airport.  Will it be able to

6    (inaudible) aircraft?  Next will be cost.  And I'm not

7    naive enough to say the cost is not going to enter into

8    this equation.  It is.  And from the --

9           MR. TURNER:  Whenever you design something,

10   normally in a project you have at least an alternative.

11          MR. THOMASON:  Yes, sir.

12          MR. TURNER:  And right now it seems like you're

13   eliminating all those alternatives by a third party.

14          MR. THOMASON:  We're eliminating alternatives to

15   reduce the cost of us going through and designing every

16   possible, conceivable --

17          MR. TURNER:  But I don't see how they can say

18   this is the easiest way if you don't have the final design

19   of what you're gonna do.

20          MR. MOTT:  Well, you know the concept of the

21   design is a 1500-foot expansion.  The things that we don't

22   know are how much earth is it gonna be that we're filling

23   in.  I can get close.  Pulling all the contours that we

24   have from the aerial, I can get close, but I can't

25   guarantee that those are correct.

1      MR. LEE:  Have you done corners?

2      MR. MOTT:  No, sir.  Because we can't get on your

3  property without your permission.

4      MR. LEE:  Didn't stop you before.

5      UNIDENTIFIED MALE SPEAKER:  Do you realize

6  there's lignite under that?

7      MR. MOTT:  Sir?

8      UNIDENTIFIED MALE SPEAKER:  There is lignite

9  under that.  There's a water --

10      MR. MOTT:  Well, part of the design will be to

11  look at that subsurface and make sure that the runway can

12  handle the weight -- the bearing weight that it has to have

13  for those --

14      MR. LEE:  Did you look at what they did when they

15  built the original airport?

16      MR. MOTT:  At this point in this design, no, sir.

17      MR. BOWDEN:  I have a couple of procedural

18  questions, just real quickly.  Who in the FAA do you send

19  this report to?  What is their name, and what is their

20  address, and how can we contact them?

21      MR. SHIPPEY:  Keafer Grimes is the FAA manager on

22  this project.  K-E-A-F-E-R, Grimes, G-R-I-M-E-S.  And --

23      MR. BOWDEN:  Do you have his phone number?

24      MR. MOTT:  (601) 664-990 --

25      MR. BOWDEN:  I'm sorry.  You'll have to slow

Stephanie D. Garrett, CCR - (334) 5 66-2039

114

1    down.

2             MR. THOMASON:  I'm sorry.  I'm trying to recall

3    out of memory.  It's area code (601) 664-9901, I believe.

4             MR. BOWDEN:  Where is he located?

5             MR. THOMASON:  Jackson, Mississippi.

6             MR. BOWDEN:  So if we get lost with the number,

7    we can contact the Jackson, Mississippi FAA?

8             MR. THOMASON:  Yes, sir.  It's a string of

9    numbers, so, I mean, if that's not him, it's the guy right

10    next to it.  So --

11             MR. BOWDEN:  The second question, your court

12    reporter, are you gonna transcribe that and provide it to

13    the FAA?  Or have it transcribed?

14             MR. SHIPPEY:  Yes.

15             MR. BOWDEN:  Okay. And will we be allowed to have

16    a copy of the transcript if we ask for it?

17             MR. MOTT:  It's a public record.  Yes.

18             MR. BOWDEN:  And if this project is approved by

19    the FAA, who will do the design of the runway?  Who is

20    that?

21             MR. MOTT:  Most likely, us.

22             MR. BOWDEN:  So y'all have got a vested interest

23    in making sure that this project goes through?

24             MR. MOTT:  Yes.

25             MR. BOWDEN:  Have y'all decided whether or not

1    you believe an EIS would be appropriate in this case or

2    not?

3             MR. MOTT:  We don't make that call.

4             MR. THOMASON:  That's an FAA decision.

5             MR. BOWDEN:  There is a place in the EA where you

6    say you don't believe there's any significant impacts.

7             MR. SHIPPEY:  Right.  Yes.  I put that in there.

8             MR. BOWDEN:  You don't believe that what you're

9    describing here will have significant impacts on the

10   environment?

11            MR. SHIPPEY:  No.  I mean, I -- no, I don't.

12            MR. BOWDEN:  Taking 18 acres of wetlands is not a

13   significant impact?

14            MR. THOMASON:  Significant --

15            MR. BOWDEN:  I was asking Keith.

16            MR. THOMASON:  Well --

17            MR. BOWDEN:  Well, I mean, he wrote the report.

18   I mean, he's the wetlands guy.

19            MR. SHIPPEY:  I'm not saying it's not an impact,

20   but, in my opinion, I do not feel that it's a significant

21   impact to stop the project.  I can't say it's not an

22   impact.  It is an impact.

23            MR. BOWDEN:  Right.  The question is whether it's

24   significant or not.  Because if it's significant, then

25   we've got to go to an EIS.  And that's what I'm trying to

1    pin you down on.

2             MR. SHIPPEY:  Right.

3             MR. THOMASON:  Significant as determined by the

4    FAA.

5             MR. BOWDEN:  Right.  Do you believe it's

6    significant as determined by the FAA?

7             MR. SHIPPEY:  I can't speak on what I think the

8    FAA is gonna say is significant or not.

9             MR. BOWDEN:  Well, let me ask it this way,

10    because you know what I'm trying to ask you.  Do you

11    believe that these impacts we've talked about for the last

12    two hours are significant enough that an EIS should be

13    required?

14             MR. SHIPPEY:  No.

15             MR. MOTT:  And that's Keith's opinion too.

16             MR. SHIPPEY:  Yeah.  I mean, that's --

17             MR. MOTT:  We answer to the FAA.

18             MR. SHIPPEY:  The FAA makes the final decision.

19    Like I said, they'll get all the comments today --

20             MR. BOWDEN:  You realize there's reams of

21    authority that says when you take delineated jurisdictional

22    wetlands that that's a significant impact?  You understand

23    that?

24             MR. SHIPPEY:  Yeah.  I understand it's an impact.

25    The Corps of Engineers -- that's why we were gonna mitigate

1    and -- they're not gonna allow us to do something that they

2    think -- if we don't mitigate, that's significant in their

3    eyes.  Their jurisdiction are wetlands.  And we just can't

4    go out there and start filling them without meeting their

5    approval.

6            MR. MOTT:  There's many, many projects, not just

7    airports, that I run across wetland issues every day.  And

8    it's -- you know, it's a cost factor to mitigate them back,

9    but, normally, unless it's something very significant, the

10   corps will not stop a project for a wetland issue.

11           MR. BOWDEN:  But we don't know yet, because you

12   haven't asked them.

13           MR. MOTT:  That's correct.  There's more

14   questions.  Ma'am?

15           MS. CARR:  I was just curious, speaking about the

16   cost here.  I know that y'all have been involved with other

17   airports in other areas recently.  How close are you,

18   generally, on your estimate costs for those as opposed to

19   what it actually cost?  I'm sure there's records of that --

20   public records available.

21           MR. THOMASON:  Yes, ma'am.  Typically, this

22   year -- the ones I've seen come in so far this year I think

23   we've been under almost every one.  I can't remember one

24   where we -- our engineers' pending probable cost has been

25   over the bid, from the ones we've taken out of our office.

118

1    MR. MOTT:  Now, that's out of Birmingham's

2    office.  Out of the Dothan office, on the projects I've bid

3    in the past two years, I'd say on the average you'll hit

4    one that's completely out of whack, for example with the

5    fuel prices and there was one project that had a lot of

6    asphalt in it.  It was a type of asphalt slurry seal that

7    was very expensive.  That was something that could not be

8    projected at the time with the fuel cost.  Typically in our

9    office we hit -- we're normally the high bidder.  And the

10   last four or five jobs we've had we've been the high bidder

11   by 10 percent -- 5 or 10 percent of the project cost.  But

12   it's really job specific.  It's not a blanket.  I try to be

13   the high bidder.  I try to expect the worst case scenario.

14       MR. KERVIN:  Is that your preliminary estimate at

15   this stage or is that the final estimate?

16       MR. MOTT:  That's the final estimate once the

17   design is complete and --

18       MR. KERVIN:  How far have you been on your

19   preliminary at this stage on other projects versus what it

20   actually cost.

21       MR. MOTT:  I'd say probably --

22       MR. THOMASON:  It's gonna depend on what we find

23   in between now, doing a preliminary cost estimate, and then

24   actually going out there -- I mean, if we go out there and

25   do borings and find, you know, rock at two feet the whole

1    length of the runway, that's gonna impact it significantly.

2         MR. KERVIN:  All right.  So we really --

3         MR. THOMASON:  If it's all perfect fill, it's

4    gonna impact it significantly the other way.

5         MR. KERVIN:  So we really don't have a clue how

6    much it's gonna cost yet?

7         MR. MOTT:  We have a --

8         MR. KERVIN:  Come on.  You can tell me.

9         MR. MOTT:  If it was a five-million-dollar guess,

10   you could expect four million or seven million.  Could it

11   range?  Yes.  I mean -- so can I give you a definite

12   number?  Not until I get out there and do some borings, and

13   I know what I'm up against, and I know how much material

14   I'm dealing with.  That's the best guess that -- from what

15   I can look at the site and what I can tell from looking at

16   jobs in that area, that's the best guess I can --

17        MR. KERVIN:  Which is back to the point the

18   gentlemen in the back made.  We don't know whether this is

19   the best alternative, or the cheapest alternative, or if

20   the whole project should be abandoned, because what if you

21   find some type of issue on each of the options?  I mean, we

22   don't know at this point, do we?

23        MR. MOTT:  At this point, this is the most direct

24   and best alternative that we have.

25        UNIDENTIFIED MALE SPEAKER:  Which goes back to my

1    point.  You can justify it any way you want to do it.

2              MR. THOMASON:  There --

3              UNIDENTIFIED MALE SPEAKER:  Don't answer it.

4              MR. THOMASON:  FAA makes all the justification.

5    We just provide the evidence.

6              MS. HUSSEY:  I've got a question.  I just want

7    justification -- you know, just to get it straight in my

8    mind.  Okay.  We don't have a design.  We've got something

9    that we kind of want to do, but we don't really know for

10   sure that that's gonna be the design.  We don't know how

11   much fill we're gonna have to do.  So how can y'all stand

12   there and how can you say that it's not gonna affect the

13   church and cemetery's properties if you don't know about

14   how many trees you're gonna have to top or cut out and is

15   in that safety zone?

16             MR. MOTT:  Let me answer that one.  When I say it

17   has not been designed -- when I look at this drawing, I

18   show that 1500-foot extension, I show the taxiway, I show

19   lights.  I show everything that's within the project.  I

20   consider that a 2-D, two-dimensional, flat-sheet-of-paper

21   design of this project.  That's what the project will look

22   like.  What I don't understand is turning that piece of

23   paper like this and putting a set of drawings out that a

24   contractor can bid on.  Is this sheet of paper up here?  Is

25   it down here?  It makes a big difference with your runway.

1    That will affect the cost.  But the project -- where we're

2    going with the project, being the runway length, and the

3    lighting and the electrical, we have a good idea what we

4    have -- what we're up against.  The only thing that I

5    cannot control in this point in the design is the

6    Z elevation or the elevation of the land itself.  And,

7    again, we talked about those cross slopes.  We have to make

8    sure safety is the number one concern.

9         UNIDENTIFIED FEMALE SPEAKER:  You can't look at

10   a --

11        MR. MOTT:  I don't know if that answered your

12   question, but that's the best I can do.

13        MR. BOWDEN:  You can't look at a topo and tell

14   how much dirt is gonna go in there?

15        MR. MOTT:  That's not what -- topos are

16   estimates.

17        UNIDENTIFIED MALE SPEAKER:  You've got a forty to

18   fifty-foot hole to fill there.

19        MR. MOTT:  Yes, sir.

20        UNIDENTIFIED FEMALE SPEAKER:  A seven-acre pond.

21        UNIDENTIFIED MALE SPEAKER:  You've got a

22   million-and-a-half cubic yards of dirt to put in there, at

23   least.  The dirt is gonna cost more than five million

24   dollars.

25        UNIDENTIFIED MALE SPEAKER:  And who's gonna sell

1    the dirt?  I want to sell some.

2              UNIDENTIFIED FEMALE SPEAKER:  Also, an overrun on

3    dirt can be very costly.

4              MR. THOMASON:  If I'm recalling correctly, our

5    cost estimate shows approximately two million dollars of

6    dirt.

7              UNIDENTIFIED MALE SPEAKER:  How much is dirt a

8    yard -- cubic yard?

9              MR. THOMASON:  It just depends on the site.

10             UNIDENTIFIED MALE SPEAKER:  Just roughly?

11             MR. MOTT:  It really -- it's a range.  Anywhere

12   from two dollars a yard all the way up to twenty dollars a

13   yard.

14             UNIDENTIFIED MALE SPEAKER:  To get the dirt and

15   to place the dirt, what would be a reasonable estimate per

16   yard?

17             MR. THOMASON:  Approximately two million dollars

18   of that is earthwork.

19             MR. MOTT:  It depends on where the -- a majority

20   of the money in dirt is the hauling.  Dirt doesn't cost a

21   lot.  It's the hauling.  So it really depends on how

22   close -- I mean, we'll do a design that's (inaudible)

23   specification of what that dirt has to be.  It's the

24   contractor's responsibility to go find that dirt as close

25   to the project and as cheap as they can and get it there.

1    We can't answer how much it's gonna cost or where it's

2    gonna come from.  All I can tell you is what the dirt's

3    gonna look like at the time --

4                UNIDENTIFIED MALE SPEAKER:  Did you estimate the

5    number of yards?

6                MR. MOTT:  Off the contours that we got, which

7    are, again, very exaggerated contours.

8                MR. KERVIN:  And you can see that -- already

9    yourself that you don't know the slope and the grade, so

10    therefore you don't know how --

11                MR. MOTT:  Please.  She's trying to record.

12                MR. KERVIN:  So you've conceded that you don't

13    know how the design will actually end up, so therefore you

14    don't know the slopes, the contours of the dirt, the -- how

15    it's gonna have to taper off.  So how do you know it's not

16    gonna impact the cemetery or the church, if you don't know

17    what the design is gonna look like?  Because you don't know

18    how far you're gonna have to go.

19                MR. MOTT:  In the cost estimate (inaudible) we're

20    extending their runway out at the same elevation it is now,

21    using the contours we have, we came up with -- we know what

22    the slopes of the runways are.  Those are set by the

23    criteria.  We have --

24                MR. KERVIN:  Do you have it on these maps where

25    it will be?  Where the slope will come to?

1     MR. MOTT:  No.

2     MR. KERVIN:  Why not?  That would --

3     MR. MOTT:  It's a calculation that we use just to

4     come up with a cost estimate.  It's a rough guess.  There's

5     no reason to design anything off of contour lines that

6     don't necessarily exist.

7     MR. KERVIN:  But yet you're making an unequivocal

8     statement that it's not going to impact the cemetery or the

9     church, and yet you don't know what the design of this

10    whole thing is gonna look like.  And you're --

11    MR. THOMASON:  That's what the mayor was saying

12    earlier.  If we get into the design and they realize that

13    it's going to impact the church, the mayor has said, that's

14    not an option.

15    MR. KERVIN:  And I ask if you're gonna abandon

16    the project?

17    MR. MOTT:  Well, he didn't say impact.  He said

18    purchase.

19    MR. KERVIN:  Well, even if you don't purchase the

20    property, are you gonna have to fill in -- what if you have

21    to slope into the cemetery?  Will that stop the project?

22    MR. SHIPPEY:  We can't -- we're not gonna slope

23    into the cemetery without purchasing the property to slope

24    into the cemetery, so...

25    MR. KERVIN:  So you would abandon the project if

1    the cemetery was --

2        MR. SHIPPEY:  Had to be acquired.

3        MR. KERVIN:  -- the cemetery or the church

4    property had to be acquired?

5        MR. MOTT:  That's what you heard, as well as we

6    did.

7        MR. KERVIN:  I just wanted to get that on the

8    record again.

9        MR. BOWDEN:  I have a question about the noise

10   contours.  Is there any range -- you know, you've got your

11   contours drawn.  You've got a 65-decibel level at the back

12   door of the church.  Is there any range in that 65?  In

13   other words, is it plus or minus two or three decibels on

14   that line?

15       MR. THOMASON:  No, sir.  What the computer gives

16   us is what it gives us.  That's --

17       MR. BOWDEN:  You're telling me that it gives you

18   an exact number, that there is no range?  When it's drawn

19   it will not be greater than 65 decibels at that point?

20       MR. THOMASON:  That's what the computer

21   program -- the computer program draws the line.  It's

22   saying anything inside the line is 65, anything outside is

23   less.  That's why the lines are so erratic and how they

24   deviate so much.

25       MAYOR LUNSFORD:  One point we might need to make.

The church is at a higher elevation than the runway.  The runway elevation is approximately 385.  The church is approximately 390 elevation.  So you couldn't even fill (inaudible) make it higher.  That should answer that one point.

MR. MOTT:  Yes, sir?

MS. JANET KERVIN:  May I ask a point for clarification?  Doesn't the side on the runway slope up?  The existing runway that's out there now, the land contours, it's flat and then it slopes up; is that correct?  You've been out to the airport before.  Is this --

MR. MOTT:  It comes out and then there are --

MS. JANET KERVIN:  So if the church is lower, then how are you gonna handle that?

MR. MOTT:  I don't see -- I mean, at this point, not -- the contours are not an issue now, at the point that -- because you're at the end of the runway now.  If you're -- if you're not an obstruction now, you shouldn't be an obstruction once we extend it past the church.

MR. KERVIN:  Didn't -- your firm, I think, submitted a plan to the FAA approximately two years ago, three years ago -- we have a copy of it dated -- to extend the runway to 6100 feet.  And that was turned down.  Do you have any comments about why it was turned down?  Could we get any information about why that happened?

1        MR. THOMASON:  As far as the layout plan?

2        MR. KERVIN:  The whole project was turned down, I

3    believe, I'm not sure, approximately two years ago.  And

4    that was to extend the runway to 6100 feet, in the same

5    direction, I might add.  Now we've come back with a

6    proposal to extend it to 6500.  I'm just interested in the

7    fact that -- first of all, would you concede that that was,

8    in fact, submitted, and --

9        MR. THOMASON:  Yes.

10        MR. KERVIN:  Oh, it was?

11        MR. THOMASON:  Yes.

12        MR. KERVIN:  Okay.  And why was it rejected or

13    why was it turned down?

14        MR. THOMASON:  It wasn't -- it was accepted by

15    the FAA, as well as this one for 65.

16        MR. KERVIN:  Okay.

17        MR. TURNER:  You know, I'm understanding now that

18    you're gonna take all these comments, all the corrections

19    of whatever the FAA has requested, you're gonna submit all

20    that and they're either gonna approve it or disapprove it,

21    and that's it?

22        MR. SHIPPEY:  They will approve the report by

23    issuing a FONSI.  They can require, you know, more

24    information per whatever topic, or --

25        MR. TURNER:  Well, I'm just saying if -- whatever

1  you submit, then they're gonna come back if they have any

2  questions.  We won't know, if you answer them, what those

3  questions are.  You will answer those questions.  And if

4  they approve it, from what the mayor says here, if it's not

5  gonna affect the cemetery or the church land, this project

6  will go on?  Is that yes or no?

7           MR. SHIPPEY:  If the FAA makes that decision --

8           MR. TURNER:  Is that yes or no?

9           MR. SHIPPEY:  If the FAA makes a decision based

10  off what we submit, it's adequate in their eyes to issue a

11  FONSI, they'll issue a FONSI.

12           MR. MOTT:  That does not mean the project will go

13  forward.

14           MR. TURNER:  Pardon?

15           MR. MOTT:  That does not necessarily mean the

16  project will go forward just because they issue a FONSI for

17  EA.

18           MR. TURNER:  But, I mean, how do the people here

19  know what their decision is?

20           MR. MOTT:  Falls back to your politicians, to ask

21  them.  They know what's involved in every portion of the

22  project.  We report to them every single page.  They know

23  where we're at.

24           UNIDENTIFIED FEMALE SPEAKER:  What politicians

25  are you talking about?  Which ones now?

1    MR. MOTT:  The mayor, the city council.  They

2    approve the resolutions for awarding the contract, or going

3    forward with the project.  They should be able --

4         MS. YOUNGBLOOD:  I guess they need to come clean

5    with us then, all the time, about --

6         MR. MOTT:  They may not know the specifics of

7    your question, but they should be able to get your question

8    and get it answered and get back to you.

9         MR. KERVIN:  Was there a public hearing on the

10   6100-foot plan that was approved?

11        MR. THOMASON:  No, sir.  That was a layout plan

12   and does not require a public hearing.

13        MR. KERVIN:  Okay.  What's the -- so there was no

14   official application for a 6100-foot runway that was

15   accepted?

16        MR. THOMASON:  No, sir.  ALPs do not require --

17        MR. KERVIN:  Was there one that was rejected?

18        MR. THOMASON:  No, sir.  ALPs do not require a

19   public hearing.  I prepare the documents, submit them to

20   both the State and FAA for their review.  The FAA then

21   coordinates the drawing throughout their different

22   departments to insure the safety and compliance with design

23   requirements.  After they review that, if they see this as

24   a good layout, they will approve this layout.  This is the

25   airport's wish list.

130

1    MR. KERVIN: In your opinion, wouldn't it have

2  been with keeping the -- keeping the citizenry informed, a

3  good idea to have some type of public meeting, or at least

4  some information be distributed to these people about the

5  fact that there was a plan like that going on?  I mean,

6  you're gonna use public dollars to do this, yet nobody in

7  here, in this room, really, but you guys, knew that that

8  happened, until after the fact.

9    MR. MOTT: Well, there was most likely a

10  resolution passed to go forward with creating an ALP plan

11  for the airport.  There was a --

12    MR. KERVIN: By the city council, right?

13    MR. MOTT: -- city council.

14    MR. KERVIN: So it's the city council that didn't

15  inform the citizenry.

16    MR. MOTT: They would have passed a resolution to

17  sign our contract to do an ALP plan.  Again, this is not a

18  project.  This is -- the way he put it is correct.  It's a

19  wish list from the city or from the airport that these are

20  the things that we see that we might want to do.

21    MR. KERVIN: It's my understanding from one of

22  our prior meetings -- and I'm not sure if you guys were

23  there, I think you were, but I'm not positive -- but that

24  the mayor said they did not know that that plan was

25  submitted -- the 6100-foot plan was submitted.  So there's

1    a disconnect here on who knows what, and it doesn't sound

2    like anybody knows anything really.

3                MR. MOTT:  Your comment's noted.

4                MR. TURNER:  Can somebody tell me what an ALP is,

5    please?

6                MR. THOMASON:  Airport layout plan.  I apologize.

7    An airport layout plan is the document that the FAA uses to

8    determine that it's -- the layout of the airport is --

9                MR. TURNER:  And an EA is an environmental --

10               MR. SHIPPEY:  Assessment.

11               MR. TURNER:  -- assessment?  And an EIS is

12   environmental --

13               MR. SHIPPEY:  Impact statement.

14               MR. TURNER:  And who does the environmental

15   impact statement?

16               MR. SHIPPEY:  The environmental impact statement

17   will be done by a consultant.  And that would also have to

18   be submitted and approved by the FAA if they require one.

19               MR. KERVIN:  Is there a plan -- a long-term plan?

20   You mentioned some type of plan for the long-term wish

21   list, I believe you termed it, for the city and the

22   airport.  Does that exist here?

23               MR. THOMASON:  This is -- this is the most recent

24   plan for the airport?

25               MR. KERVIN:  Is there a long-term plan to --

1        MR. BOWDEN:  I believe he called it a master

2  plan.

3        MR. KERVIN:  The master plan.

4        MR. THOMASON:  There was a master plan

5  accomplished -- I can't remember the date on it.

6        MR. KERVIN:  Did it involve, even as a wish, to

7  extend the runway beyond 6500 feet?

8        MR. THOMASON:  I can't make a statement without

9  looking at it.  I couldn't remember it off the top of my

10  head.

11        MR. BOWDEN:  Where is it?

12        MR. THOMASON:  I believe we have a copy -- I

13  believe I have a copy in my office.

14        MR. BOWDEN:  Does the city have a copy of it?

15        MR. THOMASON:  I'm not sure.

16        MR. MOTT:  Let me point out one thing.  We're at

17  7:30, 30 minutes over.  I don't want to end the public

18  hearing if we've got legitimate questions.

19        Yes, ma'am?

20        MS. CARR:  I think we're winding down, so I

21  wanted to, just for the record, get some things in there.

22  I feel like our little church is somewhat on trial here.

23  We're not real sure who the judge is yet, but...

24        MR. BOWDEN:  You know who the judge is.

25        MS. CARR:  But just so that they get in the

1    record, can I just sort of read a statement that I've got?

2    Because I know most of us here probably know what I'm going

3    to read, but just so this can be in the record.

4    I'm Peggy Carr and a member of Oak Grove United

5    Methodist Church.  Our church is actually a bit different

6    from what we think the EA report shows.  That is not

7    surprising considering that we were apparently giving no

8    recognition of existence at all on the FAA and possibly

9    other applications until we challenged the City of Troy as

10   soon as we learned of this project.  The EA report does not

11   lie when it says simply that we have church on Sunday

12   mornings.  However, the following is a list of some of the

13   functions and uses not listed, many of which activities are

14   held outside on the grounds of the church and are already

15   disturbed by airport activity:  Weekly Sunday morning

16   breakfast; weekly Sunday school, sometimes for the kids

17   held outside; revivals; vacation Bible school; homecoming,

18   with dinner on the ground; fall festival for the kids, and

19   much of that is outside; Easter sunrise services, also held

20   outside; Easter program; Easter egg hunts and breakfast;

21   Thanksgiving socials, in conjunction with food drives;

22   Christmas carolling to the sick and shut-ins; a very pious

23   Santa visits with the kids; Christmas program and social;

24   benefit gospel singings; ground singings; frequent board

25   meetings and other committee meetings; annual United

1  Methodist Church conference meeting; monthly socials as

2  part of our community outreach; choir practices; funerals,

3  and I might mention especially those are problematic with

4  the airport activity; weddings; church historical society

5  meetings to prepare our yearly church scrapbook.  Some of

6  the charitable causes that we participate in: The Relay for

7  Life, and we generally raise a good amount of money for

8  that; we hold what is called the souper bowl in January to

9  collect cans of soup or money to feed the needy;

10  participate in Franklin Graham's Shoebox Ministry at

11  Christmas; hold yard sales to benefit multiple causes; we

12  adopt a needy family oftentimes at Christmas; we support

13  our youth and wish to take mission trips; participate in

14  community-wide food drives at local grocery stores; donate

15  to the Methodist Children's Home; participate in the annual

16  Alzheimers District Walk, held in Dothan this year, and

17  took first place in money raised against a lot of big

18  churches; donate time and money to a lot of the other

19  miscellaneous causes as they arrive.

20       No doubt, even this is not a complete list, but

21  as one can plainly see, this tiny little church, with its

22  dedicated membership, though not large in number, serves a

23  worthy purpose well beyond our small community and whose

24  worth cannot be fully measured.  The church also means a

25  great deal to a lot of people now spread across the country

1    whose families have had roots in the church and community

2    for generations.  Their loved ones were buried in our

3    cemetery, thought to be sacred ground.  Among those are

4    descendants of American Indians and veteran confederate

5    soldiers.  This Church is loved and it loves back.  It is

6    worth preserving.  We strongly believe that another airport

7    expansion, either with or without actual church land

8    acquisition will, in the long run, if not in short, will

9    bring about its demise.  We shall implore the FAA to look

10    very closely at this project and see where the greater

11    worth actually lies.

12            UNIDENTIFIED MALE SPEAKER:  Amen.

13            MR. MOTT:  Are there are any other questions?

14            MS. KELLY KERVIN:  I do have one last question,

15    because I know we're done, and I'm ready to go.  And after

16    that, I'm definitely ready to go.  But just something to

17    leave with.  Your name's Keith.  I've been sitting outside

18    and I couldn't hear very well, but a few minutes ago Ben

19    had asked if you thought the wetlands were significant, you

20    know, and you answered no.  I think I could hear that,

21    because I couldn't hear very well out there.  But just to

22    leave -- and, again, you don't have to answer -- this is

23    a -- and, also, for the council members that we have here,

24    I'd love for them to hear this too.  And don't answer,

25    please.  If they were your wetlands, would they be

1    significant? And if it was your church, would it be

2    significant then? And I think that you might change your

3    mind. I'm not sure about them. But I think -- I wonder --

4    I wonder if it would be significant to you then. And

5    that's not really directed at you, but that's directed at

6    others. So that's all I wanted to -- to leave that thought

7    with you when you drive home tonight.

8         MR. MOTT: One more time, if you have not signed

9    in, there are sign-in sheets up front. If you're willing

10   to sign in, please sign in, so we can get it as part of the

11   record that you were here. If you've got any written

12   comments there's these comment sheets. if you can't get one

13   filled out that you'll -- I can be expecting it and I'll

14   give you a way to get it to me so we can get it as part of

15   the record. My business cards are up front. It's

16   Barry Mott, M-O-T-T. Pick one up. You're welcome to call

17   me if you need me.

18        MS. JANET KERVIN: Barry, may I ask one question

19   in here? You said we have five days to get the written

20   comments to you at this address?

21        MR. MOTT: I think that's what it says.

22        MS. JANET KERVIN: Is that five days that it has

23   to be in your hand, or is it postmarked five days from

24   today?

25        MR. MOTT: If you've got comments and you need to

Stephanie D. Garrett, CCR - (334) 566-2039

1    extend the five days, let me know.

2            MS. JANET KERVIN:  Can you answer the question?

3    Is it five days from today --

4            MR. MOTT:  I don't know if that's a federal

5    guideline on the time frame.  But if you've got a comment

6    to get to me and it's gonna take longer than five days, let

7    me know so I can find an answer for you.  I don't think

8    that's a federal requirement, but I think that's the

9    recommendation.  I'll have to find an answer.  I don't

10   know.

11           (The hearing was concluded at 7:35 p.m.)

12       *     *     *     *     *     *     *     *     *

13

14

15

16

17

18

19

20

21

22

23

24

25

138

```
 1                    *  *  *  *  *  *  *  *  *  *

 2                      REPORTER'S CERTIFICATE

 3                    *  *  *  *  *  *  *  *  *  *

 4    STATE OF ALABAMA)

 5    COUNTY OF PIKE)

 6              I, Stephanie D. Garrett, Certified Court Reporter and

 7    Notary Public in and for the State of Alabama at Large, do

 8    hereby certify that on Thursday, July 15th, 2004,

 9    I reported the above-referenced proceeding, and that

10    the foregoing 1-137 pages contain a true and accurate

11    transcription of the aforementioned proceeding.

12              I further certify that I am neither of kin nor of

13    counsel to the parties involved in this proceeding,

14    nor in any manner directly interested in the results

15    thereof.

16              This the 1st day of August, 2004.

17

18                                        Stephanie D. Garrett
                                          Certified Court Reporter
19

20

21

22

23

24

25
```

# COMMENTS SUBMITTED IN RESPONSE TO

# ENVIRONMENTAL ASSESSMENT

## PROPOSED AIRPORT EXPANSION
## TROY MUNICIPAL AIRPORT
## TROY, ALABAMA

I.     **INTRO:**

The following information is provided in response to the.Environmental Assessment evaluating the Proposed Airport Expansion at the Troy Municipal Airport, Troy, Alabama, dated June 2004.

This response is provided on behalf of the Oak Grove United Methodist Church (hereinafter referred to as "the Church") and other concerned citizens affected by the proposed runway extension.

II.    **SUMMARY OF OBJECTIONS:**

The primary objection to the environmental assessment is its lack of depth, detail, and analysis. A project of this magnitude, disrupting 18 acres of wetlands, increasing noise levels dramatically, condemning 120 acres of private property, and destroying the serenity of a 100-year old plus church and cemetery are all, individually and collectively, significant environmental impacts and call for the highest levels of study and analysis. This environmental assessment falls well short of what is required for a project of this size. We call for an environmental impact statement so that the agencies involved in this project will have all of the information available to them to make a proper decision about the project's proposed impact on the environment.

We also have serious reservations about the justification submitted for this project. This is mentioned because one of the options available is the "No Action Alternative." We believe the "No Action Alternative" is the best alternative available under the circumstances. That leads to an analysis of the justification for this project. A thorough review of the justification reveals that this project will overwhelmingly benefit only one company—Sanders Aviation, headquartered at the Troy Airport. Given the cost and the environmental impact, the justification for the project should be subjected to higher scrutiny to determine if the "No Action Alternative" is more appropriate.

A more detailed description of the individual objections with this report follows for your consideration. While we have attempted to touch on all the problems and

deficiencies, there will be areas that we have missed. Failure to comment on these issues should not in any way be considered agreement on or consent to the conclusions reached by the environmental assessment.

## III.    DETAILED OBJECTIONS:

A.  Justification for Extension of Runway:

In order to justify the runway extension, a survey was conducted by Barge, Waggoner, Sumner & Cannon, Inc. (hereinafter "BWSC"). (App. "A" of the EA). This survey contains numerous flaws.

To begin with, the survey indicates that in order to justify this project "the guidelines require the identification and documentation of 700 annual itinerant operations (AIO) of which at least 500 of those AIO's must be by aircraft requiring the additional length."

The survey identified 542 operations that were penalized by the current runway length. Of those identified, **450 were operations of Sanders Aviation.** This means that 83% of the flights that will benefit from the longer runway are expected to originate from one company.

Of more significance is that fact that these 450 operations penalized by the current runway length concern aircraft based out of the Troy, Airport. By definition, these are not itinerant operations as defined above. Therefore, in truth, the survey has only identified 92 itinerant operations that require additional runway length—far below the 500-operation threshold identified as a requirement in the survey.

Relying on the 450 flights from Sanders Aviation is also flawed in another manner. Those flights are Gulfstream II operations and the survey suggests the additional runway length would allow these aircraft to take-off with maximum gross weight. However, the survey goes on to say that "a runway length of 7,340 feet would be required for Sanders Aviation to operate its two Gulfstream IIs at maximum takeoff gross weight under conditions common at the Troy Municipal Airport." Therefore, these flights will still be "penalized" even if the runway is expanded to 6500 feet. The survey goes on to say that at times, the G-IIs could need 10,000' to take off!

In summary, the survey which justifies the entire runway expansion project is flawed. This leads to a decision that the "No Action Alternative" is the more appropriate choice. In the alternative, a more detailed survey is necessary to determine if the itinerant activity at the Troy Airport would in fact exceed the threshold set by the FAA.

B.  Alternatives to Extending Runway 07:

The EA claims that it has examined other alternatives for meeting the objectives

of the airport expansion project. As noted above, the justification for the project is weak and, given the cost and environmental impact, the "No Action Alternative" seems most appropriate. Assuming that the project is justified, then the EA does not adequately analyze the other alternatives. This failure should be stressed, as the project as proposed will require the taking of delineated wetlands. All other possibilities should be thoroughly analyzed and critiqued before wetlands are destroyed.

Most notably missing from the discussion on other alternatives is the extension of the Troy Municipal Airport's other runway (14/32). This option is mentioned in the wetlands mitigation report, but it is not fully explored. The basic rationale for not extending runway 14/32 is cost. However, saving money by taking wetlands is exactly the type of decision that environmental laws are designed to prevent. A more thorough analysis of the impact of this alternative should be undertaken to give decision-makers a better idea of what is at stake in this project.

The other alternative mentioned and discarded is the extension of the other end of runway 07, which is runway 25. Again, the analysis of this option is weak and conclusionary in nature. For example, the assessment states that U.S. Highway 231 would have to be moved if the runway was extended in that direction. However, there are no measurements made on how close the runway would come to this highway nor is there any authority offered as to why the highway could not remain in place as part of the runway safety area. There is also no mention of perhaps extending the runway to some degree at the end of both 07 and 25 in order to reach the desired length.

In conclusion, the alternatives studied are insufficient and lack detail. More analysis is required given the magnitude of the project.

C. Noise Impacts:

The assessment indicates that a noise level of less than 65 Dbl is permissible for for sensitive areas such as a residence or a church. The analysis of the projected noise level indicates it will reach 65 Dbl literally at the back door of the Church. To begin with, Church is not always held inside and the noise level outside and to the back of the Church would exceed the 65 Dbl threshold. Second, many of the trees currently in place will be cleared, which could potentially increase the noise level. It is also important to note that the software used by the study was upgraded in March 2003. Given that the results of this analysis indicate significant noise impact on the Church, it only seems reasonable that additional testing and analysis be conducted to determine more accurately the noise levels expected after the project is complete.

Related to the issue of noise is vibration. The members of the Church are concerned about damage to the church building due to vibrations. However, the assessment makes no mention of the increase in vibrations or what it might do to the environment. This is also an area that warrants a more detailed investigation.

D.  Social Impacts:

Perhaps of all the areas of the assessment, this portion seems to be the most misguided.  This airport extension will change the entire landscape of the Oak Grove United Methodist Church, its associated cemetery, and the surrounding area.  The noise level will dramatically increase.  Air traffic will increase.  To say that there is no social impact erodes the credibility of the entire report and, in a word, is dishonest.  Further evaluation, by someone who is more objective, seems to be in order.

E.  Wetlands:

The most significant environmental impact by far is the destruction of 18 acres of delineated wetlands in order to complete this extension.  Wetlands are a precious natural resource and all efforts to avoid their destruction should be utilized.  The assessment suggests that it will mitigate this destruction by the creation of 24 acres of "new" wetlands.  We object to this plan and call for a more in-depth study of other alternatives which would not require such a dramatic impact on the environment.

Our initial objection is the City's failure to consult with or coordinate the mitigation plan with the Army Corps of Engineers.  As of late yesterday afternoon, Corps officials in Mobile were unaware of the plan to destroy 18 acres of wetlands nor were they aware of the proposed mitigation plan.

There is also inconsistency in how the mitigation plan proposes to deal with waterfowl.  The assessment indicates that the new wetlands will not attract waterfowl.  The mitigation plan itself (App "E") states that the new wetlands "should provide a more hydric habitat during the late summer and early fall months and thus potentially **attract and support a variety of wildlife, including waterfowl.**"  On the other hand, FAA Order 5100.38B, Change 1, Airport Improvement Program Handbook, prohibits, due to safety reasons, the implementation of wetland wildlife attractions near an airfield.  (Section 585 – Wetlands).  This matter needs to be addressed through further analysis and coordination of the mitigation plan.

There is one other statement in the mitigation plan that needs to be addressed.  The author of this plan states that the "site development and construction project is part of a major economic development effort that will bring many needed jobs to Pike County."  It is important to note that there is no data to support this statement whatsoever.  To the contrary, the City of Troy has informed me that no economic impact study has been accomplished to determine if any jobs would be created by this project.  (Att "1").  It is pure speculation to suggest that this project will add "many needed jobs" to the area once it is completed.

F.  Wild and Scenic Rivers:

The assessment states that there are no river or stream segments classified as

"Wild and Scenic" and due protection from this project. However, the assessment ignores the fact that the wetlands and other tributaries drain into Beeman Creek, which lies slightly east of the project. Beeman Creek is a tributary of the Conecuh River, which is clearly listed on the National Park Services Nationwide Rivers Inventory. (Att "2"). Therefore, it is incorrect to say that the project will not impact any streams or rivers on the Nationwide Inventory.

Related to the Beeman Creek issue is the impact of storm water discharge. The destruction of 18 acres of wetlands, combined with an increase in the length of the runway and taxiway, have the potential to greatly increase the amount of storm water discharge. Because the wetlands in this area drain into Beeman Creek, which drains into the Conecuh River, an analysis of the impact should be done. However, the assessment currently provides no assessment of the increase in storm water discharge and the impact on the Conecuh River once the project is complete. The only discussion of this issue is found in the portion of the assessment relating to the construction phase of the project.

G. Historic and Archaeological Resources:

According to the assessment, the National Historic Preservation Act requires an initial review to determine whether or not any land or structures eligible for inclusion in the National Register of Historic Places will be impacted by the project. The assessment concludes no such structures exist within the project area. Nothing could be further from the truth.

Oak Grove United Methodist Church is located within approximately 500 feet of the end of the proposed runway expansion. It was established in 1885 and the current sanctuary was built shortly thereafter. It has been an active church since it was established and has been the place of worship for hundreds of people since it began.

The "Phase I Cultural Resource Assessment" (App "C") conducted on site failed to mention the Church even existed. The above-references assessment even went so far as to say that a one-mile "vehicular survey" around the project area did not locate any historic standing structures. This false report was presented to the Alabama Historical Commission who initially concurred with the project.

Recently, having been informed of the "facts on the ground", the Alabama Historical Commission revoked their concurrence and asked for additional information. A copy of their letter is attached. (Att "3"). Putting aside whether this glaring omission was misfeasance or malfeasance, there is only one conclusion to be drawn. This environmental assessment is inadequate to determine the true environmental impact on the surrounding area. An environmental impact statement is needed to provide further information to decision-makers as to how the project will effect the Church.

In addition to the above, the project will potentially impact the Oak Grove Cemetery, located adjacent to the Church. This cemetery has persons interred there as early as 1877. Original plans called for condemning a small portion of the cemetery.

As noted in the Commission's letter (Att "3"), it is unclear whether that is still true or not. Even if part of the Cemetery is not condemned, the fence surrounding the runway safety area will be installed very close to the Cemetery. The Cemetery should be studied to see if it would also qualify as a cultural resource due to be protected and what impact the project will have on the graves, markers, and future use of the Cemetery.

H. Miscellaneous:

In addition to the above, there are various other issues related to this project that are not dealt with adequately by the current environmental assessment. For example, there are clearly wetlands on the eastern end of runway 25. Furthermore, the project appears to include work to be accomplished at that end of the runway. However, there is no mention of the disturbance or mitigation of those wetlands. In addition to the above, the scope of the proposed project also includes the installation of "Runway End Identification Lights." It has been explained to me that these lights are extremely bright, strobe (blinking) lights. Given the close proximity of the Church to the proposed end of the runway, these lights will clearly impact the Church and Cemetery.

## III. SUMMARY:

Despite the incomplete and often misleading nature of this environmental assessment, there are some conclusions that can be drawn. The proposed project as explained will significantly impact the environment. The social, environmental, and financial costs are without question great. The report also reveals that the justification for the project is weak and will primarily benefit one company. The combination of these two—significant impacts and weak justification--should lead to a decision to abandon the project as it is currently planned. At the very least, an environmental impact statement is needed to analyze the need for this project, thoroughly explore other alternatives, and fully examine the consequences to the environment.

SUBMITTED ON BEHALF OF THE OAK GROVE UNITED
METHODIST CHURCH AND OTHER CONCERNED
CITIZENS BY:

Benjamin M. Bowden
Albrittons, Clifton, Alverson,
Moody & Bowden, P.C.
P.O. Box 880
Andalusia, Alabama




## Alabama Segments



**<u>Jeff Duncan</u>**
**National Park Service**
**Rivers, Trails & Conservation Assistance**
**424 Georgia Avenue, Suite 2B**
**Chattanooga, TN 37403**
**(423) 266-1150**

<u>Au</u>
<u>Hist</u>
<u>D</u>
<u>O</u>
<u>Rem</u>

<u>Clas</u>
<u>and</u>

<u>Ret</u>

| River | County | Reach | Length | Year Listed/ Update | Potential Classification | ORVs | Desc |
|-------|--------|-------|--------|---------------------|--------------------------|------|------|
| Bear Creek | Marion, Franklin | RM 41, MS State line, to RM 98, AL 241 bridge west of Bear Creek community | 57 | 1982 | | S, R | Signif recrea facilit includ canoe undev natura corrid |
| Big Canoe Creek | St. Clair | RM 5, Etowah County line, | 27 | 1982 | | S, R, F | Free- excep scenic |

http://www.nps.gov/ncrc/programs/rtca/nri/states/al.html

| | | to RM 32, I-59 bridge | | | | | segm |
|---|---|---|---|---|---|---|---|
| Black Warrior River, Locust Fork | Jefferson, Blount, Cullman, Marshall, Etowah | RM 34, approximately one mile above US 78 bridge, to RM 124, AL 75 bridge | 90 | 1982 | | S, R, G, F, W, H, C | Relati undev whitev strean casca water beaut stands moun laurel azalea |
| Black Warrior River, Mulberry Fork | Blount, Cullman | RM 59, I-65 bridge, to RM 113, Walker County line | 54 | 1982 | | S, R, G, F, W | Sceni undev canoe strean |
| Blackwater River | Baldwin | RM 0, confluence with Perdido River, to RM 20, one mile below US 90/AL 16 bridge | 20 | 1982 | | S, R | Heavi utilize crysta spring river v bluffs Class rapids sandy and c stands lower |

7/15/2004

| Blackwater River | Escambia, Covington | RM 44, FL State line, to RM 57, US 27/AL 15 bridge | 13 | 1982 | | S, R, F, W | Entire segm througe Cones Natior Fores extens stand: Atlant cedar |
| Buttahatchie River | Lamar, Marion, Winston | RM 40, MS State line, to RM 109, headwaters | 69 | 1982 | | S, R, G, F, W, H, C | Relati undist strean nume shoal: scenic popul: floatir strean excep fisher of Am alligat eagle Bachr warbk Florid panth |
| Cahaba River | Jefferson, St. Clair | RM 138, US 31 south of Birmingham, | 48 | 1982 | | S, R, G, F, W, H, | See S One |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | to RM 186, below Trucks Lake | | | | C | |
| Cahaba River | Dallas | RM 0, confluence with Alabama River, to RM 22, US 80 west of Selma | 22 | 1982 | | S, R, G, F, W, H, C | Wildli hiking boatir signifi histor archa sites. |
| Chickasaw Bogue | Marengo | RM 0, confluence with Tombigbee River, to RM 38, headwaters near Wilcox County line | 38 | 1982 | | S, R | One c most canoe strean State. |
| Chickasaw Creek | Mobile | RM 4, US 43/AL 13 bridge, to RM 30, headwaters north of Turnerville | 26 | 1982 | | S, R, G, F, W, H, C | Natur: crysta spring strean know wildlif recrea oppor |

http://www.nps.gov/ncrc/programs/rtca/nri/states/al.html

| Chipola and Cowarts Creek | Houston | RM 97, FL State line, to RM 107, AL 55 bridge | 10 | 1982 | | S, R, G, F, W | Predo limest strean clear long g runs, rocks rapids State trail. |
| Choccolocco Creek | Talladega, Calhoun | RM 5, US 231/AL 77 bridge, to RM 50, below AL 9 bridge | 45 | 1982 | | S, R, F, W | Excel recrea poten proxim popula cente |
| Choctawhatchee River and East Fork | Geneva, Houston, Dale, Henry, Barbour | RM 78, FL State line, to RM 170, headwaters southeast of Clayton | 92 | 1982 | | S, R, G, F, W | Sceni recrea strean ecolog signifi excell water Point Wash State Mana Area Morris Sprin |

| Coosa River | Elmore | RM 6, above Wetumka, to RM 13, below Jordon Dam | 7 | 1982 | | R, G, F, W, H, C | Excel fisher archa sites. |
|---|---|---|---|---|---|---|---|
| Cypress Creek | Lauderdale | RM 5, west of Florence, to RM 25, TN State line | 20 | 1982 | | S, R | Signif recrea site; desig canoe |
| Elk River | Limestone | RM 22, above Lake Wheeler, to RM 33, TN State line | 11 | 1982 | | S, R, F | High fishing strea |
| Escambia River and Conecuh River | Escambia, Conecuh, Covington | RM 51, FL State line, to RM 118, one mile below village of River Falls | 67 | 1982 | | S, R, F, H, C | Relati undis strea appro 10 mi bound Cone Natio Fores |
| Escambia River and Conecuh River | Covington, Crenshaw, Pike, Bullock | RM 132, above Gantt Lake, to RM 221, headwaters northeast of Peachburg | 89 | 1982 | | S, R, F, W | See i comm |

# COMMENT SHEET

**Environmental Assessment
for the
Proposed Runway Extension and Airport Improvements
Troy Municipal Airport**

## PUBLIC HEARING
### July 15, 2004

**NAME:** Janet Kervin

**ADDRESS:** PO Box 921
Troy   AL   36081

**TELEPHONE:** 334-670-3524 (day)

P. 1 of 3

**INTEREST IN PROJECT:**

AREA RESIDENT √

LOCAL BUSINESS OWNER √

PROPERTY OWNER ON PROJECT √

OTHER √   Member of Oak Grove Church

**COMMENTS:**

The following are my comments in addition to those already entered at the public hearing recorded by the court reporter that will become part of the Final Draft of the Environmental Assessment as the public was informed on Thursday July 15, 2004. Please note the entire meeting was recorded and transcripts should be attached to the report

① The city officials and all Members of the Airport authority should have been inside the meeting room and taken Questions rather than passing this to the three engineers present from Barge, Waggner Sumner and Cannon (BWSC). They could not answer most of the Questions raised.

② It is unfair that the FAA has seen a copy of the Draft of the Environmental Assessment and have provided comments back to BWSC but the public will not have another opportunity to voice Concerns or opposition to the final Environmental Assessment. The public does not get the benefits of Knowing what the FAA commented back to BWSC and what Changes BWSC will make in this report □ □ □ □ □

Mail To:    City of Troy
P.O. Box 549
Troy, Alabama 36081

# COMMENT SHEET

**Environmental Assessment**
**for the**
**Proposed Runway Extension and Airport Improvements**
**Troy Municipal Airport**

## PUBLIC HEARING
## July 15, 2004

**NAME:** Janet Kervin          P. 2 of 3
**ADDRESS:** Comments Continued

**TELEPHONE:**

**INTEREST IN PROJECT:**
**AREA RESIDENT** ✓
**LOCAL BUSINESS OWNER** ✓
**PROPERTY OWNER ON PROJECT** ✓
**OTHER** ✓ Member of Oak Grove Church

**COMMENTS:**

(Continued)

(3) In the hand out provided by BWSC for the Public hearing meeting (of which this form was attached) it was printed that "Representatives from the City of Troy and Barge Waggoner Sumner & Cannon, Inc. (BWSC) are present to discuss these maps, the Environmental Assessment report, and other aspects of this project. These individuals can be identified by the Name tags they are wearing. Please feel free to discuss the proposed project with them." Although the Mayor addressed the group during the meeting he said he could not participate in the public hearing. This seemed to be contridictorary to the printed instructions for the meeting format.

Mail To:    City of Troy
           P.O. Box 549
           Troy, Alabama 36081

# COMMENT SHEET

**Environmental Assessment**
**for the**
**Proposed Runway Extension and Airport Improvements**
**Troy Municipal Airport**

## PUBLIC HEARING
## July 15, 2004

NAME: Janet Kervin                    p. 3 of 3

ADDRESS: Continued

TELEPHONE:

INTEREST IN PROJECT:

AREA RESIDENT ✓                PROPERTY OWNER ON PROJECT ✓

LOCAL BUSINESS OWNER ____    OTHER ✓ Member of Oak Grove United
                                              Methodist Church

COMMENTS: (Continued)

④ One member attending the Meeting brought up a point regarding fire protection requirements for large planes (ie 727) flying into the airport. Would the Safety Procedures be the same or is more expense required to obtain the sufficient equipment to handle emergencies and has this been considered in the proposed costs of $5M for the Project?

⑤ Who are the members of the Troy Airport Authority?

⑥ May the "Master Plan" in place for the Troy Municipal airport be obtained by members of the public for review?

Mail To:    City of Troy
            P.O. Box 549
            Troy, Alabama 36081

# COMMENT SHEET

## Environmental Assessment
### for the
### Proposed Runway Extension and Airport Improvements
### Troy Municipal Airport

## PUBLIC HEARING
## July 15, 2004

**NAME:**      **Rachel Lee**
**ADDRESS:**   **882 County Road 1148**
               **Troy, AL 36079**
**TELEPHONE:** **334-566-7580**

**INTEREST IN PROJECT:**

AREA RESIDENT   _X_            PROPERTY OWNER ON PROJECT  _X_

LOCAL BUSINESS OWNER            OTHER

**COMMENTS:**

On July 15, 2004, the City of Troy through their engineering firm Barge, Waggoner, Sumner & Cannon, Inc. (BWSC) conducted a public hearing concerning a proposed runway extension to Troy's airport.

I am a resident of the City of Troy and landowner and resident of the proposed area that will be affected by this extension. After attending the hearing and reading the hand out, it appears that there are still many questions that need to be answered and I have many concerns about the project.

1)   The hand out stated that the representatives of the City of Troy would be in attendance for questions. Why were they not at the front so that everyone could see them and questions could be addressed to them?

2)   The hand out stated that only one single family residence would be displaced. That's great unless you happen to be the person who owns the one single family residence that will be displaced. Do you know that the owner of this residence is an elderly, Troy gentleman whose health is failing him? And now, his hometown is going to take his home. What if this were your father?

3)   Are you knowledgeable about the original construction of the airport? When the airport was constructed in the 1940's, there was a great expense involved in the attempt to get to a solid base for the runways. In some areas, the contractors dug more than 90 feet and there was nothing but mushy peat moss. More than likely, the proposed $5M will end up costing the taxpayers of Troy and Pike County much more than the current proposed match. The last time I checked, federal grants were still funded by taxes.

4)   The hand out also stated that no business would be displaced   nor would it conflict with any land use plans or create an incompatible land use. How can you say that when you do not know what plans the landowners have for the acres that will be involved? It definitely will create an incompatible use of the land. The landowner who currently has a lake will no longer have a lake.


My husband and I will not be able to continue our family tradition of taking our children to our woodlands and wetlands for a family outing because the trees will be gone and the wetlands will be gone. We had planned to start taking our grandchildren next year. It seems that more and more family traditions are going by the wayside for progress.

5)   The hand out also stated that the noise level will not be any higher than currently exists. The level may not be any higher but the frequency of the high noise level will increase with the additional planes that land and take off.

My husband had two great-grandfathers that were very instrumental in the construction of Oak Grove Methodist, which is located next to the area that will be affected. In 1885 Great-grandparents, Evan Lee and Charlotte Lee, deeded the land to the church and his great-grandfather John Early Price took a leading role in the actual construction of it. The sanctuary is constructed with wooden pegs. The current noise level is already too excessive for a little old wooden church.

6) It was brought up in the hearing that the assessment had to document at least 500 operations that were disadvantaged due to the length of the runway and that you stopped at about 542. It was also stated in the hearing that 450 of the operations were for Wily Sanders. How many of these operations were for pleasure as opposed to business?

7) It was also stated at the hearing that with the extension, some planes would still be penalized due to the length of the runway. Of the 542 operations documented, how many would still be penalized with the runway extension?

8) Considering the the cost of the extension ( another "fleecing of the taxpayers") will probably be financially unfeasible due to the amount of digging and fill that will be required for the type of soil and the slope of the terrain; and considering that there is not sufficient room to expand to a size necessary to handle all operations; would it not be fiscally responsible to look at other locations in the county for a possible alternative site and relocate the airport?

I strongly recommend  this project be abandoned.

# COMMENT SHEET

**Environmental Assessment**
**for the**
**Proposed Runway Extension and Airport Improvements**
**Troy Municipal Airport**

## PUBLIC HEARING
## July 15, 2004

NAME: _Patsy Jinright_

ADDRESS: _1123 Brundidge Blvd_

_Troy, Al. 36081_

TELEPHONE: _334/566-2832_

**INTEREST IN PROJECT:**

AREA RESIDENT _____       PROPERTY OWNER ON PROJECT _____

LOCAL BUSINESS OWNER _____       OTHER _X_

_Member of Oak Grove UMC_

**COMMENTS:**

_I was very disappointed in the information, we as church members, received at the Public Hearing - July 15, 2004. None of our questions were answered. The Environmental Assessment report had numerous errors which were addressed with the engineering firm - but they did not or could not give us answers. Our questions related to the noise factor, elevation of the runway in relation to our church, Wetlands factor, justification for the project. We sincerely want to preserve our Church and Cemetary - Where has the sacredness of worship lost its importance._

Mail To:      City of Troy
              P.O. Box 549
              Troy, Alabama 36081

RECEIVED
BARGE, WAGGONER, SUMNER & CANNON

JUL 2 3 2004

# COMMENT SHEET

### Environmental Assessment
### for the
### Proposed Runway Extension and Airport Improvements
### Troy Municipal Airport

## PUBLIC HEARING
## July 15, 2004

NAME: _Patsy Jinright_

ADDRESS: _1123 Bdge Blvd_
_Troy, Al. 36081_

TELEPHONE: _334/506-2832_

**INTEREST IN PROJECT:**

AREA RESIDENT _____          PROPERTY OWNER ON PROJECT _____

LOCAL BUSINESS OWNER _____   OTHER _X_ _Oak Grove UMC_

**COMMENTS:**

I was very disappointed in the information
we as church members received at the Public
Hearing — July 15, 2004. None of our questions
were answered. The Environmental Assessment
report had numerous errors which were asked
of the engineering firm — but they did not or
could not give us answers. Our questions
in relation to our church, (1) noise factor. (2) wetlands
to be destroyed. (3) justification (4) elevations - others. We
sincerely want to preserve our church and cemetery
(Indian + Confederate soldiers are buried here) — where has
the sacredness of worship lost its importance.

Mail To:    City of Troy
            P.O. Box 549
            Troy, Alabama 36081

RECEIVED
BARGE, WAGGONER, SUMNER & CANNON

JUL 21 2004

# COMMENT SHEET

**Environmental Assessment
for the
Proposed Runway Extension and Airport Improvements
Troy Municipal Airport**

JUL 21 2004

## PUBLIC HEARING
### July 15, 2004

**NAME:** MARY ANN HICKMAN

**ADDRESS:** 111 Camellia Avenue
Troy, Al 36081-3115

**TELEPHONE** (334) 566-5675

**INTEREST IN PROJECT:**

AREA RESIDENT _____          PROPERTY OWNER ON PROJECT ✓____

LOCAL BUSINESS OWNER _____  OTHER ✓ Church Member
Oak Grove Methodist Church

**COMMENTS:**

① My concerns are that the proposed airport improvements
will be detrimental to the church I have gone to all my
life and to the cemetery where my husband, parents, sister,
grandparents, aunts, uncles and cousins are buried and
where I, my daughter, son-in-law and other relatives had
planned to be buried.

② One of the properties that will have to be acquired has been in
my family since 1941. At one time my daughter and son-in-law
had planned to build on this property a weekend retreat as a
second home. I hate to see this property used in this
manner when it seems that it really isn't going to solve

(over)

Mail To:     City of Troy
P.O. Box 549
Troy, Alabama 36081

to '6500 feet according to the size of the park area with us
the planes will still be finalized,

the engineers have stated that there will be no impact
on the environment, however, they went on to say that
wildlife would be detered from the area. My family
members hunt deer, turkey and birds on our property. I
feel that the environment will be affected adversely on
the church level and on personal property levels.

The engineers stated that they had no plan in place
at this time but assured everyone at the public hearing
that our church and cemetery would not be affected. I
don't see how they can make this assurance before a
plan is in place and after the project is begun it
will be too late. I feel that an alternate plan should
be sought on this project.

The wetlands that will be destroyed on my family's
property feeds the larger wetlands on the Kerdin
property and they feed Beeman Creek. This will
affect the environment.

Can someone with FAA come and look over the
projected area and hear our side of the project as
I feel that our concerns have not been properly
represented and that some information may have
been misrepresented?

Thank you,

Mary Ann Nickman

Copy to; Barge, Waggoner, Sumner & Cannon Inc.
Dothan, Alabama

Ben Bowden, attorney
Andalusia, Al.

# COMMENT SHEET

## Environmental Assessment
## for the
## Proposed Runway Extension and Airport Improvements
## Troy Municipal Airport

## PUBLIC HEARING
## July 15, 2004

**NAME:** **Donald Lee**
**ADDRESS:** **882 County Road 1148**
**Troy, AL 36079**
**TELEPHONE:** **334-566-7580**

## INTEREST IN PROJECT:

AREA RESIDENT    X          PROPERTY OWNER ON PROJECT  X

LOCAL BUSINESS OWNER        OTHER

## COMMENTS:

On July 15, 2004, the City of Troy through their engineering firm Barge, Waggoner, Sumner, and Cannon, Inc., (BWSC) conducted a public hearing concerning a proposed runway extension to Troy's airport.

As a landowner, resident and church member in the proposed area that will be afflicted by this project, I attended the hearing expecting to receive a truthful presentation of information that would be at a minimum forthcoming with an atmosphere of honesty to the land owners, church members, and area residents. Personnel from BWSC engineering firm conducted the meeting, which extended approximately two ½ hours. Information provided by BWSC to the group amounted to non answers; Do Not Know

the Information; or the answer to the question is someone else's responsibility. When the group members asked questions, representatives from BWSC confessed to pertinent information being omitted from the reports. The BWSC staff was very adept at moving onto another point after being caught in an undefendable position.

The public hearing served to only meet the minimal requirement that a public hearing be conducted. In light of the con (meaning to swindle) operation being perpetrated on the impacted area residents and taxpayers that are expected to support the unnecessary expenditure of public funds, I strongly recommend the Troy Airport Runway extension be abandoned.

# COMMENT SHEET

### Environmental Assessment
### for the
### Proposed Runway Extension and Airport Improvements
### Troy Municipal Airport

## PUBLIC HEARING
## July 15, 2004

NAME:    James LeVeque

ADDRESS:    2440 County Rd. 1149

Troy, Alabama 36079

TELEPHONE:    334-566-5261

## INTEREST IN PROJECT:

AREA RESIDENT    X            PROPERTY OWNER ON PROJECT _____

LOCAL BUSINESS OWNER _____            OTHER _____

## COMMENTS:

I attended the public hearing on July 15, 2004. At that hearing, the existence of a Troy Airport Master Plan and a Runway Justification Study (as to why runway 14/32 was determined not to be a preferred alternative) were mentioned by representatives of your firm and by Calvin Lott, the City of Troy representative. Could we obtain a copy of the Troy Airport Master Plan and the Runway Justification Study mentioned at the public hearing? Also, would it be possible to obtain a copy of the Noise Contours Maps (Fig. 6 & 7) that were on display at the public hearing? I appreciate your time in helping us.

Mail To:    City of Troy
P.O. Box 549
Troy, Alabama 36081

# COMMENT SHEET

**Environmental Assessment**
for the
**Proposed Runway Extension and Airport Improvements**
**Troy Municipal Airport**

## PUBLIC HEARING
### July 15, 2004

NAME: _Carl Hussey_

ADDRESS: _308 Second Avenue_
_Troy, AL 36081_

TELEPHONE: _334.566-1819_

INTEREST IN PROJECT:

AREA RESIDENT _____          PROPERTY OWNER ON PROJECT ✓

LOCAL BUSINESS OWNER _____   OTHER ✓

COMMENTS:

_Is it possible for someone from the FAA to come meet with the church and cemetery people to see the impact this airport (runway) expansion will be making on the community?_

_If not:_
_Would the FAA let someone from the church or the lawyer come meet with them in Mississippi to state our objections to the 07 expansion?_

RECEIVED
BARGE, WAGGONER, SUMNER & CANNON

JUL 1 9 2004

Mail To:    City of Troy
P.O. Box 549
Troy, Alabama 36081

# COMMENT SHEET

**Environmental Assessment**
**for the**
**Proposed Runway Extension and Airport Improvements**
**Troy Municipal Airport**

## PUBLIC HEARING
### July 15, 2004

NAME: _Lorena Joyce Nicoll_

ADDRESS: _3806 Delzer av_

_Montgomery, Al 36109-2816_

TELEPHONE: _334-272-0481_

**INTEREST IN PROJECT:**

AREA RESIDENT _____        PROPERTY OWNER ON PROJECT _____

LOCAL BUSINESS OWNER _____     OTHER _X_

COMMENTS: _Oak Grove Church_
_and Cemetery_

_Representing the Alabama Cemetery_
_Preservation Alliance (ACPA) we are_
_Concerned that the Oak Grove Church is_
_being impacted. Any building near an_
_airport is in danger especially one over_
_100 years old. Our historical cemeteries_
_and churches are being lost ~~continuously~~_
_every day. Please consider changing this_
_project._

Mail To:      City of Troy
              P.O. Box 549
              Troy, Alabama 36081

# COMMENT SHEET

**Environmental Assessment**
**for the**
**Proposed Runway Extension and Airport Improvements**
**Troy Municipal Airport**

# PUBLIC HEARING
## July 15, 2004

**NAME:** _John Turner_

**ADDRESS:** _332 Stonegate_

_Dothan AL._

**TELEPHONE:** _792-6947_

**INTEREST IN PROJECT:**

AREA RESIDENT _____          PROPERTY OWNER ON PROJECT _✓_

LOCAL BUSINESS OWNER _____          OTHER _✓_ _Family Buried There_

**COMMENTS:**

_Copy of Response To Church Area Being A_
_Historical Site_

Mail To:       City of Troy
               P.O. Box 549
               Troy, Alabama 36081

# COMMENT SHEET

Environmental Assessment
for the
Proposed Runway Extension and Airport Improvements
Troy Municipal Airport

## PUBLIC HEARING
### July 15, 2004

NAME: Ellis R. and Peggy Carr

ADDRESS: 2420 Henderson Hwy.
Troy, AL 36079

TELEPHONE: (334) 566-7912

INTEREST IN PROJECT:    Eventually we will have a very small interest in a small # of acres affected

AREA RESIDENT _____    PROPERTY OWNER ON PROJECT _____ ✓

LOCAL BUSINESS OWNER _____    OTHER _____ ✓ member, Oak Grove United Methodist Church

COMMENTS:

We have many concerns w/ the findings of the EA (and justification survey) We believe:
The overall "Attitude" of the report is to minimize any potential significant environmental considerations by very selective wording which skirts the facts or outright misrepresents the facts as they should be reported. Many examples of this exist and will be brought to the attention of the FAA. Some of these concerns were discussed by a number of our church members and others in attendance. We concur w/ these concerns and refer you to the minutes taken by court reporter of the entire meeting on July 15, '04. Our feelings are also being expressed by church Attorney, Ben Bowden.

Mail To:    City of Troy
P.O. Box 549
Troy, Alabama 36081

RECEIVED
BARGE, WAGGONER, SUMNER & CANNON
JUL 2 3 2004

Pg 1 of 15
w/ 4 pgs of photos
additionally

pg. 2 of 15

The following are some additional thoughts:
We believe that this entire project has been shrouded in confusion and secrecy. Public involvement has been reduced through a series of manipulations designed to remove any power from the citizenry regarding this project, essentially leaving them to "chase their tails" until, hopefully, the project is so far down the pipeline that it cannot be halted. Perhaps it's already there? We are not fooled by these procedures and do not approve of or appreciate these techniques. One example of this is holding the obligatory meetings regarding the project as "informal," thereby escaping the need to have documentation of any statements (promises) made to the public about their concerns.

A number of concerns are not a matter of opinion. It is a fact that:

① Land was illegally accessed for purposes of project up

to this point.

② Most landowners have had no notification that their land is involved in this project.

③ Individuals are given contradictory/conflicting "facts" that seem to keep changing

④ The EA contains numerous inaccuracies.

We believe that the closing of the road running directly in front of church a short time ago was done to facilitate this project w/out penalty from the EA which requires that the project not ① affect delivery of public services (such as mail or emergency vehicles) or ② have any adverse effect on community access to neighborhood facilities (church). We believe this same reasoning is why we are being told that a second road running the other direction from church will not be closed; but from all information made available, it will be necessary to do so to achieve completion of project.

The closing of this 2nd road was confirmed to a church member by trespassing surveyors on the project. Perhaps this closing is planned to be delayed so it will be disassociated w/ this project? This first road closing was done, by some accounts, illegally. (It is a county road.)

The EA keeps referring to the airport being in the city. Most, or all, of the proposed land to be acquired is in the county. How can a city obtain county land under imminent domain? Can imminent domain be imposed where it hasn't been proven that the project is actually for the public good? Can it be forced if there are other alternatives? We have grave concerns that this would be a real abuse of power somewhere. "Having the right to do something doesn't make it right."

pg 3 of 15

There doesn't seem to be adequate proof of increased economic benefit as EA suggests. In fact, in some parts of EA, it states the contrary. Pg. 25 — ...and changes in business and economic activity would be "modest" which avoids the need for detailed analysis. Let's get a detailed analysis anyway to see which version is correct. Also, Pg. 23 states that no appreciable change in employment are anticipated.

There is a deafening absence of real cost details. Much of the proposed project costs seem to be absent or vague. Engineers at EA mtg. could not answer specific questions adequately, choosing instead to repeat the same (unrealistic?) figures w/out being able to support how they arrived at those figures. Our sources suggest that this project will be much, much, much more $

to complete all phases specified or otherwise required... What is the purpose for such potential "low-balling?" Could a greater cost estimate prompt more stringent FAA requirements, possibly losing funding altogether? Or does the money matter at all? It does sound better to taxpayers if the number is not actual? But then, who will know?

The EA report fails to adequately address noise and vibration concerns. The 120+ yr. old building has beautiful stained glass vulnerable to vibrations and the overall wood structure will be rattled greatly. The EA, pg. 31, does make reference that historic resources being adversely impacted is not acceptable. This report is pathetic in regard to the church and cemetery. Indirect damage

to the church would include loss of potential for add'l homes to be built in the community, people which would support the church for the coming generations. Also we expect an exodus of people now in the community once the airport encroaches further. By the way, the church was there long before any airport. Even if project is approved w/ the promise that actual church/cemetery land will not be taken, the project will still be the ruination of that church. Even you know that

With regard to "Enviromental Justice" - pg 40, I contend that we, as a church, are not receiving fair treatment, meaning that "no group of people shall bear a disproportionate share of the negative enviromental consequences..." The report

states that the Troy Municipal Airport will not unfairly or adversely impact any group of people. This is simply <u>not</u> <u>true</u>.

The report keeps referring to the project providing <u>safety</u> aspects to the existing airport. I do not recall there being any incidents occurring related to the length of the runway. Any crashes have been attributed to other causes, already remedied w/ past improvements.

We wonder who the "traveling public" is that the report refers to. We are hard-pressed to find anyone who uses the airport, or knows of anyone who does. This suggests the report is misleading at best.

The EA + Justification Report makes numerous references to the Anticipated needs of the City. In one meeting, The Mayor said that funding could not be obtained on "anticipated" needs for future. He said there is a current need, and then he said that no planes any larger than ones already currently using airport are expected to ever use it. This confuses us. EA not consistent

The Mayor also said that those people signing in at the meeting prior to this EA meeting would receive by mail notification from City of the date of EA meeting. No notices were mailed. Though not legally required, we feel that some people failed to attend the EA meeting due to a lack of notification as promised. Even though it was published in paper, not

everyone checked paper since they were awaiting notification by City. Also, at that earlier meeting, Mayor said he would get a ruling from the FAA regarding noise/vibration concerns and get back to us in writing. He did not. These are but 2 examples of the chaos surrounding project information. There are many.

The entire purpose of the EA meeting was questionable to us since actual final drawings did not exist, or were not made available to us upon request. How can an EA study be done in absence of actual plan? Earlier drawings displayed were "not-to-scale" and only close guesses. How could we ask all appropriate or desired questions on a plan which is not complete. We feel cheated by not.

having a legitimate opportunity to object fully. (Some drawings did involve actual graves in cemetery.)

In fact, this same frustration has been experienced by the Church and others in response to prior airport expansions. The same lack of or conflicting info has been provided and then, all of a sudden, the project is underway. How is it that this can happen over + over w/ the public making great attempts to have input?

The EA report says the funding will likely be funded w/ fed., state, + local funds. Where can we see actual offers of $ from these agencies? (With specific dollar amounts and/or percentages offered.)

Pg. 11 of EA report suggests that residential land

uses in vicinity of the airport will develop. And who typically builds homes at/near airports?

How do other cities our size manage w/ shorter runways? Are businesses flying in going to limit themselves to Troy only? Don't newer planes require shorter runways than ever?

Pg. 16 of EA states that the project will not conflict w/ any land use plans or create an incompatible land use. Absolutely untrue — the chur Also, it says that it will not impact any historic resources. How can one miss a church & cemetery? Whenever possible, the word "Church" is avoided in rep

Pg. 16 also refers to impact on a man-made lake. This reference to "man-made"

lake does not suggest that the lake has been there for approx. 60 yrs., contributing more to the enviroment than a newer man-made lake might?

We believe that the proposed 24 acres of wetland mitigation will not be adequate & add'l property owners not represented at any hearings might be affected by this need for more land.

Who are the "disadvantaged" businesses who will get the work for the proposed project? Who were those on prior airport and/or City projects?

The EA hearing meeting of July 15, '04 was brought to a close by the Engineering firm who was conducting the hearing almost exclusively. All questions and concerns had yet not been heard and, in fact,

requests for add'l meetings once requested info becomes available was denied. The people in attendance left with more questions than answers, more illwill than goodwill.

It baffles us how so many church-going, professed God-fearing Christians can think of destroying a church. Common sense will tell anyone knowledgeable about this situation that if this project goes through, the church is doomed. Does anyone care?

We realize that the (Mayor + Council) City of Troy will likely try to lay the blame back on the FAA. But Troy, Alabama will know for sure where to place this blame. Simply saying that the project will not take any church land is not adequate. The only acceptable solution is to abandon this and all future

attempts to expand the airport in the direction of our church or cemetery. Any such intentions must be in writing in the plainest of language in totally unambiguous terms for the public to judge for themselves and be able to believe them.

God gives each of us a choice and a responsibility to choose right over wrong. We hope you will choose to preserve God's house. It is clearly up to you. This entire situation begs to answer the question: Is nothing sacred?



















# EXHIBIT B

# DEPARTMENT OF TRANSPORTATION
# FEDERAL AVIATION ADMINISTRATION
# FINDING OF NO SIGNIFICANT IMPACT

## Troy Municipal Airport
## Troy, Alabama

**Proposed Action:**

The City of Troy, Alabama, has filed a request for Federal Assistance, under the Airport Improvement Program (AIP). The proposed work requires a Federal Aviation Administration (FAA) environmental finding:

1. Extension of Runway 07 by approximately 1500 feet and displacing Runway 25 threshold approximately 745 feet to achieve an ultimate runway length of approximately 6,509 feet.

2. Extend the existing parallel taxiway approximately 1500 feet.

3. Grade and improve the existing runway safety area (RSA) to meet C-II airport design standards.

4. Relocate approach visual aids and glide slope.

5. Install runway end identification lights (REILS).

6. Install runway and taxiway markings.

**Purpose and Need:**

The City of Troy, Alabama wants to upgrade the Troy Municipal Airport to provide a safe aviation facility that meets current airport design standards. The proposed project will improve the existing local transportation network by allowing a range of general aviation aircraft, including larger business jets to safely use the airport. Aircraft currently based at the Troy Municipal Airport require a longer runway and improved facilities to enhance safety of operations at the airport.

The existing airport main instrument runway is 5,009 feet in length. The City of Troy indicates that the capability of the Troy Municipal Airport to more fully serve the people and business community of the city and surrounding area is currently limited by the runway length. A survey in 2003, determined that there were more than 500 aircraft operations that are penalized due to the length of the runway. That study also suggested that approximately a 1,500 feet runway extension was needed to fully serve the city and business community of Troy, Alabama.

**Alternatives**

Six alternatives were examined in this study and the alternative analysis study:
Extend Runway 25
Extend both runway ends of Runway 7/25
Extend secondary Runway 14/32
Extend Runway 07
Postponing the Project
No Action

**Extend Runway 25**
Extending Runway 25 approximately 1500' would require extensive fill in a swamp area. This alternative would require approximately 50 acres of wetlands to be filled, would impact the access road to the Sirkorsky Support Services, would impact County Road 105. It would also require tree and stump removal on approximately 8.74 acres of wetlands. To minimize the wetlands impacted this alternative was rejected.

**Extend both runway ends of Runway 07/25**
This alternative would consist of extending each Runway approximately 750 feet on each runway end. This proposal would require the acquisition of approximately 90 acres of land. This alternative would impact Sirkorsky Support Services access road, County Road 105 (Old Montgomery Highway). This alternative would also impact two forested wetlands systems located at each runway end. The extension of Runway 25 end would cause the placement of fill into a forested wetland system associated with an unnamed tributary to Conecuh Creek. Extension of Runway 7 end would impact a man-made lake (Lake Haven) and affect a forested wetland complex associated with Beeman Creek. This alternative would require the relocation of the glide slope and localizer. Because of the many impacts to roads, two forested wetlands, and navigational aids, this alternative was not chosen.

**Extend Secondary Runway 14/32**
The improvements for this alternative included extensions on both ends of runway 14/32, relocating the instrument landing system (ILS) and other visual aids for runway 7/25 to runway 14/32. The major factors affecting this alternative are airspace restrictions. There are other factors affecting this alternative that includes development cost associated with earthwork, relocating navigational aids, and relocation of a county road.

For runway 14, the airspace issue is associated with conflicts in airspace between Cairns Army Reserve Aviation Center and Montgomery Approach Control. For runway 32, the issue is moving the flight tracts for this runway over the urbanized central section of the City of Troy. The flight tracks for this alternative would expose large areas of residential development and sensitive land uses to over-flights.

The development cost is primarily driven by earthwork requirements and relocation of navigational aids. A large hill in the approach to runway 14 would require cuts exceeding 35 feet to accommodate the approaches. County Road 289 would also have to be relocated approximately 1,359 feet to the northwest to achieve proper clearance for the Runway 14 approach slope.

This alternative was rejected because of the airspace conflicts, the routing of a higher volume of aircraft over an urban area, and the development cost associated with this proposal.

## Extend Runway 07

Extending the runway on the Runway 07 end (the preferred alternative) would require the acquisition of approximately 90 acres of land, the filling of a manmade lake, and impacts to approximately 27 acres of forested wetlands associated with Beeman Creek. This proposal would require construction measures to minimize environmental impacts on wetlands and storm water discharge. This proposal would also require a possible installation of a natural buffer zone between the Oak Grove Methodist Church and the airport's parallel taxiway to prevent any adverse impacts to the church.

This proposal will not displace any residences, businesses, or public use facilities. The preferred alternative would not have airspace restrictions or impact a major road. .This proposal would have the least number of environmental impact factors of the development proposals. This is the preferred alternative since it would meet the needs of the owner and have the least environmental impacts.

## Postponing the Project

Postponing the project would delay any potential environmental affect, but would affect people directly affected by the project generating concern and uncertainty of the timing of the project. The postponing would also delay any safety-based improvements and benefits to the traveling public.

## No Action

The No Action alternative precludes new construction and improvements at the airport. The selection of this alternative would avoid any adverse environmental impacts, but would not satisfy the existing and future demands of the aviation community. This alternative was considered not acceptable.

### Probable Impacts

## Noise

Noise analysis was accomplished using the Integrated Noise Model Version 6.0b. The noise analysis (figure 6) shows that the entire 65 Ldn contour will be on airport property and will not affect any residences, schools, churches or other noise sensitive land uses.

Based on the corrected modeled noise analysis in the environmental assessment, the existing and forecasted aircraft noise will not constitute an impact on any existing or planned land uses in the vicinity of the airport. (Page 22, paragraph 2).

## Compatible Land Use

The Troy Municipal Airport is located in the corporate boundaries of the City of Troy. The airport is considered an integral component of the local transportation system. Correspondence dated October 30, 2002, from the South Alabama Regional Planning Commission concurs with the project (Appendix B). Also, the Alabama Department of Transportation indicated in their letter dated October 30, 2002, that they have no planned or proposed highway projects in the vicinity that would affect the proposed project (Appendix B). The proposed extension of Runway 7 will not create any land use

conflicts or incompatibilities. No major shifts or changes in land use are anticipated as a result of the proposed extension. Residential, commercial, recreational and industrial development around the airport will continue with or without the proposed extension.

## Social Impacts
The environmental assessments indicates that the proposed extension of Runway 7 at the Troy Municipal Airport will not have an adverse affect on community access to public or neighborhood facilities, nor will the proposed project divide any communities or neighborhoods. Implementation of the proposed project will not cause displacement of any residences or businesses (page 26, paragraphs 3 and 4). Two churches are located in the vicinity of the airport. The preferred alternative will not require the acquisition of any property from the churches. The City of Troy will work to conserve the natural buffer of trees between the proposed project and the Oak Grove Methodist Church (page 27, paragraphs 1-2).

There will be no significant social impacts resulting from the proposed airport development.

## Relocation Impacts
The implementation of the preferred alternative will not cause the displacement of any residences. Therefore there will be no significant relocation impacts resulting from the proposed development (page 29, paragraphs 1-3).

## Induced Socioeconomic Impacts
There are no significant adverse induced socioeconomic impacts anticipated from the proposed runway extension (page 29, paragraph 4).

## Air Quality
The Alabama Department of Environmental Management (ADEM), Air Division, determined that the proposed project is located within an attainment area and will have no significant impact on air quality (Letter dated November 20, 2002, Appendix B).

The aviation activity at the Troy Municipal Airport is forecast to be less than 90,000 operations by the year 2012. This is well below the 180,000 general aviation operations under Federal guidelines requiring specific air quality analysis. During construction, air pollution will be minimized by following guidelines in FAA Advisory Circular 150/5370-10, Standards for Specifying Construction of Airports.

No significant air quality impacts are anticipated due to the proposed runway extension.

## Water Quality
Implementing the Preferred Alternative will not affect any aquifers designated as sole or principal drinking water resources for the airport area (page 3, paragraph 2).

Correspondence from the Alabama Department of Environmental Management, Groundwater Branch, states that the proposed project will not pose a threat to groundwater or drinking water supplies (letter dated, Appendix B.

It has been determined that this project will affect some jurisdictional wetlands; therefore a 404 permit will be required. A water quality certification must be obtained from

Alabama Department of Environmental Management prior to initiating construction activities.

There is the potential for construction related impacts in waterways that include turbidity, sedimentation, improper use of fertilizers, and accidental releases of petroleum products from equipment or machinery. A construction General Permit for Storm Water Discharges from construction activities will be obtained from the State Water Division (page 33, paragraph 5).

The construction phase of the proposed project will include measures to control erosion and the discharge of suspended materials into water bodies as prescribed in FAA Advisor Circular, 150/5300-10 Standards for Specifying Construction of Airports. The construction phase of the project will also incorporated Best Management Practices as required by state issued National Pollutant Discharge Elimination System permits for construction projects (page 34, paragraph 1).

Based on the preceding paragraphs the proposed extension of Runway 7 will create no significant impacts on the quality of public drinking water supplies, ground water or surface water (page 35, paragraph 2).

### Department of Transportation Act, Section 4(f)
There are no public parks, recreation areas, lands of historical significance, or wildlife and waterfowl refuges affected by this project. Consultation with relevant agencies has not revealed any parks or public lands needing protection (page 35, paragraph 4).

### Historic, Architectural, Archeological, and Cultural Resources
The proposed project was coordinated with relevant agencies and an archeological survey of the site was performed. There also was a review of information associated with the Oak Grove Methodist Church to determine if the church could be listed as a historic site. It was determined the church did not meet the criteria for inclusion as a historic site (Appendix B, Troy Environmental Assessment). No significant artifacts, no structures, or any significant resources were found during the archeological survey (Appendix C). Undisturbed areas not included in the Phase I, Cultural Resources Assessment will be surveyed after land acquisition but before the start of construction. If artifacts are found, work will cease and the Alabama Historical Commission will be contacted.

The proposed development will have no significant impact on Historic, Architectural, Archeological, and Cultural Resources.

### Biotic Communities
Correspondence with federal and state agencies has indicated that the airport project represents a small percentage of the area's inventory of biotic communities and affects only common wildlife species. A majority of the project area is forested. Correspondence from the U.S. Fish and Wildlife Service, the Alabama Forestry Commission, and the U.S. Army Corps of Engineers are included in Appendix B. Reviews of this correspondence indicate that the proposed project will have no significant impact on biotic communities (Appendix B).

**Endangered and Threatened Species of Flora and Fauna**
The U.S. Department of Interior, Fish and Wildlife Services in their letter dated November 8, 2002, indicated that no endangered, threatened or proposed species, or their critical habitat occurs in the project area (Appendix B). The project plans will incorporate a mitigation plan for impacted wetlands that can't be avoided.

The proposed project will have no significant impact on threatened or endangered species.

**Wetlands**
This project was coordinated with the U.S. Army Corps of Engineers, Mobile District as the key federal agency that has jurisdiction to define wetlands in the United States. The USACOE concurred with the findings that there are two wetland habitats that will be directly impacted by the proposed construction and can be classified as jurisdictional (page 38, paragraph 3). Impacts to wetlands are approximately 18 acres. A 5-acre lake will also be impacted by the proposed project. A mitigation plan will be prepared that will compensate for the impacts associated with the project. A preliminary mitigation plan is given in Appendix E. A section 404 permit under the Clean Water Act of 1977 will be obtained before any construction is started.

Beneficial wetland functions expected to be provided by the enhancement and restoration protocol described in the mitigation plan will be similar to those functions provided by a natural wetland system which include habitats for wildlife, recharge of groundwater, water quality improvement, and flood control. The proposed mitigation plan proposes to offset the impacts associated with the proposed project; therefore, no significant impact on wetlands is anticipated.

**Floodplains**
The project is not located within the limits of a base floodplain associated with any water body. This project will not indirectly support secondary development within a base floodplain. There are no floodplains that will be affected by this project (page 42, paragraph 1).

**Coastal Zone Management Program and Coastal Barriers**
The Troy Municipal Airport is not located within an area subject to the Alabama Coastal Area Management Program. Hence, there is no impact on Coastal Zones or Coastal Barriers (page 42, paragraph 2, Troy Environmental Assessment).

**Wild and Scenic Rivers**
There are no Wild and Scenic Rivers that will be affected by the project (page 42, paragraph 4, Troy Environmental Assessment). It is noted that Beeman Creek a tributary to the Conecuh River is located approximately 1,500 feet west of the proposed project. The Conecuh River is listed on the Nationwide Rivers Inventory. Correspondence form the National Park Service states that the proposed project is unlikely to have any tangible impacts to the NRI listed segment (correspondence dated October 1, 2004, Appendix B).

**Prime and Unique Farmland**
The Natural Resources Conservation Service (NRCS) has determined that prime and unique farmlands do exist in the project area. However, the 25 acres identified are

located under the approach surface and would not be impacted by construction of the proposed project (Appendix B).

**Energy Supply and Natural Resources**
The proposed development will have a very slight increase in energy usage due to lighting a longer runway and taxiway. This additional energy usage is not expected to produce a measurable effect on local energy demand and will be well within the capacity of the local utility to provide. The proposed airport design will not cause a significant increase in energy usage due to increased ground movement, runup times, or flight pattern change.

There will be no significant impact from the proposed development on energy supply and natural resources (page 43, Troy Environmental Assessment).

**Light Emissions**
The proposed site is in a predominantly agricultural setting with some residential developments located nearby. The proposed runway extension will not be in close proximity to residences or other land uses that may be sensitive to lights. No significant impacts from airfield lighting are expected as a result of this project (page 44, Troy Environmental Assessment).

**Solid Waste Impact**
The proposed project will generate minimal solid waste. Therefore, there will be no significant solid waste impact from the proposed project (page 45, Troy Environmental Assessment).

**Construction Impacts**
Construction techniques will meet the guidelines and standards published in FAA Advisory Circular 150/5370-10, Standards for Specifying Construction of Airports. The construction activities will require a National Pollutant Discharge Elimination System (NPDES) permit from the Alabama Department of Environmental Management. Implementation of Best Management Practices, as mandated by the permit, will ensure that steps necessary to maintain the quality of water discharged from the construction site are taken. There will be no significant impact from construction activity.

**Environmental Consequences – Other Considerations**
Unavoidable adverse impacts associated with the proposed airport improvement have been coordinated with appropriate federal, state and local units of government. Correspondence received is included in Appendix B of the environmental assessment.

The following document is incorporated by reference:
Environmental Assessment, Proposed Airport Expansion, Troy Municipal Airport dated December 2004. Runway Development Alternatives Study dated January 2002. Correspondence and documentation received from responding agencies has been referenced in the appropriate discussions and included in Appendices of this report.

**Environmental Justice**
The proposed project will not unfairly or adversely impact any groups. The population in the vicinity of the airport is diverse with no concentration of groups that would raise environmental justice concerns (page 47, paragraph 2-3, Troy Environmental

Assessment). The proposed development will not have adverse environmental justice impacts.

## Public Hearing

A "Legal Notice of Opportunity for Public Hearing" was published in the Troy Messenger newspaper starting on June 15, 2004, advertising a public hearing that would be held on July 15, 2005. A public hearing was held on July 15, 2004 (Appendix G). Approximately 61 people attended the public meeting. Some adverse comments were received and a transcript of comments from the public hearing is provided in Appendix G. All comments and concerns will be addressed in the execution of the proposed project. A few of the more significant comments are addressed below:

The Oak Grove Methodist Church through their representative Mr. Benjamin M. Bowden had a number of concerns. They wanted an FAA representative to meet with them to discuss their concerns about the project and its impact on their church. A FAA representative met with church officials and their attorney. In particular, there were concerns about the aircraft noise and vibrations. They also had concerns about the environmental assessment study and why Runway 14/32 was not chosen as the preferred alternative.

One reason for the church's concern about the noise study validity was because of an earlier study (Runway Development Alternatives Study, 2002, funded by the State of Alabama) had indicated that the 65-decibel noise curve would actually reach the church. There are differences in the noise curve presented in this environmental assessment report and the curves in the environmental assessment and those in the separately funded Runway Development Alternatives Study conducted in 2002. It was discovered that an error in data for the modeling matrix produced noise curves in the earlier study that extend out from the airport property. The runway alternative study had incorrectly used a high number of touch-and-go operations using Boeing 737 aircraft. The earlier simulation also had the aircraft turning shortly after take-off. It was determine that the modeled touch-and-go operations were not feasible. The Boeing 737 aircraft climbs to a given altitude (usually 2000-3000 feet) before executing a turn.

A more detailed discussion of why runway 14/32 was not the preferred alternative is given in the environmental assessment and has been found to be credible.

The City of Troy is sensitive to the churches concern regarding vibrations and will work with the Federal Aviation Administration to leave in place as much as possible a natural barrier between the airport and the church and cemetery. Also, if required the city will install a mitigation buffer between the airport and the church.

Other concerns expressed by the church were evaluated by the various federal and state agencies having jurisdiction over those resources and their comments can be found in Appendix B.

The following actions are directed to be taken and determinations and approvals are made under the appropriate laws, data, and information contained in the Environmental Assessment.

## Mitigation Measures

1. Incorporate the provisions of FAA Advisory Circular 150/5370-10A, Standards for Specifying Construction of Airports (dated February 17, 1989 with changes) in the plans and specifications for the construction to minimize the temporary air and water pollution and erosion during construction.

2. The acquisition of land will be in accordance with 49 CFR Part 24, Uniform Relocation Assistance and Real Property Acquisition Regulations for Federal and Federal Assisted Programs.

3. A storm water management plan that addresses the construction phase of the runway extension will be required.

4. The construction phase of the project will require the use of Best Management Practices, as recommended by Alabama Department of Environmental Management (ADEM) to maintain the quality of any storm water discharged. A water quality certification must be obtained from the ADEM prior to initiating construction activities.

5. The construction phase of the project will also require a National Pollutant Discharge Elimination Systems (NPDES) permit prior to the start of construction.

6. A Construction General Permit for Storm Water Discharges form construction activities must be obtained from the State of Alabama, Water Division.

7. Undisturbed areas not included in the Phase I, Cultural Resources Assessment will be surveyed after land acquisition but before the start of construction. If artifacts or archaeological features are encountered during construction activities, work will cease and the Alabama Historical Commission will be contacted immediately.

8. A section 404 Dredge and Fill permit will be required to address the jurisdictional wetlands that were identified in the project area. The owner will perform all required mitigation associated with the wetlands.

9. Due to wildlife concerns and other concerns expressed during the public hearing, the city will be required to finalize their wetland mitigation plan prior to the start of construction to eliminate any creation of wetlands in the vicinity of the proposed project. When the wetlands are surveyed for inclusion on a legal description or property plat it must be submitted to the Mobile District, Corps of Engineers for review and sign-off.

10. The city will work with FAA to conserve a natural buffer of trees between the Oak Grove Methodist Church and the proposed project.  If needed, a mitigation buffer of low height compatible trees and shrubs will be installed between the airport and the Oak Grove Methodist Church and cemetery.

Federal Findings

After careful and thorough consideration of the facts contained herein, the undersigned finds that the proposed Federal action is consistent with existing and national environmental policies and objectives as set forth in section 101(a) of the National Environmental Policy Act of 1969 (NEPA) and that it will not significantly affect the quality of the human environment or otherwise include any condition requiring consultation pursuant to section 102(2) (c) of NEPA.


APPROVED: _____                    8/15/2005
                Manager                                                    Date
                Airports District Office
                Jackson, Mississippi


**Right of Appeal**

This decision constitutes the Federal approval for the actions identified above and any subsequent actions approving a grant of federal funds to City of Troy. This action is taken pursuant to 49 USC Subtitle VII, Parts A and B, and constitutes a Final Order of the Administrator subject to review by the courts of appeals to the United States in accordance with 49 USC 46110.